UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Disability Rights South Carolina, | ) | Civil Action No. <u>8:22-cv-1358-MGL-</u>JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| Richland County, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff Disability Rights South Carolina ("DRSC" or "Plaintiff"), by and through its undersigned counsel, files this Complaint against Defendant Richland County, and alleges as follows:

## I.     NATURE OF THE ACTION

1.      This is a civil rights action brought by Plaintiff to address the dangerous, inhumane, and unconstitutional conditions, policies, and practices that exist and have existed for the people detained at the Alvin S. Glenn Detention Center ("ASGDC"), including people with disabilities ("Disabled Detainees"). These Disabled Detainees are held prior to being convicted of any crime. Many are locked in cold, moldy, filthy, infested, unsafe, and unsanitary cells for up to 24 hours a day largely as a result of their symptomatology where they are denied adequate mental health care and are left in solitary confinement or restrictive housing for extended periods of time.

2.      Not all Disabled Detainees are in solitary confinement. Other passive, mildly symptomatic, or asymptomatic, detainees with serious mental illness or those with intellectual disabilities are subjected to a heightened risk of violence at the hands of other

1

detainees as a result of Defendant's operation of ASGDC at dangerously low staffing levels.

3.     On many occasions, Disabled Detainees are also subjected to cruel methods of punishment by Defendant's pattern and practice locking them for up to 48 hours at a time in shower stalls so small they cannot sit down. Disabled Detainees are also frequently shackled to a "restraint chair" for prolonged periods without regard to their ongoing behavior and often with little or no monitoring or breaks. In some cases, Disabled Detainees are left in the restraint chairs for so long without a break they are forced to urinate on themselves.

4.     When Disabled Detainees are placed on "suicide watch," they are often placed naked into non-therapeutic, filthy cells where they are behind metal doors with small windows and cannot be seen by security staff.

5.     Forcing anyone, especially people with mental, emotional, or intellectual disabilities, to be subjected to such medieval conditions is unconscionable, inexcusable, and unconstitutional. These practices exacerbate Disabled Detainees, already fragile, vulnerable conditions. They must stop.

6.     The systematic and significant operational deficiencies at the ASGDC violate the Fourth Amendment's mandate that people in pretrial custody be protected from harm and not subjected to punishment, as well as the prohibition of the Eighth Amendment that when punishment is administered, it must not be cruel and unusual.

7.     Plaintiff brings this action to redress violations by the Defendant, acting under color of state law, of the civil and constitutional rights of the Disabled Detainees.

8.      Defendant is deliberately indifferent to the substantial risks of serious harm these people face. The conditions at ASGDC, and the policies and practices of Defendant, endanger the Disabled Detainees' physical health and safety, threaten their emotional and psychological well-being, and deprive them of rights and privileges because of their disabilities.

9.      Concerns expressed by detainees and those acting on their behalf, in addition to those conveyed by Defendant's own agents, administrators, and staff, about the unlawful treatment of the Disabled Detainees have been unheeded for years. The conditions to which Disabled Detainees are subjected have only grown worse over time.

10.     As detailed below, the combination of numerous, specific, and repeated violations of the Fourth, Eighth, and Fourteenth Amendments, taken together with multiple deficient policies and practices that cause or contribute to those violations, is sufficient to establish a pattern or practice of constitutional violations.

11.     Plaintiff, on behalf of the Disabled Detainees, asserting associational and organizational standing, seeks declaratory and injunctive relief against Defendant on the grounds that Defendant has deprived the Disabled Detainees of the rights secured to them by the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, as enforced by 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, *et seq*., and relevant provisions of federal law.

## II.      JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(3), this being an action to redress the deprivation of rights under color of state law secured by the Constitution.

13.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(4), this being an action to secure declaratory and injunctive relief under the Acts of Congress providing for the protection of civil rights, specifically the Civil Rights Act.

14.     This Court also has jurisdiction over this action under 28 U.S.C. § 1331, this being an action in which the matter in controversy arises under the Constitution and the laws of the United States.

15.     This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

16.     This District is an appropriate venue for this action pursuant to 28 U.S.C. § 1391(b) as the acts and events giving rise to the claims herein occurred within the Columbia Division of South Carolina.

### III.     PARTIES

17.     DRSC is a private, not-for-profit South Carolina corporation established as a protection and advocacy organization for the State of South Carolina and charged by state and federal law to protect and advocate for the rights of people with disabilities in South Carolina.

18.     Richland County is responsible for the ownership, management, operation, staffing, and oversight of ASGDC and has, at all times relevant to this action, excised such responsibility through the color of law by and through the policies, practices, acts, and omissions of its officers, agents, and servants, including without limitation the following: elected members of Richland County Council; duly designated administrators of Richland County; personnel with administrative, supervisory, and front-line

responsibilities at ASGDC; and third-party contractual providers of medical, mental health, and other services at ASGDC.

