UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Disability Rights South Carolina; and 15 Unnamed Plaintiffs as Class Representatives on behalf of themselves and others similarly situated, | ) ) ) ) ) ) | Civil Action No. 4:22-cv-01358-MGL-TER |
| Plaintiffs, | ) ) | **SECOND AMENDED COMPLAINT** |
| v. | ) ) | |
| Richland County, | ) ) | |
| Defendant. | ) | |

Plaintiffs by and through their undersigned counsel, file this Second Amended Complaint against Defendant Richland County, and allege as follows:

## I.     NATURE OF THE ACTION

1.     This is a civil rights action brought by Plaintiffs to address the dangerous, inhumane, and unconstitutional conditions, policies, and practices that exist and have existed for an extended period of time because of Defendant's failure to provide adequate mental health care and safe and sanitary conditions of confinement to detainees suffering from serious mental illness ("SMI Detainees") in custody at Alvin S. Glenn Detention Center ("ASGDC").  This class action seeks declaratory and injunctive relief on behalf of such individuals, most of whom are pre-trial detainees.

2.     For a period of no less than two years, Defendant has operated ASGDC in a manner deliberately indifferent to SMI Detainees' substantial risk of serious harm in the following respects:

1

a.    Failing to protect SMI Detainees from harm by operating housing units with inadequate supervision by detention officers and, on many occasions, with no supervision.

b.    Failing to protect SMI Detainees, even when supervised, by its deliberate indifference to the prevalence of contraband weapons and drugs throughout the facility and to the robberies, beatings, extortions, sexual assaults, and stabbings that have occurred and continue to occur under the watch of ASGDC detention officers and supervisors.

c.    Confining SMI Detainees in squalid, unsanitary condition without properly functioning toilets, lavatories, showers, lighting, and sufficient access to drinking water whether detainees are confined in single cells, pod-based housing units, or open-bay dormitories.

d.    Locking down SMI Detainees for prolonged periods in isolated cells or crowded pods without charges, without opportunities to contest the confinement, without prior consultation with a psychiatrist or other medical provider, and without adequate recreational opportunities.

e.    Failing to provide to SMI Detainees adequate mental health services, including the following: the proper administration of psychotropic medications; the development of treatment plans that organize the delivery of mental health services in a manner that corresponds to SMI Detainees' various levels of acuity; and the delivery of the full range of such care, including, without limitation, individual therapy, group therapy, crisis stabilization, and out-of-cell and out-of-

pod structured and unstructured therapeutic activities for individuals in prolonged periods of isolation.

   f. Subjecting SMI Detainees to excessive force by locking them in shower stalls, restraint chairs, and other means of restricting the movement of detainees for punitive purposes without regard to the detainees' ongoing behavior, without prior psychiatric or medical consultation.

   g. Isolating SMI Detainees who attempt suicide or express suicidal ideations in non-therapeutic, punitive settings, where they are confined without proper assessment, mental health treatment, or sufficient observation.

   3. Forcing anyone, particularly people with mental and emotional disabilities, to be subjected to such sordid and dangerous conditions is unconscionable, particularly without the benefit of medically necessary mental health treatment.

   4. Despite being given many opportunities over more for two years to remedy these unconstitutional practices, Defendant attempts to mitigate the harm to which SMI Detainees have been exposed have been inadequate.  They have failed repeatedly to take reasonable measures to prevent SMI Detainees from continuing to be exposed to substantial risks of serious harm.

   5. Defendants' systemic operational failures violate the Due Process Clause of the Fourteenth and the Cruel and Unusual Punishment Clause of the Eighth Amendment that protect SMI Detainees from Defendant's deliberate indifference to their harm, to their need for adequate mental health care, from the application of excessive and unreasonable force, and from the effects of prolonged confinement on their compromised mental health.

6.    Plaintiffs bring this action to address significant violations by Defendant, acting under color of state law, of the civil and constitutional rights of the SMI Detainees.

7.    The conditions at ASGDC, and the patterns and practices of Defendant, endanger their physical health and safety, threaten their emotional and psychological well-being, and deprive them of rights and privileges because of their illness.

8.    The aggregate effect of the numerous, specific, and repeated violations of the Eight and Fourteenth Amendments, taken together with pervasive violations of its own policies that cause and contribute to those violations, is sufficient to establish a pattern and practice of constitutional violations.

9.    Plaintiffs seek declaratory and injunctive relief against Defendant on the grounds that Defendant has deprived detainees with serious mental illness of the rights secured to them by the Eighth and Fourteenth Amendments of the United States Constitution, as enforced by 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, *et seq.*, and relevant provisions of federal law.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(3), this being an action to redress the deprivation of rights under color of state law secured by the Constitution.

11.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(4), this being an action to secure declaratory and injunctive relief under the Acts of Congress providing for the protection of civil rights, specifically the Civil Rights Act.

12. This Court also has jurisdiction over this action under 28 U.S.C. § 1331, this being an action in which the matter in controversy arises under the Constitution and the laws of the United States.

13. This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

14. This District is an appropriate venue for this action pursuant to 28 U.S.C. § 1391(b) as the acts and events giving rise to the claims herein occurred within the Columbia Division of South Carolina.

### III.     PARTIES

15. Disability Rights South Carolina ("DRSC") is a private, not-for-profit South Carolina corporation established as a protection and advocacy organization for the State of South Carolina and charged by state and federal law to protect and advocate for the rights of people with disabilities in South Carolina. On behalf of detainees with serious mental illness confined at ASGDC, DRSC asserts organizational, associational, and statutory standing as a party to this action.

16. The plaintiff representatives of the putative class ("Named Plaintiffs") are detainees who suffer from serious mental illness and who are presently confined at ASGDC. Due to the highly private and personal nature of the facts surrounding their claims and to protect their privacy and dignity, these individuals will be identified in this Second Amended Complaint by numerical designations. The identities of the representatives of the putative class will be provided to Defendant and the Court in an unredacted copy of Exhibit A, attached hereto, which will be filed simultaneously with this Second Amended Complaint and a Motion to File Under Seal pursuant to Local Rule 7.

