**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENWOOD/ANDERSON DIVISION**

| | | |
|---|---|---|
| Disability Rights South Carolina; 15 Unnamed Plaintiffs as Class Representatives on behalf of themselves and others similarly situated, | ) ) ) ) | Civil Action No. 8:22-cv-01358-MGL-BM |
| Plaintiffs, | ) ) | **PLAINTIFF DISABILITY RIGHTS SOUTH CAROLINA'S MOTION FOR** |
| v. | ) | **INJUNCTIVE RELIEF** |
| Richland County, | ) ) | |
| Defendant. | ) | |

Plaintiff Disability Rights South Carolina[1] ("Plaintiff" or "DRSC"), by and through its undersigned counsel, respectfully submits this Motion for Preliminary Injunctive Relief.

## I.     INTRODUCTION

For over a decade, rotating members of Richland County Council and county administrators failed to heed dire warnings of emergencies at the Alvin S. Glenn Detention Center ("ASGDC") due to critical staffing shortages, physical plant failures, uncontrolled detainee violence, and the unmet need for a therapeutic environment and services for detainees with serious mental illnesses ("SMI Detainees"). The confluence of these severe operating deficiencies has created an environment that, notwithstanding Defendant's representations of attempting to mitigate, continues to subject SMI Detainees to a substantial risk of serious harm in violation of their constitutional rights.

Since the filing of this litigation, Defendant has insisted that it has made substantive changes to its practices and the physical facility to fix the constitutional violations detailed in the pleadings. However, through recently produced discovery along with observations at the Expert

---

[1] Because a class has not yet been certified in this matter, Plaintiff DRSC files this motion on behalf of the individual interests of SMI Detainees.

Site Inspection in January 2024, Plaintiffs have confirmed that the constitutional infirmities detailed in the Complaint and Amended Complaint are ongoing, emergent, and necessitate court intervention. As such, Plaintiff DRSC asks the Court to grant injunctive relief preliminarily to protect the rights and wellbeing of SMI Detainees while the parties continue to litigate the merits of their claims.

## II.      LEGAL ANALYSIS

### A.  Preliminary Injunction Standard

A court should grant a motion for preliminary injunction where the movant shows "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### B.  Plaintiff Can Show a High Likelihood of Success on the Merits

The Eighth Amendment prohibits cruel and unusual punishment, and requires prison officials to provide "humane conditions of confinement[,]" ensuring that "inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Importantly, the rights of pretrial detainees are "*at least* as great as the Eighth Amendment protections available to the convicted prisoner." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (emphasis added). When a jail adopts policies or practices "incompatible with the concept of human dignity," the "courts have a responsibility to remedy the resulting [constitutional] violation." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

The Due Process Clause guarantees that a pretrial detainee will be "free from punishment before his guilt is adjudicated" *Tate v. Parks*, 791 Fed. App'x 387, 390 (4th Cir. 2019). The Court of Appeals for the Fourth Circuit recently confirmed the objective standard for deliberate

indifference applies to pretrial detainees' Fourteenth Amendment claims. *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023). Accordingly, pretrial detainees meet their burden on the "purely objective basis" that the challenged governmental action is not "rationally related to a legitimate governmental purpose" or is "excessive in relation to that purpose." *Id.* at 611 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). The standard for each of the constitutional violations alleged herein[2] requires pretrial detainees to show: (1) the existence of a condition that posed a substantial risk of serious harm; (2) defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) defendant knew or should have known (a) that the detainee had the condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed. *Short*, 87 F.4th at 611. Stated differently, Plaintiffs must show that Defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.*

In this case, Plaintiff can show that Defendant is deliberately indifferent to the substantial risk of serious harm caused by its failure to provide necessary care to SMI Detainees with serious medical needs, its subjection of SMI Detainees to inhumane living conditions, and its failure to protect SMI Detainees from rampant violence.

### 1. Defendant's Failure to Provide Necessary Mental Health Servies Constitutes Unconstitutional Deliberate Indifference

The government is required to provide adequate care to meet the serious medical needs of incarcerated individuals. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). There is no distinction between the right to medical care and the right to mental health care. *Bowring v. Godwin*, 551 F.2d

---

[2] *See Short*, 87 F.4th at 611 (deliberate indifferent to medical needs), *Anderson v. Patton*, No. 1:22-cv-515, 2024 U.S. Dist. LEXIS 80047 (M.D.N.C. May 2, 2024) (conditions); *Savage v. Jolley*, No. JRR-23-2056, 2024 U.S. Dist. LEXIS 84964 (D. Md. May 10, 2024) (failure to protect).

44, 47 (4th Cir. 1977); *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). This obligation remains even if it has contracted with a private party to provide medical care. *West v. Atkins*, 487 U.S. 42, 56 (1988); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1188 (M.D. Ala. 2017). In actions challenging systemic health care deficiencies, deliberate indifference can be shown by proving there are such "systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Baxley v. Jividen*, 508 F. Supp. 3d 28, 55 (S.D. W. Va. 2020) (quotation omitted). Plaintiff can successfully show systemwide deficiencies in the provision of mental health care at ASGDC that, taken as a whole, subject mentally ill detainees to substantial risk of serious harm and cause the delivery of care to detainees to fall below the evolving standards of decency that mark the progress of a maturing society.

### i. Defendant's Longstanding Failure to Provide Adequate Mental Health Services

### a. SMI Detainees have Serious Medical Needs

Plaintiff DRSC brings this action in a representative and associational capacity on behalf of SMI Detainees. There is no dispute that SMI Detainees have serious mental health needs. A medical need is serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "Serious mental illness" is a term of art used in the field of psychiatry which refers to "a subset of particularly disabling conditions . . . defined by the diagnosis, duration, and severity of the symptoms." *Braggs v. Dunn*, 257 F. Supp. 3d at 1246; (*see also* **Ex. 1**, Proposed Consent Decree to Resolve DOJ Investigation of Hampton Rds. Reg'l Jail, ¶ 18 (defining SMI)).

As defined in the Second Amended Complaint, SMI Detainees are individuals who, at any time since April 28, 2022, have been or will be confined at ASGDC and who have been or will be:

4

(1) assigned to a "mental health" housing unit at ASGDC; (2) diagnosed by a psychiatrist or other licensed clinical mental health professional with certain mental illnesses; (3) diagnosed by a psychiatrist or other licensed clinical mental health professional with another mental disorder that has resulted in significant functional impairment (as defined therein); or (4) has been admitted to a licensed behavioral health or psychiatric hospital. (Dkt. No. 99, at ¶ 33.) Based on this definition, SMI Detainees must have a psychiatric diagnosis, a history of psychiatric admission, or sufficient indicia of mental illness to warrant a special housing assignment. Accordingly, SMI Detainees clearly have a serious need for mental health services during their detention.

### b. SMI Detainees are Housed Throughout ASGDC in Large Numbers

While no exact count of individual with serious mental illness on the jail's mental health caseload has been identified, one thing is clear: It's a large number. They are present in every housing unit and every phase of the facility. Virtually anything that affects the operations of the jail affects them. During the January 2024 site inspection of Plaintiffs' subject matter experts ("Expert Site Inspection"), ASGDC Director Crayman Harvey informed one of the Plaintiff's experts that detainees with mental illness were being housed in virtually all housing units throughout the facility, comprising 60 to 70% of the population. (*See* **Ex. 2,** Ray Report at 36.) Similarly, Laurrinda Saxon-Ward, ASGDC site manager for mental health services, testified that 608 of the 960 detainees in the jail's custody during November 2023 received mental health services. (**Ex. 3**, Saxon-Ward Dep. at 134:8–10, 152:14–17.) Further evidencing the placement of SMI Detainees across ASGDC is the Mental Health Housing Activity Report prepared by the County's IT Department. (**Ex. 4**.) Importantly, a large percentage of those with mental illness qualify as seriously mentally ill. For example, in 2020, then-ASGDC Director Ronaldo Myers reported to Richland County Council that out of the 336 identified detainees with mental health needs 223 were seriously mentally ill. (**Ex. 5**, Myers Briefing at 3.)

