UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Disability Rights South Carolina, | ) | C/A No. 8:22-cv-1358-MGL-WSB |
| and 15 Unnamed Plaintiffs | ) | |
| as Class Representatives on behalf of themselves | ) | |
| and others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| v. | ) | |
| | ) | |
| Richland County, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court on Plaintiffs' Motion for Preliminary Injunction. ECF No. 115. Several individual detainees (the "Named Plaintiffs")[1] at the Alvin S. Glenn Detention Center ("ASGDC") in Richland County, South Carolina, along with Disability Rights South Carolina ("DRSC") (together referred to as "Plaintiffs") brought this action against Richland County ("Defendant") alleging claims of constitutional violations pursuant to 42 U.S.C. § 1983 and discrimination under Title II of the Americans with Disabilities Act ("ADA"). The undersigned United States Magistrate Judge is authorized to consider all pretrial motions in this case and submit findings and recommendations to the district court under 28 U.S.C. § 636(b) and Local Civil Rule

---

[1] The Second Amended Complaint includes fifteen Named Plaintiffs who are presently or were previously detainees at ASGDC. ECF No. 99 at 6–10, ¶¶ 17–31. The Named Plaintiffs are proceeding in this action using numerical designations rather than their names to protect their identities. *Id*. at 5, ¶ 16. The identities of the Named Plaintiffs were disclosed to the Court in a sealed exhibit attached to the Second Amended Complaint. *See id*. at 5, ¶¶ 15–16; ECF No. 99-1 (sealed exhibit). Plaintiffs have voluntarily dismissed four of the Named Plaintiffs as putative class representatives. ECF Nos. 123; 129. As such, the Named Plaintiffs presently include the following eleven individuals: CR2, CR3, CR4, CR5, CR6, CR9, CR10, CR11, CR12, CR14, and CR 15. *See* ECF Nos. 99 99 at 6–10, ¶¶ 17–31; 123 at 1.

73.02(B) (D.S.C.).[2]  For the reasons below, the Motion for Preliminary Injunction should be denied.

## BACKGROUND

**Case Summary**

The Named Plaintiffs are pretrial detainees at ASGDC with serious mental illnesses.[3]  ECF Nos. 115 at 1; 99 at 1, ¶ 1 (Second Amended Complaint).  DRSC is "a private, not-for-profit South Carolina corporation established as a protection and advocacy organization for the State of South Carolina and charged by state and federal law to protect and advocate for the rights of people with disabilities in South Carolina.  On behalf of SMI Detainees confined at ASGDC, DRSC asserts organizational, associational, and statutory standing as a party to this action."[4]  ECF No. 99 at 5,

---

[2] "Because a motion for injunctive relief is dispositive, this Report and Recommendation is entered for the district judge's consideration."  *Randolph v. Haroff*, C/A No. 1:13-cv-74-JMC-SVH, 2013 WL 1891333, at *1 (D.S.C. Apr. 12, 2013), *R&R adopted by* 2013 WL 1891340 (D.S.C. May 6, 2013).

[3] The Named Plaintiffs seek to be representatives of a putative class of "detainees who suffer from serious mental illness and who are presently confined at ASGDC"—the "SMI Detainees."  ECF No. 99 at 5, ¶ 16.  The Second Amended Complaint defines "SMI Detainees" as individuals who, at any time since April 28, 2022, have been or will be confined at ASGDC and who have been or will be (1) assigned to a "mental health" housing unit at ASGDC; (2) diagnosed by a psychiatrist or other licensed clinical mental health professional with certain mental illnesses; (3) diagnosed by a psychiatrist or other licensed clinical mental health professional with another mental disorder that has resulted in significant functional impairment (as defined therein); or (4) has been admitted to a licensed behavioral health or psychiatric hospital.  *Id*. at 11–12, ¶ 33; *see also* ECF No. 115 at 3–4.  According to Plaintiffs, a "large number" of SMI Detainees—comprising 60 to 70% of the population at ASGDC—"are present in every housing unit and every phase" of ASGDC.  ECF No. 115 at 5; *see also* ECF No. 99 at 12, ¶ 35.

[4] Defendant contends that DRSC lacks standing.  *See* ECF No. 127 at 15–16 (arguing the Court should analyze the factors applicable to a request for injunctive relief in light of the individual Named Plaintiffs, and not DRSC, as DRSC cannot show that it suffered an injury-in-fact for which a remedy is sought).  At the hearing held on November 13, 2024, the parties agreed that a determination of DRSC's standing would not impact the Motion for Preliminary Injunction. The Court does not address the parties' standing arguments.

¶ 15.   Plaintiffs contend they are entitled to injunctive relief at this time because Defendant continues to violate SMI Detainees' constitutional rights by subjecting them to deliberate indifference to their serious medical needs, unconstitutional conditions of confinement, and discrimination in violation of the ADA.

**Procedural History**

Plaintiffs commenced this action by filing a Complaint on April 28, 2022.  ECF No. 1. Defendant filed an Answer to the Complaint on May 20, 2022.  ECF No. 9.  On June 13, 2022, Plaintiffs filed an Amended Complaint, ECF No. 12, and Defendant filed an Answer to the Amended Complaint on June 27, 2022, ECF No. 19.  On April 17, 2024, with leave of the Court, Plaintiffs filed a Second Amended Complaint.  ECF No. 99.  On April 30, 2024, Defendant filed an Answer to the Second Amended Complaint.  ECF No. 102.  The Second Amended Complaint is the operative pleading in this matter.

On July 22, 2024, Plaintiffs filed a Motion for Preliminary Injunction.  ECF No. 115.  On September 16, 2024, Defendant filed a Response in Opposition.  ECF No. 127.  On September 30, 2024, Plaintiffs filed a Reply.  ECF No. 137.  The Court held a hearing on the Motion for Preliminary Injunction on November 13, 2024.  ECF No. 151.  The Motion is ripe for review.[5]

**Allegations from the Second Amended Complaint**

Plaintiffs bring this action "to address the dangerous, inhumane, and unconstitutional conditions, policies, and practices that exist and have existed for an extended period of time because of Defendant's failure to provide adequate mental health care and safe and sanitary conditions of confinement to [SMI Detainees] in custody at [ASGDC]."  ECF No. 99 at 1, ¶ 1.

---

[5] Also pending is Plaintiffs' Motion to Certify Class.  ECF No. 124.  The Court will address that Motion at a later time.

Plaintiffs contend that Defendant has operated ASGDC in a manner deliberately indifferent to SMI

Detainees' substantial risk of serious harm in the following respects:

- Failing to protect SMI Detainees from harm by operating housing units with inadequate supervision by detention officers and, on many occasions, with no supervision.

- Failing to protect SMI Detainees, even when supervised, by its deliberate indifference to the prevalence of contraband weapons and drugs throughout the facility and to the robberies, beatings, extortions, sexual assaults, and stabbings that have occurred and continue to occur under the watch of ASGDC detention officers and supervisors.

- Confining SMI Detainees in squalid, unsanitary conditions without properly functioning toilets, lavatories, showers, lighting, and sufficient access to drinking water whether detainees are confined in single cells, pod-based housing units, or open-bay dormitories.

- Locking down SMI Detainees for prolonged periods in isolated cells or crowded pods without charges, without opportunities to contest the confinement, without prior consultation with a psychiatrist or other medical provider, and without adequate recreational opportunities.

- Failing to provide to SMI Detainees adequate mental health services, including the following: the proper administration of psychotropic medications; the development of treatment plans that organize the delivery of mental health services in a manner that corresponds to SMI Detainees' various levels of acuity; and the delivery of the full range of such care, including, without limitation, individual therapy, group therapy, crisis stabilization, and out-of-cell and out-of-pod structured and unstructured therapeutic activities for individuals in prolonged periods of isolation.

- Subjecting SMI Detainees to excessive force by locking them in shower stalls, restraint chairs, and other means of restricting the movement of detainees for punitive purposes without regard to the detainees' ongoing behavior, and without prior psychiatric or medical consultation.

- Isolating SMI Detainees who attempt suicide or express suicidal ideations in non-therapeutic, punitive settings, where they are

confined without proper assessment, mental health treatment, or
sufficient observation.

*Id*. at 2–3, ¶ 2.

Based on these and other allegations in the Second Amended Complaint, Plaintiffs assert
the following five causes of action. For a first cause of action, Plaintiffs seek a declaratory
judgment that Defendant has violated Plaintiffs' substantive due process rights under the Fourth
and Fourteenth Amendments. *Id*. at 27–28, ¶¶ 111–115. For a second cause of action, Plaintiffs
seek a declaratory judgment that Defendant has violated Plaintiffs' rights under the Eighth and
Fourteenth Amendments. *Id*. at 28–30, ¶¶ 116–122. For a third cause of action, Plaintiffs seek a
declaratory judgment that Defendant has violated the ADA by failing to provide the minimal care
necessary to meet SMI Detainees' mental health needs and by discriminating against them. *Id*. at
30–31, ¶¶ 123–130. For a fourth cause of action, Plaintiffs seek preliminary and permanent
injunctive relief under 42 U.S.C. § 1983 to enjoin Defendant "from operating ASGDC in such a
way as to deprive SMI Detainees of their constitutional and statutory rights and privileges." *Id*. at
31, ¶¶ 131–137. For a fifth cause of action, Plaintiffs seek attorneys' and experts' fees under 42
U.S.C. § 1988(b) & (c). *Id*. at 31–32, ¶¶ 138–139.