<h3 style="text-align:center">IV.     FACTUAL ALLEGATIONS</h3>

19.     ASGDC is located in a complex situated 8.1 miles from the South Carolina Statehouse. The facility is outside of the public eye, and, according to reports at or near the time of the filing of this action, houses 650-700 individuals.

**A.     Disabled Detainees**

20.     ASGDC has both a large number of detainees receiving some form of mental health treatment and a large number of detainees with serious mental health needs.

21.     Disabled Detainees have serious mental health needs that require treatment and place them at serious risk of harm if their needs are not addressed adequately.

22.     Disabled Detainees are subjected to a substantial risk of serious harm as a result of inadequate mental health care.

23.     Defendant's inadequate mental health programming places detainees with serious mental illness at substantial risk of harm to which Defendant has been aware and deliberately indifferent.

24.     By way of example, Disabled Detainee A.C. has a long history of severe mental illness, including persistent suicidality. He has been detained at ASGDC since October 2021 and has been taken to the hospital from ASGDC over 10 times for treatment for injuries caused by his mental illness since he has been detained, including injuries from multiple suicide attempts. A.C. is frequently confined to the restraint chair for days

on end, not allowed to stretch his limbs or use the restroom, left alone bathe. A.C. has been forced to urinate on himself while confined to the restraint chair. ASGDC employees do not monitor A.C. while he is in the restraint chair and on more than one occasion, A.C. has been able to access the means to harm himself while in the chair. On one notable occasion, A.C. was able to grab a bottle of bleach and drink it while "restrained" in the restraint chair. After being transported to the hospital for treatment, A.C. returned to ASGDC where he was placed back in the restraint chair as punishment for drinking bleach. When A.C. was interviewed about the conditions under which he has been suffering, A.C. was still wearing a uniform stained with and still containing bleach vomit. A.C. has attempted to light himself on fire and has been denied proper wound care for the significant burns he suffered to his leg. A.C. has been able to access wires and shards of glass with which to mutilate himself, again all while he is ostensibly on "suicide watch." A.C. even communicated to ASGDC guards the methods with which he could harm himself in a particular cell and asked for assistance in protecting himself and was placed into the cell regardless of his efforts. A.C. then harmed himself in the precise manner he predicted would occur.

     25.    By way of example, <u>Disabled Detainee H.M.</u> has been detained at ASGDC since November 2021. Following a report of suicidality, H.M. was placed in the Special Housing Unit ("SHU") for suicide watch. When H.M. was first placed in SHU, he was held in the showers for two days straight, unable to sit or lie down, unable to bathe, forced to relieve himself standing up or squatting over a drain, and unable to recreate. Eventually, H.M. was placed in a suicide watch cell. For H.M., suicide watch meant being locked in a cell for 24 hours a day for at least two weeks straight, occasionally being observed by

guards. During suicide watch, H.M.'s clothes were removed from him and he was given an anti-suicide smock and anti-suicide blanket. During suicide watch, H.M. was not allowed to leave his cell for recreation, bathing, or for any other purpose. H.M. was not allowed to have any toilet paper or anything else in his suicide watch cell, except for a sliver of soap the size of his thumbnail. H.M.'s cell was intermittently flooded with an inch of contaminated water originating from the toilet in the adjacent cell. H.M. could only speak to a visitor or guard if he stood on his toilet and spoke out the small, barred window on his door. H.M. was provided no medical care for at least two weeks of this ostensible "suicide watch." H.M.'s mental condition drastically worsened and continues to worsen due to the conditions he has been suffering under in SHU.

26.     By way of example, <u>Disabled Detainee L.B.</u> was detained in ASGDC for two weeks. Upon intake, L.B. was not noted to have any mental health concerns. However, after a week of detention, L.B. was noted to be exhibiting strange and extreme behavior.  Even though this was unusual, no immediate care or attention was given to L.B. L.B. was instead evaluated the next day and was noted to be "floridly psychotic" and unable to respond to questions from his medical provider. He was observed lying face down on the floor of his assigned cell unclothed, with torn drink containers on the floor and in unsanitary conditions. Even though L.B.'s condition was rapidly declining, instead of being evaluated medically or given appropriate treatment, L.B. was warehoused in SHU. For two days, L.B., who was so sick that he had been unable to even speak to a medical provider, was simply warehoused in SHU. After those two days, was noted that L.B. provided a "blank stare" to a medical staff member and that he was displaying "bizarre physical gestures." This continuation of alarming behavior again did not trigger further

evaluation or appropriate medical treatment. The next day, staff again observed L.B. lying naked on the floor of his room surrounded by flies, unable to respond to questions or hold his head up. Instead of performing a medical evaluation, transporting him to the hospital, or providing basic first aid, ASGDC staff moved L.B. to a suicide watch cell, where he was placed on the floor of the cell. The next morning, ASGDC staff noticed L.B. had died. L.B. died of acute dehydration. His body had evidence of rat bites.