17.     CR1 was diagnosed with depression and anxiety. Her constitutional rights have been violated by Defendant. For example, CR1 has not received adequate mental health care to treat her condition during her detention at ASGDC and has not been properly supervised. She has been placed in lock down and told she is on a mental health hold without explanation and despite requests to return to an open dorm. She has made sick calls to for medical treatment that have been ignored. CR1 has been denied access to showers for days at a time without justification. CR1 has been and continues to be at substantial risk of serious harm of which Defendant is aware and has been deliberately indifferent.

18.     CR2 has a history of serious mental illness, including a diagnosis of bipolar disorder at 10-years old and a prior diagnosis of anxiety with a history of panic attacks. He is currently being denied access to medications to treat his bipolar disorder. CR2 experiences panic attacks regularly due to fear for his safety in ASGDC, as well as violence he has experienced and witnessed at ASGDC. He has been assaulted and witnessed numerous stabbings while his dorm was left unsupervised by Defendant. CR2 has requested psychotherapy and asked to be prescribed mental health medication but has not received the requested services. He has been and continues to be at substantial risk of serious harm of which Defendant is aware and has been deliberately indifferent.

19.     CR3 has been diagnosed with schizophrenia. Although he has been in lockdown for months for a disciplinary investigation—first in Papa, then in BMU—he was not provided any paperwork to substantiate disciplinary charges, has not met with a hearing officer, and has surpassed the date he expected to leave the lockdown unit. In BMU, he is only allowed out of his cell for showers three days a week and ten-minute

phone calls every other day. Despite his mental health diagnosis, CR3 has not been provided psychotherapy or recreation. He has been and continues to be at substantial risk of serious harm of which Defendant is aware and has been deliberately indifferent.

20.     CR4 has been diagnosed with anxiety. She is prescribed medication for her diagnosis, but she has not been provided psychoeducation on the need for such medicine or the potential benefits, risks, and alternatives to such medication. CR4 has been placed in X-Ray, where she is locked in a cell shared with another female for the majority of every day. J.H.'s cell does not have a working light or sink. CR4 only has access to drinking water when guards are present in her dorm and allow her to leave her cell. CR4's dorm is left unsupervised most of the day. She has been and continues to be at substantial risk of serious harm of which Defendant is aware and has been deliberately indifferent.

21.     CR5 has been diagnosed with depression and anxiety.  He does not have regular access to mental health providers and has not been provided psychotherapy.  He has made regular sick call requests but there was no response from medical staff. CR5 has been harassed and attacked by other detainees after jail staff improperly disclosed his medical condition. He has been forced to seek protective custody while being held in pretrial detention but is still housed in the same unit with his primary aggressor. CR5 has been and continues to be at substantial risk of serious harm of which Defendant is aware and has been deliberately indifferent.

22.      CR6 has been diagnosed with anxiety and posttraumatic stress disorder. He is a veteran and has numerous medical illnesses. He is confined to a wheelchair most of the time and suffers congestive heart failure.  CR6 been in many units within ASGDC.

In the last two years, he reports that he seldom sees detention officers in his unit. In the absence of the officers, the units are run by strong detainees who bully and rob the weaker detainees. CR6 has been stabbed by another detainee and has witnessed violence by guards and detainees. He has been and continues to be at substantial risk of serious harm of which Defendant is aware and has been deliberately indifferent.

23.     CR7 has been diagnosed with post-traumatic stress disorder stemming from a brutal attack at ASGDC in September 2022. While he was asleep, detainees were able to enter his locked room and beat him so badly that he was in a coma for almost two weeks. He suffered brain swelling and damage. He has many continuing symptoms, including recurrent nightmares. He is housed un unit Mike, the medical dorm. His toilet leaks and does not work. His sick call requests take two weeks to get a response. He has filed several paper grievances and gotten no responses.

24.     CR8 has been diagnosed with depression and has not received prescribed medications on a consistent basis, nor has he received any mental health treatment beyond medications.  During his confinement in a restrictive housing unit where all detainees were locked in their cells, correctional officers permitted detainees to leave their cells after which they attacked CR8, brutally beating him with a board in the face which he was hospitalized and has been permanently disfigured.

25.     CR9 has been treated for serious mental illness for over 20 years before being confined at ASGDC.  During intake, he was not assessed by a mental health provider who could prescribe medications.  He was detained in a cramped, crowded holding tank with more than 30 other detainees for a week, with one toilet and sink, sleeping on the floor shoulder to shoulder without a mattress.  In the first unit to which he

was assigned, 56 men were forced to use two working toilets. During his various housing assignments, it was uncommon for an officer to be present during the evening shift from 6:30pm to 6:30am, other than to accompany a nurse for medpass and to appear to do rounds for a few minutes each night. During these periods, detainees frequently presented street knives and shanks, threatening and attacking vulnerable detainees.

26. CR10 has been assigned to the ASGDC mental health unit because of the serious condition of his mental illness. He has been placed on suicide watch on multiple occasions, the last of which occurred after he was bullied and beaten in a Phase 5 unit. He was never assessed on suicide watch, nor was he supervised. In fact, to get the attention of a detention officer, CR10 often had to scream at his cell door. He remained on suicide watch for 33 days before being released. More recently, CR10 was the victim of severe attack in which he was stabbed the head, neck, and back 11 times and was taken to a local hospital by EMS. No officer was present in the unit during the assault.

27. CR11 has been diagnosed with schizophrenia. He receives no treatment for his mental illness other than medications, which on numerous occasions have not been provided as prescribed. CR11 is not assigned a bed or a cell. He sleeps in a plastic crate with a mattress on the floor of an open unit in Phase 1, along with over 30 other men who also have no bunk. That housing unit designed for 56 is occupied by over 80 men. To avoid competing for access to the limited toilets and showers, CR11 routinely wakes at an early hour. One morning when he followed his routine and showered, CR11 slipped in a dark shower stall without lighting on contaminated water and sustained a concussion in the fall. Seven days passed before CR11 received any medical treatment.