**c.  Defendant Systematically Fails to Provide Necessary Treatment to SMI Detainees**

Courts have identified certain minimally necessary components for a correctional facility's mental health program, including the provision of mental health services and treatment planning that involves more than segregation and close supervision of the mentally ill. *See, e.g.*, *Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980) *aff'd in part and rev'd in part on other grounds*, 679 F.2d 1115 (5th Cir. 1982); *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 n.10 (E.D. Cal. 1995); (*see also* **Ex. 6**, Johnson Report at 2–3 (setting forth essential elements).) In this case, Dr. Nicole Johnson, Plaintiff's forensic psychiatrist, who has served as an investigator for the Department of Justice and a consultant examining some of the largest jails in the nation, found significant deviations from the standards generally recognized and accepted in correctional facilities, including minimal to no behavioral health treatment, no therapeutic programming, and little to no differentiation in delivery of care or treatment planning. (*Id.* at 4–9.) Defendant's failure to address SMI Detainees' mental health needs is objectively unreasonable on a systemic level.

i.  Inadequate Treatment

Importantly, correctional facilities must provide not only psychotropic medication but also appropriate psychotherapy or counseling to detainees who need it to treat their serious mental health needs. *See Braggs v. Dunn*, 257 F. Supp. 3d at 1190 n.11 (crediting expert testimony that "treatment of serious mental illnesses requires, *at a minimum*, multidisciplinary efforts to coordinate and implement interventions, including psychotherapy or counseling, psychotropic medications, and monitoring for signs of decompensation or progress."). "Minimal and triage-based services" are not sufficient. *Braggs v. Dunn*, 257 F. Supp. 3d at 1197; *see also Jensen v. Shinn*, 609 F. Supp. 3d 789, 853 (D. Ariz. 2022) (discussing inadequacy of "drive-by mental health encounters"). This means Defendant must make available a range of mental health services to provide when and if such services are needed by SMI Detainees.

6

Defendant does not provide constitutionally required care to SMI Detainees. This is made clear by detainee medical records, as well as testimony of ACH staff. Site Manager Saxon-Ward was unequivocal in describing what she directs her clinicians to do, stating that "I don't expect my clinicians to sit down and have a one to one with the patients." (Saxon-Ward Dep. at 240:9–11.) She further testified that they do "crisis management," not individual therapy, because "[t]here's no privacy, there's no safe zone or safe place for that to happen." (*Id.* at 91:15–17, 240:21–241:1.) In sharp contrast to the non-therapeutic services at ASGDC, Ms. Saxon-Ward discussed her extensive experience with individual counseling programs at the South Carolina Department of Mental Health, which incorporated a broad range of therapeutic models based on individual patient needs. (*Id.* at 13:11–15:25.) In explaining the distinction between crisis management provided at ASGDC and individual therapy, Ms. Saxon-Ward observed that "[i]ndividual counseling, it gives you privacy; it gives you a safe environment so you can express your feelings and thoughts without being judged or, you know, your privacy being violated. It's more intimate, you know, individual counseling." (*Id.* at 17:8–13.) The testimony of ACH clinician Judy Lassiter confirmed her experience with the limited treatment provided at ASGDC. (**Ex. 7**, Lassiter Dep. at 114:5–8.) ("Q. …And as you've said before, those sessions did not involve individual therapy, is that right? A. Correct.").)

Former ACH clinician Patti Green further corroborated Ms. Saxon-Ward's testimony that the available scope of mental services expressly excluded traditional therapeutic treatment modalities. Ms. Green was hired by ACH in July 2022 as discharge planner responsible for community coordination and referrals. (**Ex. 8,** Green Dep. at 12:13–25.) Ms. Green testified that she learned during her first day on the job that she was also expected to provide clinical mental health services to SMI Detainees. (*Id.* at 14:5–8.) Even though Ms. Green had no education,

experience, or training to perform psychotherapy (*id.* at 26:19–20, 27:5–8), it was immaterial to the services she provided to SMI Detainees because her supervisor, Ms. Saxon-Ward, told her ACH mental health staff do not provide therapy at ASGDC (*id.* at 27:11).

In limiting services to crisis management, Defendant withholds other vital and well recognized forms of treatment from SMI Detainees. For example, in her deposition, Ms. Saxon-Ward described that individual counseling could incorporate different kinds of therapeutic models depending on patient need, including, for example, cognitive behavioral therapy, trauma therapy, and life skills coaching. (**Ex. 3**, Saxon-Ward Dep. at 15:3–25.) An integrated system of mental health care "using a variety of mental health therapies, including biological, psychological, and social therapies" is imperative to the provision of necessary care in a correctional setting. (Johnson Report at 3.) Appropriate care mandates a "continuum of behavioral health programming," including group therapy, individual counseling, substance abuse treatment and medication. (*Id.*) ASGDC systematically fails to provide necessary treatment to SMI Detainees.

Because ASGDC does not do formal treatment plans for SMI Detainees, there cannot be individualized treatment. (Johnson Report at 6 ("Without individualization, everyone is treated the same and that is NOT treatment.").) Treatment planning is necessary for the provision of minimally adequate care because mental health treatment cannot begin unless providers are aware of who needs treatment and for what. *Braggs v. Dunn*, 257 F. Supp. 3d at 1201, 1206. As explained by SME Dr. Johnson, instead of being provided individualized treatment, SMI Detainees are provided the same services regardless of diagnosis and acuity. (Johnson Report at 5, 17.) In fact, as Dr. Johnson observed, it appears that the worse someone is in terms of the acuity of their mental illness, the less engagement is performed by the mental health clinicians. (*Id.* at 7.) Defendant also

systemically fails SMI Detainees by not determining what treatment is medically necessary through the development of treatment plans

ii. <u>Inadequate Out-of-Cell Time</u>

Defendant's practice of placing SMI Detainees in housing where they are locked in cells or pods for more 23 or more hours a day ("Restricted Housing") without providing adequate time out of their cells amounts to categorically prohibited punishment. Detainees with serious mental illness do not receive minimally adequate care when they spend "months in administrative segregation" with "harsh and isolated conditions" and "limited mental health services." *Brown v. Plata*, 563 U.S. at 503–04. Regardless of where SMI Detainees are housed or why, they must be provided adequate opportunity for out-of-cell time weekly. *See, e.g.*, *Georgia Advocacy Office v. Jackson*, No. 1:19-CV-1634-WMR-JFK, 2019 U.S. Dist. LEXIS 238805, *49–50 (N.D. Ga. Sept. 23, 2019); *Shorter v. Baca*, 895 F.3d 1176, 1185–86 (9th Cir. 2018).

As SME Dr. Johnson explains, "[b]oth unstructured and structured therapeutic interventions are necessary medical treatments for this population to help decrease the risk that behaviors related to their mental illness will put them at risk of violating the rules of the facility resulting in ongoing restrictions." (Johnson Report at 12.) Structured programming consists of planned therapeutic out-of-cell activities, which can include group therapy, individual skills sessions, and certain recreational activities. (*Id.* at 11–12.) ASGDC currently provides no structured out-of-cell programming because it does not provide any social or psychosocial groups or individual treatment sessions. Unstructured programming can include time for shower, phone call to supports, visits with family and supports from the community, watching television or socializing with peers. (*Id.* at 11.) SMI Detainees are currently receiving approximately one hour

a day of unstructured time out-of-cell which is inadequate to assist with recovery.[3] (*Id.*) ASGDC must provide more than one hour a day of out of cell time to SMI Detainees, including both structured and unstructured activities.