For relief, Plaintiffs seek a declaratory judgment from the Court declaring that the
conditions of confinement at ASGDC and the policies, patterns, practices, acts, and omissions of
Defendant

    a.   constitute punishment and subject the Named Plaintiffs and SMI
Detainees to denial of substantive and procedural due process,
in violation of their constitutional rights under the Fourteenth
Amendments to the United States Constitution;

    b.   are the result of Defendant's deliberate indifference to a
substantial risk of serious harm to the Named Plaintiffs and SMI
Detainees in violation of the Eighth and Fourteenth
Amendments to the United States Constitution;

      c.  deprive Named Plaintiffs and the Plaintiff Class SMI Detainees of their rights under the ADA.

*Id.* at 32.  Plaintiffs further ask the Court to issue preliminary and permanent injunctions restraining and prohibiting Defendant from confining SMI Detainees unless and until Defendant complies with the following:

      a.  Immediately cease and desist from placing SMI Detainees in a cell, pod, or other confined space that does not have an operable toilet, an operable sink, adequate light, and a designated bed and mattress, other than under the following circumstances: a detainee is held temporarily before or after being transported or relocated; a detainee is confined in a shower stall solely for the purpose of taking a shower; and in a case of emergency documented by a supervising officer.

      b.  Immediately cease and desist from confining SMI Detainees in any housing unit that does not have an officer physically present in the unit on a 24/7 basis.

      c.  Immediately cease and desist from failing to provide generally recognized and suggested mental health treatment to SMI Detainees, including without limitations, individual and in secure confidential group therapeutic services settings and necessary higher level of care for more seriously ill SMI Detainees who may not need hospitalization or for when hospitalization is not available.

      d.  Immediately cease and desist from confining SMI Detainees in cells and pods for over 16 hours a day when such Detainees are not being confined for disciplinary charges as administrative holds.

      e.  Immediately cease and desist from confining SMI Detainees in BMU, X-ray, and other restrictive housing as a result of a charge, conviction, and sentence for a rules infraction of consistent with ASGDC policies or administrative hold without due process of law and without first obtaining a determination by a qualified mental health provider ("QMHP") that the SMI Detainees that placement in such restrictive housing will not present a substantial risk that the detainee's mental health will be adversely affected.

    f.   Immediately cease and desist from confining SMI Detainees in BMU, X-ray, and other restricted housing without providing at least ten hours of out-of-cell and out-of-pod structured therapeutic activities per week, and at least ten hours of out-of-cell and out-of-pod unstructured activities per week.

    g.   Immediately cease and desist from permitting inmates to participate in the handling and distribution of food and water to SMI Detainees without close supervision by detention officers.

    h.   Immediately recognize Defendant to engage in staff recruitment practices consistent with industry standards to reduce the number of detention officers with gang affiliations and other inappropriate relations with detainees.

    i.   Immediately cease and desist from employing restraint chairs, tasers and taser gloves, chemical sprays, and other rises of force in a manner contrary to generally recognized and accepted correctional practices, to manufacturers' instructions, and to Defendant's own policies, all of which pose a substantial risk of serious harm. . . .

    j.   Allow each SMI Detainee, except those temporarily placed in segregation for safety or disciplinary reasons, a minimum of one (1) hour per day of outdoor recreation and a minimum of three (3) showers per week.

*Id*. at 33–35. Plaintiffs also ask the Court to (1) enjoin Defendant from accepting and booking detainees into ASGDC from jurisdictions other than Richland County until such time as ASGDC is adequately and safely staffed; (2) order Defendant to develop and implement a comprehensive plan for the correction of the unlawful policies, practices, acts, and omissions complained of herein and to submit this plan to the Court and to the attorneys for Plaintiffs for review, with this plan addressing, without limitation, the following: medical and mental health staffing and services; prolonged use of restrictive housing; security staff recruitment, training, and supervision; use of force; detainee classification system; and sanitation and hygiene; (3) appoint a monitor to oversee implementation of this injunctive relief; (4) retain jurisdiction over Defendant until such time as the Court is satisfied that Defendant's unlawful policies, practices, acts and omissions complained

of herein no longer exist; and (5) award Plaintiffs the costs of this lawsuit and their reasonable attorneys' fees, costs, and expert's fees. *Id*. at 35–36.

**The Motion for Preliminary Injunction**

Plaintiffs request the following injunctive relief in their Motion for Preliminary Injunction:

(1) Provide therapeutic services necessary to treat the full range of medical needs of SMI detainees;

(2) Provide adequate structured and unstructured out-if-cell therapeutic activities for SMI Detainees in all Restricted Housing units;

(3) Refrain from placing SMI Detainees in cells or pods without access to running water, working toilets, working light fixtures, clean and mildew-free showers with adequate hot and cold water, and access to feminine hygiene products; and

(4) Refrain from placing SMI Detainees in housing units without direct supervision.

ECF No. 115 at 35.

## APPLICABLE LAW

**Preliminary Injunction**

Rule 65 of the Federal Rules of Civil Procedure authorizes a district court to issue a preliminary injunction. Fed. R. Civ. P. 65(a). "A preliminary injunction is an extraordinary remedy afforded before trial at the discretion of the district court [and is] never awarded as of right." *Ansel v. Hicks*, 846 F. Supp. 2d 493, 494 (W.D.N.C. 2012) (citing *In re Microsoft Corp. Antitrust Litig.,* 333 F.3d 517, 524–26 (4th Cir. 2003)); *see Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) ("A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit."). A preliminary injunction should be granted only if the moving party clearly establishes entitlement to the relief

sought. *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981). To obtain a preliminary injunction, the moving party must establish the following four elements:

> (1) a clear showing that it will likely succeed on the merits;
>
> (2) a clear showing that it is likely to be irreparably harmed absent preliminary relief;
>
> (3) the balance of equities tips in favor of the moving party; and
>
> (4) a preliminary injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22–23 (2008) (the "*Winter* factors"); *Real Truth About Obama, Inc. v. Fed. Election Comm.,* 575 F.3d 342, 346–47 (4th Cir. 2009); *W. Va. Assoc. of Club Owners & Fraternal Servs., Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009).

"[A] preliminary injunction can be categorized as mandatory or prohibitory." *Curtin v. Va. State Bd. of Elections*, 463 F. Supp. 3d 653, 657 (E.D. Va. 2020). Unlike traditional preliminary injunctions which seek to protect the status quo, mandatory preliminary injunctions seek to compel action. *Wright v. Webber*, C/A No. 1:11-cv-2199-TLW-SVH, 2011 WL 6112371, at *2 (D.S.C. Nov. 10, 2011), *R&R adopted by* 2011 WL 6101915 (D.S.C. Dec. 7, 2011); *see Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (explaining that mandatory preliminary injunctions "alter rather than preserve the status quo" and are particularly "disfavored"). Mandatory injunctive relief "'in any circumstance is disfavored, and warranted only in the most extraordinary circumstances.'" *De La Fuente v. S.C. Democratic Party*, 164 F. Supp. 3d 794, 798 (D.S.C. 2016) (quoting *In re Microsoft Corp.,* 333 F.3d at 525)); *see Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (noting mandatory injunctions are "warranted only in the most extraordinary circumstances"). Consequently, "application of th[e] exacting standard of review [for preliminary injunctions] is even more

searching when" the relief requested "is mandatory rather than prohibitory in nature." *Perry v. Judd*, 471 F. App'x 219, 223–24 (4th Cir. 2012).

"An additional consideration is required when injunctive relief is sought in the context of [a] prisoner civil rights case." *Bonnett v. Comm'r of Corr.-MD*, C/A No. PWG-20-cv-3529, 2021 WL 1516052, at *5 (D. Md. Apr. 15, 2021). The Prison Litigation Reform Act ("PLRA") provides as follows:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C. § 3626(a)(2). With regard to injunctive relief under the PLRA, it has been noted in this District as follows:

> The [PLRA] provides for preliminary injunctive relief in litigation regarding prison conditions. 18 U.S.C. § 3626(a)(2) (1997). This relief must be "narrowly drawn" to correct a harm via "the least intrusive means necessary." *Id.* Courts in the Fourth Circuit recognize that preliminary injunctions implicating prison management "should be granted only under exceptional and compelling circumstances." *Sarratt v. S.C. Dep't of Corrs.*, C/A No. 8:16-cv-03486-RBH-JDA, 2017 WL 4048556, at *3 (D.S.C. Aug. 10, 2017) (citing *Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994)), *R&R adopted by* 2017 WL 4012468 (D.S.C. Sept. 12, 2017). The decision whether to grant a preliminary injunction is committed to the equitable discretion of the district court. *See Salazar v. Buono*, 559 U.S. 700, 714 (2010); *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007).

10

*Dontell v. Safford*, C/A No. 9:22-cv-01641-BHH-MHC, 2024 WL 3541928, at *3 (D.S.C. June 26, 2024), *R&R adopted by* 2024 WL 3541625 (D.S.C. July 25, 2024).

**Requirements for a Cause of Action Under § 1983**

Claims in this action are filed pursuant to 42 U.S.C. § 1983, which provides a private cause of action for constitutional violations by persons acting under color of state law.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  A civil action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).  Section 1983 provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.  To establish a claim under § 1983, a plaintiff must prove two elements: (1) that the defendant "deprived [the plaintiff] of a right secured by the Constitution and laws of the United States" and (2) that the defendant "deprived [the plaintiff] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage."  *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (third alteration in original) (citation and internal quotation marks omitted).