**B.     Defendant Fails to Provide an Adequate Mental Health Program for Disabled Detainees**

27.     Components of a constitutionally adequate correctional mental health program include the following: (1) a systematic program for screening and evaluating detainees to identify those who require mental health treatment; (2) individualized treatment plans that provide for treatment that is more than placement in restrictive housing and that includes close supervision of detainee patients; (3) prescription and administration of psychotropic medications with appropriate supervision coupled with adequate psychotherapy; and, (4) a basic program for identification, treatment, and supervision of detainees with suicidal tendencies.

**1.  <u>ASGDC Does Not Have an Effective Systematic Program for Screening and Evaluating Detainees to Identify Those Who Require Mental Health Treatment</u>**

28.     Failure to identify and respond appropriately to serious mental illness can lead to significant medical deterioration and, in some cases, death.

29.     Accepted standards of correctional intake screenings are used to identify detainees with histories of mental health treatment, major mental illnesses, the need for psychotropic medications, and suicide potential.

30.     Without the application of thorough and effective screening systems, detainees may suffer a loss of the continuity of care that may lead to depression, decompensation, psychosis, and other acute problems.

31.     Defendant's mental health screening and evaluation program is inadequate in that, among other things, it relies heavily on detainee self-reporting and does not seek or incorporate diagnostic and treatment histories from community and state mental health providers that previously treated Disabled Detainees.

32.     These deficiencies in the ASGDC mental health screening and evaluation system expose Disabled Detainees to a substantial risk of serious harm to which Defendant has been deliberately indifferent.

**2.  <u>Defendant Fails to Provide An Adequate Mental Health Treatment Program and Fails to Closely Supervise Disabled Detainees</u>**

33.     The mental health treatment program at ASGDC consists of little more than placement of Disabled Detainees in restrictive housing and *pro forma* attempts to supervise Disabled Detainees.

34.     Neither by and through contractual service providers or otherwise does Defendant engage in individual psychotherapeutic treatment planning for Disabled Detainees or provide therapeutic services.

35.     Defendant also fails to adequately supervise Disabled Detainees in any setting, whether they are in solitary confinement in the SHU or housed in other units of ASGDC.

36.     Defendant's failure both to provide adequate mental health treatment and to closely supervise Disabled Detainees exposes them to a substantial risk of serious harm of which Defendant is aware and deliberately indifferent.

**3.** **Defendant Fails to Administer Psychotropic Medications with Appropriate Supervision and Psychotherapy**

37.    Defendant does administer prescribed psychotropic medications in some circumstances to Disabled Detainees but fails to supervise appropriately the administration of such medications or provide related psychotherapy pursuant to a treatment plan.

38.    The needs of Disabled Detainees for individual and group psychotherapy to complement their medication regimen are not addressed by Defendant in any manner.

39.    As a result of Defendant's deliberate indifference to Disabled Detainee's needs for closely supervised medication administration coupled with psychotherapy, Disabled Detainee are at substantial risk of serious harm.

**4.** **Defendant Has Failed to Develop and Maintain a Program to Identify, Treat, and Supervise Detainees with Suicidal Tendencies**

40.    Defendant's suicide prevention program is woefully inadequate and dangerously deficient.

41.    Defendant relies almost exclusively on self-reporting of suicidal thoughts to determine whether a Disabled Detainee should be placed on "suicide watch."

42.    Suicide watch at ASGDC does not occur in a therapeutic environment, but instead functions as a punitive measure that consists of placement in a filthy, stripped-out cell in the SHU or, on some occasions, in small, rank shower stalls or dilapidated restraint chairs.

43.    Suicide watch cells are frequently not cleaned between occupants. New occupants, most of whom are Disabled Detainees, often find fecal matter, urine, blood, and other bodily fluids on the walls and floors of the cells into which they are transferred.

10

After being transferred to such cells, a suicidal Disabled Detainee, may be confined for days or weeks. Defendant does not clean or sanitize the cell while it is occupied, creating a substantial risk to Disabled Detainees of contracting a communicable disease.

44.　Overflowing toilets are common in SHU and, from time to time, can cause raw sewage to flow into a suicide watch cell. Suicidal Disabled Detainees have been forced to remain in such contaminated cells for days at a time with no ability to stand on the floor without coming in direct contact with the raw sewage.