28.    CR12 suffers from severe depression.  His condition has been compounded at ASGDC.  He has been repeatedly robbed and stabbed, and threatened with increased violence if he reported the assaults.  Officers are generally scarce.  When they are present, CR12 has observed them releasing men from their cells to attack and rob other detainees.  To avoid the constant threats, CR12 has requested protective custody.

29.    CR13 has been diagnosed with schizoaffective disorder.  He suffers also from PTSD as a result of a stabbing attack in a prior detention at ASGDC.   In a recent incident, he was tased by officers while handcuffed and then placed in a restraint chair for an unreasonably long period.  CR13 has also been assaulted in the mental health unit, which he reported to the supervising officer who refused to accept his grievance.

30.    CR14 has been diagnosed with psychosis, for which he is not receiving effective medications.  His requests to change medications have been unheeded.  CR14 was sexually assaulted in the mental health unit, but his report of the incident has not been investigated and responded to.

31.    CR15 has been diagnosed with major depression.  The living conditions in his housing units have been deplorable.  He has been beaten and robbed.  His finger has been broken.  He has been denied attempts to secure a safe haven through protective custody.  These conditions have made his life miserable at ASGDC.   And yet he has no medical treatment that begins to meet his needs.

32.    Richland County is responsible for the ownership, management, operation, staffing, and oversight of ASGDC and has, at all times relevant to this action, exercised such responsibility through the color of law by and through the policies, practices, acts, and omissions of its officers, agents, and servants, including without

limitation the following:  elected members of Richland County Council; duly designated administrators of Richland County; personnel with administrative, supervisory, and front-line responsibilities at ASGDC; and third-party contractual providers of medical, mental health, and other services at ASGDC.

## IV.   CLASS ACTION ALLEGATIONS

33.      The plaintiff representatives of the putative class bring this action on behalf of themselves and all others who are similarly situated ("Disabled Detainees"), pursuant to Rule 23 of the Federal Rules of Civil Procedure.

The class is so numerous that joinder of all members is impracticable.  The class consists of all individuals at any time since April 28, 2022, have been or will be confined at ASGDC and who, at any time since such date, have been or will be:

1) Assigned to a "mental health" housing unit at ASGDC.

2) Diagnosed by a psychiatrist or other licensed clinical mental health professional with any of the following mental illnesses:

   a. Cognitive disorders (e.g., traumatic brain injuries, Cognitive Disorder Not Otherwise Specified);

   b. Schizophrenia (all subtypes);

   c. Schizoaffective Disorder (all subtypes);

   d. Paranoid Disorder (e.g., Delusional Disorders);

   e. Major Depressive Disorder (all subtypes);

   f. Bipolar Disorder (all subtypes);

   g. Other Psychotic or Mood Disorders (e.g., Schizophreniform, Dysthymia, Psychotic Disorder Not Otherwise Specified); or

3) Diagnosed by a psychiatrist or other licensed clinical mental health professional with another mental disorder, not listed above, that has resulted in significant functional impairment, defined as:

    a.   the inability to attend and effectively perform the usual or necessary activities of daily living;

    b.   an extreme impairment of coping skills, rendering the patient exceptionally vulnerable to unintentional or intentional victimization and possible mismanagement; or

    c.   behaviors that are bizarre and/or dangerous to self or others.

4) Has been admitted to a licensed behavioral health or psychiatric hospital.

## V.    FACTUAL ALLEGATIONS

34.    ASGDC is a pre-trial detention center located in Richland County approximately eight miles from the South Carolina statehouse. ASGDC is rated by the South Carolina Department of Corrections as having a capacity for detaining 1,106 individuals; the facility at the time of this filing has custody of approximately 1,000 men and women.

### A.    SMI Detainees

35.    As many as 60 to 70 percent of the men and women at ASGDC suffer from mental illness, according Crayman Harvey, ASGDC Director, and Luarrinda Saxon-Ward, the on-site mental health manager for Advanced Correctional Healthcare ("ACH"), ASGDC's medical and mental health provider.

36.    The great majority of the individuals at ASGDC with mental illness are SMI Detainees or, as a result of the trauma inflicted by exposure to the dangerous, unsanitary conditions, are at substantial risk of developing a serious mental illness.

37.    SMI Detainees have complex medical needs that require proper diagnosis and treatment beyond the provision of medications.

38. As a result of Defendant's failure to provide adequate mental health care, SMI Detainees have been seriously harmed and remain at substantial risk of serious harm of which Defendant is aware and deliberately indifferent.

**B. Defendant Fails to Provide an Adequate Mental Health Program**

39. Components of a constitutionally adequate correctional mental health program include the following: (1) a systematic program for screening and evaluating detainees to identify those who require mental health treatment; (2) individualized treatment plans that provide for treatment that is more than placement in restrictive housing and that includes close supervision of detainee patients; (3) prescription and administration of psychotropic medications with appropriate supervision coupled with adequate psychotherapy; and, (4) a basic program of identification, treatment, and supervision of detainees with suicidal tendencies.

**1) <u>ASGDC Does Not Have an Effective Systematic Program for Screening and Evaluating Detainees to Identify Those Who Require Mental Health Treatment.</u>**

40. Failure to identify and respond appropriately to serious mental illness can lead to significant medical deterioration and, in some cases, death.

41. Accepted standards of correctional intake screenings are used to identify detainees with histories of mental health treatment, major mental illnesses, the need for psychotropic medications, and suicide potential.

42. Without the application of thorough and effective screening systems, SMI Detainees may suffer a loss of the continuity of care that may lead to depressions, decompensation, psychosis, and other acute problems.

43.     Defendant's mental health screening and evaluation program is inadequate in that, among other things, it relies heavily on detainee self-reporting and does not have a policy or custom of consistently obtaining and incorporating diagnostic and treatment histories from community and state mental health providers that previously treated SMI Detainees into individual treatment plans for SMI Detainees.

44.     These deficiencies in the ASGDC mental health screening and evaluation system expose SMI Detainees to a substantial risk of serious harm to which Defendant has been and continues to be deliberately indifferent.