### iii.   Inadequate Suicide Watch Practices

ASGDC's supervision of detainees at risk for suicide is facially deficient. Dr. Johnson's review of ASGDC's own suicide watch logs showed that there were hours unaccounted for and watches were done in exact intervals or done in longer intervals than required—in dereliction of ASGDC policy and accepted standards of care. (Johnson Report at 10 (detailing specific examples).) Further, SMI Detainees on suicide watch are not consulted with in a private, confidential therapeutic setting, which renders any assessment of those individuals questionable at best. (*Id.* at 9.) The substantial deviation here constitutes a systemic practice of constitutional violation. As discussed below, such deviations from the standard of care illustrate the deliberate indifference that creates a substantial, and at times fatal, risk of harm to SMI Detainees.

### ii.   **Defendant's Long-Standing Knowledge of Significant, Obvious Risk**

As early as 2011, Richland County Council acknowledged the need for a dedicated mental health unit and services by appropriating millions of dollars for a facility expansion for this purpose. (*See* **Ex. 5**, Myers Briefing at 1; **Ex. 13**, Feb. 18, 2020 Meeting Minutes at 1.) In 2013, Defendant commissioned a management operations study by Pulitzer/Bogard Associates, LLC which found that ASGDC did not have "sufficient and appropriate beds" to accommodate detainees with serious mental illness, advising that its efforts to "make do" through patch work measures were having "deleterious effects" on vulnerable detainee populations.[4] (**Ex. 14**, 2014

---

[3](*See, e.g.*, **Ex. 9**, CR2 Decl. at 2; **Ex. 10**, CR12 Decl. at 1; **Ex. 11**, CR18 Decl. at 2; **Ex. 12**, CR19 Decl. at 4.)

[4] Notably, this study followed a 2008 assessment commissioned encompassing multiple dimensions, with particular emphasis on critical staffing shortages. (*See* Ray Report at 16.)

Management Study at 97.) In 2016, not prepared to act based on the findings of the earlier study, Defendant commissioned yet another assessment, this time by Carter Gable Associates, LLC. (**Ex. 15**, 2016 Needs Assessment.) The 2016 Needs Assessment found, as had the 2014 Management Study, that Defendant was failing to meet the needs of detainees with mental illness in part because of inappropriate housing. (*Id.* at 1-17.)

In 2020, more than three years later, Defendant still had taken no steps to mitigate the daily harm to which its vulnerable population are exposed. In a February 20, 2020 meeting of Defendant's Detention Center Ad Hoc Committee, then-ASGDC Director Ronaldo Myers submitted a briefing paper in which he made the case for the construction of a dedicated unit for the large population of SMI Detainees at ASGDC. (Feb. 18, 2020 Meeting Minutes at 2 (stating they were "attempting to build something more therapeutic[,]" where they could do group and individual therapy.).)

Even though Defendant was clearly on notice that it was systematically exposing SMI Detainees to harm, another two years passed before Defendant took any action whatsoever. Defendant's knowledge of the harm presented by not reasonably responding to SMI Detainees' need for mental health care is longstanding and well-documented.

### iii.    Defendant's Objectively Unreasonable Response to Substantial Risk of Harm

Importantly, Defendant cannot escape liability simply by attempting to show that they eventually took some form of "corrective action" in response to a risk of harm. *Lewis v. Cain*, No. 15-318-SDD-RLB, 2021 U.S. Dist. LEXIS 63293, *125 (M.D. La. Nov. 6, 2023) (citing *Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998)). "Efforts to correct systemic deficiencies that 'simply do not go far enough,' when weighed against the risk of harm, also constitute deliberate indifference," because such insufficient efforts are not "reasonable measures to abate" the known risk of harm. *Id.* at *125–26 (citing *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002)).

Prior to the filing of this lawsuit, Defendant had not taken <u>any</u> reasonable steps to mitigate the substantial risk of harm to SMI Detainees in its custody, as evidenced by the numerous warnings discussed above. Since this suit was filed, and to their credit, ASGDC and county officials have presented ideas and plans for addressing the woefully inadequate treatment of mentally ill detainees. However, the longstanding nature of these deficiencies, the substantial notice to Defendant, and the ongoing and current harm make clear that such ideas, without meaningful progress, are surface level attempts to evade liability for ongoing constitutional harm.

On November 17, 2022, then-Interim Director Crayman Harvey announced the "historic closing" of the special housing unit. (**Ex. 16**, Crayman Harvey Email.) The occasion for self-congratulations was, however, misguided and illusory. As Defendant's own advisors have explained for more than a decade, the principal purpose in designating a discrete mental health unit is to create a "therapeutic environment" for SMI detainees, not to merely segregate them from the general population. (*See, e.g.*, **Ex. 5**, Agenda Briefing at 3, Attachment 5 at 1-17.) This is also the constitutional standard. *Wyatt v. Aderholt*, 503 F.2d 1305, 1309 n.4 (5th Cir. 1974) (without out-of-cell time and effective treatment, housing severely mentally ill prisoners in a mental-health unit is tantamount to "warehousing" the mentally ill).

Although ASGDC purports to have created specialized mental health units, it does not provide mental health programming *even in the so-called mental health unit*. (*See* Johnson Report at 8 ("no groups conducted to help them learn about their medications, appropriate social skills, adequate hygiene care, emotional control like anger management, current events, etc.").) Merely creating new units to deposit mentally ill detainees to languish is not a reasonable response to systemic deficiencies in the provision of mental health services. The complete lack of therapeutic programming and treatment planning equates to unconstitutional warehousing of the mentally ill.

Defendant has not made any material changes to the mental health services it provides and SMI Detainees, particularly those in Restricted Housing for prolonged periods are at substantial risk of decompensating while detained at ASGDC without access to necessary mental health services.

### iv.    Ongoing, Substantial Risk of Harm to SMI Detainees

Inadequacies in mental health policies and practices, "alone and in combination, subject mentally ill prisoners to actual harm and a substantial risk of serious harm." *Braggs v. Dunn*, 257 F. Supp. 3d at 1193; *see also United States v. Hinds Cnty.*, No. 3:16-CV-489-CWR-RHWR, 2022 U.S. Dist. LEXIS 135504, at *9 (S.D. Miss. July 29, 2022) SMI Detainees suffer further harm and the continued substantial risk of harm caused by Defendant's practice of allowing them to languish in isolation without proper mental health care as evidenced by preventable deaths by suicide, exhibition of deteriorating behaviors, and symptoms of psychosis. For example, Dr. Johnson met with a detainee who presented as "actively psychotic and responding to internal stimuli, disorganized in her thought process and presentation, delusional, and combative." (Johnson Report at 7; *see also id.* ("Having active symptoms of a mental illness has been described as painful and miserable by individuals who have experienced symptoms[.]").) Despite these symptoms, Dr. Johnson's review of the medical records of this detainee and others showed almost identical treatment to detainees without such acute symptoms. (*Id.* at 8.)

Staff inattention and absence can and does have a fatal effect on incarcerated men and women in crisis. On March 2, 2024, the body of a grieving 20-year old woman was found in her cell hours after she pleaded with officers not to be put alone on lockup. (*See* **Ex. 17**, CR16 Decl. No. 1 at 2.) This young woman's death is a text-book case of foreseeable missed opportunities to save her life. At the time of her death, Jamila[5] had been incarcerated for three tempestuous days.

---

[5] Jamila is a pseudonym used to protect the privacy of this detainee and her family.