**Deliberate Indifference**

A pretrial detainee cannot be subject to any form of "punishment."  *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021).  As such, a pretrial detainee's claim of deliberate indifference to a

11

serious medical need is brought pursuant to the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's prohibition on cruel and unusual punishment.[6]  *Id*.  To state a medical deliberate indifference claim under the Fourteenth Amendment, a pretrial detainee must show the following:

> (1) the detainee suffered from a medical condition or injury that posed a substantial risk of serious harm;
>
> (2) the defendant "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed";
>
> (3) the defendant knew or should have known that the detainee had the condition and that the defendant's action/inaction posed an "unjustifiably high risk of harm"; and
>
> (4) the detainee was harmed as a result.

*Short v. Hartman*, 87 F.4th 593, 611–12 (4th Cir. 2023).  Under this standard, "the plaintiff [need not] show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm."  *Id.*  "[I]t is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Id.*[7]

---

[6] Although Plaintiffs' claims are analyzed under the Fourteenth Amendment, case law interpreting the standard of deliberate indifference under the Eighth Amendment is instructive. *See Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) (noting that courts "traditionally apply Eighth Amendment deliberate indifference precedents" to Fourteenth Amendment claims).  "The constitutional protections guaranteed to a pretrial detainee under the Fourteenth Amendment 'are co-extensive with those provided to convicted prisoners by the Eighth Amendment.'"  *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 381 (W.D. Va. 2020) (citation omitted).  Thus, a pretrial detainee can establish a violation under the Fourteenth Amendment where "he shows deliberate indifference to serious medical needs" under cases interpreting the Eighth Amendment. *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988).

[7] At the hearing, Defendant argued that the length of time that Defendant knew of problems was irrelevant under the analysis in *Short*.  The Court disagrees because it can support a finding of knowing and reckless conduct or a failure to appreciate and address the risks.

(quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).  It is insufficient, however, for a plaintiff to show that "the defendant negligently or accidentally failed to do right by the detainee."  *Id.* at 611–12.

**Conditions of Confinement**

"[C]laims related to conditions of confinement for pretrial detainees are analyzed pursuant to the Fourteenth Amendment utilizing the same analysis for claims brought pursuant to the Eighth Amendment."  *Harrison v. Moketa/Motycka*, 485 F. Supp. 2d 652, 655 (D.S.C.), *aff'd*, 235 F. App'x 127 (4th Cir. 2007).  To establish a conditions-of-confinement claim, a pretrial detainee must show that the action taken was not "'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'"  *Short*, 87 F.4th at 611 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015)).  In other words, a pretrial detainee must only show that "the defendant's action or inaction was . . . objectively unreasonable" in that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Id*. (quoting *Farmer*, 511 U.S. at 836).

**Discrimination under the ADA**:

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (1994).  To establish a claim under Title II of the ADA, a plaintiff must show:

(1) the plaintiff has a disability;

(2) the plaintiff is otherwise qualified to receive the benefits of a public service, program, or activity; and

(3) the plaintiff was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability.

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). "[T]he ADA applies to state prisons and correctional facilities." *Scott v. Kelly*, 107 F. Supp. 2d 706, 710 (E.D. Va. 2000), *aff'd*, 6 F. App'x 187 (4th Cir. 2001); *see Baxley v. Jividen*, 508 F. Supp. 3d 28, 60 n.34 (S.D.W. Va. 2020) ("The supporting regulations to the ADA make clear that correctional facilities have an affirmative duty to ensure that inmates and detainees are not 'subjected to discrimination.'" (quoting 28 C.F.R. § 35.152(b)(1))).

### THE PARTIES' POSITIONS[8]

1. **Plaintiffs' Motion for Preliminary Injunction and Supporting Brief**

Plaintiffs contend they meet the requirements for a preliminary injunction under *Winter*. ECF No. 115 at 2.

   a. **Likelihood of Success**

Plaintiffs assert they can show a likelihood of success on the merits because Defendant's failure to provide necessary mental health services constitutes deliberate indifference. *Id*. at 2–3. Plaintiffs argue SMI Detainees have serious medical needs in that they have serious mental health issues and that Defendant has systematically failed to provide necessary treatment to SMI Detainees. *Id*. at 4, 6. Relying primarily on expert reports, Plaintiffs contend "Defendant's failure to address SMI Detainees' mental health needs is objectively unreasonable on a systemic level" in that SMI Detainees have been subjected to inadequate treatment, inadequate out-of-cell time, and inadequate suicide watch practices. *Id*. at 6–10. According to Plaintiffs, due to the inadequacies

---

[8] The parties have submitted over 1,200 pages of documents and exhibits in support of their respective positions on the Motion for Preliminary Injunction. The Court has carefully analyzed the briefs submitted by the parties and also reviewed the documents and exhibits attached thereto.

in Defendant's mental health policies and practices, SMI Detainees are subjected to an ongoing, substantial risk of harm. *Id*. at 13–14.

Plaintiffs also contend the inhumane living conditions at ASGDC deprive SMI Detainees of minimal civilized measures of life's necessities. *Id*. at 14. Plaintiffs allege Defendant houses SMI Detainees in cells without access to basic necessities, including ready access to drinking water, personal hygiene, toilets, sinks, showers, privacy for bodily functions, light, and recreation as well as protection from fire, electrical shock, vermin, mold, and human waste. *Id*. at 15–18. According to Plaintiffs, Defendant's long-standing awareness of this substantial risk of harm is well-documented, *id*. at 18–20 (citing numerous reports, surveys, and audits), and Defendant's objectively unreasonable response fails to address these long-standing issues, *id*. at 20 (noting that, despite Defendant's knowledge and purported efforts to attempt to correct deficiencies that have existed for years, SCDC continues to find violations of the *Minimum Standards*). As a result, Plaintiffs assert, Defendant's deliberate indifference subjects SMI Detainees to an ongoing, substantial risk of serious harm. *Id*. (noting SMI Detainees are housed in cells and dorms without access to drinking water, adequate toilets, and lighting, depriving them of life's basic necessities in blatant violation of their constitutional rights).

Plaintiffs further assert that Defendant's failure to protect SMI Detainees from a pervasive and substantial risk of bodily harm, due to staffing shortages, constitutes deliberate indifference. *Id*. at 23. According to Plaintiffs, the conditions at ASGDC pose an ongoing, substantial risk of serious harm as, for over a decade, Defendant has consistently demonstrated a pattern and practice of failing to maintain adequate staffing levels and implement minimally adequate staffing practices at ASGDC. *Id*. at 23–30. Plaintiffs cite multiple studies and assessments conducted over the past decade evaluating the staffing levels at ASGDC. Those studies and assessments suggested

minimum staffing levels given the intended inmate capacity and security needs at ASGDC. A 2023 Staffing Needs Assessment, for example, made the following findings and recommendations. ECF No. 115-45. The total inmate count at ASGDC on June 13, 2023, was 760. *Id*. at 9. At that time, ASGDC was funded to staff 242 Security Officers and 57 Administrative Staff. *Id*. However, due to numerous vacancies, the facility at that time was staffed by only 118 Security Officers and 49 Administrative Staff. *Id*. Further, based on the many factors considered in that study, it was recommended that the minimum staffing level be 294 Security Officers and 84 Administrative Officers/Support Staff positions. *Id*. at 13. At the hearing, Plaintiffs noted that the current staffing level of Security Officers was about 90. Defendant acknowledged these staffing shortages at the hearing and in its filings. *See*, *e.g.*, ECF No. 127-1 at 3, ¶ 9 (Affidavit of ASGDC Director Crayman Harvey) (noting ASGDC has faced staffing shortages and that Defendant "currently employs 128 detention officers and supervisors at ASGDC" and that Defendant has been "unable to fill" 75 positions that are currently funded).

At the hearing, Plaintiffs emphasized that, at any given time, hundreds of detainees at ASGDC present with mental health issues requiring a full range of services. Plaintiffs estimated that, at the time of the hearing, approximately 600 detainees out of more than 950 total detainees housed at ASGDC required some level of mental health services.[9] Due to the inadequate staffing levels and the sheer number of SMI Detainees, Plaintiffs argued, ASGDC simply cannot provide the minimal level of care for SMI Detainees. Plaintiffs further argued that the "extreme level" of staffing shortages has resulted in unsupervised housing units, which in turn has resulted in inmate-

---

[9] The data presented by Plaintiffs is compelling. At the hearing, Plaintiffs noted that in June 2023, 760 total detainees were housed at ASGDC. In August 2024, that number had risen to 943 and, at times, exceeded 1,000. Plaintiffs further noted that, while the number of detainees increased, the number of staffed positions decreased. Plaintiffs explained that this shift caused a proliferation of gangs, among other things, resulting in an increase in violence.

on-inmate violence often targeting SMI Detainees. Plaintiffs argued ASGDC has a significant and chronic retention issue with staffing and that the staff members currently employed are subjected to excessive working hours. Although Plaintiffs noted that they do not allege any malice or intentionality regarding the staffing shortages at ASGDC, Plaintiffs assert the chronic issues with understaffing coupled with overcrowding and a lack of supervision of inmates poses a real and significant threat of harm to SMI Detainees.

Plaintiffs finally contend that Defendant discriminates against SMI Detainees in violation of the ADA. ECF No. 115 at 30. First, Plaintiffs contend SMI Detainees have disabilities that substantially limit one or more of their major life activities as they are individuals with clinically diagnosed mental illnesses, including mental illnesses that have resulted in significant functional impairments. *Id*. at 31. Second, "as detainees at ASGDC, SMI Detainees who are not in Restrictive Housing for disciplinary infractions ordinarily would be deemed 'qualified' to receive several hours per day of out-of-cell time and access to out-of-cell activities because being a person confined at ASGDC is the essential eligibility requirement for these programs and services." *Id*. Third, Defendant denies service to SMI Detainees because of their disabilities by placing them in Restrictive Housing Units ("RHU") solely based on their disabilities and related symptoms. *Id*. at 32.