45.　Suicidal Disabled Detainees are frequently given no toilet paper or soap and are unable to clean themselves. If they are allowed any clothing at all, they are not provided clean clothing and are forced to remain in their soiled garments for weeks.

46.　Suicidal Disabled Detainees are on occasion strapped into restraint chairs and placed inside suicide watch cells and are not supervised in the cells.

47.　While on suicidal watch, Disabled Detainees are provided no therapeutic counseling or psychotherapy.

48.　Supervision of Disabled Detainees on suicide watch is scarce, unreliable, and inadequate.  It falls far short of being continuous. In some cases, suicidal Disabled Detainees are held in cells out of view of ASGDC staff, or where they are only visible through a small window, and where it is impossible to perform the continuous supervision required for their safety.

49.　Defendant's failure to develop and maintain a program to identify, treat, and supervise Disabled Detainees with suicidal tendencies exposes them to substantial risk of serious harm, even death. Defendant is aware and deliberately indifferent to such risk.

**C.    Defendant's Use of Shower Stalls and Restraint Chairs to Confine Detainees for Extended Periods Serve No Legitimate Governmental Purpose and Punish Them for Manifesting the Symptoms of Their Illness**

50.    Disabled Detainees are routinely and indiscriminately confined and held by Defendant for extended periods in shower stalls and restraint chairs for manifesting symptoms of their mental illness.

51.    On other occasions, Defendant confines Disabled Detainees in shower stalls or restraint chairs because of overcrowded conditions in a particular unit or merely for the convenience of the staff.

52.    The shower stalls in which Defendant routinely confines Disabled Detainees behind a barred metal door measure two by three feet. They contain no chair or padding. The detainees cannot sit. If they are unable to stand, they must lean or squat.

53.    The shower stalls have no toilet or sink. To relieve themselves, Disabled Detainees urinate in the drain at their feet. If they defecate at all, they often do so in a Styrofoam tray in which their food is served.

54.    During these periods of confinement, which are determined randomly by officers, Disabled Detainees are not permitted to leave the shower stall. There they remain for hours, in some cases, up to 48 hours.

55.    Defendant also routinely confines Disabled Detainees in restraint chairs that look like an electric chair with straps used to immobilize Disabled Detainees by strapping down their feet, legs, torso, arms, neck, and head. These restraint chairs are in poor condition, and frequently instead of using the strap restraints, Disabled Detainees are handcuffed or zip-tied to the chairs.

12

56.     Defendant places Disabled Detainees in shower stalls and restraint chairs without consultation with mental health or other medical professionals prior to, during, or immediately following such isolation or restraint to assess the detainee's physiological or psychological condition or to determine whether such measures are necessary and appropriate to affect the detainee's behavior.

57.     During their confinement in shower stalls and restraint chairs, Disabled Detainees are held long beyond the point they are needed, that is in when a detainee's objectionable conduct that formed the ostensible justification for the confinement has been extinguished.

58.     Placement in shower stalls and restraint chairs occurs often in response to a Disabled Detainee's conduct related to manifestations of their underlying mental illness, including the following: suicide attempts, self-harm and, disordered behavior usually from a single cell in which the detainee is already confined, e.g., cursing, spitting, exposing themselves, talking back, yelling, smearing feces, throwing bodily fluids, etc.

59.     Defendant often places Disabled Detainees in shower stalls and restraint chairs without charging them with an offense or violation of an ASGDC disciplinary rule and without due process of law.

60.     In 2014, Richland County Council commissioned Pulitzer/Bogard & Associates, LLC to conduct a management and operations study ("Management and Operations Study"). In a report dated April 18, 2014, the Management and Operations Study identified the existence of a "cool down sanction" in use at ASGDC, finding it was common practice to place detainees in SHU in an individual cell or shower stall for up to 12 continuous hours as "an ambiguous punitive measure that is frequently used and has

a host of negative consequences for the affected inmate." The Management and Operations Study observed that the principles of direct supervision, under which ASGDC then reportedly operated, did not support the use of the cool-down sanction. The Management and Operations Study recommended that "ASGDC should conduct an independent review of the legality, liabilities, and appropriateness of the cool down sanction in the Detention Center's SHU as it is currently administered." Study at pp. 14-15.

61.     Based on the 2014 report as well as the custom and practice of using shower stalls and restraint chairs for many years, for periods even greater than 12 hours, Defendant is aware of and deliberately indifferent to the substantial risk of serious harm to which Disabled Detainees are exposed by being confined in shower stalls and restraint chairs.