### 2) Defendant Fails to Provide An Adequate Mental Health Treatment Program and Fails to Closely Supervise SMI Detainees.

45.     The mental health program at ASGDC consists of little more than placement of SMI Detainees in restrictive housing, the administration of psychotropic and other medications, and brief, periodic *pro forma* contact with SMI Detainees.

46.     Defendant has failed and continues to refuse to provide generally recognized and accepted forms of mental health treatment.

47.     Defendant also fails to adequately supervise SMI Detainees in any setting, whether in the so-called "mental health" unit, the medical unit, or restrictive or open housing units.

48.     As a matter of course for individuals not charged with disciplinary infractions, Defendant confines SMI Detainees for prolonged periods in individual cells, in dual-occupancy cells, and in eight-person pods without providing adequate opportunities for recreation, programming, or structured and unstructured therapeutic activities.

49.    Defendant confines SMI Detainees in such restrictive housing while expressly denying them an opportunity to contest such placement.

50.    Systemic deficiencies in Defendant's mental health program largely contribute to its overreliance on and inappropriate use of restrictive housing as a means of controlling SMI Detainees.  Those deficiencies include inadequacies of Defendant's mental health program, marginalized role of its mental health staff, severe deficiencies in security operations, inadequate training of security staff in the management of SMI Detainees, and the absence of supervisory oversight mechanisms to monitor and assess the effect on SMI Detainees of prolonged confinement in restrictive housing.

51.    In 2014, the Richland County Council commissioned Pulitzer/Bogard & Associates, LLC to conduct a management and operations study ("Management and Operations Study").  The Management and Operations Study commissioned by Defendant expressed concerns about housing SMI Detainees in restrictive housing, particularly detainees on suicide watch and those awaiting mental health competency evaluations.

52.    The Management and Operations Study also found that restrictive conditions of confinement deprive detainees of constructive, meaningful, and sufficient opportunities to engage in ASGDC programs, services, rights, and privileges for which the detainees otherwise would be eligible.

53.    Defendant's continued reliance on restrictive housing to confine SMI Detainees under the current conditions at ASGDC, including the failure to provide an adequate program for mental health treatment, subjects to them the substantial risk of serious harm and demonstrates Defendant's deliberate indifference to such risk.

54.     Defendant's confinement of SMI Detainees for prolonged periods coupled with its failure to provide adequate mental health treatment and adequate supervision exposes them to a substantial risk of serious harm of which Defendant has been and continues to be aware and deliberately indifferent.

### 3) Defendant Fails to Administer Psychotropic Medications with Appropriate Supervision and Psychotherapy.

55.     Defendant does administer prescribed psychotropic medications in some circumstances to SMI Detainees but fails to supervise appropriately the administration of such medications or provide related psychotherapy pursuant to an adequate treatment plan.

56.     Defendant has failed and continues to refuse to provide through its medical contractor staffing sufficient to perform individual and group psychotherapeutic and other forms of mental health treatment to complement SMI Detainees' medical regimens.

57.     As a result of Defendant's deliberate indifference to SMI Detainee's needs for closely supervised medication administration coupled with psychotherapy, SMI Detainees are at substantial risk of serious harm.

### 4) Defendant Has Failed to Develop and Maintain a Program to Identify, Treat, and Supervise Detainees with Suicidal Tendencies.

58.     Defendant's suicide prevention program is woefully inadequate and dangerously deficient.

59.     Suicide watch at ASGDC does not occur in a therapeutic environment, but instead functions as a punitive measure that has consisted for years, and, in cases of SMI women, consists of placement in filthy, dark cells that exasperate their fragile state.

60.     Defendant denies SMI Detainees on suicide watch opportunities for confidential communications with mental health professionals and other forms of mental health treatment.

61.     Supervision of SMI Detainees on suicide watch is scarce, unreliable, and inadequate.  In many cases, suicidal SMI Detainees are held in cells out of view of ASGDC staff, or where they are only visible through a small window, and where security officers cannot perform the supervision required for the safety of SMI Detainees on suicide watch.

62.     Defendant's failure to develop and maintain a program to identify, treat, and supervise SMI Detainees with suicidal tendencies exposes them to substantial risk of serious harm, and even death.  Defendant is aware of and deliberately indifferent to such risk.

**C.     Defendant's Use of Shower Stalls and Restraint Chairs to Confine Detainees for Extended Periods Serve No Legitimate Governmental Purpose and Punish Them for Manifesting the Symptoms of Their Illness.**

63.     At the time of the filing of this action, SMI Detainees were routinely and indiscriminately confined and held by Defendant for extended periods in shower stalls and restraint chairs for manifesting symptoms of their mental illnesses.

64.     Because of its refusal to treat the mental health care needs of SMI Detainees, Defendant continues to confine SMI Detainees, upon information and belief, in restraint chairs at rates materially greater and for periods of time materially longer than Defendant confines non-mentally-ill detainees.

65.     At the commencement of this action, Defendant confined SMI Detainees in restraint chairs that looked like electric chairs with straps used to immobilize SMI

Detainees by strapping down their feet, legs, torso, arms, neck, and head. These restraint chairs were in poor condition, and frequently, instead of using the strap restraints, SMI Detainees were handcuffed or zip-tied to the chairs.

66.     Defendant confines SMI Detainees in restraint chairs, as it has with shower stalls without consultation with mental health professionals prior to, during, or immediately following such restraint to assess the detainee's psychological condition or to determine whether such measures are necessary and appropriate to affect the detainee's behavior.

67.     During their confinement in restraint chairs, SMI Detainees are held long beyond the point continued confinement is needed, that is when a detainee's allegedly dangerous conduct that formed the ostensible justification for the confinement has been extinguished.

68.     Defendant uses placement in restraint chairs, as it has with shower stalls, instead to punish SMI Detainee's conduct related to manifestations of their underlying mental illness, including the following:  suicide attempts, self-harm, and disordered behavior usually from a single cell in which the detainee is already confined, e.g. cursing, spitting, exposing themselves, talking back, yelling smearing feces, etc.