After her bond was denied, she was observed to be "very upset," crying and screaming because she could not attend her boyfriend's funeral. (*Id.* at 1; **Ex. 18**, CR17 Decl. at 2.) No officer was present in the unit to observe Jamila's outburst. Hours later, Jamila became involved in an altercation with a detainee who spit on her. Officers moved her to the female lock-down unit without consulting mental health professionals. Had they done so, they would have learned that Jamila had been placed on "observation" for nearly 10 hours at Intake, a status normally assigned to individuals at suicide risk. (**Ex. 19**, Mental Health Records at 7–9.) They also would have seen that during confinements at ASGDC in the preceding 18 months, Jamila had been assigned an MH-2 code, meaning "serious mental illness" on 3 occasions, and an MH-1 code, mild mental illness, at 2 other times. (*Id.* at 3–9.) Moreover, they would have learned that Jamila had been placed on suicide watch approximately 8 months earlier. (*Id.* at 7–8.) Despite these readily available warning signs, Jamila was moved to Juliet and, at 10:34 p.m., a nurse discovered her body hanging from a sheet wrapped around her neck and tied through broken light fixture in the ceiling. (**Ex. 20**, Incident Report.)

As evidenced generally and specifically herein, the substantial risk of harm caused to SMI Detainees from Defendant's longstanding deficiencies in mental health services is obvious and known to Defendant, who has failed to reasonably respond to the risk, leaving SMI Detainees to deteriorate and die in its custody. Plaintiff can clearly show a high likelihood of success on the merits of this claim.

## 2. Inhumane Living Conditions at ASGDC Deprive SMI Detainees of Minimal Civilized Measures of Life's Necessities

The Constitution does not permit inhumane living conditions for incarcerated men and women. *Farmer v. Brennan*, 511 U.S. at 832. Correctional officials must furnish prisoners with "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 349

14

(1981). Such necessities include access to working toilets, drinking water, lights, sanitary products, and safe and sanitary living quarters. *Manon v. Hall*, No. 3:14-CV-1510, 2015 U.S. Dist. LEXIS 163812, at \*15 (D. Conn. Dec. 7, 2015) (citing *LaReau v. MacDougall*, 473 F.2d 974, 977–79 (2d Cir. 1972)) ("It cannot seriously be disputed that access to a functioning toilet constitutes a basic human need."); *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (quotations omitted) ("Adequate lighting is one of the fundamental attributes of 'adequate shelter' required by the Eighth Amendment.").

### i.  Defendant Houses SMI Detainees in Cells Without Access to Basic Necessities

Defendant deprives SMI Detainees of life necessities including ready access to drinking water, personal hygiene, toilets, sinks, and showers, privacy for bodily functions, light, and recreation as well as protection from fire, electrical shock, vermin, mold, and human waste. Such conditions serve no legitimate correctional purpose and are "so far beyond the pale of civilized standards that they would be unjustified even if they did serve some such purpose." *Palmigiano v. Garrahy*, 443 F. Supp. 956, 980 (D.R.I. 1977). Multiple independent examinations of the facility, as well as reports from staff and detainees, provide first-hand accounts of the unsanitary and unsafe conditions that place confined men and women in an environment that is uncivilized, degrading, and dangerous.

Having served for 10 years as Deputy Commissioner for the Mississippi Department of Corrections and—for over 30 years—as a consultant investigating and monitoring correctional institutions nationwide, Emmett Sparkman knows the complex and intricate systems necessary to protect incarcerated persons, security staff, and the public. (**Ex. 21**, Sparkman Report at 3–4.) At the Expert Site Inspection in January 2024, Mr. Sparkman observed serious sanitation and maintenance deficiencies in cells where detainees were left to languish without access to drinking

water, and staff were absent for hours, at times for entire shifts. (*Id.* at 16.) With regard to ASGDC's physical plant and environmental health, Mr. Sparkman found that the housing conditions "observed during the on-site inspections are deplorable with housing units that fail to meet basic living standards." (*Id.* at 6.) Mr. Sparkman concluded that "[a]llowing these conditions in any living and working environment is unacceptable and unconscionable." (*Id.* at 16.)

Defendant's records also document years of a practice of housing detainees in units that are unfit for human habitation. Housing detainees, and SMI Detainees specifically, in single cells without working toilets or open cells with an insufficient ratio of working toilets to detainees is a clear deprivation of a basic human need. The testimony of detainees is even more telling. Locked in cells for hours on end with no officer present in their units, detainees have endured frequent and prolonged periods when they were not released to relieve themselves. (*See, e.g.*, **Ex. 9**, CR2 Decl. at 2 ("Some days they don't let us out at all.").) Under such dire circumstances, these men and women have been forced to humiliate themselves by urinating in their sinks and defecating in the cardboard containers in which their meals are served. (*See, e.g.*, *id.* at 3 ("I have had to poop in a tray because the officer on duty wouldn't let me out to use the restroom."); (**Ex. 10**, CR12 Decl. at 3 (reporting having in defecate into a Styrofoam container and urinate into a sink").) Forcing SMI Detainees to defecate into cardboard and urinate into sinks is inexcusable.

The same is true for clean and consistent drinking water. As stated by Plaintiffs' SME Sparkman, "[m]any cells do not have a service port which prevents other inmates out of their cells from delivering water and food to these inmates. The inmates are literally at the mercy of a staff member making an appearance in the housing unit to obtain water to survive." (Sparkman Report at 16.) Detainee declarations also detail extensive drinking water insecurity. (*See, e.g.*, **Ex. 18**, CR17 Decl. at 1 ("I haven't had enough water to drink since I arrived at the ASGDC [on December

31, 2023.]"); **Ex. 11,** CR18 Decl. at 2–7 (recording repeated instances of water insecurity); **Ex. 22**, CR16 Decl. No. 2 at 3–7 (describing numerous times where she reported felt dizzy, lightheaded, and saw spots the resulting impact on her blood pressure).)

The lack of lighting in units across ASGDC is also constitutionally deficient. The South Carolina Department of Corrections (SCDC) November 2023 Security Audit Report found ASGDC to be noncompliant with lighting requirements throughout the facility and in detainee cells.[6] (*See* **Ex. 23**, SCDC 2023 Security Audit Report Summary at 4.) This was confirmed during the January 2024 Expert Inspection, for example, when only 2 of the 56 cells in X-Ray had working light fixtures. (Sparkman Report at 25.) This is a Restricted Housing unit, meaning the female detainees in this unit, including those in administrative segregation because of their mental health diagnosis, are locked in cells for over 23 hours a day without access to light.

In addition to the failure to provide SMI Detainees with adequate access to usable toilets, drinking water, and lights, SMI Detainees live in units plagued with mold and infestations, standing water, and human waste. Based on his inspection, Dr. Ray found that: "The overall environment is poorly maintained, leading to unsanitary and unsafe conditions that expose SMI and non-SMI inmates and staff to pervasive risks of harm." (Ray Report at 57.)

The conditions detailed above are ongoing across the physical facility, as illustrated by the male detainee declarations attached as exhibits to this motion. (*See* **Ex. 9** CR2 Decl. at **2** (Hotel) (no running water, no working toilet, no lights, bare wires hanging from the ceiling); **Ex. 12**, CR19 Decl. at 2 (Golf) (flooding, lack of toilets, sinks, lights, flooding); *id.* (Papa) (only one working toilet, standing feces, forced to use trays as toilets).) Female detainees provide similar descriptions

---

[6] SCDC has statutory oversight of South Carolina's jails through annual inspections designed to ensure compliance with minimum standards. S.C. Code Ann. §§ 24-9-10, *et seq.*

of the horrible conditions. (**Ex. 24**, CR1 Decl. at 2 (rooms full of mold, feces, broken sinks and toilets); **Ex. 11**, CR18 Decl. at 2 ("They kept me in cell for 6 days, no running water in sink and toilet did not flush."); **Ex. 18**, CR17 Decl. at 1 ("feces was all in the toilet[,]" "toilet leaked, so every day my cell was flooded in a pool of water."); **Ex. 11**, CR18 Decl. at 3–8 (flooding and inoperable toilets in X-Ray and Juliet); **Ex. 22**, CR16 Decl. No. 2 at 10 (mold and mildew in Delta); **Ex. 25**, CR20 Decl. at 1 (same).) Disturbingly, female detainees are not provided with necessary feminine hygiene products. (*See, e.g.*, **Ex. 18**, CR17 Decl. at 1; **Ex. 26**, CR21 Decl. at 2.) These conditions are subhuman and constitutionally deficient.