### b. Irreparable Harm

Plaintiffs contend SMI Detainees will suffer irreparable harm absent the requested injunctive relief. *Id*. Plaintiffs urge the Court to intervene, arguing that, without such intervention, SMI Detainees will suffer immediate and irreparable harm due to Defendant's practice of locking detainees in cells and housing units without access to running water, lights, and a sufficient number of working toilets; by locking detainees in units without direct supervision; in keeping SMI

17

Detainees in locked-down units without providing minimally required time out of cells; and by failing to provide minimally adequate mental health services to SMI Detainees. *Id*.

### c. Balance of Equities

Plaintiffs contend the risk of harm to SMI Detainees significantly outweighs any potential harm to Defendant if the Court issues the injunctive relief. *Id*. at 33. According to Plaintiffs, "the physical and emotional hardships to SMI Detainees are clear and not remediable once suffered. There is no comparable harm to Defendant." *Id*. at 34.

### d. Public Interest

Finally, Plaintiffs contend that an injunction would serve the public interest. *Id*. at 34. Plaintiffs argue SMI Detainees and their families have an interest in the requested relief, the public at large benefits from remedying the egregious violations of constitutional rights, and "[t]he public has an interest in having SMI Detainees leave the jail reasonably healthy and with the capacity to hold productive jobs, or, at the very least, leave the jail alive and not completely deteriorated." *Id*.

## 2. Defendant's Response in Opposition

By way of response, Defendant "strongly disputes that [the Named] Plaintiffs have serious mental health needs" and that the only two Named Plaintiffs who were diagnosed with a serious mental illness have been released from incarceration at ASGDC. ECF No. 127 at 17. Defendant argues that Plaintiffs have not shown ASGDC failed to provide SMI Detainees with the "constitutional minima" required for mental health treatment. *Id*. According to Defendant, rather than citing controlling case law, Plaintiffs rely exclusively "on the opinions of its compensated expert witnesses who offer opinions as to what they believe is required by 'industry standards' or by a medical or mental health 'standard of care.'" *Id*. at 18. Defendant further contends ASGDC employs a constitutionally adequate mental health care program that satisfies the requirements of

the cases cited by Plaintiffs. *Id*. at 20–23. Defendant acknowledges that ASGDC does not provide all the programs requested by Plaintiffs, but argues it is not required to do so. *Id*. at 23–24 (noting ASGDC does not "provide group therapy and other types of out-of-cell group programming and 'therapeutic activities,' which are beyond the requirements of a local detention facility").

Defendant asserts that Plaintiffs have also failed to show discrimination in violation of the ADA. *Id*. at 25. According to Defendant, "[t]he Supreme Court [has] confirmed that the ADA is a statutory scheme intended to prevent discrimination, but the Court was not mandating a 'standard of care' or setting a minimum level of services that may be required." *Id*. at 27. Defendant argues that, despite Plaintiffs' allegation that ASGDC failed to provide adequate mental health services, the ADA is not violated by allegations or proof that a prison or local detention facility merely failed to attend to the medical or mental health needs of an inmate. *Id*.

Defendant next contends that Plaintiffs' condition-of-confinement claims regarding access to toilets, showers, lighting, and security-related issues is without merit. *Id*. at 29. Significantly, Defendant argues the evidence shows Defendant is currently engaged in renovations of the housing units and that such renovations will ameliorate any claims Plaintiffs may have, thus mooting the need for any injunctive relief. *Id*. at 29–30. Defendant further argues that any temporary inconveniences resulting from a lack of access to toilets or sinks do not rise to the level of a constitutional deprivation. *Id*. at 31.

Finally, Defendant argues that DRSC has not demonstrated that Plaintiffs are likely to suffer irreparable harm in the absence of the preliminary injunctive relief sought. *Id*. at 34. Defendant notes that Plaintiffs are not seeking to maintain the status quo, but instead are seeking

mandatory injunctive relief without first showing they are entitled to judgment on the Fourteenth

Amendment claims or ADA claims asserted in the Second Amended Complaint. *Id*.[10]

### 3. Plaintiffs' Reply

By way of reply, Plaintiffs contend that "Defendant's Response largely ignores the

unconstitutional practices detailed by DRSC's expert witnesses, multiple detainees, and the jail's

mental health counselors themselves." ECF No. 137 at 2. Plaintiffs also argue that Defendant's

response fails to refute the material facts at issue in that (1) there is no factual dispute regarding

the mental health services provided at ASGDC, (2) understaffing, inadequate supervision, and

contraband continue to place SMI Detainees at risk of serious harm, and (3) Defendant continues

to place detainees in housing units without access to basic human necessities. *Id*. at 5–11. Finally,

---

[10] In addition to the arguments discussed above, Defendant also contends that Plaintiffs cannot demonstrate a likelihood of success on the merits because they have not satisfied the PLRA's exhaustion requirements. ECF No. 127 at 32. In response, Plaintiffs argue that exhaustion is an affirmative defense for which Defendant bears the burden of proof, but Defendant has failed to carry that burden in its opposition to the Motion for Preliminary Injunction. ECF No. 137 at 4–5. Under the PLRA, an inmate must follow the required procedural steps to exhaust his administrative remedies prior to filing suit in federal court. *Miles v. Bell*, C/A No. DKC-20-cv-2107, 2021 WL 229674, at *4 (D. Md. Jan. 22, 2021). In this case, if Defendant had shown that Plaintiffs failed to exhaust their administrative remedies, such a showing could be evidence to oppose the Motion for Preliminary Injunction because the claims might be subject to dismissal for failure to exhaust. *See Alkebulanyahh v. Nettles*, C/A No. 6:10-cv-2976-MBS, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011), *aff'd*, 454 F. App'x 231 (4th Cir. 2011) ("Plaintiff did not exhaust his administrative remedies, which indicates that Plaintiff is not likely to succeed on the merits of this case as currently filed.") (citation omitted). However, Defendant has failed, in its briefing on the Motion for Preliminary Injunction, to meet its burden to show that Plaintiffs did not adequately exhaust their remedies related to the claims asserted in the Second Amended Complaint. *See Washington v. Fed. Bureau of Prisons*, C/A No. 5:16-cv-3913-BHH, 2018 WL 6061039, at *4 (D.S.C. Nov. 20, 2018); *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017) ("[F]ailure-to-exhaust is an affirmative defense that the defendant must raise.") (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) ("[I]nmates need not plead exhaustion, nor do they bear the burden of proving it."). Defendant has not provided the Court with sufficient information to evaluate whether Plaintiffs have exhausted their administrative remedies or whether adequate administrative remedies exist, and the Court thus finds that Defendant has not met its burden regarding exhaustion at this stage.

Plaintiffs argue that SMI Detainees will continue to suffer irreparable harm absent immediate injunctive relief and the Court must therefore intervene. *Id*. at 11–12.

## ANALYSIS

This case involves serious allegations of constitutional inadequacies regarding the care and treatment of vulnerable individuals with mental health conditions committed to Defendant's custody.  Plaintiffs contend those alleged constitutional inadequacies include limited access to mental health resources and treatment, lack of safe and sanitary accommodations, a failure to protect SMI Detainees from harm, and discrimination based on the SMI Detainee's purported disabilities.  The parties both agree ASGDC is understaffed, ASGDC lacks various resources, and portions of ASGDC facilities are in need of repair and/or remediation.  However, the parties disagree as to whether Defendant has violated the constitutional rights of SMI Detainees and whether a mandatory preliminary injunction is appropriate at this stage of these proceedings.  For its part, Defendant contends it is trying to rectify the staffing issues central to Plaintiffs' claims, implement appropriate and feasible therapeutic treatment options for SMI Detainees, and remodel and remediate the conditions at ASGDC to provide a safe environment for detainees and employees.  Plaintiffs contend those efforts are insufficient, and they ask the Court to intervene and mandate that Defendant stop violating SMI Detainees' well-established constitutional rights.

### The Minimum Constitutional Requirements

Before analyzing the parties' arguments under the *Winter* factors, the Court considers the minimum constitutional requirements for treatment that a local detention facility, such as ASGDC, must provide to a detainee with a serious mental health condition, such as the SMI Detainees in this case.  At the hearing held on November 13, 2024, counsel for Plaintiffs posed the issue as follows:

> Whether a county jail, as a matter of practice, may lawfully withhold generally recognized and accepted medical services, not because of one's medical condition, but because of the nature of the correctional facility?

Plaintiffs suggest that the answer to this question is "No." The Court agrees. Although certain limitations may be present at a local detention facility—such as constraints due to a lack of resources, lack of funding, the short-term nature of the detention, and other factors—pretrial detainees are entitled to the same constitutionally mandated protections, if not more, than those afforded to convicted inmates confined to a state prison. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."); *Martin*, 849 F.2d at 870 ("The due process rights of a pretrial detainee are at least as great as the [E]ighth [A]mendment protections available to the convicted prisoner; while the convicted prisoner is entitled to protection only against punishment that is 'cruel and unusual,' the pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to *any* form of 'punishment.'"). Thus, the Court rejects Defendant's argument that a local detention center is subjected to a lower standard of care or lesser obligation to provide a range of services of mental health treatment than a long-term correctional facility. *See* ECF No. 127 at 22 (arguing that "certainly a local detention facility owes at least the same and most likely a lesser level of care" than a long-term correctional facility). Certain resources at a local detention center might be more limited than those at a long-term correctional facility. However, the minimum constitutional standards required for the treatment of health issues, including mental health issues, is the same for all inmates, whether they are confined at a local detention center or a long-term correctional facility. The law requires that medically necessary treatment for mental health issues must be provided. *See Bowring v. Godwin*, 551 F.2d

44, 48 (4th Cir. 1977) (holding inmates are entitled to medically necessary mental health treatment).