**D.     Defendant's Use of Prolonged Solitary Confinement Coupled with Inadequate Mental Health Services Constitutes Cruel Unusual Punishment and Discriminates Against Disabled Detainees Because of their Disabilities**

62.     Defendant's isolation of Disabled Detainees in cells for 22 to 24 hours per day for consecutive weeks and months without being released for structured therapeutic activities, supervised programs, or recreation violate detainees' rights to be free from cruel and unusual punishment.

63.     The harms associated with use of improper and excessive restrictive housing have been increasingly recognized throughout the nation.

64.     Systemic deficiencies in Defendant's mental health program contribute to its overreliance on and inappropriate use of restrictive housing as a means of controlling detainees with serious mental illness. Those deficiencies include inadequacies

Defendant's mental health program, marginalized role of its mental health staff, severe deficiencies in security operations, and the absence of supervisory oversight mechanisms to monitor and assess the effect on Disabled Detainees of prolonged confinement in restrictive housing.

65.     The 2014 Management and Operations Study commissioned by the Defendant expressed concerns about housing detainees with serious mental illness in SHU, particularly detainees on suicide watch and those awaiting mental health competency evaluations.

66.     The Management and Operations Study also found that restrictive conditions of confinement in SHU deprive detainees of constructive, meaningful, and sufficient opportunities to engage in ASGDC programs, services, rights, and privileges for which the detainees otherwise would be eligible.

67.     Defendant's continued reliance on restrictive housing to confine Disabled Detainees under the current conditions at ASGDC, including the failure to provide an adequate program of mental health treatment, subjects to them the substantial risk of serious harm and demonstrates Defendant's deliberate indifference to such risk.

**E.    Defendant Is Operating ASGDC at Dangerously Low Staffing Levels that Violate Disabled Detainees Constitutional Rights to Be Protected from Harm**

68.     ASGDC is dangerously understaffed. It is not uncommon for a single front-line security officer to be directly responsible at one time for supervision of up to four housing units consisting of more than 150-200 detainees.

69.     For at least six consecutive years from 2016 to 2021, inspectors from the South Carolina Department of Corrections found that ASGDC was operating with chronic shortages in security staffing. Concerns were particularly noted about SHU not being

staffed adequately to comply with the unit's 24-hour observation standard. Upon information and belief, the report of each annual inspection was provided to Defendant.

70.     On or about February 18, 2020, the Richland County Council Detention Center Ad Hoc Committee met to discuss the conditions at ASGDC, expressing concerns that mentally ill detainees may not be getting proper treatment due to the fact that "the only place to house [severely mentally ill detainees] is in a single cell in the [SHU]."

71.     On or about February 25, 2020, the Detention Center Ad Hoc Committee again met and discussed the conditions at ASGDC, specifically the manner in which housing for mentally ill detainees should be provided.

72.     On or about May 4, 2020, Detention Center Ad Hoc Committee again met, acknowledging there were 109 security staff vacancies at the time of the meeting.

73.     On or about September 28, 2021, another site inspection was conducted by the South Carolina Department of Corrections that reported there were 172 vacant security staff vacancies at ASGDC, an increase of nearly 60 percent in the number of vacancies in less than five months. The Inspector found insufficient personnel to provide 24-hour supervision and processing of detainees and further found that the special purpose cells used for suicide watch in SHU were not being continuously monitored in accordance with applicable state regulations. The Inspector further noted four housing units were closed due to personnel limitations.

74.     Despite this dangerously low staffing level, ASGDC routinely accepts pre-trial detainees from the U.S. Department of Justice, the City of Columbia, the City of Forest Acres, and the University of South Carolina—for a fee—even though it cannot

adequately supervise the detainees presented for booking by the Richland County Sheriff's Office.

75.     The recent escalation of violence at ASGDC was noted in a March 2022 report of the Midlands Gang and Fugitive Task Force of the Richland County Sheriff's Department. In a search of three ASGDC housing units, the Task Force reported seizing, among other things, 13 shanks, 7 cell phones, and 28 grams of marijuana.

76.     ASGDC operates at such low staffing levels that housing units can be completely unsupervised for extended periods. Fights and attacks can occur in cells, pods, or units without officers responding in a timely manner, if at all.

77.     As a result of such limited supervision, coupled with escalating violence, Disabled Detainees are increasingly in need of the protection Defendant can only provide in the immediate future, not by locking them down in restrictive housing, but by reducing its population and adopting, an evidence-based classification system that classifies detainees appropriately based not on their pending charges but on their anticipated in-custody behavior.

78.     These extensive deficiencies in the operation of Defendant's security practices increase the risk of violence at ASGDC, placing both detainees and staff at substantial risk of serious harm to which Defendant has been deliberately indifferent.