69.     Defendant often places SMI Detainees in restraint chairs without charging them with an offense or violation of an ASGDC disciplinary rule and without due process of law.

70.     The 2014 Management and Operations Study commissioned by Defendant identified the existence of a "cool down sanction" in use at ASGDC, finding it was common practice to place detainees in restrictive, segregated housing in an individual cell or shower stall for up to 12 continuous hours as "an ambiguous punitive measure that is

frequently used and has a host of negative consequences for the affected inmate." The Management and Operations Study observed that the principles of direct supervision, under which ASGDC then reportedly operated, did not support the use of the cool-down sanction. The Management and Operations Study recommended that "ASGDC should conduct an independent review of the legality, liabilities, and appropriateness of the cool down sanction in the Detention Center's SHU as it is currently administered."

71.    Based on the 2014 report, as well as the custom and practice of using shower stalls and restraint chairs for unreasonable and prolonged periods of time, Defendant is aware of and for over nine years was deliberately indifferent to the substantial risk of serious harm to which SMI Detainees were exposed by being confined in shower stalls before allegedly terminating such practice after the filing of this action. Defendant, however, continues to apply excessive and unnecessary force to SMI Detainees by confining them in restraint chairs as punishment without legitimate non-punitive governmental purpose.

**D.    Defendant's Use of Prolonged Solitary Segregation Coupled with Inadequate Mental Health Services Violates SMI Detainees' Constitutional Rights.**

72.    ASGDC is dangerously understaffed. It is not uncommon for a single front-line security officer to be directly responsible at one time for supervision of up to four housing units consisting of over 200 detainees.

73.    On or about February 18, 2020, the Richland County Council Detention Center Ad Hoc Committee met to discuss the conditions at ASGDC, expressing concerns that mentally ill detainees may not be getting proper treatment due to the fac that "the only place to house [severely mentally ill detainees] is in a single cell in the [restricted housing unit.]"

74.     On or about February 25, 2020, the Detention Center Ad Hoc Committee again met and discussed the conditions at ASGDC, specifically the manner in which housing for mentally ill detainees should be provided.

75.     On or about May 4, 2020, the Detention Center Ad Hoc Committee again met, acknowledging there were 109 security staff vacancies at the time of the meeting.

76.     The South Carolina Department of Corrections ("SCDC") is required by statute to inspect all county detention facilities annually to ensure compliance with South Carolina's Minimum Jail Standards, as set forth by the SC Association of Counties ("SCAC").  These standards set forth conditions and adequate staffing requirements for local detention centers, based on earlier SCAC staffing assessments of each institution. SCDC issues annual reports describing deficiencies that must be addressed to safely house and supervise the authorized jail population for each facility.

77.     On or about September 28, 2021, a site inspection conducted by SCDC reported there were 172 vacant security staff vacancies at ASGDC, an increase of nearly 60 percent in the number of vacancies in less than five months.  The Inspector found insufficient personnel to provide 24-hour supervision and processing of detainees and further found that the special purpose cells used for suicide watch were not being continuously monitored in accordance with applicable state regulations.  The Inspector further noted four housing units were closed to personnel limitations.

78.     For the past eight years, SCDC inspectors have found that ASGDC is operating with chronic shortages in security staffing.

79.     During this time the minimum required number of security staff has ranged from 242 to 262 security officers.  In the last audit requested by Richland County in

October 2023, the Association of Counties found that ASGDC now requires 294 certified security officers based on current conditions. However, the actual number of certified security officers at ASGDC has ranged from 168 detention officers to 88 officers in SCDC's November 30, 2023 annual report.  This means that ASGDC has 30% of the detention offices needed to safely and securely operate the jail based on the October SCAC staffing assessment report when the jail only had a population of 811 detainees.

80.     To make matters worse, the bonding laws for those arrested in South Carolina were amended in July 2023 to severely restrict the re-release of those rearrested on violent offenses.  Since then, ASGDC's jail detainee census has risen to nearly 1,000, a 20% increase.  This sharp increase is now approaching the jails total rated capacity or maximum.

81.     Despite this dangerously low staffing level before the filing of this action, ASGDC routinely occupied pre-trial detainees from the United States Department of Justice, the City of Columbia, the City of Forest Acres, and the University of South Carolina pursuant to contractual service arrangements, even though Defendant cannot adequately supervise the detainees presented for booking by the Richland County Sheriff's Office.

82.     After the commencement of this action, the United States Department of Justice, acting through the Marshals' Service, terminated, with limited exceptions, its long-standing practice of placing a substantial number of federal pretrial detainees at ASGDC, upon information and belief, because Defendant could not protect those men and women from harm.

83.     An escalation of violence at ASGDC was noted before the commencement of this action in a March 2022 report of the Midlands Gang and Fugitive Task Force of the Richland County Sheriff's Department.  In a search of three ASGDC housing units, the Task Force reported seizing, among other things, 13 shanks, 7 cell phones, and 28 grams of marijuana.

84.     For over two years, ASGDC has operated at such low staffing levels that housing units are completely unsupervised for extended periods.  During these prolonged intervals, violence reigns.  Many cell locks are inoperable.  Stabbings have become a daily occurrence.  Threats with weapons, robberies, and extortions are commonplace.

85.     As a result of such limited supervision and prevalent violence, SMI Detainees are increasingly in need of the protection Defendant has demonstrated it is unable or unwilling to provide.

86.     Defendant's chronic security staffing shortages are compounded by its failure to establish a quality assurance, evidence-based system to identify, measure, monitor, and reduce, if not prevent conduct of detainees and officers that poses substantial risk of serious harm to SMI Detainees.

87.     These fundamental, systemic flaws in ASGDC operations materially increase the likelihood violence in the facility, place detainees and front-line security staff at substantial risk of serious harm to which Defendant has been deliberately indifferent and has failed to take reasonable measures to mitigate.