### ii. Defendant's Long-Standing Awareness of Substantial Risk is Well-Documented

"A prison official's subjective actual knowledge can be proven through circumstantial evidence," *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015), which may be inferred "from the fact that the risk of harm is obvious," *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), such that no official "could not have failed to know of it." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). Defendants therefore cannot "simply bury their heads in the sand and thereby skirt liability," *Makdessi*, 789 F.3d at 133, by "hid[ing] behind an excuse that [they were] unaware of a risk." *Brice*, 58 F.3d at 105. Defendant's evidence provides indisputable proof that Defendant has longstanding, pervasive, well-documented, and expressly noted knowledge of the substantial risk to detainees living in these subhuman conditions.

In 2021, a document memorializing a "town hall" meeting with Richland County Administrator Leonardo Brown and ASGDC employees identified horrible work conditions, filthy facilities, rooms in one housing unit with what "look[ed] like feces growing out of toilet", mice running through units, mold and puddles of water, delays in fixing broken light fixtures, and staff flushing toilets manually with buckets of water. (**Ex. 27**, Town Hall Meeting Notes at 1.)

In August 2022, recently appointed ASGDC Director Tyrell Cato reported progress on the considerable infrastructure problems he had inherited. (**Ex. 28**, 2022 Cato Status Report.)

On January 23, 2023, in correspondence to Richland County Council Chairperson Overture Walker regarding its October 24, 2022, site inspection, SCDC Division Director of Compliance, Standards, and Inspections Blake Taylor stated: "It shall come as no surprise to you that the conditions at your Detention Center are in need of immediate attention and improvement." (**Ex. 29**, Letter from Blake Taylor to Overture Walker, Jan. 23, 2023.) The "Narrative Report" identified 17 violations of the *Minimum Standards for Local Detention Facilities in South Carolina*. (**Ex. 30**, SCDC 2022 Inspection Report.) In contrast, in its inspections over the prior three years, ASGDC had been charged with no more than six violations of the *Minimum Standards*. (*See* **Exs. 31-33**, SCDC Inspection Reports for 2019, 2020, and 2021.) As such, the conditions at ASGDC are growing more dire, not less.

On July 26 and 27, 2023, SCDC returned to ASGDC to conduct a security and technical assistance audit, in which the security audit team identified numerous maintenance issues related to plumbing, electrical, and structural concerns. (**Ex. 23**, SCDC 2023 Security Audit Summary at 4–5.) The Report described "deplorable" conditions creating "a disgusting environment for individuals to live[,]" and commented that many of the issues identified were considered "Corrections Basic 101" that "should be obvious to the eyes of security personnel at all levels of experience." (*Id.* at 5.) The Report went on to "encourage the ASG administration to conduct a self-examination of their commitment to the operation of the facility, their employees, and the inmates for which they are responsible." (*Id.* at 6.)

In January 2024, over 18 months after the filing of this action and years after concerns about the physical plant were brought to Defendant's attention, a jail survey documented that more

than 100 toilets—approximately one-third of detainee toilets—in the facility's housing units were inoperable. (**Ex. 34**, Jan. 2024 Toilet Survey Emails.)  Defendant's historic and current knowledge of the harm and substantial risk of harm cannot be genuinely denied.

### iii. Defendant's Objectively Unreasonable Response Fails to Address Long-Standing Issues

The inhumane and unsafe living conditions discussed herein have existed for years and persist despite Defendant's knowledge and purported efforts to correct the deficiencies. Most recently, SCDC's November 2023 inspection revealed some progress towards improving the facility. However, SCDC still found 19 violations of the *Minimum Standards*. (**Ex. 35**, SCDC 2023 Inspection Report at 1.) The 19 violations were greater than the 17 found the prior year and included many of the same areas of non-compliance identified in the October 2022 Inspection (**Ex. 30**) and in the July 2023 Security Audit (**Ex. 23**), including issues related to light fixtures, toilets, and sinks. Again, Defendant continues its practice of housing SMI Detainees in cells that are non-compliant with the *Minimum Standards* and incompatible with human decency. Closing units for repair while ignoring the daily reality of people living in uninhabitable conditions is not a reasonable response. While Defendant may assert good intentions and steps taken towards future remedies, it is still liable for acts and omission within its control—here, not placing detainees in constitutionally unacceptable conditions.

### iv. Defendant's Deliberate Indifferent Subjects SMI Detainees to Ongoing, Substantial Risk of Serious Harm

SMI Detainees housed in cells and dorms without access to drinking water, adequate toilets, and lighting are deprived of life's basic necessities in blatant violation of their constitutional rights. These conditions are inconsistent with the evolving standards of decency that mark the progress of a maturing society and contribute to their poor mental health overall. As Plaintiff's Expert Dr.

Johnson states in her report: "There is an overall lack of dignity and respect for individuals living in these conditions." (Johnson Report at 14.)

Plaintiff's Expert Dr. Ken Ray, a nationally recognized correctional and law enforcement professional who has completed over 50 evaluations of correctional operations in the United States and abroad, found that ASGDC "stands out as particularly hazardous and inappropriate for the management and protections of inmates with Serious Mental Illness" based on his identification of "persistent, severe issues of critical shortages of adequate staffing, consistent lack of necessary mental health services for SMI inmates, and a history of poorly maintained and unsafe living conditions." (Ray Report at 76.) Dr. Ray concluded that "[i]ssues such as overcrowding, poor lighting, and exposure to hazardous materials are pervasive, falling short of accepted standards and posing severe health and safety risks to both SMI inmates and staff." (*Id.* at 75.)

Dr. Johnson observed that the conditions of confinement are significant to treatment of mentally ill detainees in that "[t]he deterioration of the environment in which an individual is confined can contribute to deterioration of mental health resulting in harm to the detainee and undermines the therapeutic milieu necessary to adequately treat the mentally ill." (Johnson Report at 12.) As a specific example of the compounding effects of substandard conditions of confinement, Dr. Johnson states that "lack of adequate drinking water for someone taking psychotropic medications is inhumane," explaining that such medications are "known to cause the sensation of dryness in many patients" and that "thirst, nasal passages and dry eyes are all symptoms of dehydration which can be attributed to many psychotropic medications." (*Id.* at 13.) Dr. Johnson characterizes as "dangerous" the jail's failure to supply sufficient supplies for water needed by detainees who are taking medications. (*Id.*)

Dr. Johnson also reports that psychotropic medications can cause difficulty with urination, constipation, and nausea. (Johnson Report at 13.) She explains that these conditions are embarrassing and not having consistent access to a private or semi-private working toilet can contribute to medication noncompliance resulting in further deterioration of mental illness. (*Id.* at 13.) Dr. Johnson also observed that the lack of sanitary napkins and tampons reported in detainee declarations was disturbing, stating that "[i]t is demoralizing to walk around in bloody clothes," and that feminine hygiene supplies should be readily accessible as needed. (*Id.* at 13.) Ultimately, Dr. Johnson found that the cumulative effect of "these unsanitary conditions make it difficult to ensure a therapeutic environment where treatment can be provided." (*Id.* at 14.)

The harm caused by Defendant's deprivation of basic humane living conditions is multifaceted. Initially, such deprivation violates detainees' constitutional right to be free from punishment. Compounding this initial harm, SMI Detainees exposed to such living conditions have a high risk of exacerbated symptomology and deterioration. (Johnson Report at 13.) Finally, because ASGDC exposes many SMI Detainees to these substandard conditions in restrictive housing, based on their diagnosis and for other reasons, they are subjected to these subhuman conditions for over 23 hours per day.