The claims in this case require the Court to evaluate two considerations.  First, the Court must decide *when* treatment is necessary under the Constitution.  Second, the Court must determine *what* treatment is required by the Constitution.  The parties agree that the case law in the Fourth Circuit is "undeveloped" as to the minimum constitutional standards applicable to local detention facilities in caring for detainees with serious mental health issues.[11]  Nevertheless, the Court finds clear guidance from other circuits on this issue and from cases in the Fourth Circuit evaluating general medical deliberate indifference claims.

In *Bowring*, the Fourth Circuit held that an inmate

> is entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.  The right to treatment is, of course, limited to that which may be provided upon a reasonable cost and time basis and **the essential test is one of medical necessity** and not simply that which may be considered merely desirable.

551 F.2d at 47–48. (emphasis added).  Following *Bowring*, courts in the Fourth Circuit have reiterated "[t]here is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart." *Mills v. Nines*, C/A No. SAG-22-cv-3304, 2023 WL 7386154, at *3 (D. Md. Nov. 8, 2023); *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th

---

[11] Plaintiffs contend this inquiry turns on the substance of mental health services, which in their view, is a legal and not a factual question requiring the Court to determine whether and what services a county must provide to detainees.  Plaintiffs contend, for example, that ASGDC may not withhold individual and group therapeutic services or other mental health treatment options recognized as necessary by professional standards.

Cir. 2018) ("Courts treat an inmate's mental health claims just as seriously as any physical health claims."). The right to treatment for mental health issues is thus determined by "medical necessity," applying the three-part test in *Bowring*. In light of *Bowring*, and the many cases that follow it, there can be no doubt that Defendant is obligated to provide constitutionally adequate mental health treatment to SMI Detainees upon a showing of medical necessity.

Once an inmate has demonstrated entitlement to mental health treatment under this test, the inquiry then turns to the adequacy of that treatment. The parties note that no clear standard has been recognized by courts in this District or within the Fourth Circuit regarding the constitutionally required minima for a mental health care delivery system at a local detention facility such as ASGDC. However, other courts around the country have identified "six components of [a] minimally adequate prison mental health care delivery system under the Eighth Amendment." *Perri v. Coughlin*, C/A No. 90-cv-1160, 1999 WL 395374, at *7 (N.D.N.Y. June 11, 1999); *see Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980) ("The components of a minimally adequate mental health treatment program may be ascertained by resort to judicial precedent in previous prison cases, by consideration of the expert testimony in the instant case, and by applying the basic principles of minimally adequate care to the specific problem of mental health care."), *aff'd in part, rev'd in part*, 679 F.2d 1115 (5th Cir. 1982), *amended in part, vacated in part*, 688 F.2d 266 (5th Cir. 1982).

These six components (the "*Ruiz* components") are as follows:

> (1) A systematic program for screening and evaluating inmates to identify those in need of mental health care;
>
> (2) A treatment program that involves more than segregation in close supervision of mentally ill inmates;
>
> (3) Employment of a sufficient number of mental health professionals;

(4) Maintenance of accurate complete and confidential mental health treatment records;

(5) Administration of psychotropic medications only with appropriate supervision and periodic examination;

(6) A basic program, to identify, treat, and supervise inmates at risk for suicide.

*See Balla v. Idaho State Board of Corrections,* 595 F. Supp. 1558, 1577 (D. Idaho 1984); *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995) (noting that, to analyze "whether the mental health care delivery system operated by [a prison] is so deficient that it deprives seriously mentally ill inmates of access to adequate mental health care . . . the courts have focused on the presence or absence of six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system); *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1128 (M.D. Ala. 2016) ("Because this framework was first articulated over 35 years ago, and because mental-health care has evolved dramatically since that time, the court considers it to be instructive but not determinative as to the floor below which mental-health care would be grossly inadequate and therefore unconstitutional."); *Tellis v. LeBlanc*, C/A No. 18-cv-541, 2024 WL 3470644, at *30 (W.D. La. July 18, 2024) ("*Ruiz* identified the minimum criteria required for mental health care as: systematic screening and evaluation; treatment that is more than mere seclusion or close supervision; participation by trained mental health professionals in appropriate numbers; safeguards against psychotropic medications that are prescribed in dangerous amounts, without adequate supervision or otherwise inappropriately administered; accurate, complete, and confidential records; and a suicide prevention program.").  This Court finds these six *Ruiz* components to be persuasive criteria in determining whether the mental health treatment services at ASGDC are constitutionally adequate.

Having identified the relevant test and considerations to determine when and what mental health treatment is required, the Court now turns to an application of the *Winter* factors.

**The *Winter* Factors**

**(1) Likelihood of Success on the Merits**

"[P]laintiffs seeking prohibitory injunctions must make a clear showing of their likelihood of success; however, '[t]o justify a mandatory injunction, . . . the movant must demonstrate a *clear and convincing probability of success.*'"[12]  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 612 F. Supp. 3d 563, 579 (E.D. Va. 2020) (emphasis added) (quoting *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 566 (E.D. Va. 2016)).  "In other words, for mandatory injunctive relief to be available, the movant's 'right to relief must be indisputably clear.'"  *Id*. (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972).  Although Plaintiffs have presented significant evidence of deficiencies in the care provided to SMI Detainees and identified dramatic staffing shortages at ASGDC, there is still a dispute on the merits of the claims such that it is not "indisputably clear" that Plaintiffs are entitled to the relief sought.

---

[12] At the hearing, counsel for Plaintiffs argued the Motion for Preliminary Injunction seeks only to maintain the status quo and is therefore not a mandatory injunction.  Plaintiff's counsel argued that the relief sought was only for the Court to prevent Defendant from continuing to violate the law in exposing SMI Detainees to unconstitutional conditions.  The Court disagrees.  "The Fourth Circuit has defined 'the status quo' as the 'last uncontested status between the parties which preceded the controversy.'"  *Mahmoud v. McKnight*, 688 F. Supp. 3d 265, 287 (D. Md. 2023) (citing *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014)), *aff'd*, 102 F.4th 191 (4th Cir. 2024).  In the Motion for Preliminary Injunction, Plaintiffs ask the Court to require Defendant to provide certain therapeutic services not currently available at ASGDC, to remediate current conditions of ASGDC facilities, and to rectify the staffing shortages at ASGDC.  Such requests are not seeking to preserve the status quo but are instead a request to mandate that Defendant do something different.  Plaintiffs' attempt to frame their requested relief as a prohibitory rather than mandatory injunction is without merit.

**Deliberate Indifference Claims**

There is significant evidence to support Plaintiffs' assertion that the Named Plaintiffs (and likely many other SMI Detainees at ASGDC) satisfy the *Bowring* "medical necessity" test to warrant mental health treatment.[13]   However, there is a genuine dispute at this stage as to whether ASGDC's mental health treatment program is so deficient that it offends the Constitution or fails to comply with the six *Ruiz* components.

Plaintiffs cite to expert opinions and certain studies to support their contention that the mental health treatment program at ASGDC is constitutionally deficient.  One such study was conducted by Pultizer/Bogard & Associates, LLC, which issued a Final Report on April 18, 2014, in the "Alvin S. Glenn Detention Center Management and Operations Study" (the "2014 Management Study").  ECF No. 115-16.  Finding 4 of the 2014 Management Study concluded that mental health treatment at ASGDC is limited to crisis stabilization and medication management as follows:

> The focus of mental health treatment at ASGDC is limited to crisis intervention, stabilization and psychiatric medication management. There is little opportunity for ongoing counseling, no group counseling, and no special mental health programs.   The one

---

[13] In the Second Amended Complaint, Plaintiffs allege that CR2 has a history of serious mental illness, having been diagnosed with bipolar disorder and anxiety with a history of panic attacks, ECF No. 99 at 6, ¶ 18; CR3 has been diagnosed with schizophrenia, *id*. at 6, ¶ 19; CR 4 has been diagnosed with anxiety and is prescribed medication for her diagnosis, *id*. at 7, ¶ 20; CR5 has been diagnosed with depression and anxiety, *id*. at 7, ¶ 21; CR6 has been diagnosed with anxiety and posttraumatic stress disorder, *id*. at 7, ¶ 22; CR9 has been treated for serious mental illness for over 20 years, *id*. at 8, ¶ 25; CR10 has a mental illness that has resulted in being placed on suicide watch on multiple occasions, *id*. at 9, ¶ 26; CR11 has been diagnosed with schizophrenia, *id*. at 9, ¶ 27; CR12 suffers from severe depression, *id*. at 10, ¶ 28; CR14 has been diagnosed with psychosis, *id*. at 10, ¶ 30; and CR15 has been diagnosed with major depression, *id*. at 10, ¶ 31.  Plaintiffs make numerous other allegations in the Second Amended Complaint regarding the nature of the Named Plaintiffs' mental disorders and need for effective treatment. Plaintiffs also have provided evidence in the form of affidavits of the Named Plaintiffs and mental health providers, as well as medical records, regarding the nature of the disorders and treatment needs of the Named Plaintiffs and other SMI Detainees.

> exception is that a caseworker from Columbia Area Mental Health
> sees those inmates who are on the mental health center's special
> needs caseload once every thirty days to support planning for reentry
> into the community upon release.