**F.     The Unsafe and Unsanitary Conditions in the SHU Expose Disabled Detainees to Substantial Risk of Infection and Disease**

79.     Defendant fails to maintain ASGDC, and particularly the SHU, in a sanitary and safe condition. The toilets frequently flood and break, spilling raw sewage into detainees' living quarters. The facility's air-handling system is full of visible mold and in some cases, fecal matter. Disabled Detainees suffer bites from rats, bed begs, fleas,

biting flies, fire ants, and mosquitoes. Many Disabled Detainees are forced to eat meals in foul, nauseating conditions in their cells, and at times, while in the showers or restrained in a restraint chair.

80. Because of visible mold and fecal matter in the air handles in the SHU, Disabled Detainees, particularly those with asthma, chronic bronchitis, compromised immune systems, and other physical vulnerabilities, are at high risk of contracting serious disease and infections.

81. Suicide watch cells are frequently not cleaned between occupants, and new occupants, most of whom are Disabled Detainees, often find fecal matter, urine, blood, and other bodily fluids on the walls and cells into which they have been transferred for being at risk of suicide.

82. Cells in SHU are not adequately heated or cooled.

83. Water in the cell sink in SHU is frequently cloudy and appears contaminated causing many Disabled Detainees to drink it reluctantly, if at all, concerned with developing gastro-intestinal ailments.

84. On the infrequent occasions when Disabled Detainees in SHU are permitted to shower, there is no hot water.

85. In the SHU, Defendant operates large, industrial grade fans through the unit that blow constantly at high decibels. The operation of these fans exposes Disabled Detainees, as well as other detainees and staff alike, to substantial risk of permanent hearing loss.

86.     Because of the severely low staffing levels at ASGDC, Defendant has no adequate procedure to evacuate the facility, but particularly the SHU, in the event of a fire or other emergency.

87.     Defendant's failure to provide safe, decent, and sanitary conditions in the ASGDC Special Housing Unit expose Disabled Detainees to substantial risk of serious harm of which Defendant is aware and deliberately indifferent.

**G.     Knowledge of Defendant**

88.     Defendant has acted and continues to act, under the color of law with respect to all matters alleged herein. All of the conditions, policies, customs, and practices described herein are the result of, and pursuant to, acts and omissions of Defendant.

**H.     Necessity for Injunctive Relief; No Adequate Remedy at Law**

89.     Defendant has acted and continue to act in violation of the law as described herein. As a proximate result of Defendant's policies, practices, acts, and omissions, Disabled Detainees are at substantial risk of suffering and will, in fact, suffer serious and irreparable physical, psychological, mental, and emotional injuries if such policies, practices, acts, and omissions continue unabated. Neither Plaintiff, nor the Disabled Detainees have a plain, adequate, or complete remedy at law to redress the wrongs described herein.

<u>**FOR A FIRST CAUSE OF ACTION**</u>
(Declaratory Judgment: Substantive Due Process Under the Fourth
and Fourteenth Amendments to the U.S. Constitution)

90.     Plaintiff repeats and realleges the allegations set forth herein in paragraphs 1 through 89 above, incorporating the allegations herein by reference.

19

91.     When Defendant takes a Disabled Detainee into custody, it assumes a duty under the Fourth and Fourteenth Amendments to protect the Disabled Detainee from harm and substantial risks of serious harm.

92.     Disabled Detainees held at the ASGDC have substantive due process rights that include, but are not limited to: the right to be free from any punishment while they are detained pending trial; the right to be free from and protected from serious physical, psychological, and emotional harm; the right to necessary treatment, care, and services in an integrated setting; the right not to deteriorate physically, psychologically, or emotionally while in state custody; and the right to be free from substantial risks of the above-mentioned harms.

93.     The conditions of confinement at ASGDC and Defendant's policies, practices, acts, and omissions complained of herein constitute the impermissible punishment of pretrial detainees for which no legitimate governmental purpose exists.

94.     Defendant knows of the substantial risks of serious harm that Disabled Detainees will suffer as a result of these practices and policies. Defendant's action and inaction shock the conscience and are in deliberate indifference to serious, known health and safety needs of the Disabled Detainees, and create substantial risks of serious harm in violation of the Disabled Detainees' rights under the Fourth and Fourteenth Amendments.

95.     The conditions of confinement at ASGDC and Defendant's policies, practices, acts, and omissions complained of herein have also resulted in the imposition of disciplinary punishment and other restrictions on Disabled Detainees without notice, opportunity to contest or appeal the restrictions, or other constitutionally adequate

procedural due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

96.    Consequently, Plaintiff is entitled to a declaratory judgment declaring that Defendant has violated the constitutional rights of the Disabled Detainees as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION
(Declaratory Judgment: Eighth and Fourteenth Amendments)

97.    Plaintiff repeats and realleges the allegations set forth herein in paragraphs 1 through 89 above, incorporating the allegations herein by reference.