**E.     Defendant Fails to Maintain ASGDC in a Safe, Sanitary, and Habitable Condition.**

88.     For years, Defendant allowed ASGDC to deteriorate into filthy, deplorable, dungeon-like conditions. It was deliberately indifferent to an antiquated inoperable

plumbing system where more toilettes and lavatories throughout the housing units were broken than functional. In many instances, SMI Detainees were assigned to cells that had become encrusted with mold, blood, and feces.

89.     When they were locked in cells without functioning toilets without a detention officer in the unit, SMI Detainees were forced to endure the humiliation of urinating in their sinks and defecating in Styrofoam foam food containers left over from a prior meal.

90.     They suffered the same fate, not infrequently, when detention officers were present in the housing unit but refused to permit detainees to leave their cell to use a working toilet in another cell or pod.

91.     Such degrading, inhumane treatment was not reserved for individuals who were combative, violent, or acutely psychotic, not that they don't have an unqualified constitutional right to be treated with basic human dignity. Instead, hundreds of SMI Detainees confined in housing units throughout ASGDC have suffered these indignities for a prolonged period, at least since 2021.

92.     Defendant provides no consistent daily means of assuring SMI Detainees have a sufficient and consistent supply of drinking water to meet their needs. The ASGDC housing units have no dedicated drinking fountains. Detainees rely instead on their sinks and a limited sporadic supply of water from a single five-gallon cooler for as many as 70 to 80 men during the course of a day.

93.     Due to broken sinks, which have been common since 2021, detainees are dependent on the presence and good will of detention officers and the detainee workers to whom officers delegate the responsibility to distribute water to SMI Detainees.

94.     Again, during the frequent and extensive absences of the detention officers, SMI Detainees with broken sinks are unable to quench their thirst.  In some instances, when the limited supply of water in an intake holding tank was exhausted with no expectation that it would soon be replenished, they could get no officer's attention, detainees have been compelled to drink from the toilets in their cells.

95.     The foul conditions throughout ASGDC have created an environment in which pests thrive.  SMI Detainees have been plagued in their living quarters with rats, mice, snakes, spiders, bed bugs, and numerous sorts of other insects.

96.     Showers throughout ASGDC housing units have been dysfunctional for years.  Some produce too little water to permit a shower.  Others produce only hot water or only cold water.

97.     In other shower stalls, drains have been frequently clogged causing water to flow out of the stall into the bathroom area and often into the area where detainees congregate when not in their cells or pods.

98.     The plumbing system has been in such a state of despair that at times during a detainee's shower raw sewage has oozed from the shower drain.

99.     As a result of these deplorable shower conditions, it has not been uncommon for SMI Detainees, particularly those with mobility limitations, to fall on slippery tile floors or in adjacent spaces and injure themselves.

100.    Exacerbating these wretched conditions, lighting in shower, cells, and pods has been broken and inoperable in many housing units, particularly increasing the risk of physical harm from slipping in shower stalls and bathrooms without handrails or adhesive floor material.

24

101.    The effect on SMI Detainees of inadequate lighting in cells and pods is to increase their risk of harm by other detainees who cannot be detected in darkened cells, particularly when their individual cells have been broken or compromised.

102.    In addition, the lighting in the cells of many SMI Detainees is too dim, if it exists at all, is too dim to permit reading and so poor that it compounds the depression and anxiety with which many SMI Detainees struggle.

103.    SMI Detainees are not afforded recreational opportunities on a consistent daily basis.  In no less than ten of the ASGDC housing units, SMI Detainees are locked in cells or pods for prolonged periods without recreational activities.

104.    Notwithstanding the presence of dangerous and hazardous conditions at ASGDC, Defendant has no adequate emergency evacuation procedure.

105.    Defendant's failure over the period of no less several years to provide safe, decent, and sanitary living conditions is appalling.  The deplorable physical conditions of the facility have exacerbated.  SMI Detainees already compromised conditions.

106.    SMI Detainees have continually, over the period of several years, brought to Defendant's attention the deplorable physical conditions of ASGDC.  Numerous named plaintiffs have repeatedly attempted to no avail to file and to exhaust grievances concerning such conditions.  For several years, Defendant's grievance procedure has been in a state of flux, using paper forms for a period, then electronic, then paper again – without communicating to SMI Detainees the changes in the process and how to properly file grievances.  Moreover, detention officers in some instances would inform SMI Detainees that they had no grievance forms.  Others would discourage them from being filed at all.  Most importantly, countless numbers of SMI Detainees would, over the

course of several years, submit hand-written grievances without a response from jail administrators. There was but one conclusion – no grievance process has been available to SMI Detainees.

**F.     Defendant's Attempted Mitigation Has Been Unreasonable and Inadequate.**

107.   At the time of the commencement of this matter in April 2022, the claimts set forth in this Second Amended Complaint were in effect. The condition of ASGDC was disgusting. SMI Detainees received little to no mental health treatment other than the administration of psychotropic medications. And, with a continuous severe staffing shortage, compromised officers and supervisors, soaring presence of contraband drugs and weapons, SMI Detainees found no safe sanctuary.

108.   Since Plaintiff Disability Rights South Carolina filed this action, Defendant has made some attempts to mitigate the constitutional violations set forth in the original Complaint. Those measures, however, have been inadequate and short-sighted. They have not been reasonably calculated to prevent SMI Detainees from continuing to be exposed to a substantial risk of serious harm. In other respects, even after having been advised of specific constitutional violations, Defendant has refused to correct the violations or undertake remedial efforts. This leaves Plaintiffs without recourse other than to turn to the Court for relief.

**G.     Knowledge of Defendant**

109.   Defendant has acted and continues to act, under the color of law with respect to all matters alleged herein. All of the conditions, policies, customs, patterns and practices described herein are the result of, and pursuant to, acts and omissions of Defendant.

**H.     Necessity for Injunctive Relief; No Adequate Remedy at Law**

110.    Defendant has acted and continues to act in violation of the law as described herein.  As a proximate result of Defendant's policies, customs, patterns, practices, acts, and omissions, SMI Detainees have suffered and are at substantial risk of continuing to suffer serious and irreparable physical, psychological, mental, and emotional harm if such policies, customs practices, patterns, acts, and omissions continue unabated.  Neither Plaintiff DRSC, nor the Named Plaintiffs or the SMI Detainees have a plain, adequate, or complete remedy at law to redress the wrongs described herein.