In sum, the totality of circumstances at ASGDC deprive SMI Detainees of the minimal measure of life's necessities. These detainees live in subhuman conditions that are patently inconsistent with modern standards of decency and result in punishment in violation of the Fourteenth Amendment. Further, Defendant's records establish its longstanding knowledge of such issues and the resulting harm, its unreasonably deficient response over several years, and further harm caused to SMI Detainees. Accordingly, Plaintiff can foreshadow a high likelihood of success on the merits of this claim.

**3. Defendant's Failure to Protect SMI Detainees from Pervasive and Substantial Risk of Bodily Harm Constitutes Deliberate Indifference.**

**i. The Conditions at ASGDC Pose an Ongoing, Substantial Risk of Serious Harm**

ASGDC conditions are unsafe by any objective measure. Under the Constitution, officials must take precautions to protect prisoners from violence, and are "not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833. This means officials must have systems in place to ensure objectively reasonable levels of safety and supervision. *Tillery v. Owens*, 719 F. Supp. 1256, 1275 (W.D. Pa. 1989). In assessing whether a risk exists, "it does not matter whether the risk comes from a single source or other multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. To that end, jail officials must supervise prisoners by providing adequate numbers of qualified security staff and may not leave prisoner safety to the prisoners themselves. *See Hinds Cnty.*, No. 3:16-CV-489-CWR-RHWR, 2022 U.S. Dist. LEXIS 69057, at *53 (S.D. Miss. April 13, 2022) ("Sufficient staffing is essential for safeguarding detainees' constitutional right to protection from harm."); *see also United States v. Hinds Cnty.*, 2022 U.S. Dist. LEXIS 135504, at *11 (discussing widespread impact of understaffing).

For over a decade, Defendant has consistently demonstrated a pattern and practice of failing to maintain adequate staffing levels and to implement minimally adequate staffing practices at ASGDC. This persistent practice has directly compromised the ability to provide detainees with objectively reasonable and consistent monitoring, supervision, and care necessary to protect them from harm. (*See* Ray Report at 15–36.) The staffing deficiencies at ASGDC impact every facet of its operation. The system-wide impact of understaffing cannot be overstated. At ASGDC, lack of staffing causes situations where detention center staff fail to make housing unit security rounds for extended periods, officers are tasked with covering multiple units, inability to respond quickly to

medical and safety emergencies, inability to conduct searches and take other measures to control weapons and other contraband. (Sparkman Report at 58–60.) Overall, issues stemming from understaffing combine with other inadequate safety measures to create an environment permeated by violence and fear.

Expert review and analysis of more than 400 ASGDC shift rosters from 2020 to 2023 reveals a consistent pattern and persistent practice of Defendant's failure to adhere to minimum staffing guidelines. (Ray Report at 52–54.) Dr. Ray's analysis discloses 3,778 instances (42.3% of the shifts) during this period where staffing levels fell below the standard threshold of one officer on each unit. (*Id.* at 53.) The data further reveals that on 1,527 occasions housing units were not staffed at all, which accounts for 17.2% of the total shifts during the period. (*Id.*)

ASGDC's chronic shortage of security officers has caused the collapse of its direct supervision security model. The Constitution does not mandate direct supervision, but where, as here, "an institution is designed to operate as a direct supervision facility, direct supervision is the minimum constitutional requirement." *Hinds Cnty.*, No. 2022 U.S. Dist. LEXIS 69057, at *57. "Direct supervision" is a term of art used by corrections professionals and refers to a model for safely operating and supervising a correctional facility. *Hinds Cnty.*, 2022 U.S. Dist. LEXIS 69057, *54. The direct supervision method for supervising a correctional facility requires placing detention officers inside housing units, where such officers have continuous direct contact with prisoners and are not routinely separated from prisoners by physical barriers. *Id.* at *55 (crediting expert testimony that "direct supervision," as opposed to camera surveillance, "is the only practical way to run a jail.").

ASGDC housing units are designed for direct supervision of pretrial detainees by detention officers, meaning detention officers must be present 24-hours a day, 7 days a week. (*See generally*

**Ex. 36** Post Orders.) Without them, the units become rudderless and dysfunctional. ASGDC policy also requires detention officers to conduct safety patrols or rounds by patrolling their assigned units every 30 minutes. (*See* Ray Report at 54.) ASGDC records, however, reveal that officers throughout the facility seldom perform the watch tours as expected. For the period in January 2024 examined by Dr. Ray, Defendant's own policy required detention officers to conduct approximately 1,176 rounds in each housing unit; however, fewer than 17% of the required rounds were conducted. (*Id.* at 55.) Of the rounds that were clocked, less than half (approximately 44.1%) of them met the 30-minute policy requirement. (*Id.* at 54–57.)

By operating unsupervised housing units, Defendant is forcing detainees to provide for their own safely and security as best as they can. Roving officers cannot detect or address violence or threats of violence that happen in their absence. Victims cannot report threats and assaults without considerable risk of further violence by perpetrators. Detainee victims understand that the detention officer will soon be gone again, the unit will be unguarded, and that they will once again be at the mercy of predators. (*See, e.g.*, **Ex. 37**, CR5 Decl. at 2; **Ex. 10**, CR12 Decl. at 2–3.)

As Defendant's security staff declined over the last three years to dangerously low levels, ASGDC records document a substantial increase in reported incidents of inmate-on-inmate violence, including assaults, stabbings, fights, and armed robberies. Dr. Ray's review found that the average number of Serious Incidents per month more than doubled from 17.5 in 2021 to 45.9 in 2023, an increase of 162.2%. (Ray Report at 40.) An examination of reported incidents of contraband reflects a similar growth pattern. The monthly average of contraband incidents increased from 10 in 2022 to 36 through July 2023. (*Id.* at 47.)

Plaintiff's subject matter experts have concluded that ASGDC is in crisis. Supervisors find their day filled with plugging staffing holes, helping the detention officers, and dealing with daily

crises. The critical staffing shortage set against the backdrop of increasing 911 call volumes indicates that each staff member faces significantly higher workloads, especially in handling critical situations. (*See, e.g.*, Ray Report at 73.)

### ii. Defendant has Long-Standing Knowledge of the Threat to SMI Detainees

ASGDC lacks basic systems for ensuring detainee safety. These deficiencies are long-standing, and Defendant's awareness cannot genuinely be denied. In fact, these severe and chronic staffing problems have been thoroughly documented for over a decade. In studies Defendant commissioned in 2008 and again in 2014, Defendant's own consultants emphasized the urgent need to address extant, persistent, and pervasive staffing and operational deficiencies required to improve the care, custody, and management of inmates. In 2019, Richland County Interim Administrator Edward Gomeau presented a recruiting and retention project in response to what he called a "dangerous and importunate situation which demands prompt significant action to mitigate." (**Ex. 38**, ASGDC Recruiting & Retention Project at 2.) In July 2021, County Administrator Leonardo Brown conducted jail listening sessions during which staff identified numerous threats to safety, including staffing shortages. (*See* **Ex. 27**, 2021 Town Hall Meeting.)

In a February 2022 memorandum to the County Administrator, ASGDC Interim Director Shane Kitchen categorized the jail's shortage of detention office as a "crisis" that warranted a call to the National Guard to provide emergency staffing. (**Ex. 39**, Kitchen Memo.) On March 24, 2022, South Carolina's chief jail inspector at SCDC, Blake Taylor, stated in correspondence to Administrator Brown that "the low level of security staffing has created what must be labelled as a control and safety emergency." (**Ex. 40**, Blake Taylor March 24, 2022 Letter at 1.) Since that letter, ASGDC's ratio of security staff to detainees has only declined. (*See generally* Ray Report.) In April 2022, ASGDC's medical provider, Wellpath, chose not to renew its contract after its clearly communicated safety concerns were not addressed. (**Ex. 41**, Wellpath Communications.)

26

In June 2022, ASGDC's current healthcare provider, ACH, communicated to Defendant that ASGDC had a "degrading emergency staffing issue" that must be addressed immediately. (**Ex. 42**, ACH Email (detailing consequences of staffing deficiencies).) Yet, the emergency persists.