*Id*. at 41.  According to Plaintiffs, the 2014 Management Study also found that "Defendant was failing to meet the needs of detainees with mental illness in part because of inappropriate housing." ECF No. 115 at 11.  Plaintiffs argue that Defendant was aware of the harm and risks to SMI Detainees because the 2014 Management Study "emphasized the urgent need to address extant, persistent, and pervasive staffing and operational deficiencies required to improve the care, custody, and management of inmates."  *Id*. at 26.

Plaintiffs' reliance on the 2014 Management Study (and other similar studies and reports cited in their brief) is insufficient at this time to show it is "indisputably clear" that the current mental health treatment program and conditions at ASGDC violate SMI Detainees' constitutional rights.  It very well might be that the deficiencies identified in the 2014 Management Study persist at the present time, but that is not clear based upon the Court's review of the record.  Further, Plaintiffs concede that crisis stabilization and medication management, as cited in the 2014 Management Study, qualify as valid treatment options as part of a constitutionally sufficient mental health treatment program.  These components, as implemented at ASGDC, might be insufficient to satisfy the Constitution, but that is a matter that remains heavily disputed by the parties and there is insufficient evidence at this time to satisfy the high burden Plaintiffs must show to establish an indisputably clear right to relief for issuance of a mandatory injunction prior to a resolution on the merits of the claims.

Plaintiffs also argue that ASGDC fails to provide necessary treatment to SMI Detainees in that they do not provide group therapy, individual counseling, and substance abuse treatment and medication, among other purported deficiencies.  ECF No. 115 at 8.  Plaintiffs have not shown,

however, that any of the six *Ruiz* components require such treatment options. Further, the undersigned is unaware of any case law suggesting that group therapy or any of the other specific therapeutic modalities preferred by Plaintiffs are required to satisfy the constitutional minima.[14] To the contrary, courts have recognized in various contexts that "lack of access to programming such as group therapy does not alone imply that a Fourteenth Amendment violation has occurred." *Boyer v. Iser*, C/A No. PWG-cv-20-1260, 2021 WL 3852292, at *11 (D. Md. Aug. 27, 2021). There is no doubt that SMI Detainees could benefit from expanded counseling, therapeutic, and mental health treatment services at ASGDC than those currently provided. That reality, however, is insufficient to demonstrate that the present system at ASGDC is inadequate to meet the constitutional minima. *Grubbs v. Bradley*, 552 F. Supp. 1052, 1130 (M.D. Tenn. 1982) ("That more extensive on-site mental health services are not currently available . . . is lamentable and disturbing, but does not at the present time evidence the deliberate indifference to serious needs, necessary to show cruel and unusual punishment.").

Defendant contends the mental health treatment program at ASGDC satisfies the *Ruiz* components, citing the affidavits of Crayman Harvey ("Harvey"), the Director of ASGDC, and Melissa S. Caldwell, Ph.D. ("Caldwell"), the President of Freedom Behavioral Health, Inc., who oversees Advance Correctional Healthcare, Inc. ("ACH"), which is contracted to provide medical and mental health services at ASGDC. ECF Nos. 127-1 at 13, ¶ 53; 127-3 at 2, ¶¶ 1–2. Harvey was named Interim Director of ASGDC on August 1, 2022, and Director in August 2023.[15] ECF

---

[14] At the hearing, Plaintiffs conceded that medication, crisis stabilization, and "brief check-ins" are all forms of therapy that are being provided to SMI Detainees at ASGDC. However, Plaintiffs argued that such practices, as implemented at ASGDC, are insufficient to satisfy the constitutional minima.

[15] Harvey is the Rule 30(b)(6) witness for Defendant in this case. ECF No. 127-1 at 2, ¶ 2.

No. 127-1 at 2, ¶¶ 2–3. After arriving at ASGDC, Harvey created a mental health unit for SMI detainees in the Unit Mike. *Id.* at 6, at ¶ 25.

> Unit Mike is a pod unit, with 4 pods on each of the two floors. Each pod contains 8 individual cells and its own day room with a television and bathroom facilities. Except for routine lockdowns for medication pass and meal pass, the SMI detainees in Mike are out of their cells and interacting with the other detainees in their pod.
>
> . . . [T]he benefits of housing SMI detainees in Mike include protection from being taken advantage of by other detainees in the general population and constant direct supervision by detention officers. No detainee in Mike shares a cell with another detainee. They are free to interact outside of their cells with a smaller number of detainees in the more controlled environment of their dayrooms, and the medical and mental health staff can access them on a more regular basis. They have televisions in their pods and like all other detainees are provided tablets with access to reading, entertainment, educational and mental health programming. They also have access to the outdoor recreation area.

*Id.* at 6–7, ¶¶ 25–26. Harvey acknowledges that, at times, certain detainees are brought to ASGDC exhibiting outward signs of severe mental health issues and, depending on the severity of those issues, the detainee might be isolated in the intake area "for observation and medication management for a temporary period of time before being assigned to Mike." *Id.* at 7, ¶ 28. According to Harvey, all detainees are screened by the mental health staff for mental health issues during the classification process. *Id.* at 13, ¶ 54. If a detainee presents with mental health issues, they are referred to the mental health staff for further assessment and available mental health records are obtained from the South Carolina Department of Mental Health ("SCDMH"). *Id.*

In her affidavit, Caldwell provides a detailed description of the mental health services provided by ACH to ASGDC detainees. ECF No. 127-3 at 3–9, ¶¶ 5–18. Caldwell also describes efforts being undertaken to provide additional mental health services at ASGDC that were

previously unavailable. *Id*. at 9, ¶ 19. As to current mental health services provided by ACH at ASGDC in recent months, Caldwell avers as follows:

> In May 2024 at ASGDC, ACH employees performed 36 Mental Health Non-Contact Professional Activities (e.g., consult with community providers), 223 Mental Health Placement Review of Detainee in Observation (e.g., suicide risk assessments), 344 Mental Health Screening Interviews, 597 Mental Health Services Clinical Contacts (e.g., counseling, psychotherapy), and 150 Mental Health Services Clinical Contact-Psychiatry.
>
> In June 2024 at ASGDC, ACH employees performed 43 Mental Health Non-Contact Professional Activity, 206 Mental Health Placement Review of Detainee in Observation, 373 Mental Health Screening Interviews, 532 Mental Health Services Clinical Contacts, and 137 Mental Health Services Clinical Contact-Psychiatry.
>
> In July 2024 at ASGDC, ACH employees performed 33 Mental Health Non-Contact Professional Activity, 179 Mental Health Placement Review of Detainee in Observation, 400 Mental Health Screening Interviews, 466 Mental Health Services Clinical Contacts, and 161 Mental Health Services Clinical Contact-Psychiatry.
>
> In August 2024 at ASGDC, ACH employees performed 14 Mental Health Non-Contact Professional Activity, 123 Mental Health Placement Review of Detainee in Observation, 411 Mental Health Screening Interviews, 353 Mental Health Services Clinical Contacts, and 139 Mental Health Services Clinical Contact-Psychiatry.

*Id*. at 10, ¶¶ 20–23.

Plaintiffs might ultimately be able to show that the efforts at ASGDC, as detailed in these affidavits, fail to provide a constitutionally sufficient mental health treatment program and that SMI Detainees are entitled to relief. However, there remains a genuine dispute with conflicting evidence as to whether the mental health treatment program at ASGDC conforms to the six *Ruiz* components and thus satisfies the constitutional minima. Based on the present record before the Court, Plaintiffs have not demonstrated a clear likelihood of succeed on the merits of this claim.

**Conditions of Confinement Claims**

Plaintiffs make many allegations in the Second Amended Complaint concerning the deplorable conditions at ASGDC.  Plaintiffs have submitted affidavits of numerous inmates who recount first-hand experiences with such conditions at ASGDC.  Plaintiffs also rely on various studies that have been performed over the years regarding the state of the conditions at ASGDC.

Defendant acknowledges problems with the conditions at ASGDC, but argues those problems are being remediated and that the conditions of confinement at ASGDC do not rise to the level of a constitutional violation.  In his affidavit, Harvey notes that Defendant "has embarked on a project to completely renovate the entire detention center facility," having completed a total renovation of the kitchen facility in July 2023, the lobby and family visitation area, and four housing units (BMU, Yankee, Papa, and X-Ray).  ECF No. 127-1 at 7–8, ¶¶ 29–30.  Renovation of the housing units include installing state-of-the-art electronic locking systems, new stainless-steel sinks and toilets, new plumbing, water management systems, reinforced light fixtures that cannot be broken, and secure control rooms for officer observation.  *Id*. at 8, ¶¶ 30–31.  All housing units at ASGDC will be upfitted with these same renovations with five units (Lima, Alpha, Golf, India, and Hotel) actively under construction.  *Id*. at 8 ¶ 32.  Harvey avers that "there is no detainee who is placed in a cell that does not have a working toilet."  *Id*. at 10, ¶ 38.

As to the individual Named Plaintiffs, Harvey makes the following averments:

> The only [Named Plaintiffs] who currently reside in ASGDC are CR2, CR3, CR5, CR6, CR12 and CR15.  CR2 is currently housed in Papa in a room with a working lock, toilet, sink, lighting and access to a working shower in his pod.  CR3, CR9 and CR15 are currently housed in Yankee and are housed in rooms with a working locks, toilets, sinks, lighting and access to working showers in their unit.  CR5 is housed in Unit Mike in a room with a working lock, toilet, sink, lighting and access to a working shower in his pod.  CR6 is currently housed in Bravo, which is an open bay dorm.  He has access to working toilets, sinks and showers in the unit.  CR12 is

> housed in unit Kilo in a room [with] a working lock, toilet, sink, lighting and access to a working shower in his pod.