98.    The Eighth Amendment prohibits the imposition of cruel and unusual punishment on convicted individuals and, in some cases, on individuals incarcerated pending disposition of criminal charges.

99.    Defendant's operation of ASGDC through its policies, practices, acts, and omissions have subjected Disabled Detainees to substantial risk of serious harm and violated the Disabled Detainees rights to be protected from cruel and unusual punishment in each of the following respects:

    a.  Failing to provide Disabled Detainees adequate medical and mental health services;

    b.  Confining Disabled Detainees for prolonged periods in restrictive housing without the provision of adequate mental health treatment and supervision;

    c.  Engaging in excessive use of force against Disabled Detainees by confining them in shower stalls for extended periods and in restraint chairs after the limited behavioral justification for placement in such chairs has been extinguished;

21

d. Failing to adequately supervise Disabled Detainees and to protect them from escalating violence at ASGDC by entering into agreements with other jurisdictions to accept more detainees than it can safely manage and by not operating an appropriate classification system; and/or,

e. Failing to maintain the ASGDC Special Housing Unit in a safe, decent, and sanitary condition that exposes Disabled Detainees to communicable disease.

100.    The conditions of confinement to which Disabled Detainees are exposed have inflicted, and continue to inflict, grave and inhumane deprivations, injuries, and risks that violate contemporary standards of decency and are intolerable in today's society.

101.    The risks of serious harm to which to Disabled Detainees are exposed as a result of the conditions of confinement and Defendant's policies, practices, acts, omissions described herein are substantial and known to Defendant.

102.    Despite its knowledge of Disabled Detainees excessive and substantial risks of harm, Defendant has disregarded those risks and failed to take action sufficient to abate the conditions of confinement and revise polices, practices, and customs that form the basis for the violation of the Eighth Amendment.

103.    Plaintiff is entitled to a declaratory judgment that Defendant has violated the constitutional rights of the Disabled Detainees as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

## THIRD CAUSE OF ACTION
(Declaratory Judgment: Violation of the ADA)

104.    Plaintiff repeats and realleges the allegations set forth herein in paragraphs 1 through 89 above, incorporating the allegations herein by reference.

105.    Defendant's policies, practices, acts, and omissions complained of herein, and its failure to provide adequate mental health services, deprive the Disabled Detainees of their rights under the ADA.

106.    ASGDC does not provide treatment for the Disabled Detainees that is more than placement in restrictive housing.

107.    ASGDC does not provide close supervision of the Disabled Detainees

108.    ASGDC does not provide adequate medications or psychotherapy to the Disabled Detainees.

109.    ASGDC does not have a basic program for identification, treatment, and supervision of Disabled Detainees with suicidal tendencies.

110.    Consequently, Plaintiff is entitled to a declaratory judgment of this Court declaring that Defendants have violated the statutory rights of the Disabled Detainees at ASGDC under the ADA by failing to provide the minimal care necessary to meet the Disabled Detainees' mental health needs.

## FOURTH CAUSE OF ACTION
(Preliminary and Permanent Injunctive Relief; 42 U.S.C. § 1983)

111.    Plaintiff repeats and realleges the allegations set forth herein in paragraphs 1 through 89 above, incorporating the allegations herein by reference.

112.    The conditions of confinement at ASGDC and Defendant's policies, practices, acts, and omissions complained of herein have deprived the Disabled

Detainees of their respective rights, privileges, and immunities secured by the Constitution and laws of the United States.

113.    As a result of these deprivations, Disabled Detainees are likely to suffer irreparable harm in the absence of injunctive relief requested below.

114.    The balance of equities favors the entry of the requested injunctive relief.

115.    The requested injunctive relief is in the public interest.

116.    Plaintiff is likely to succeed on the merits of its claims.

117.    Consequently, Plaintiff seeks an order preliminarily and permanently enjoining Defendant from operating ASGDC in such a way as to deprive Disabled Detainees of their constitutional and statutory rights and privileges as set forth more fully below in the Prayer for Relief.

### FIFTH CAUSE OF ACTION
(Attorneys' and Experts' Fees; 42 U.S.C. § 1988(b) & (c))

118.    Plaintiff repeats and realleges the allegations set forth herein in paragraphs 1 through 89 above, incorporating the allegations herein by reference.