**FOR A FIRST CAUSE OF ACTION**
(Declaratory Judgment: Substantive Due Process Under the Fourth
and Fourteenth Amendments to the U.S. Constitution)

111.    Plaintiffs repeat and reallege the allegations set forth above, incorporating the allegations herein by reference.

112.    When Defendant takes a SMI Detainee into custody, it assumes a duty under the Fourteenth Amendments to protect the SMI Detainee from harm and substantial risks of serious harm.

113.    SMI Detainees held at the ASGDC procedure and substantive due process rights that include without limitation, the right to be free from any punishment while they are detained pending trial; the right to be protected from Defendant's deliberate indifference to the substantial risk of serious harm inflicted by other detainees; the right to be protected from Defendant's deliberate indifference to the substantial risk of serious harm caused by the introduction of contraband weapons and drugs by detention officers with the knowledge and complicity of security staff supervisors; the right to necessary

medical and mental health treatment, care, and services; the right to be free from confinement in cells or pods located in ASGDC housing units for periods routinely in excess of 20 to 24 hours a day; the right to contest confinement for disciplinary infractions or "administrative holds" in cells or pods in ASGDC housing units without due process of law; and the right to be detained in safe, decent, and sanitary housing conditions.

114.   The conditions of confinement at ASGDC and Defendant's policies, customs, practices, acts, and omissions complained of herein constitute the impermissible punishment of pretrial detainees for which no legitimate governmental purpose exists.

115.   Plaintiffs and SMI Detainees are entitled to a declaratory judgment finding that Defendant has violated the constitutional rights of the SMI Detainees as guaranteed by the Fourteenth Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION
(Declaratory Judgment: Eighth and Fourteenth Amendments)

116.   Plaintiffs repeat and reallege the allegations set forth above, incorporating the allegations herein by reference.

117.   The Eighth Amendment prohibits the imposition of cruel and unusual punishment on convicted individuals.

118.   Defendant's operation of ASGDC through its policies, customs, practices, patterns, acts, and omissions have subjected these SMI Detainees confined at ASGDC post-conviction to substantial risk of serious harm and violated the rights of these SMI Detainees to be protected from cruel and unusual punishment in each of the following respects:

a. Failing to provide SMI Detainees adequate medical and mental health services;

b. Confining SMI Detainees for prolonged periods in restrictive housing without the provision of adequate mental health treatment and supervision;

c. Placing SMI Detainees on suicide watch in non-therapeutic settings without providing adequate mental health services or appropriate supervision.

d. Engaging in excessive use of force against SMI Detainees, including confinement in shower stalls and restraint chairs without non-punitive, legitimate, governmental purpose.

e. Failing to adequately supervise SMI Detainees and to protect them from escalating violence at ASGDC.

f. Failing to maintain the ASGDC in a safe, decent, and sanitary condition.

119.    The conditions of confinement to which SMI Detainees are exposed have inflicted, and continue to inflict, grave and inhumane deprivations, injuries, and risks that violate contemporary standards of decency and are intolerable in today's society.

120.    The risks of serious harm to which to SMI Detainees are exposed as a result of the conditions of confinement and Defendant's policies, practices, patterns, acts, omissions described herein are substantial and known to Defendant.

121.    Despite its knowledge of SMI Detainees excessive and substantial risks of harm, Defendant has disregarded those risks and failed to take action sufficient to abate the conditions of confinement and revise polices, practices, patterns and customs that form the basis for the violation of the Fourteenth and Eighth Amendment.

122.    Plaintiffs and SMI Detainees are entitled to a declaratory judgment that Defendant has violated the constitutional rights of the SMI Detainees as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

### THIRD CAUSE OF ACTION
(Declaratory Judgment: Violation of the ADA)

123.    Plaintiffs repeat and reallege the allegations set forth above, incorporating the allegations herein by reference.

124.    Defendant's policies, practices, acts, and omissions complained of herein, and its failure to provide adequate mental health services, deprive the SMI Detainees of their rights under the ADA.

125.    Defendant does not provide adequate mental health treatment for SMI Detainees, including sufficient treatment planning, confidential counseling, or individual and group psychotherapy.

126.    Defendant fails to provide close supervision of the SMI Detainees.

127.    Defendant fails to provide adequate medication management and fails to complement medications with adequate treatment planning and psychotherapy.

128.    Defendant does not have an adequate basic program for the identification, treatment, and supervision of SMI Detainees with suicidal tendencies.

129.    Defendant discriminates against SMI Detainees on the basis of their mental illnesses by confining them, upon information and belief, at materially greater rates and for materially longer periods than non-disabled detainees are subjected to such confinement.

130.    Plaintiffs and SMI Detainees are entitled to a declaratory judgment of this Court declaring that Defendants have violated the statutory rights of the SMI Detainees

at ASGDC under the ADA by failing to provide the minimal care necessary to meet the SMI Detainees' mental health needs and by discriminating against SMI Detainees as set forth above.

## FOURTH CAUSE OF ACTION
(Preliminary and Permanent Injunctive Relief; 42 U.S.C. § 1983)

131.   Plaintiff repeats and realleges the allegations set forth above, incorporating the allegations herein by reference.

132.   The conditions of confinement at ASGDC and Defendant's policies, customs, patterns, practices, acts, and omissions complained of herein have deprived, and continue to deprive, the SMI Detainees of their respective rights, privileges, and immunities secured by the Constitution and laws of the United States.

133.   As a result of these deprivations, SMI Detainees are likely to suffer irreparable harm in the absence of injunctive relief requested below.

134.   The balance of equities favors the entry of the requested injunctive relief.

135.   The requested injunctive relief is in the public interest.

136.   Plaintiffs are likely to succeed on the merits of its claims.

137.   Consequently, Plaintiffs seek an order preliminarily and permanently enjoining Defendant from operating ASGDC in such a way as to deprive SMI Detainees of their constitutional and statutory rights and privileges as set forth more fully below in the Prayer for Relief.