### iii. Defendant's Response to Pervasive Issues is Objectively Unreasonable

Measures that are not reasonably calculated to provide safety from violence do not establish a reasonable response to the risk. *Riley v. Oik-Long*, 282 F.3d 592, 597 (8th Cir. 2002). If protective measures prove inadequate, failure to take additional measures may be evidence of deliberate indifference. *See Jensen v. Clarks*, 94 F.3d 1191, 1200 (8th Cir. 1996). "For over a decade, Richland County and ASGDC have consistently demonstrated a pattern and practice of failing to maintain adequate staffing levels and to implement minimally adequate staffing practices at ASGDC." (Ray Report at 15); *see Wilson v. S.C. Dep't of Corr.*, No. 0:19-2107-JFA-MGB, 2019 U.S. Dist. LEXIS 230568, at *67 (Nov. 25, 2019) (crediting expert's findings on impacts of severe understaffing).

SCDC's most recent inspection report shows Defendant's lack of progress in correcting enduring staffing deficiencies. (**Ex. 35**, SCDC 2023 Inspection Report.) Further evidencing the insufficient response, the South Carolina Association of Counties' staffing analysis conducted on October 26, 2023, found that ASGDC needs 294 certified detention officers. (**Ex. 43**, SCAC Staffing Analysis at 11.)[7] However, in the last 8 years, the actual number of certified security officers has ranged from 168 to the 88 noted in SCDC's November 30, 2023 Inspection Report. Given the nature and extent of the crisis and its duration, it is simply not possible to credit arguments that Defendant entertains a good faith belief that its efforts have been sufficient.

---

[7] Dr. Ray reviewed the October 2023 Staffing Assessment and concluded that, while it is a step in the right direction, the study overlooks many of factors that must be considered to accurately calculate correctional staffing levels. (Ray Report at 50–52.)

In fact, Defendant decreased authorized ASGDC security and custody staff from 301 positions in 2021 to 252 positions in 2022. (Ray Report at 50.) Dr. Ray found that "[t]he disparity between the rates of decrease in staff numbers versus inmate numbers known by [Defendant] at the time staffing reductions were approved raises serious concerns regarding the priority [Defendant] places on inmate protection, care and custody service." (*Id.* at 19.) Persistent failure to supervise detainees exacerbates violence and, accordingly, unconstitutional harm to detainees. Defendant has reduced staffing levels by 38.6% over a period of 6 years, from 264 officers in 2018 to 162 officers in 2023. (*Id.* at 19.) The detainee population skyrocketed to approximately 948 as of January 24, 2024 and is expected to continue to increase in the immediate future. (*See* **Ex. 44**, Harvey Jan. 16, 2024 Dep. at 234:16–235:12.)

In its March 15, 2024 response to SCDC's 2023 Inspection Report, ASGDC again stated plans to fix the issues sometime in the future, but failed to address the immediate need for direct supervision. (Sparkman Report at 91–97); *see Coleman v. Wilson*, 912 F. Supp. at 1318 ("Defendants are not free to disregard the constitutional rights of mentally ill inmates for three to four years."). Again, Defendant's purported efforts to correct systemic deficiencies "simply do not go far enough" when weighed against the substantial risk of harm. *Braggs v. Dunn*, 257 F. Supp. 3d at 1252 (such efforts are not "reasonable measures to abate" the identified substantial risk of serious harm). Defendant cannot continue to rely on patently ineffective gestures to sidestep liability for acts and omissions with its control.

### iv.  SMI Detainees at ASGDC Face Ongoing, Substantial Risk of Harm

According to 911 call data maintained by Richland County Emergency Medical Services, Fire Department, and Sheriff's Department, a total of 1,247 Serious Incidents[8] occurred at ASGDC

---

[8] Emergency response agencies categorize 911 call responses from P0 to P6. The P0 to P2 categories ("Serious Incidents") are assigned to the most critical incidents. (Ray Report at 65.)

from 2020 to 2023, including physical injuries and security and medical emergencies. (Ray Report at 68.) Notably, there was a 138% increase in Serious Incidents from 2020 to 2023. (*Id.*) In his report, Dr. Ray identifies a "concerning upward trajectory in grave risks and incidents" to which individuals with serious mental illness are exposed with alarming regularity. (*Id.* at 73.) Reports of inmate-on-inmate assaults with a weapon and stabbing/puncture incidents are staggering, with the former rising 1600% (from nonexistent to 16 instances) from 2020 to 2023 and the latter increasing 1800% (2 to 16 incidents) during the same period. (*Id.* at 73–74.) As Dr. Ray observes, "these figures are not mere numbers; they represent a clear and present escalation in violence and health-related emergencies that necessitated urgent and decisive action by Richland County officials to safeguard the wellbeing of SMI inmates." (*Id.* at 73.) Dr. Ray notes that the "staggering rise in call volume, juxtaposed with the falling staff numbers, underscores a significant rise in workload per staff member. The emerging picture is one that clearly evidences that existing staff faced and continue to face heightened pressures, raising important questions about Richland County's priorities and the degree to which it failed to recognize and reasonably address the growing urgency in potential and actual harm to SMI detainees."  (*Id.* at 70.)

The ongoing risk of harm and daily fear is particularly detrimental to SMI Detainees.  Dr. Johnson identified specific ways in which Defendant's failure to protect SMI Detainees threatens their mental health and places them at substantial risk of serious harm, including increased paranoia, sleep deprivation, and medication noncompliance. (Johnson Report at 12.) Testimony from individual detainees illustrates the daily fight for survival at ASGDC. On January 3, 2024, CR10 was stabbed 11 times during an armed robbery of his canteen property. (**Ex. 45**, CR10 Decl. at 3.) No officer was in the unit to prevent or to stop this assault or to call for assistance. (*Id.*) CR10 was bleeding heavily after the stabbings, but had to wait for nurses to conduct their med passes,

rather than rely on the designated security staff. (*Id.*) Similarly, in March 2024, after being awoken from sleep to three men with knives robbing him, Detainee CR12 was too frightened to go back to sleep, so he packed his belongings and stood at the unit's entrance door. (C12 Decl. at 2.) He waited three hours for a supervisor to arrive and begged to be moved to another housing unit. (*Id.*) His request to press charges were ignored was refused. (*Id.*)

In sum "[d]etainees depend on the jail systems for their very lives[,]" *Hinds Cnty.*, 2022 U.S. Dist. LEXIS 135504, at *13–14 (quotations omitted), and Defendant disregards this responsibility. Defendant's unjustifiably insufficient response to the dangerous threat of violence at ASGDC and the particular threat to SMI Detainees disregards the lives and health of SMI Detainees in its charge, causes substantial harm and risk of harm, and violates their Fourteenth Amendment rights.

### 4. Defendant Discriminates Against SMI Detainees in Violation of the ADA

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Congress found that such protection is necessary to address pervasive discrimination in critical areas including "institutionalization." *Id.* § 12101(a)(2); *see Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131 (1)(b)) (holding ADA applies to state prisons).

To establish a claim under Title II of the ADA, a plaintiff must show: (1) he has a disability; (2) he is otherwise qualified to receive the benefits of a public service, program, or activity; and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). "Unjustified isolation . . . is

properly regarded as discrimination based on disability." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).