*Id*. at 10–11, ¶ 39.  It is not clear whether these efforts undertaken by Defendant are sufficient to correct the deficiencies identified by Plaintiffs to ultimately defeat the claims in the Second Amended Complaint.  However, Plaintiffs have not shown a clear likelihood of success as to the merits of those claims at this stage.

**Staffing Issues**

Plaintiffs' allegations and supporting evidence regarding the staffing issues at ASGDC and the dangers allegedly created by staffing shortages are troubling.  The chronic staffing issues at ASGDC are well-documented in the various studies cited by Plaintiffs.  Indeed, Defendant concedes that ASGDC is short staffed.  For example, Harvey acknowledges in his affidavit that ASGDC "has been unable to hire people to fill all the positions funded and available at ASGDC" but contends that Defendant is "aggressively seeking applicants."  ECF No. 127-1 at 3, ¶ 9.  As of the date of Harvey's affidavit (September 16, 2024), Defendant employed 128 detention officers and supervisors at ASGDC and had approved funding for 75 positions that were unfilled.  *Id*. Harvey details the efforts Defendant is undertaking to fully staff ASGDC.  *Id*. at 3–4, ¶¶ 9–14. Harvey emphasizes that Defendant is not intentionally "'understaffing' ASGDC by not allocating funds sufficient to staff the facility properly" and is aggressively attempting to staff all funded positions.  *Id*. at 4, ¶ 14.  By the time of the hearing in Mid-November 2024, Plaintiffs noted that the current staffing level of Security Officers had dropped to about 90.  Defendant did not dispute that number.

The fact that ASGDC is significantly understaffed is not in dispute.  Plaintiffs may ultimately show that these staffing shortages rise to the level of a constitutional violation.  The

claim regarding staffing levels and the associated safety dangers leans most heavily in Plaintiff's favor.

### ADA Claim

Plaintiffs' ADA claim is not entirely clear. Almost no argument was provided at the hearing regarding the ADA claim. To the extent Plaintiffs assert an ADA claim based on purportedly inadequate medical treatment (*see* ECF No. 99 at 30, ¶¶ 124–28 (alleging Defendant does not provide adequate mental health services or mental health treatment; fails to provide close supervision and adequate medication management; and does not have an adequate basic program for the identification, treatment, and supervision of SMI Detainees with suicidal tendencies)), they are not likely to succeed because the ADA prohibits discrimination because of disability, not inadequate treatment for disability. *See Goodman v. Johnson*, 524 F. App'x 887, 890 (4th Cir. 2013); *Jenkins v. Beeman*, C/A No. PX-21-cv-2364, 2023 WL 2599544, at *7 (D. Md. Mar. 22, 2023) (dismissing a claim under the ADA where the complaint focused on an inmate's denial of adequate medical care for an ankle injury). Moreover, Plaintiffs' allegations regarding a purported violation of the ADA are vague and conclusory and unsupported by record evidence at this stage. For example, Plaintiffs fail to demonstrate what service, program, or activity Plaintiffs were excluded from or denied the benefit of, other than generally asserting that ASGDC fails to provide adequate services and programs for SMI Detainees. Plaintiffs further have not shown that SMI Detainees were discriminated against on the basis of any disability. Instead, Plaintiffs contend Defendant failed to provide mental health treatment and services to Plaintiffs, which is insufficient to state an ADA claim. *See Miller v. Hinton*, 288 F. App'x 901, 903 (4th Cir. 2008) (noting "that the ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled

prisoners" absent discrimination (internal quotation marks omitted)).  Accordingly, Plaintiffs are not likely to succeed on their ADA claim on the record presently before the Court.

**(2) Irreparable Harm**

To establish irreparable harm, Plaintiffs must make a "clear showing" that they will suffer harm that is "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (internal quotation marks omitted). "Additionally, the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline,* 915 F.3d at 216.  Plaintiff has presented evidence of harm, but not clearly that the harm will not be addressed if they receive a judgment at the end of the case.

Further, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).  "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (citation omitted).[16]  Thus, a party's delay in seeking injunctive relief undermines their claim of irreparable injury.  *See Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607, 618 (D. Md. 2023) (finding a year-long delay before seeking a preliminary injunction undermined the plaintiff's allegation of irreparable harm), *aff'd*, No. 23-

---

[16] The Fourth Circuit has explained that its "decision in *Quince Orchard* instructs that any delay attributable to plaintiffs in initiating a preliminary injunction request, coupled with prejudicial impact from the delay, should be considered when the question of irreparable harm to plaintiffs is balanced against harm to defendants." *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 138 (4th Cir. 2001).  *Quince Orchard*, however, does not require a court "to find, *as a matter of law*, that the plaintiff suffered no irreparable injury because it delayed in initiating its request for a preliminary injunction." *Id.* (emphasis added).  Here, the Court finds the delay in this case, without an explanation from Plaintiffs and balanced against the harm to Defendant, is sufficient to defeat Plaintiffs' argument regarding irreparable harm.

1567, 2023 WL 8728503 (4th Cir. Dec. 19, 2023); *FS Med. Supplies, LLC v. Tanner Pharma UK Ltd.*, C/A No. 3:23-cv-000598-RJC-WCM, 2023 WL 6812565, at *4 (W.D.N.C. Oct. 16, 2023) ("A plaintiff's failure to act with haste in seeking preliminary relief belies claims of emergency.").

Plaintiffs waited more than two years (nearly 28 months) after filing the initial Complaint before filing the present Motion for Preliminary Injunction. This delay "suggests that fear of irreparable harm is less than dire . . . [and] is sufficient to deny [Plaintiffs' Motion]." *Domtar AI Inc. v. J.D. Irving, Ltd.*, C/A No. 5:14-cv-58-BO, 2014 WL 1800795, at *3 (E.D.N.C. May 6, 2014) (explaining the plaintiffs' delay in seeking a preliminary injunction for six weeks after the filing of their complaint supports a finding that they were not suffering an irreparable harm); *see also Potomac Heritage Trail Ass'n, Inc. v. United States Dep't of Transp.*, C/A No. DLB-22-cv-2482, 2022 WL 7051160, at *19 (D. Md. Oct. 11, 2022) ("[T]he plaintiffs' significant delay in seeking judicial intervention reduces the weight the Court might afford to their claim of irreparable harm."). Plaintiffs have not provided an explanation for the delay in bringing the instant Motion for Preliminary Injunction. As such, the Court finds that the delay in this matter is sufficient to show Plaintiffs are not able to demonstrate irreparable harm.[17]  *See, e.g., Charleston W. 76 Auto/Truckstop, Inc. v. Nat'l Auto/Truckstops, Inc.*, C/A No. 3:97-cv-25, 1997 WL 528491, at *8 (N.D.W. Va. May 21, 1997) (explaining a "delay in seeking injunctive relief cuts against a finding of irreparable harm"); *Scott v. WFS Fin., Inc.*, C/A No. 2:06-cv-349, 2007 WL 190237, at *9 (E.D. Va. Jan. 18, 2007) ("Plaintiff's delay [of five months after filing the complaint] in moving for an injunction supports the conclusion that Plaintiff's harm is not irreparable."); *Ultimate Outdoor*

---

[17] Plaintiff's delay in bringing the Motion for Preliminary Injunction "also weighs against Plaintiff[s] in balancing the equities." *Roswell*, 671 F. Supp. 3d at 618; *see also Quince*, 872 F.2d at 80 (explaining that a delay in seeking injunctive relief is "quite relevant to balancing the parties' potential harms").

*Movies, LLC v. FunFlicks, LLC*, C/A No. SAG-18-cv-2315, 2019 WL 2642838, at *7 (D. Md. June 27, 2019) (finding "Defendants' irreparable harm argument is belied by their delay" in bringing their request for injunctive relief "until almost a year after the Plaintiffs filed the underlying suit").

Additionally, setting aside the issue of delay, Plaintiffs have not clearly shown under the applicable standard that they will suffer irreparable harm absent injunctive relief. Plaintiffs contend

> SMI Detainees will suffer immediate and irreparable harm without court intervention based on Defendant's practice of locking detainees in cells and housing units without access to running water, lights, and a sufficient number of working toilets, by locking detainees in units without direct supervision in violation of its own policies and despite known danger, in keeping SMI Detainees in locked down units without providing minimally required time out of cells and pods, and by failing to provide minimally adequate mental health services to SMI Detainees.

ECF No. 115 at 32. However, although Plaintiffs may suffer some injurious consequences as a result of the ongoing issues detailed in the Second Amended Complaint and the Motion for Preliminary Injunction, Plaintiffs have not demonstrated that they will suffer *irreparable harm* absent immediate intervention by the Court. *See Hodges v. Abraham*, 253 F. Supp. 2d 846, 864 (D.S.C. 2002) ("The rule barring consideration of remote or speculative injury for purposes of a preliminary injunction applies despite the degree of injurious consequences." (collecting cases)). "There must be a likelihood that immediate irreparable harm will occur." *Reid v. Johnson*, 333 F. Supp. 2d 543, 550 (E.D. Va. 2004) (*Manning v. Hunt,* 119 F.3d 254, 263 (4th Cir. 1997)). Plaintiffs have not made any such showing.