119.    Upon prevailing on the preceding claims, Plaintiff will request that it be awarded its reasonable attorneys' fees and costs, including experts' fees, as part of the costs of the action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

I.      Assume jurisdiction over this action;

II.     Issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, declaring that the conditions of confinement at ASGDC and the policies, practices, acts, and omissions of Defendant complained of herein:

    a.  constitute punishment and subject the Disabled Detainees to denial of substantive and procedural due process, in violation of their constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution;

    b.  are the result of Defendant's deliberate indifference to a substantial risk of serious harm to the Disabled Detainees in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

    c.  are a substantial departure from the accepted professional judgment, standards, and policies, and thereby subject the Disabled Detainees to denial of due process of law, in violation of the Disabled Detainees' constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution; and,

    d.  deprive Disabled Detainees of their rights under the ADA.

III.    Issue preliminary and permanent injunctions restraining and prohibiting Defendant from confining Disabled Detainees unless and until Defendant complies with the following:

    a.  Immediately cease and desist from placing Disabled Detainees in a shower stall or locking Disabled Detainees in any room or cell that does not have an operable toilet, an operable sink, natural light, and a bed, other than at times when a detainee is being transported, held temporarily for a formal proceeding, or in an emergency.

    b.  Immediately cease and desist from confining Disabled Detainees in the Special Housing Unit (SHU) unless they are assigned to SHU or other disciplinary unit solely as a result of being charged and convicted of a rules infraction consistent with ASGDC disciplinary policies and procedures. In this alternative setting, Defendant shall not confine a Disabled Detainee in his cell for medical purposes without prior written approval from a licensed mental health profession ("LMHP"), and then only as long as is necessary to extinguish self-harming behavior or active threats to others.

    c.  Immediately cease and desist from placing Disabled Detainees in a restraint chair except by order of an ASDGC security supervisor ("Supervisor") for the sole purpose of preventing self-harm under the following circumstances:

i. Such an order shall be issued only by a Supervisor with no involvement in the underlying incident that gave rise to the order.

ii. The Supervisor shall conduct an in-person examination of the detainee and make a determination that the detainee poses a material threat of self-harm and immediately documents that finding.

iii. Under no circumstances shall a detainee be restrained in the restraint chair with handcuffs, zip-ties, or any other restraints that were not originally part of the chair's design.

iv. After being placed in the restraint chair, the detainee shall be monitored continuously and asked about his or her condition at frequent intervals in accordance with accepted practice.

v. The detainee shall be allowed to move and stretch his or her limbs in accordance with accepted restraint chair practice at regular intervals.

vi. The detainee shall be released from the restraint chair as soon as the detainee demonstrates he or she has regained a reasonable degree of control over his or her behavior.

vii. Under no circumstances shall the detainee be confined in the restraint chair for more than 60 minutes without an in-person examination by an LMHP under the direction of a psychiatrist.

        viii.  Upon release from the restraint chair, the detainee shall be examined immediately by an LMHP or medical provider.

        ix.  The restraint chair shall never be used to punish or discipline a detainee.

   d.  Allow each Disabled Detainee, except those temporarily placed in segregation for safety or disciplinary reasons, a minimum of one (1) hour per day of outdoor recreation and a minimum of three (3) showers per week.

IV.    Enjoin Defendant from accepting and booking detainees into ASGDC from jurisdictions other than Richland County until such time as ASGDC is adequately and safely staffed.

V.    Order Defendant to develop and implement a comprehensive plan for the correction of the unlawful policies, practices, acts, and omissions complained of herein and to submit this plan to the Court and to the attorneys for the Plaintiff for review including without limitation the following: medical and mental health staffing and services; prolonged use of restrictive housing; security staff recruitment, training, and supervision; use of force; detainee classification system; and sanitation and hygiene.

VI.    Appoint a monitor to oversee implementation of this injunctive relief.

VII.    Retain jurisdiction over Defendant until such time as the Court is satisfied that Defendant's unlawful policies, practices, acts and omissions complained of herein no longer exist.

VIII.    Award Plaintiff the costs of this lawsuit and its reasonable attorneys' fees, costs, and expert's fees; and,

IX.    Order such additional relief as this Court may deem just and proper.

Respectfully submitted,

s/Nekki Shutt
Stuart M. Andrews (Fed. I.D. No. 1099)
Nekki Shutt (Fed I.D. No. 6530)
Sarah J.M. Cox (Fed. I.D. No. 13166)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, 2nd Floor (29201)
PO Box 1929
Columbia, South Carolina 29202
T: 803.904.7915
F: 803.904.7910
SAndrews@BurnetteShutt.Law
NShutt@BurnetteShutt.Law
SCox@BurnetteShutt.Law

**ATTORNEYS FOR PLAINTIFF**

Columbia, South Carolina

April 28, 2022