## FIFTH CAUSE OF ACTION
(Attorneys' and Experts' Fees; 42 U.S.C. § 1988(b) & (c))

138.   Plaintiff repeats and realleges the allegations set forth above, incorporating the allegations herein by reference.

139.    Upon prevailing on the preceding claims, Plaintiffs will request that they be awarded reasonable attorneys' fees and costs, including experts' fees, as part of the costs of the action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

I.    Assume jurisdiction over this action;

II.    Issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, declaring that the conditions of confinement at ASGDC and the policies, patterns, practices, acts, and omissions of Defendant complained of herein:

a.    constitute punishment and subject the Named Plaintiffs and SMI Detainees to denial of substantive and procedural due process, in violation of their constitutional rights under the Fourteenth Amendments to the United States Constitution;

b.    are the result of Defendant's deliberate indifference to a substantial risk of serious harm to the Named Plaintiffs and SMI Detainees in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

c.    deprive Named Plaintiffs and the Plaintiff Class SMI Detainees of their rights under the ADA.

III.    Issue preliminary and permanent injunctions restraining and prohibiting Defendant from confining SMI Detainees unless and until Defendant complies with the following:

    a.   Immediately cease and desist from placing SMI Detainees in a cell, pod, or other confined space that does not have an operable toilet, an operable sink, adequate light, and a designated bed and mattress, other than under the following circumstances: a detainee is held temporarily before or after being transported or relocated; a detainee is confined in a shower stall solely for the purpose of taking a shower; and in a case of emergency documented by a supervising officer.

    b.   Immediately cease and desist from confining SMI Detainees in any housing unit that does not have an officer physically present in the unit on a 24/7 basis.

    c.   Immediately cease and desist from failing to provide generally recognized and suggested mental health treatment to SMI Detainees, including without limitations, individual and in secure confidential group therapeutic services settings and necessary higher level of care for more seriously ill SMI Detainees who may not need hospitalization or for when hospitalization is not available.

    d.   Immediately cease and desist from confining SMI Detainees in cells and pods for over 16 hours a day when such Detainees are not being confined for disciplinary charges as administrative holds.

e. Immediately cease and desist from confining SMI Detainees in BMU, X-ray, and other restrictive housing as a result of a charge, conviction, and sentence for a rules infraction of consistent with ASGDC policies or administrative hold without due process of law and without first obtaining a determination by a qualified mental health provider ("QMHP") that the SMI Detainees that placement in such restrictive housing will not present a substantial risk that the detainee's mental health will be adversely affected.

f. Immediately cease and desist from confining SMI Detainees in BMU, X-ray, and other restricted housing without providing at least ten hours of out-of-cell and out-of-pod structured therapeutic activities per week, and at least ten hours of out-of-cell and out-of-pod unstructured activities per week.

g. Immediately cease and desist from permitting to participate in the handling and distribution of food and water to SMI Detainees without close supervision by detention officers.

h. Immediately recognize Defendant to engage staff recruitment practices consistent with industry standards to reduce the number of detention officers with gang affiliations and other inappropriate relations with detainees.

i. Immediately cease and desist from employing restraint chairs, tasers and taser gloves, chemical sprays, and other rises of force in a manner contrary to generally recognized and accepted

correctional practices, to manufacturers' instructions, and to Defendant's own policies, all of which pose a substantial risk of serious harm.

   i. Such an order shall be issued only by a Supervisor with no involvement in the underlying incident that gave rise to the order.

   ii. The Supervisor shall conduct an in-person examination of the detainee and make a determination that the detainee poses a material threat of self-harm and immediately documents that finding.

   iii. Under no circumstances shall a detainee be restrained in the restraint chair with handcuffs, zip-ties, or any other restraints that were not originally part of the chair's design.

   iv. After being placed in the restraint chair, the detainee shall be monitored continuously and asked about his or her condition at frequent intervals in accordance with accepted practice.

j. Allow each SMI Detainee, except those temporarily placed in segregation for safety or disciplinary reasons, a minimum of one (1) hour per day of outdoor recreation and a minimum of three (3) showers per week.

IV. Enjoin Defendant from accepting and booking detainees into ASGDC from jurisdictions other than Richland County until such time as ASGDC is adequately and safely staffed.

35

V.       Order Defendant to develop and implement a comprehensive plan for the correction of the unlawful policies, practices, acts, and omissions complained of herein and to submit this plan to the Court and to the attorneys for the Plaintiff for review including without limitation the following: medical and mental health staffing and services; prolonged use of restrictive housing; security staff recruitment, training, and supervision; use of force; detainee classification system; and sanitation and hygiene.

VI.      Appoint a monitor to oversee implementation of this injunctive relief.

VII.     Retain jurisdiction over Defendant until such time as the Court is satisfied that Defendant's unlawful policies, practices, acts and omissions complained of herein no longer exist.

VIII.   Award Plaintiff the costs of this lawsuit and its reasonable attorneys' fees, costs, and expert's fees; and,

IX.      Order such additional relief as this Court may deem just and proper.

Respectfully submitted,

s/ Annie Day Bame
Stuart M. Andrews (Fed. I.D. No. 1099)
Nekki Shutt (Fed I.D. No. 6530)
Sarah J.M. Cox (Fed. I.D. No. 13166)
Ashley Pennington (Fed. I.D. No. 3035)
Annie Day Bame (Fed. I.D. No. 13363)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, 2nd Floor (29201)
PO Box 1929
Columbia, South Carolina 29202
T: 803.904.7915
F: 803.904.7910
SAndrews@BurnetteShutt.Law
NShutt@BurnetteShutt.Law

SCox@BurnetteShutt.Law
APennington@BurnetteShutt.Law
ABame@BurnetteShutt.Law

**ATTORNEYS FOR PLAINTIFFS**

Columbia, South Carolina

January 30, 2024