First, SMI Detainees have disabilities that substantially limit one or more of their major life activities. As set forth above, SMI Detainees include individuals with clinically diagnosed mental illnesses including those that have resulted in significant functional impairment. (*See* Section II.B.1.i., *supra*.) This definition includes those with mental illnesses acknowledged by the ADA's regulations as impairments that "it should be easily concluded . . . will, at minimum, substantially impair the major life activity of 'brain function,' known to substantially limit brain activity, including major depressive disorder, bipolar disorder, post-traumatic stress disorder, traumatic brain injury." 28 CFR § 35.108(d)(2)(iii)(K). Further, the Second Amended Complaint identify individuals on whose behalf Plaintiff filed this action who have serious mental illnesses and histories of necessary mental health treatment, and Dr. Johnson's Expert Report sets forth case studies based on medical records and observations of SMI Detainees whose disabilities substantially limit their life activities. (Johnson Report at 7 (describing meetings with detainees who were "actively psychotic" and "actively delusional").) SMI Detainees also include those assigned to "mental health" housing by ASGDC or who have been admitted to a licensed behavioral health or psychiatric hospital, meaning they are regarded as being impaired by their disabilities by ASGDC or psychiatric professionals. As such, SMI Detainees have disabilities that trigger the protections of the ADA.

Second, as detainees at ASGDC, SMI Detainees who are not in Restrictive Housing for disciplinary infractions ordinarily would be deemed "qualified" to receive several hours per day of out-of-cell time and access to out-of-cell activities because being a person confined at ASGDC is the essential eligibility requirement for these programs and services. *See* 42 U.S.C. § 12131(2);

*see also Ga. Advocacy Office*, 2019 U.S. Dist. LEXIS 238805, at *36. Instead, SMI Detainees in restrictive housing are isolated for 23 hours per day. While in Restrictive Housing units, SMI Detainees are denied access to activities, resulting in a "predictable decline in mental functioning that results from prolonged solitary confinement of people who experience psychiatric disabilities." *Georgia Advocacy Office*, 2019 U.S. Dist. LEXIS 238805, at *36.

Third, Defendant denies such services to SMI Detainees because of their disabilities by placing SMI Detainees in Restrictive Housing units solely based on their disabilities and related symptoms. *See, e.g.*, *Shields v. Prince George's Cnty.*, No. GJH-15-1736, 2019 U.S. Dist. LEXIS 129529, at *44 (D. Md. Aug. 2, 2019); *Biselli v. Cnty. of Ventura*, No. CV 09-08694 CAS (Ex), 2012 U.S. Dist. LEXIS 79326, at *45 (C.D. Cal. June 4, 2012). Other than in the recently opened behavioral management unit, a housing unit for men only, there is no distinction in housing placement, conditions, or services between individuals placed in Restrictive Housing for disciplinary or maximum-security classification reasons and those placed in Restrictive Housing based on mental health diagnosis and associated symptoms. As such, ASGDC's policies and practices punish SMI Detainees and deny them services because of their disabilities in violation of the ADA.

**C.    SMI Detainees Will Continue to Suffer Irreparable Harm Absent Injunctive Relief**

As set forth above, SMI Detainees will suffer immediate and irreparable harm without court intervention based on Defendant's practice of locking detainees in cells and housing units without access to running water, lights, and a sufficient number of working toilets, by locking detainees in units without direct supervision in violation of its own policies and despite known danger, in keeping SMI Detainees in locked down units without providing minimally required time out of cells and pods, and by failing to provide minimally adequate mental health services to SMI Detainees. When "the cumulative impact of the conditions of incarceration threatens the physical,

mental, and emotional health and well-being of the inmates and/or creates a probability of recidivism and future incarceration," the court must conclude that the conditions violate the Constitution. *Rhodes*, 452 U.S. at 364 (concurrence). As the evidence shows, these injuries and Defendant's knowledge and inaction are both longstanding and ongoing. Defendant's constitutionally deficient practices continue to present a substantial risk of serious harm to these detainees necessitating emergency intervention.

Moreover, because ASGDC has and continues to violate detainees' constitutional rights, the irreparable harm factor is clearly satisfied. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quotation omitted); *Thomas v. Bryant*, 614 F.3d 1288, 1322 (11th Cir. 2010) (No remedy at law will provide protection for unconstitutional condition of confinement in the future.).

Importantly, a trial in this matter is likely to take weeks. Scheduling and preparing for such a trial will take months. Based on the current scheduling order and the time necessary for the Court to issue an order in this factually complex matter, it is not inconceivable that a year could pass, during which time SMI Detainees will continue to suffer harm that cannot be remedied later. The fundamental constitutional guarantees of SMI Detainees are violated daily and a dire emergency exists for SMI Detainees at ASDGC that warrants court intervention.

**D.    The Risk of Harm to SMI Detainees Significantly Outweighs Any Harm to Defendant**

The significant risk of harm to SMI Detainees far exceeds any harm Defendant will suffer if the injunction issues. SMI Detainees are suffering concrete and serious psychological harm that amounts to cruel and unusual punishment. They are subject to inhumane, unlivable conditions. Preventable deaths continue to occur because of Defendant's indifference to known constitutional

violations. Importantly, Defendant cannot be harmed by issuance of a preliminary injunction that prevents practices likely to be found unconstitutional. "If anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. In this case, Defendant cannot argue it will be harmed by an injunction preventing further violations of SMI Detainees' constitutional rights. And, even if it could, the physical and emotional hardships to SMI Detainees are clear and not remediable once suffered. There is no comparable harm to Defendant.

### E.    Injunctive Relief Serves the Public Interest

Finally, an injunction will serve the public interest. SMI Detainees are members of the public. Their loved ones are members of the public. The public at large benefits from remedying egregious violations of constitutional rights. *Leaders of a Beautiful Struggle*, 2 F.4th at 346 ("It is well-established that the public interest favors protecting constitutional rights."). The public also has an interest in having SMI Detainees leave the jail reasonably healthy and with the capacity to hold productive jobs, or, at the very least, leave the jail alive and not completely deteriorated. *See, e.g.*, *C.P.M. v. D'Ilio*, 916 F. Supp. 415, 422 (D.N.J. 1996) ("no question that society has an interest in the rehabilitation and reassimilation of offenders into productive, employed, tax-paying citizens") (citing *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972)). As such, the requested relief will benefit the public interest.

### 1.    Scope of Relief under the Prison Litigation Reform Act

Under the PLRA, a court granting prospective relief must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). However, recognizing the extensive nature of the findings required, Congress provided a safe-harbor provision in the PLRA that permits a district court to enter a preliminary injunction and defer making those findings for up to 90 days. *See* 18 U.S.C. § 3626(a)(2). Thus,

the Court can grant the relief requested herein and order Defendant to submit a plan for meeting the requirements within a set timeframe. The precise method by which Defendant accomplishes these requirements should be left to Defendant. *See Lewis v. Casey*, 518 U.S. 343, 362 (1996) (explaining that correctional defendants should be given the first opportunity to correct their own constitutional violations). The Court cannot allow these constitutional violations to continue simply because a remedy would involve intrusion into the realm of correctional administration.

## III.    CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, Plaintiff respectfully requests emergency injunctive relief requiring Defendant to:

1. Provide therapeutic services necessary to treat the full range of medical needs of SMI Detainees;
2. Provide adequate structured and unstructured out-of-cell therapeutic activities for SMI Detainees in all Restricted Housing units;
3. Refrain from placing SMI Detainees in cells or pods without access to running water, working toilets, working light fixtures, clean and mildew-free showers with adequate hot and cold water, and access to feminine hygiene products; and
4. Refrain from placing SMI Detainees in housing units without direct supervision.

Respectfully submitted by:

s/Annie Day Bame
Stuart M. Andrews (Fed. I.D. No. 1099)
Nekki Shutt (Fed I.D. No. 6530)
Ashley Pennington (Fed. I.D. No. 3035)
Sarah J.M. Cox (Fed. I.D. No. 13166)
Annie Day Bame (Fed. I.D. No. 13363)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, 2nd Floor (29201)
PO Box 1929
Columbia, South Carolina 29202
T: 803.904.7915
F: 803.904.7910
SAndrews@BurnetteShutt.Law
NShutt@BurnetteShutt.Law
APennington@BurnetteShutt.law
SCox@BurnetteShutt.Law
ABame@BurnetteShutt.Law

**ATTORNEYS FOR PLAINTIFFS**

Columbia, South Carolina

July 22, 2024