Citing *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021), Plaintiffs argue that, "because ASGDC has and continues to violate detainees' constitutional rights, the irreparable harm factor is clearly satisfied." ECF No. 115 at 33. In

*Leaders of a Beautiful Struggle*, the Fourth Circuit explained that, when "there is a likely constitutional violation, the irreparable harm factor is satisfied" because "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitute irreparable injury.'" 2 F.4th at 346 (citation omitted). Courts applying *Leaders of a Beautiful Struggle* have noted, however, that not every alleged constitutional violation gives rise to *per se* irreparable harm. *See, e.g.*, *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 393–94 (D. Md. 2022) (noting "*Leaders of a Beautiful Struggle* does not hold that a violation of the Supremacy Clause gives rise to irreparable harm *per se*"). Whether *Leaders of a Beautiful Struggle* dictates a finding of *per se* irreparable harm for the Fourteenth Amendment violations alleged in this case is of no consequence because, at this stage of the proceedings, the Court concludes that the evidence is in dispute such that Plaintiffs have not clearly established a constitutional violation under the Fourteenth Amendment as detailed in the discussion above.

**(3) The Balance of Equities and the Public Interest**

"Where, as here, the government is a party, the 'balance of the equities' and 'public interest' prongs of the preliminary injunction test merge." *Miller v. Marshall*, 682 F. Supp. 3d 559, 591–92 (S.D.W. Va. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *see Bauer v. Elrich*, 463 F. Supp. 3d 606, 614 (D. Md. 2020) ("[T]he balance of equities and the public interest [] merge when the government is a party."). In evaluating the balance of the equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

This case certainly presents conflicting considerations regarding the balance of the equities and the public interest. On the one hand, it is always in the public interest to uphold constitutional rights, including the rights of the imprisoned. *See Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d

184, 191 (4th Cir. 2013); *Mogensen v. Welch*, 707 F. Supp. 3d 604, 615 (W.D. Va. 2023) ("[I]t is the public interest to protect constitutional rights. Of that there is no dispute." (citation omitted)). On the other hand, in evaluating a request for prospective mandatory injunctive relief in the prison context, as in the present case, the Fourth Circuit has explained:

> It is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities. . . . Even where there has been a finding on the merits that unconstitutional conditions exist, federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators. . . . Indeed, intrusive and far-reaching federal judicial intervention in the details of prison management is justifiable only where state officials have been afforded the opportunity to correct constitutional infirmities and have abdicated their responsibility to do so. . . . In sum, sweeping intervention in the management of state prisons is rarely appropriate when exercising the equitable powers of the federal courts. This is true where conditions at the prison have been adjudged unconstitutional following trial on the merits. It is especially true where mandatory injunctive relief is sought and only preliminary findings as to the plaintiffs' likelihood of success on the merits have been made.

*Taylor v. Freeman*, 34 F.3d 266, 268–69 (4th Cir. 1994). After the Fourt Circuit decided *Taylor*, the PLRA was signed into law, which further constrained the relief available to inmates and imposed procedural barriers on prisoners bringing suits challenging prison conditions. *See* 18 U.S.C. § 3626 (2000); 28 U.S.C. § 1932 (2000). Relevant here, the PLRA requires that "[i]njunctive relief must be narrowly tailored to extend no further than the particular plaintiff." *Bruce Tyson v. Ozmint*, C/A No. 6:06-cv-0385-PMD-WMC, 2006 WL 8443422, at *1 (D.S.C. Aug. 29, 2006) (citing 18 U.S.C. § 3626(a)(1)), *R&R adopted by* 2006 WL 3139682 (D.S.C. Oct. 31, 2006). The PLRA applies to all "prospective relief in *any* civil action brought with respect to prison conditions." *Duvall v. Hogan*, C/A No. ELH-94-cv-2541, 2020 WL 3402301, at *7 (D.

Md. June 19, 2020) (quoting 18 U.S.C. § 3626(a)(1) (emphasis added)). This includes actions brought by pretrial detainees challenging conditions of their detention. *See id.* (citing 18 U.S.C. § 3626(g)(3) (defining "prisoner" to include "any person subject to . . . detention . . . who is accused of . . . violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program"). Since the enactment of the PLRA, "federal courts issuing injunctive relief in prisoner cases have been under the additional requirement that they 'shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of a Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" *Oken v. Sizer*, 321 F. Supp. 2d 658, 666–67 (D. Md. 2004) (quoting 18 U.S.C. § 3626(a)(1) & (2)). "Under the PLRA, federal courts are prohibited from becoming involved in the actions of the state's correctional system absent compelling reasons. A court considering whether to grant injunctive relief in a prisoner case must give substantial weight to any adverse impact on public safety or the operation of the criminal justice system." *Id.*

Based on these cases and the arguments presented by the parties, the Court finds that the balance of the equities and the public interest tip in favor of Defendant. Moreover, at this stage of the proceedings and upon the record presently before the Court, the undersigned finds that intervention in the day-to-day operations of ASGDC would be improper. *See Taylor*, 34 F.3d at 269 ("[S]weeping intervention in the management of state prisons is rarely appropriate when exercising the equitable powers of the federal courts."); *Randolph*, 2013 WL 1891333, at *2 ("The United States Court of Appeals for the Fourth Circuit has long recognized the 'wide ranging deference' that the judiciary must show prison administrators with regard to matters within their discretion."); *see also Trujillo v. Edgefield Fed. Prison*, C/A No. 0:10-cv-2058-HMH-PJG, 2010

WL 4607340, at *1 (D.S.C. Oct. 7, 2010) (denying a motion for preliminary injunction and finding

that "relief regarding the administration of a state prison should be granted only in compelling

circumstances"), *R&R adopted by* 2010 WL 4595723 (D.S.C. Nov. 4, 2010).  As the Fourth Circuit

has explained:

> The realities of running a penal institution are complex and unique
> to the prison environment.  Federal courts have traditionally been
> reluctant to interfere in the problems of prison administration.
> Indeed, the decisions made by prison administrators in their
> informed discretion have been accorded "wide-ranging deference"
> by the federal courts.  . . .  Furthermore, federal courts have an
> additional reason to show deference to the decisions of prison
> authorities, where a state penal institution is involved.  The possible
> injury to the defendant-appellants if the preliminary injunction
> stands is potentially grave.  The informed discretion of these
> penological experts could be radically limited with respect to inmate
> transfers specifically and, more importantly, with respect to prison
> discipline in general.

*Wetzel v. Edwards,* 635 F.2d 283, 288 (4th Cir. 1980).

Plaintiffs have not satisfied the heightened standard necessary for a mandatory preliminary

injunction, *see In re Microsoft*, 333 F.3d at 526 (explaining a plaintiff must establish that "a

mandatory preliminary injunction [is] necessary both to protect against irreparable harm in a

deteriorating circumstance created by the defendant and to preserve the court's ability to enter

ultimate relief on the merits of the same kind"), and Plaintiffs have not shown that the

circumstances of this case are "sufficiently demanding for the award of mandatory relief," *E.*

*Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808, 830 (4th Cir. 2004).  Because decisions relating to

the day-to-day operation of prisons are entrusted to the officials of the particular institution or

correctional system, *see Olim v. Wakinekona*, 461 U.S. 238 (1983), substantial deference must be

given to the judgment of ASGDC administrators, *see Overton v. Bazzetta*, 539 U.S. 126, 132

(2003).  Functions of prison management and security must be left to the broad discretion of prison

administrators to enable safe and effective management. *See, e.g., Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991). Thus, "the public interest is best served" if this Court does "not get involved with the daily operations of [ASGDC] . . . especially prior to the finding of a constitutional violation." *Bartlett v. Smith*, C/A No. 5:18-CT-3124-FL, 2019 WL 1051185, at *4 (E.D.N.C. Mar. 5. 2019); *see Smith v. N. Carolina Dep't of Adult Correction*, C/A No. 1:23-cv-00218-GCM, 2024 WL 3464414, at *7 (W.D.N.C. July 18, 2024) (denying a motion for preliminary injunction where, "rather than maintain the status quo, [the plaintiff asked] the Court to order prison officials to expend relatively substantial effort and resources"); *Miles v. Guice*, C/A No. 5:13-CT-3193-FL, 2014 WL 1399442, at *2 (E.D.N.C. Apr. 10, 2014) (denying an inmate's motion for preliminary injunction and noting "the public interest is best served if courts do not get involved with the daily operations of a prison"); *Cash v. Thomas*, C/A No. 6:12-cv-1278-DCN, 2013 WL 1826619, at *2 (D.S.C. Apr. 8, 2013) (denying detainee's motion for preliminary injunction, noting "the public interest is best served if the courts do not get involved in the daily operations of a detention center or prison"); *Griffith v. Bird*, C/A No. 3:06-cv-308-1-MU, 2008 WL 822483, at *1 (W.D.N.C. Mar. 26, 2008) (denying inmate's motion for preliminary injunction and noting "the likelihood of harm to the Defendants is great" and that "involvement of the court system in the daily operation of a prison is burdensome"); *Henderson v. Stephan*, C/A No. 4:19-cv-1861-BHH-TER, 2019 WL 7906087, at *2 (D.S.C. Nov. 26, 2019), *R&R adopted by* 2020 WL 707113 (D.S.C. Feb. 12, 2020).

Plaintiffs could ultimately prevail on the claims asserted in this case. However, weighing all of the *Winter* factors, issuance of the requested mandatory injunction is not appropriate at this time.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, the undersigned recommends that Plaintiffs' Motion for Preliminary Injunction be **DENIED**.

IT IS SO RECOMMENDED.

s/William S. Brown<br>
United States Magistrate Judge

December 9, 2024
Greenville, South Carolina

*The parties' attention is directed to the important notice on the following page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
250 East North Street, Suite 2300
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).