UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Disability Rights South Carolina, and 15 Unnamed Plaintiffs as Class Representatives on behalf of themselves and others similarly situated, | ) ) ) ) ) | Civil Action No. 8:22-cv-01358-MGL-BM |
| Plaintiffs, | ) ) | **DEFENDANT'S MOTION AND** |
| v. | ) ) | **MEMORANDUM IN SUPPORT OF ITS** **MOTION FOR SUMMARY JUDGMENT** |
| Richland County, | ) ) | |
| Defendant. | ) | |

Defendant Richland County ("Defendant" or "Richland County" or the "County"), by and through its undersigned counsel, hereby moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to issue an Order dismissing Plaintiffs' Second Amended Complaint because Defendant is not violating their constitutional rights as a matter of law.[1] Accordingly, summary judgment as to each of their causes of action should be granted.

## FACTUAL BACKGROUND

Plaintiff Disability Rights South Carolina ("DRSC") brought suit against Richland County on April 28, 2022. Plaintiffs then amended the initial complaint on June 13, 2022 (ECF 12), to include specific unnamed individuals who purported to represent themselves and other similarly situated. Thereafter, Plaintiffs waited until April 2024 to amended their Complaint again, name the individual plaintiffs ("Individual Plaintiffs"), and to adjust their theory of the case. (ECF 99). Initially, the case challenged certain conditions of confinement and provisions of mental health

---

[1] Pursuant to Rules 7.04 and 7.05 of the Local Civil Rules (D.S.C.), Richland County provides that a full explanation of the motion is contained within this document, such that an additional memorandum would serve no useful purpose.

services to "severely mentally disabled" detainees housed at the Alvin S. Glenn Detention Center ("ASGDC") which is operated by Defendant Richland County.

However, Plaintiffs' theory of the case has evolved since the initial complaint. The Second Amended Complaint seeks to cover "SMI detainees" rather than "Disabled Detainees." (ECF 99). Plaintiffs define SMI Detainees as individuals, "who, at any time since April 28, 2022, have been or will be confined at ASGDC and who have been or will be: (1) Assigned to a mental health' housing unit at ASGDC; (2) Diagnosed by a psychiatrist or other licensed clinical mental health professional with certain mental illnesses; (3) Diagnosed by a psychiatrist or other licensed clinical mental health professional with another mental disorder that has resulted in significant function impairments; or (4) Has been admitted to a licensed behavioral health or psychiatric hospital. (ECF 99, ¶ 33). Plaintiffs allege the representation covers any detainee who has been diagnosed with: a) Cognitive disorders (e.g. traumatic brain injuries, Cognitive Disorder Not Otherwise Specified; b) Schizophrenia (all subtypes); c) Schizoaffective Disorder (all subtypes); d) Paranoid Disorder (e.g. Delusional Disorders); e) Major Depressive Disorders (all subtypes); f) Bipolar Disorder (all subtypes); g) Other Psychotic or Mood Disorders (e.g. Schizophreniform, Dysthymia, Psychotic Disorder Not Otherwise Specified." (ECF 99, ¶ 33). Plaintiffs seek a litany of relief including a declaratory judgment, preliminary and permanent injunctions, and specific performance of development and implementation of a comprehensive corrective action plan, and the appointment of a monitor. (*See generally* ECF 99).

Plaintiffs allege that Richland County is violating constitutional rights of SMI detainees under the Fourteenth Amendment to the United States Constitution in the following ways:  (a) failing to protect SMI Detainees from harm through deliberate indifference to inadequate supervision by detention officers; (b) failing to protect SMI Detainees through deliberate

2

indifference to the introduction of contraband weapons and drugs into the facility; (c) confining SMI detainees in squalid, unsanitary conditions without properly functioning toilets, lavatories, showers, lighting, and sufficient access to drinking water; (d) placing SMI detainees on lockdown in their cells for extended periods of time; (e) failing to provide to SMI detainees with constitutionally adequate mental health services; (f) subjecting SMI detainees to excessive force by locking them in shower stalls, restraint chairs, and other means of restricting the movement of detainees for punitive purposes; (g) isolating SMI detainees who attempt suicide or express suicidal ideations in non-therapeutic, punitive settings, where they are confined without proper assessment, mental health treatment, or sufficient observation (h) discriminating against SMI detainees in violation of the ADA on the basis of their mental illnesses by confining them, upon information and belief, at materially greater rates and for materially longer periods than non-disabled detainees are subjected to such confinement.

Because Plaintiff has failed to prove facts sufficient to prove that Richland County is violating constitutional rights of SMI detainees, Richland County seeks summary judgment on all causes of action.

**A.  <u>Conditions of Confinement at ASGDC.</u>**

Richland County operates ASGDC, a facility that houses pretrial detainees and persons serving sentences lasting fewer than 90 days. As discussed in great detail in the affidavits of Director Crayman Harvey,[2] ASGDC began a construction project to renovate the entire facility in 2022 which is continuing today. (**Ex 1**, Harvey Aff. ¶8). The kitchen, lobby, visitation area, and 6 of the 18 housing units have been fully renovated. (**Ex 2**, Harvey Decl., ¶27). The renovation of

---

[2] Due to security and medical information reasons, portions of the Harvey affidavit have been redacted. A non-redacted version will be provided to the Court and opposing counsel separately.

3

Hotel Unit is expected to be completed and re-opened for housing detainees by the end of January. *Id.* at ¶14. Two additional units, Juliet (a single cell unit) and one of the pod-style units are expected to be completed in April/May 2025. *Id.* at ¶14. Five units are currently closed for renovation, and Bravo unit is being used for attorney visitation until the new visitation center is completed, which should be by February 2025. *Id.* at ¶5. When the visitation center is completed, Bravo, an open bay unit, will be open for housing detainees.

Unnamed detainees CR2, CR5 and CR12 are housed in open bay units in Phase I and have completely unrestricted movement throughout the unit with access to newly installed and repaired urinals, toilets, sinks, and showers. *Id.* at ¶54. Each Phase I unit contains 6 working sinks, 4 urinals, 4 toilets and 7 showers. *Id.* at ¶6. Detainees are provided cleaning supplies to keep these facilities clean and mold and mildew free. *Id.* at ¶6.

Detainees CR9 and CR15 are currently housed in Yankee. *Id.* at ¶57. CR15 has been back and forth between Yankee and BMU in the last several months for various infractions including tampering with the lock on his cell door, interfering with security operations, sexual misconduct, disruptive behavior, indecent exposure, vandalism (breaking the locking mechanism on the flap of his cell door) and smoking. (**Ex. 2**, Harvey Decl, ¶57).

Although CR9 also pleaded guilty to interfering with security operations, tampering with security or safety equipment and disruptive behavior in November 2024, he has remained in Yankee since being moved out of Foxtrot and spending 20 days in BMU for smuggling contraband in March 2024. (**Ex. 2**, Harvey Decl, ¶58).

Detainee CR6 was transferred out of the mental health unit (Mike) to an outside facility, Columbia Regional Care Center, to receive inpatient nursing care and physical therapy.(**Ex. 2**, Harvey Decl, ¶56).

None of the "unnamed plaintiffs" are housed in a cell without a working toilet, sink, lock, lighting and access to a working shower. *Id.* at ¶¶ 81. In fact, there is not a single detainee, SMI or not, currently housed in a single cell unit within ASGDC that has not been completely renovated and upfitted with new flooring, ceilings, door locks, lighting, toilets, sinks and shower facilities and secure control room. *Id.*

Female detainees are currently housed in Papa unit, a pod unit. *Id.* at ¶20. Each pod contains 8 individual cells with sinks and toilets and a day room with common shower facilities. *Id.* at ¶19. Papa has been completely renovated with new flooring, ceilings, door locks, sinks, toilets and showers and a central, secure control room that allows observation of all pods. *Id.* at ¶19. They, as do all male detainees housed in other pod units, have unrestricted access to the day rooms during the day except for lockdowns due to meal pass, medical pass ("med pass"),[3] or other security issues. *Id.* at ¶23. They also have access to the main portion of the unit for access to the new grievance and commissary kiosk, vending machine and outdoor recreation area on a rotating basis by pod. *Id.* at ¶40. There is no detainee housed in a pod unit or any other units for that matter, that does not have access to working bathroom facilities. *Id.* at ¶¶ 81.

Renovating ASGDC, as with any county jail that is statutorily mandated to accept all individuals arrested by a law enforcement agency in its county, poses challenges that do not exist in other types of facilities. (**Ex. 1**, Harvey Aff., ¶34). Specifically, Richland County cannot shut down ASGDC to do all renovations at once. *Id.* Rather, it is necessary to shift the population from dorms being renovated to dorms that are in operation. *Id.* As a result, ASGDC is temporarily unable to separate the security classifications as well as it would like – several dorms are housing a

---

[3] Medical pass, or what is more commonly referred to as "med pass" is the process by which nurses enter into each unit to provide specific detainees their prescribed medications, whether such medications are for a physical or mental ailment.

mixture of medium and high security detainees. *Id.* at ¶35. To compensate for these temporary conditions, ASGDC has restricted movement of detainees in 4 of the single cell units (Yankee, X-ray, Golf and India) to decrease any risk of harm created by the renovation process. *Id.* at ¶16. All of the single cell units have been completely renovated. (**Ex. 2**, Harvey Decl., ¶19). This temporary restricted movement does not apply to the dedicated mental health unit, Mike. *Id.* at ¶36.

Since August 2022, Richland County has invested tens of millions of dollars into ASGDC, both in terms of the physical facility and in terms of recruiting and retaining qualified staff. *Id.* at ¶¶8-9. These improvements have been acknowledged by the South Carolina Department of Corrections ("SCDC") in its reports following inspections on April 8, 2024 and August 21, 2024. *Id.* at ¶41.

In the interest of brevity, Defendant incorporates the additional information found in Director Harvey's testimony (**Ex. 1** and **Ex. 2**) and the Declaration of Robert Carter (**Ex 3**, Carter Decl.) regarding the conditions and operations existing at ASGDC as if fully repeated herein.

### B. <u>Supervision of Detainees/Staffing/Recreation/Contraband</u>

Staffing of correctional facilities is a national challenge. Richland County has funded many more positions for detention officers at ASGDC than it has been able to fill. Richland County is offering salaries and bonuses that are competitive in the surrounding market. Starting salaries for detention officers without any previous experience is $44,424. A new officer is also eligible to receive up to $5,000 bonus pay if they stay an entire year. The bonus is paid out as follows: $1,000 in first payroll; $500 after 90 days; $1,000 after 6 months; $500 after 9 months and $2,000 after 12 months. Therefore, if a new officer stays on the job for 12 months, they make $49,424 in their first year (without overtime). In addition, employees receive an additional $5,000 bonus paid over 12 months starting on the anniversary of their hire date as a retention bonus in addition to the

normal 2.5% salary increase under Richland County's salary program. In their second year, a detention officer makes approximately $50,534.00. (**Ex. 2**, Harvey Decl.,28).

Richland County currently employs 125 detention officers and supervisors at ASGDC. Thirteen newly hired DOs are scheduled to start on January 27, 2025, which will bring the total to 138. With the current level of staff, Richland County is able to man the security posts within all single cell units and pod units during the weekday daytime shifts to provide the services to the detainees in those units: recreation, showers, visitation, security checks, and telephone calls. (**Ex 2**, Harvey Decl., 30).

Staffing is more of a challenge for night shift. However, Richland County is also able to man almost every security post within those units during the weekday night shift. A security officer may be assigned to perform services in two units during the night shift. For much of the night shift, all detainees in the single cell and pod units are locked down for sleeping hours between 9:00 p.m. to 5:00 a.m. That officer will go back and forth between the assigned units to provide services and perform security checks. All single cell units housing detainees include a control room with glass windows manned by Allied security staff who monitor the units 24/7 both when the officer assigned to the units is in the unit or temporarily out of the unit. Therefore, there is never a time that a person is not physically observing any single cell unit at ASGDC. (**Ex. 2**, Harvey Decl., ¶¶ 37).

Staffing is prioritized for the single cell and pod units because of the movement of detainees for things like recreation, showers, or visitation that needs to take place in those units. Mike, the mental health unit, also is staffed 24/7 with a detention officer. (**Ex. 2**, Harvey Decl., ¶¶ 38).

In Phase I, there is a combination of detention officers assigned to only one unit and detention offers who may be assigned to multiple units. As previously discussed, Phase I units are

open-bay units, so movement within those units is completely unrestricted, requiring less active staff involvement. If assigned to more than one unit, an officer moves among those units throughout the day and night. In addition, other officers and supervisors are in the unit throughout the day and night for transporting detainees to visitation, med pass, and meal pass. (**Ex. 2**, Harvey Decl., ¶¶ 39).

Detainees in Phase I have unrestricted access to bathroom facilities and the outdoor recreation yard. They are not confined in a cell at any time. Detainees in pod units have access to their dayrooms and common bathroom facilities for multiple hours during the day and night. They are confined to their cells only for med pass, meal pass, sleeping hours, and security situations. Otherwise, they have access to their dayrooms and are provided access to the main portion of the dorms for access to the grievance and commissary kiosk and vending machine daily by pod on a rotating basis. (**Ex. 2**, Harvey Decl., ¶¶ 40).

Detainees in the Behavior Modification Unit ("BMU") have the most restricted movement in the facility due to the security risk those detainees present. Access to visitation and telephone calls is restricted. They are permitted out of their cells an hour each day for recreation, including showers. When out of their cells, they are transported by an officer, and the detainee is restrained for security purposes. Everyone in BMU is visited by medical and/or mental health staff daily. (**Ex. 2**, Harvey Decl., ¶¶ 41).

Currently, detainees in the four single cell units are offered at least an hour of recreation out of their cells every weekday. During that time, they have free access to the outdoor recreation yard, showers, community tables, telephones, televisions, grievance and commissary kiosk, and vending machine. They are not restrained. In addition to recreation time, they are permitted out of their cells at other times for med pass, visitation time with family members, and attendance in

programming such as the GED program, Literacy For Life program, the Art program, and the New Beginnings program. (**Ex. 2**, Harvey Decl., ¶¶ 63).

While in or out of their cells, Richland County offers them free access to a tablet that contains access to music, reading materials, news, entertainment, educational and self-help, substance abuse, and mental health programming. As previously mentioned, all single cell units currently housing detainees have been fully renovated. (**Ex. 2**, Harvey Decl., ¶¶ 43).

Violence among detainees within all units has decreased dramatically over the last year. It is impossible to stop all disagreements and fights among detainees in a jail setting, but Richland County's extraordinary actions in renovating the facility and revising and updating security measures has without a doubt decreased the risk of harm to all detainees. Fights among detainees involving the use of a weapon has become a rare occurrence, due to the upgrades in the plumbing, electrical and lighting fixtures within the cells and current supervision and management of detainees. (**Ex. 2**, Harvey Decl, ¶¶ 46).

The creation of the mental health unit in 2022 has been an enormous safety and mental health benefit to SMI detainees. The most vulnerable detainees have their own pod-style unit with 24/7 coverage by security staff. No SMI detainee in Mike unit shares a cell with another detainee. With only seven other detainees, they have access to their respective dayrooms, containing tablets, televisions, and music for hours during the day and night, and they also have access to the main part of the unit on a rotating basis during the day for outdoor recreation and access to the grievance/commissary kiosk, visitation rooms and vending machine. (**Ex. 2**, Harvey Decl, ¶¶ 49).

The safety and security measures implemented over the last year have also resulted in a decrease in the amount of contraband being introduced into the facility from the outside. The battle against contraband is a constant one. The facility is constantly under attack from people trying to

introduce contraband into it, including throwing items over or trying to cut the re-enforced fencing around the perimeter of the facility, using drones to attempt to drop contraband, drenching mail and books with liquid K-2 or fentanyl so that it cannot be detected from simply physical review, and sending humans to bring items physically into the jail. Richland County has taken extreme measures in an effort to combat the introduction of contraband into the facility. While contraband is a problem at all detention and correctional facilities, and it is impossible to stop all contraband from entering the jail, Richland County's efforts are getting positive results. (**Ex. 2**, Harvey Decl., ¶¶ 50).

An internal investigation resulted in the arrest of several employees and even a contract nurse in January 2024 for bringing contraband into the jail. ASGDC has revised its procedures for visitors and employees entering the facility. Everyone entering the facility must pass through a full body scanner and place any property being brought into the facility through a property scanner. Following several overdoses in the jail in 2024, the County purchased and installed a state-of-the-art scanner that can detect the presence fentanyl, K-2 and other drugs in mail, books and other items coming into the jail. ASGDC is the only prison or jail in South Carolina using this technology to prevent contraband from entering the jail. (**Ex. 2**, Harvey Decl., ¶¶ 51).

While Richland County and other jails and correctional facilities around the county try to prevent contraband from entering their facilities, it cannot be overlooked that a detainee's choice to obtain and use contraband that is able to make it into the facility is a personal one. The detainee in the only one with complete control over whether he or she is harmed by the use of contraband. If contraband is still making it into the jail, it is not because Richland County is not trying to stop it. However, the decrease in contraband has been confirmed by detainees. (*See* **Ex. 4**, composite exhibit of detainee testimony).

C. **ASGDC's Medical and Mental Health Contractor Provides Constitutionally Adequate Care to ASGDC's Detainees.**

Richland County has contracted with Advanced Correctional Health ("ACH"), the largest provider of correctional medical and mental health care in the United States. (**Ex. 1**, Harvey Aff., ¶53). The Declarations of Melissa Caldwell provide a detailed recitation of medical and mental health care provided to detainees at ASGDC. (**Ex. 5**, Caldwell Decl., **Ex. 6** Caldwell Decl.). All detainees are screened for medical and mental health issues, including self-harm inclinations, upon admission to the jail. (**Ex. 5**, Caldwell Decl., ¶7). In the interest of brevity, Defendant incorporates the information found in Caldwell's declaration regarding the extensive mental health care provided to detainees at ASGDC as if fully repeated herein. (*See generally* **Ex. 5** and **Ex. 6**, Caldwell Decls.). ASGDC is neither designed to nor able to serve as an inpatient psychiatric therapeutic facility. (**Ex. 7**, Dauss Decl., ¶¶ 9, 13, 14). However, ASGDC employs a sufficient number of qualified mental health professionals and nurse practitioners to identify and treat in an individualized manner detainees suffering from serious mental disorders, including identification and referral of inmates with mental health needs, crisis intervention services, individualized treatment plans and treatment, psychotropic medication management, and treatment documentation and follow-up. *Id.* at ¶ 17. There is no industry standard specifying the amount of therapeutic time required for patients with mental illness in jails, and ASGDC follows proper procedures to transfer those detainees who need inpatient psychiatric care. *Id.* at ¶¶ 19-20.

ASGDC has implemented processes to provide individualized treatment and safe environmental conditions for patients with serious mental illness and meets the threshold for adequacy while continuing to make improvements. *Id.* at ¶ 24. One such improvement is reaching a Memorandum of Agreement in December 2024 with the South Carolina Department of Mental Health and the Columbia Area Mental Health Center to embed an additional qualified mental

health professional in the facility five days a week to enhance the County's ability to identify and treat those with mental health needs. This MOA has been implemented, and the DMH employee has been working in the facility since December 2024.  (**Ex. 2**, Harvey Decl, ¶59)

In addition, ASGDC offers participation in several programs within the facility, including the "Becoming Her" program, the GED program, the New Beginnings program, the Literacy for Life program, the Art program, and the IRize program, which is coming soon. (**Ex. 2**, Harvey Decl, ¶63).

An examination of the mental health records of the individual plaintiffs remaining in ASGDC prove that they are receiving mental health treatment that far exceeds the constitutional minimum. All individual plaintiffs were screened for medical and medical and mental health issues, including suicidal ideation or tendencies after arriving at the facility.

At the time of his entry into ASGDC, CR2 reported that he had a heart condition that prevented him from taking a mental health medication that he had been previously been prescribed. At the time of CR2's arrest, he was detoxing from Xanax and alcohol. CR2 testified he was diagnosed with bipolar and major depression at the age of 10 after the passing of his mother. (**Ex. 8**, CR2 Dep. Tr., pp. 18:15-19:3; 24:6-25). CR2 was prescribed Seroquel in the past but stopped taking it more than a year prior to his incarceration at ASGDC. (**Ex. 8**, CR2 Dep. Tr., pp. 32:20-33:12; 37:4-20). Once at ASGDC, CR2 spoke to the mental health provider about restarting his prescription for Seroquel which he explained was previously discontinued due to his heart condition. (**Ex. 1**, Harvey Aff, ¶55, at Ex. 6, CR2 Medical Records, County-180059[4]). After this request, CR2 was placed back on Seroquel. (**Ex. 8**, CR2 Dep. Tr., pp. 79:4-81:22). CR2 has been

---

[4] Given the voluminous number of pages of medical and mental health records for each of the "unnamed plaintiffs," their records have been redacted for personal health information and will be provided separately to the Court rather than filed publicly.

seen regularly by the medical providers and QMHP. CR2 has been seen at least 15 times by medical providers and 20 times by QMHP. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 6; **Ex. 9**, CR2 Medical Records).

CR3 has been incarcerated since March 2021. (**Ex. 10**, CR3 Dep. Tr., p. 15:3-5). CR3, who has had significant behavioral and disciplinary problems while incarcerated, testified he was diagnosed with schizophrenia when he was born. (**Ex. 10**, CR3 Dep. Tr., p. 11:11-20). He testified that he did not disclose that he had suffered from mental health issues until sometime after he was initially incarcerated. (**Ex. 10**, CR3 Dep. Tr., pp. 33: 17–34: 23). He testified that the mental health and medical staff responded to him after he admitted to staff that he began hallucinating. *Id*. CR3 explained he was grieving the passing of his mother which caused him to act out. (**Ex. 10**, CR3 Dep. Tr., p. 36:1–24). Nurse Saxon, a mental health provider, then met with CR3 every Friday. *Id*. CR3 testified the medications prescribed helped him with hallucinations and his anxiety. (**Ex. 10**, CR3 Dep. Tr., pp. 40:3-41:4). In the sessions with Nurse Saxon, CR3 testified they discussed coping skills and that he was provided a journal (**Ex. 10**, CR3 Dep. Tr., pp. 42: 5–43: 13). CR3 even described an incident where he had an anxiety episode, met with a mental health provider, and that he was doing well. (**Ex. 10**, CR3 Dep. Tr., p. 54: 6 –55:24). CR3 has been seen by the medical providers and QMHP regularly throughout his incarceration. CR3 has been seen at least 21 times by medical providers and 49 times by QMHP. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 7; **Ex. 11**, CR3 Medical Records).

Plaintiffs allege CR5 has been diagnosed with depression and anxiety. CR5's major medical problem is being properly addressed with chronic medications. During his initial psychiatric evaluation, CR5 stated that he did not need psychiatric medication. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 9, CR5 Medical Records, County-18020-180621). CR5 also stated during his

initial screening that he had never been formally diagnosed with any mental health issues. (*Id.* at pp. County 180617-180619). Since being incarcerated, CR5 has been diagnosed with depression, mood disorder, and PTSD. (*Id.* at County 180624-180626; County 180633). CR5 has been prescribed Zoloft since May 2023. (**Ex. 12**, CR5 Dep. Tr., p. 113:18-24). He testified the QMHP have been helpful and that the Zoloft medication has helped him. (**Ex. 12**, CR5 Dep. Tr., pp. 113:25 –117: 17). CR5 has an established diagnosis of depression and is receiving appropriate treatment for this mental health diagnosis. (**Ex.13**, Fowlkes Decl., ¶ 6(b)(v)). CR5 has been seen regularly by the medical providers and QMHP. CR5 has been seen at least 9 times by medical providers and 21 times by QMHP. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 9; **Ex. 14**, CR5 Medical Records).

Plaintiffs allege CR6 has been diagnosed with anxiety and posttraumatic stress disorder ("PTSD"). (ECF 99, ¶ 22). CR6 is an elderly detainee who has multiple chronic medical conditions and long-term PTSD which is stable on his current medication regiment. (**Ex. 13**, Fowlkes Decl. ¶ 6(b)(xi)). CR6 testified he would not be interested in group therapy if offered at ASGDC because he does not believe he would benefit from it. (**Ex. 15,** CR6 Dep. Tr., p. 25:14-23). CR6 understands what triggers his PTSD and knows how to cope since he has been dealing with it for nearly 50 years. (**Ex. 15**, CR6 Dep. Tr., pp. 25: 23 –27:23). CR6 testified he has had access to tablets with excellent educational and reading materials. (**Ex. 15**, CR6 Dep. Tr., p. 29: 7-9). CR6 has never asked to be seen more regularly by a QMHP and believes he is doing well while on the medications. (**Ex. 15**, CR6 Dep. Tr., p. 95:5-24). CR6's PTSD has been addressed since the very beginning of his incarceration. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 10, CR6 Medical Records [Wellpath], County-180096- County-180103). CR6 has been seen regularly by the medical providers and QMHP. CR6 has been seen at least 74 times by medical providers and 50 times by QMHP. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 10, **Ex. 16** CR6 Medical Records). Unfortunately, CR6's

14

physical condition has deteriorated since his deposition was taken, and he has been transferred out of ASGDC to the Columbia Regional Care Center for inpatient nursing care and physical therapy.

Plaintiffs allege CR9 has been treated for SMI for over 20 years before becoming incarcerated at ASGDC. (ECF 99, ¶ 25). CR9 claims that he has been prescribed Seroquel and Trazodone when he was incarcerated previously. (**Ex. 17**, CR9 Dep. Tr., pp. 14:23 –15: 4). At intake, CR9 did not disclose that he had heard voices for fear, based on experience at other detention facilities, of being placed on suicide watch as a precaution if he answered in the affirmative. *Id*. He wanted to avoid this so he would be able to freely use the phone and work on making bond. *Id*. CR9 has no complaints about not receiving medications that have been prescribed. (**Ex. 17**, CR9 Dep. Tr., p. 87: 16-18). CR9 has met with QMHP where they review coping skills and discuss the adequacy of his medications. (**Ex. 17**, CR9 Dep. Tr., p. 119:5-13). CR9's main issue with ASGDC is that he wants to be placed back on Seroquel and Trazadone as he was in the past. (**Ex. 17**, CR9 Dep. Tr., p. 158:20-23). After CR9's requests about these medications, he met with the QMHP who planned to contact a previous provider to verify these prescriptions. (**Ex. 17**, CR9 Dep. Tr., pp. 119:25–120:22). CR9 is being seen regularly by the QMHP staff and psychiatric providers. (**Ex. 13**, Fowlkes Decl., ¶ 6(b)(x)). During his approximate 6-month incarceration, CR9 was seen at least 6 times by medical providers and 6 times by QMHP. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 11; **Ex. 18**, CR9 Medical Records).

Plaintiffs allege CR12 suffers from depression. (ECF 99, ¶ 28). CR12 has been diagnosed with depression and PTSD, but he has been seen regularly by a QMHP, has been prescribed medications, and his condition is stable. (**Ex. 13**, Fowlkes Decl., ¶ 6(b)(xii)). CR12 first reached out to the QMHP staff after he was seeing his deceased son, hearing voices, and requesting to be evaluated for medications. (**Ex. 19**, CR12 Dep. Tr., pp. 90:12 –91:19). He requested to be

prescribed Latuda and Lorazepam specifically. *Id*. CR12's primary issue with ASGDC was that he would prefer to be taking Citalopram rather than Lorazepam even though he has been told he could not be given Lorazepam because it is a controlled substance. (**Ex. 19**, CR12 Dep. Tr., pp. 125:16 –126:22; p. 127:7-14). CR12 has been seen regularly by the medical providers and QMHP. CR12 has been seen at least 6 times by medical providers and 17 times by QMHP. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 14; **Ex. 20**, CR12 Medical Records).

Plaintiffs allege CR15 suffers from "major depression." (ECF 99, ¶ 31). CR15 was first seen by QMHP while incarcerated at the juvenile facility at ASGDC in 2021. (**Ex. 21**, CR15 Dep. Tr., p. 12:2-15). The QMHP did rounds at the juvenile facility at least once a week, and they spoke to CR15, asked him how he was doing, and pressed deeper. (**Ex. 21**, CR15 Dep. Tr., pp. 14:10 – 15:7). This led to CR15 being seen by the psychiatrist. *Id*. CR15 had never participated in any type of group therapy prior to coming to the juvenile detention center. (**Ex. 21**, CR15 Dep. Tr., p. 16: 5-11). The medical records do not support that CR15 has SMI or any significant mental health complaints. CR15 has not made any significant mental health complaints to the QMHP. (**Ex. 13**, Fowlkes Decl. ¶ 6(b)(xv)). CR15 has been seen regularly by the medical providers and QMHP. CR15 has been seen at least 59 times by medical providers and 32 times by QMHP. (**Ex. 1**, Harvey Aff., ¶55, at Ex. 16; **Ex. 22**, CR15 Medical Records).

None of the "unnamed plaintiffs" currently listed as plaintiffs have alleged or testified that they have been placed in a restraint chair at all, much less for an extended period of time. No unnamed plaintiff has alleged or testified that they have been locked in a shower for any reason other than taking a shower.

## SUMMARY JUDGMENT STANDARD

In deciding a summary judgment motion, this Court must determine whether there exists a genuine issue of material fact. *See* Fed. R. Civ. P. 56. Under Rule 56(c), FRCP, a party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. However, "Rule 56 does not require the moving party to *negate* the elements of the nonmoving party's case." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990). (Emphasis in original). In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the United States Supreme Court found "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323. (Emphasis in original).

In *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390 (4th Cir. 1994), the Fourth Circuit Court of Appeals explained that "the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." 33 F.3d at 393. "[T]he burden on the moving party may be discharged by 'showing' –- that is, pointing out to the district court –- that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

The summary judgment inquiry "scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of [her] claim at trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). "[T]he summary judgment procedure allows the court to forecast the proof at trial to determine whether consequential facts are in dispute, and if not, to resolve the case without a trial." *Id*. In fact, the Supreme Court in *Celotex* recognized that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."

*Celotex*, 477 U.S. at 323-24. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." 477 U.S. at 327.

Under the summary judgment standard, "the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion." *Taylor v. Lowe's Home Centers, LLC,* 2018 WL 1431560, *2 (D.S.C. 2018). "Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Id*. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

## LEGAL ANALYSIS

### A.    DRSC Lacks Standing to Sue

Defendant submits that Plaintiff DRSC lacks standing to bring this action and should be dismissed as a party-plaintiff. "Article III of the United States Constitution limits federal courts to resolving actual cases and controversies." *Burke v. City of Charleston*, 139 F.3d 401, 404 (4th Cir. 1998). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quotations omitted). An organizational plaintiff may establish Article III standing in two ways: "in its own right to seek judicial relief for injury to itself" or "as a representative of its members who have been harmed." *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 Fed. Appx. 493, 495 (4th Cir. 2021) (*citing S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013)). The

former is called "organizational" or "direct" standing, and the latter is "associational" standing. However, not every organization or association may sue in a representational capacity. Only true "voluntary membership" organizations with identifiable members (like a trade association or union) or functionally equivalent non-member associations may sue on behalf of their "members" provided all other Article III standing requirements are met. *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 342, 97 S.Ct. 2434, 2440 (1977).

It is well settled that an association's representative standing is derivative of its members' standing. The United States Supreme Court has instructed that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343 (1977). However, where an association is not a traditional voluntary membership organization, its constituents must possess the "indicia of membership in an organization." 432 U.S. at 344. The Washington State Apple Advertising Commission in the *Hunt* case is such an example. The Supreme Court explained:

> The Commission, while admittedly a state agency, for all practical purposes, performs the functions of a traditional trade association representing the Washington apple industry.
> * * *
> [W]hile the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone *elect the members of the Commission*; they alone *may serve on the Commission*; they alone *finance its activities*, including the costs of this lawsuit, through assessments levied upon them. In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests.

432 U.S. at 344-345. (Emphasis added). Thus, as the highlighted language indicates, the Supreme Court focused on such factors as election of members, participation in the organization as members, and the financing of the organization's activities. In addition, the organization must provide "the means by which [the members] express their collective views and protect their collective interests." 432 U.S. at 345.

Other courts have similarly focused on such factors in determining whether a non-traditional membership organization has a sufficient "indicia of membership" to give rise to associational standing. For example, in *Mental Hygiene Legal Service v. Cuomo*, 609 Fed. Appx. 693 (2d Cir. 2015), the Second Circuit found that, even though the plaintiff organization "represents and advises individual constituents as counsel, those constituents lack sufficient 'indicia of membership' in [the organization] for it to provide them 'the means by which they express their collective views and protect their collective interests.'" 609 Fed. Appx. at 695, *citing Hunt*, *supra*. Similarly, in *Hope, Inc. v. DuPage County*, 728 F.2d 797 (7th Cir. 1984), the Seventh Circuit explained:

> Clearly, the Apple Commission in *Hunt* was an organization which represented the growers who were for all practical purposes "members" of that commission. The same cannot be said for those low and moderate income individuals whom HOPE purports to represent. Since they cannot even be said to be the substantial equivalent of members of HOPE, HOPE has no standing in a representational capacity to represent them as if they were.

738 F.2d at 815. *See also*, *Fund Democracy, LLC v. Securities & Exchange Commission*, 278 F.3d 21 (D.C. Cir. 2002) (court concluded that Fund Democracy did not have any "members" and thus failed to demonstrate associational standing).

The circuits vary in *Hunt's* application to protection and advocacy (P&A) organizations like DRSC. The Eighth and Fifth Circuits have adopted a narrow approach, denying associational

standing unless all indicia of membership are present. *Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir. 2007) (*MOPAS*); *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (*ARCD*) (holding that Advocacy Inc. lacked associational standing but "[might] be permitted to participate in such a case as *amicus curiae*").

On the other hand, the Ninth and Eleventh Circuits view *Hunt's* requirements as non-mandatory and have extended associational standing to non-member organizations that would be adversely affected by the outcome of litigation even when no indicia of membership is present. *Oregon Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1111–12 (9th Cir. 2003) (holding a P&A possessed associational standing even though none of *Hunt's* indicia was present because the P&A's governing board and advisory council consisted of members "who broadly represent[ed] or [were] knowledgeable about the needs of the clients," more than half of whom were "individuals who ha[d] received or [were] receiving mental health services and family members of such individuals," and it maintained "a grievance procedure for clients and prospective clients" to facilitate input from its constituents and to ensure their protection); *Doe v. Stincer,* 175 F.3d 879, 886 (11th Cir. 1999) (concluding the P&As "possess[ed] the means to influence the priorities and activities" undertaken by the organization constituents "[m]uch like members of a traditional association" because the organization had the same governing board and advisory council composition as in *Oregon Advocacy Ctr.,* had a formal grievance procedure, and provided for public opportunity to comment). But those cases offer little justification for such an expansive view of *Hunt* and fail to examine how the personal characteristics, degree of knowledge, or life experience of a P&A board's membership meaningfully inform the analysis the Supreme Court

requires: whether the *constituents* of a non-member association are "effectively" members in substance, if not in form. *Hunt*, 432 U.S. at 345.

Although the Fourth Circuit has yet to weigh in on the issue, in a recent case holding that the *Hunt* test is inapplicable to true membership organizations, the Supreme Court emphasized that the non-member constituents in *Hunt* "alone" met "all" of the indicia of membership:

> We recognized, however, that as a state agency, "the Commission [wa]s not a traditional voluntary membership organization . . ., for it ha[d] no members at all." *Id.*, at 342, 97 S.Ct. 2434. As a result, we could not easily apply the three-part test for organizational standing, which asks whether an organization's ***members*** have standing. We nevertheless concluded that the Commission had standing because the apple growers and dealers it represented were ***effectively members*** of the Commission. *Id.*, at 344, 97 S.Ct. 2434. The growers and dealers "**alone** elect[ed] the members of the Commission," "**alone** . . . serve[d] on the Commission," and "**alone** finance[d] its activities"—they possessed, in other words, "**all** of the indicia of membership." *Ibid.* The Commission was, therefore, a genuine membership organization in substance, if not in form. And it was "clearly" entitled to rely on the doctrine of organizational standing under the three-part test recounted above. *Id.*, at 343, 97 S.Ct. 2434.

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230, 200–01,143 S. Ct. 2141, 2175 (2023) (italics in original) (bold emphasis added). And one member of the Court has since expressed doubt that expansion of the associational standing doctrine "can be squared with Article III's requirement that the courts respect the bounds of their judicial power" and acknowledged a need for the Court to address the issue "[i]n an appropriate case" in the future. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 403–05, 144 S. Ct. 1540 (2024) (Thomas, J. concurring). *See also Assoc. of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F. 4th 531, 537–43 (6th Cir. 2021) (elucidating why the Supreme Court's recent case law on standing has undercut its associational-standing test). These hints that the Supreme Court

is inclined to limit or potentially abrogate associational standing are not precedential, but they do add some persuasive weight to a narrow application of *Hunt.*

Applying these principles to the facts of this case, we begin with the pleadings. Because the plaintiffs do not allege that DRSC has suffered any direct harm (i.e., its own ADA or constitutional rights were violated due to any action or inaction taken by the Defendant), representational standing is DRSC's only viable path to satisfying Article III standing.[5] And because DRSC is not a traditional membership organization, the threshold question is whether DRSC operates enough like a membership organization to assert claims on behalf of the Named Plaintiffs and the other unnamed SMI Detainees it seeks to represent.

To begin, DRSC has not alleged that SMI Detainees are its membership or that it can be considered a voluntary membership organization or a functional equivalent. *Hunt*, 432 U.S. at 344; ECF No. 99 at 5, ¶ 15 (alleging only that DRSC is a state P&A system "charged by state and federal law to protect and advocate for the rights of people with disabilities in South Carolina"). *See also* S.C. Code Ann. § 43-33-350(1) (authorizing DRSC to "protect and advocate for the rights of all persons with a developmental or other disability … by pursuing legal, administrative, and other appropriate remedies").[6] No information in the Second Amended Complaint would allow the Court

---

[5] DRSC does not allege a perceptible impairment to its ability to function as an organization or seek injunctive or declaratory relief to remedy any injury to it, and it is unlikely that DRSC could do so. *See S.C. State Conf. of NAACP v. S.C. Dep't of Juv. Just.*, No. CV 0:22-01338-MGL, ECF No. 139, Report and Recommendation (December 6, 2023) (dismissing DRSC's organizational claims arising out of alleged constitutional violations to juvenile detainees at DJJ). *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114 (1982) (An organization has direct standing to pursue a claim and redress an injury on its behalf if it meets the three ordinary requirements to establish Article III standing: injury in fact, causation, and redressability).

[6] The original name for South Carolina's P&A entity that exists today was Advocacy for Handicapped Citizens, Inc. In 1979, the name changed to South Carolina Protection and Advocacy System for the Handicapped, Inc. In 2020, the name changed again to Disability Rights South Carolina, Inc. Although the latest name change is not updated in the code, the board is authorized

to find that the DRSC's leadership and financial structure are closely tied to those of its client constituents or that they exert any control over DRSC's direction or operation. Thus, dismissal is appropriate on the pleadings alone.

Moreover, because DRSC cannot rely on its authorizing statutes to invoke associational standing under *Hunt*, the Plaintiffs cannot cure these deficiencies by amending the complaint. As discussed above, the Commission in *Hunt* was a non-member state agency representing the interests of the state's apple growers and dealers, 432 U.S. at 336–337, and it was authorized to litigate claims to further its statutory mission, *id.* at 339 n.3 (the Commission was statutorily authorized to "sue and be sued"). Similarly, DRSC is a non-member state system authorized to protect and advocate for the rights of persons with disabilities in South Carolina and to litigate claims pursuant to its statutory mission. S.C. Code Ann. § 43-33-350(1). But the characteristics key to the Court's holding in *Hunt* -- that the Commission consisted of thirteen state growers and dealers *chosen from electoral districts by their fellow growers and dealers*, all of whom, by mandatory assessments, financed the Commission's operations, *Hunt*, 432 U.S. at 337 -- are simply not present in a P&A system like DRSC.

"[T]he question is whether *the individuals whose standing the association seeks to borrow can exert sufficient control over the association to be considered its members*." *Nat'l Ass'n of Consumer Advocs. v. Gemini Tr. Co., LLC*, No. CV 24-2356 (JDB), 2024 WL 4817122, at *2–3 (D.D.C. Nov. 18, 2024) (emphasis added); *see also MOPAS*, 499 F.3d at 810; *ARCD*, 19 F.3d at 244. DRSC is governed by a board of at least twelve members -- the Governor appoints four, and

---

to change its corporate name, and the powers and duties of the South Carolina Protection and Advocacy System for the Handicapped, Inc. are automatically the powers and duties of the successor nonprofit corporation. S.C. Code Ann. § 43-33-330.

the board elects the others. S.C. Code Ann. § 43-33-330. DRSC is federally funded and does not collect dues. 42 U.S.C. § 15042(a) and (b). And DRSC's constituents, including SMI Detainees, have no role or control as to the spending of such funds. Even if the majority of DRSC's advisory council and board are members of DRSC's constituency or meet certain statutorily mandated qualifications that align with its constituency, they are not the *only* ones who may serve on DRSC's leadership bodies, and DRSC's disabled constituency does not elect them. Thus, even though DRSC *promotes* the interests of a wider constituency of "disabled persons" in South Carolina (of which SMI Detainees are a niche subset), it does not *represent* them.[7] The Named Plaintiffs possess none of *Hunt's* "indicia of membership" to permit DRSC's representative claims: its "constituents," including the SMI Detainees, do not "elect members" of DRSC, serve in DRSC roles, or "finance its activities, including the costs of this lawsuit, through assessments levied upon them." *Id.* at 344–45. Because the governor and the board itself (not the constituency of SMI Detainees that DRSC purports to represent) control DRSC, it does not provide the means through which SMI Detainees "assert their collective views" or "protect their collective interests" like "membership in a union" or "a bar association." *Hunt*, 432 U.S. at 345.

Finally, even if standing were permissible in the absence of any *Hunt's* indicia, applying the most expansive view of the Court's associational standing test, there are no other facts to suggest that the interests of DRSC itself may be adversely affected by the outcome of this litigation. *Stincer*, 175 F.3d at 886 n.5 ("Although the Advocacy Center has no similar direct financial interest in this litigation [as in *Hunt*], the issue of access to records is an important issue for the Advocacy Center's clients and, to the extent that the Advocacy Center devotes its work to

---

[7] DRSC may, however, represent individual clients with consent. 42 C.F.R. § 51.42(e) (DRSC cannot "take formal action on behalf of individuals with legal guardians or conservators or initiate a formal attorney/client or advocate/client relationship without appropriate consent.").

assisting clients in obtaining records, other needs may go unmet"); *Mink*, 322 F.3d at 1111–12 (noting that "OAC has a statutorily mandated interest in the timely transfer of mentally incapacitated defendants to OSHH"). And a plaintiff's associational standing cannot depend solely on whether DRSC and the SMI Detainee's interests are aligned -- even the Ninth Circuit agrees it is not enough that DRSC's derivative lawsuit is consistent with its authority to sue to further its statutory mission. *Mink*, 332 F.3d 1109 ("Although we agree that PAIMII is relevant to OAC's [direct] standing, it cannot override constitutional standing requirements" with respect to an organization's derivative standing on behalf of its members).[8]

Because DRSC is not "subject to the influence" of SMI Detainees and it has no "personal stake in the outcome of this litigation," *Mink*, 322 F. 3d at 1111, there is no associational standing. Accordingly, DRSC cannot properly invoke derivative claims on behalf of SMI Detainees, and DRSC's representative claims must, therefore, be dismissed.

### B.     Standards for Determining Constitutional Minima

From the outset, it is critical to recognize that the focus of this litigation must be on the constitutional minima. Notably, in prior filings, the Plaintiffs did not rely on any existing case law from the Fourth Circuit or any jurisdiction that outlines what the constitutional minima are for a local detention facility such as ASGDC. By way of example, the Plaintiffs have relied most heavily

---

[8] The Defendant acknowledges that this court recently applied the broad view of associational standing consistent with the approach adopted by the Ninth and Eleventh Circuits. *See S.C. State Conf. of NAACP v. S.C. Dep't of Juvenile Justice*, 2024 WL 5153170, *7 (D.S.C. 2024). However, the Defendant has presented the Court with arguments not raised by DJJ or the other defendants in DRSC's related case that the Court considers for the first time in this case. The Defendant respectfully requests that the court find that DRSC cannot establish associational standing under either the Ninth and Eleventh Circuits' expansive application of *Hunt* or the Fifth and Eighth Circuits' stricter application without deciding which standard should apply in this district. Alternatively, the Defendant requests the Court adopt the narrow application of *Hunt* based on the Defendant's arguments herein.

on two cases, *Braggs v. Dunn*, 257 F.Supp.3d 1171 (M.D. Ala. 2017), and various district court orders from the *United States v. Hinds County* litigation from Mississippi. Critically, neither case was decided at the Circuit Court of Appeals level. The *Braggs* case is readily distinguishable and thus not instructive in the present case because it involves the provision of mental health care to long-term incarcerated convicts at the Alabama Department of Corrections and not short-term pre-trial detainees housed at a local detention facility. Without question, there are significant differences between a long-term facility housing convicts with respect to its requirements for health care including mental health care and the availability of resources as compared to a local detention facility where convicts serve sentence of 90 days or less and pre-trial detainees are typically short-term. Similarly, the *Hinds County* litigation is not instructive because that case, and all of the court orders generated therein, are based on a consent order that was agreed to by the county early in the litigation process. Moreover, the orders previously relied on by the Plaintiffs are *not orders on the merits*, meaning those orders do not represent rulings by the district court as to what the Fourteenth Amendment actually requires. Instead, those orders address remedies that Hinds County voluntarily agreed to and then failed to deliver. Those orders do not reflect any adjudication as to what are the constitutional minima. In sum, the Plaintiffs are not relying on any controlling authority where a federal court has actually adjudicated the constitutional minima for a local detention facility such as ASGDC.

      In addition, the Plaintiffs rely heavily on the opinions of its compensated expert witnesses who offer opinions as to what they believe is required by "industry standards" or by a medical or mental health "standard of care." However, those do not equate with the constitutional minima. In fact, the United States Supreme Court held more than 40 years ago that the American Correctional Association (ACA) standards "do not establish the constitutional minima." *Bell v. Wolfish*, 441

U.S. 520, 543 (1979). The Supreme Court has similarly held that constitutional standards are not established by "opinion of experts as to desirable prison conditions." *Rhodes v. Chapman*, 452 U.S. 337, 350 (1981). *Accord*, *Alexander S. v. Boyd*, 876 F.Supp. 773, 779 (D.S.C. 1995).

To the extent that the Plaintiffs' experts' opinions may be given any weight, it is also important to recognize that they rely almost exclusively on the Minimum Standards for Local Detention Facilities in South Carolina ("Minimum Standards") as a basis for a majority of their opinions. While the Defendant does strive to meet the Minimum Standards and works diligently to correct issues identified by the South Carolina Department of Corrections (SCDC) as part of their annual inspections, the Minimum Standards do not establish the constitutional minima. Indeed, contrary to the Plaintiffs' apparent understanding, the Minimum Standards do not even have the force of law, as the South Carolina Supreme Court in a unanimous opinion has already ruled. In *Myrtle Beach Hospital, Inc. v. City of Myrtle Beach*, 341 S.C. 1, 532 S.E.2d 868 (2000), the Supreme Court recognized that "[t]hese Minimum Standards have never been subject to the legislative scrutiny afforded regulations under the Administrative Procedures Act. Instead, they are merely the product of the County Association, adopted by the DOC, an executive agency. They cannot validly be viewed as expressing anything about legislative intent." 532 S.E.2d at 871. Thus, the Minimum Standards have never been adopted as regulations, and as a result, do not have the "force of law" under South Carolina law. In fact, pursuant to the South Carolina Administrative Procedures Act, the Minimum Standards expressly do not have the force or effect of law. S.C. Code Ann. § 1-23-10(4) sets forth the APA's definition of "regulation," which provides in pertinent part that "[p]olicy or guidance issued by an agency other than in a regulation *does not have the force or effect of law*." S.C. Code Ann. § 1-23-10(4). (Emphasis added.)

28

In short, the Minimum Standards should not be viewed as anything more than recommended guidelines, protocols, or policies. Thus, to the extent that the Plaintiffs claim that the Defendant fails to comply with the Minimum Standards, that nonetheless does not constitute a constitutional deprivation actionable under § 1983. In the case of *United States v. Caceres*, 440 U.S. 741 (1979), the United States Supreme Court determined that violations of an agency's own guidelines do not necessarily give rise to a constitutional cause of action. The departure from agency guidelines or regulations will only be actionable under 42 U.S.C. § 1983 when compliance with the guideline or regulation is mandated by the Constitution. Similarly, in *Dowdy v. Johnson*, 510 F. Supp. 836 (E.D. Va. 1981), the District Court relied on *Caceres*, in concluding that certain Virginia prison regulations "are not intended to secure and protect established constitutional rights, and compliance with the guideline is thus not mandated by the Constitution or federal law." 510 F. Supp. at 838.

As an additional point, the Plaintiffs' experts routinely point to other jurisdictions in the United States, such as Atlanta, Philadelphia, New Orleans, Miami, and others, where those local governments provide for what are, in essence, mental health facilities as part of a local detention center or county jail. Yet, the simple fact that some jurisdictions, as a matter of public policy and given the available resources, choose to provide such a level of care and services does not mean that the Fourteenth Amendment requires that same level of care and services for every local detention center, regardless of location and available financial and manpower resources. Likewise, as dictated by the Equal Protection Clause, it is also critical to recognize that the constitutional minima for ASGDC and Richland County can be no different than for any other jurisdiction. Therefore, the Court will need to consider what is feasible, practical, and medically necessary, which are also considerations in evaluating what the Fourteenth Amendment requires as the

constitutional minima. In other words, a court cannot order Richland County, as a constitutional mandate (as opposed to perhaps an issue of state tort law), to provide a level of mental health care and services greater than that required in any other local detention facility in the smallest and poorest counties in South Carolina or anywhere else in the United States.

Finally, this litigation and the remedy, if any, that can be fashioned by this Court are governed by the Prison Litigation Reform Act ("PLRA"). Because this is an action for injunctive relief only, and not money damages, the PLRA plays a critical role. The PLRA's limitations on any award of prospective relief in this litigation are set forth in 18 U.S.C. § 3626(a)(1)(A), which states:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that ***such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right***. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). (Emphasis added). Accordingly, any injunctive relief awarded would need to be (1) narrowly drawn, (2) extend no further than necessary to correct the violation of the federal right, and (3) be the least intrusive means necessary to correct the violation of the federal right." *Id*.

Thus, each of the Plaintiffs' myriad of conditions claims, including the points related to the delivery of mental health care for detainees at ASGDC, must be viewed through the PLRA lens.

## C.    <u>Constitutionally Adequate Mental Health Care Program</u>

The seminal case is *Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977), in which a convict (not a pre-trial detainee) sued a state corrections system to provide him "a psychological diagnosis

and treatment in the hope that he may ultimately qualify for parole." 551 F.2d at 46. The Fourth

Circuit acknowledged that there is "no underlying distinction between the right to medical care for

physical ills and its psychological or psychiatric counterpart." 551 F.2d at 47. The Fourth Circuit

ultimately held that "Bowring (or any other prison inmate) is entitled to psychological or

psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care

at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's

symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be

substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the

denial of care would be substantial." *Id*. The Fourth Circuit further held that "[t]he right to

treatment is, of course, limited to that which may be provided upon a reasonable cost and time

basis and *the essential test is one of medical necessity* and *not simply that which may be considered

merely desirable*." 551 F.2d at 47-48. (Emphasis added).

Later, in the case of *Williams v. Branker*, 462 Fed. Appx. 348 (4th Cir. 2012), the plaintiff,

who was a convict and not a pre-trial detainee, alleged that he was unable to remain disciplinary

free and out of solitary confinement because he was denied "effective treatment of his mental

illness." 462 Fed. Appx. at 353. In rejecting that claim, the Fourth Circuit observed that there is

"no authority for the proposition that the Eighth Amendment entitles him to 'effective' treatment,

or that DOC is a guarantor of mental health." 462 Fed. Appx. at 354. Citing the Supreme Court,

the Fourth Circuit explained that "society does not expect prisoners will have unqualified access

to health care." 462 Fed. Appx. at 353, *citing Hudson v. McMilliam*, 503 U.S. 1, 8-9 (1992). The

Fourth Circuit ultimately held that "the lack of effective mental health [cannot] deprive[] Williams

of a basic human need." 462 Fed. Appx. at 354. In fact, the Fourth Circuit noted "that to make the

Eighth Amendment a guarantor of a prison inmate's prior mental health … would go immeasurably

beyond what today would generally be deemed cruel and unusual." *Id*. The same is true with respect to the Fourteenth Amendment.

To reiterate, *Bowring* and *Williams* are not pre-trial detainee cases, but they do inform the limitations on the mental health care owed by a local detention facility. Certainly, if a corrections system which houses long-term convicts need not provide unqualified or unlimited mental health care, certainly a local detention facility owes at least the same and most likely a lesser level of care. The key from *Bowring* is that a local detention facility must provide what is medically necessary and not what may be medically desirable. For a short-term facility, where the detainee may be present for mere days and not typically more than a period of months awaiting trial, the medical necessity should extend no further than screening, diagnosis, medication management, and limited treatment as necessary to stabilize and maintain the detainee in his pre-incarceration condition until he/she can be further treated in the community (if released) or in a corrections system (if convicted). In effect, the mental illness cannot be ignored, but efforts to cure or improve the detainee beyond his/her pre-incarceration condition is not constitutionally required. In effect, as the Fourth Circuit instructs, the detainee is not entitled to unqualified or unlimited access to mental health care.

In their Second Amended Complaint, the Plaintiffs allege:

> Components of a constitutionally adequate correctional mental health program include the following: (1) a systematic program for screening and evaluating detainees to identify those who require mental health treatment; (2) individualized treatment plans that provide for treatment that is more than placement in restrictive housing and that includes close supervision of detainee patients; (3) prescription and administration of psychotropic medications with appropriate supervision coupled with adequate psychotherapy; and, (4) a basic program of identification, treatment, and supervision of detainees with suicidal tendencies.

(*See* ECF 99, ¶ 39). The Plaintiffs derived these components almost verbatim from the *Ruiz* factors as identified in the case of *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D. Tex. 1980), which addressed the components of a mental health care program for a *corrections* system and not a local detention facility. The *Ruiz* factors, however, say nothing about "adequate psychotherapy"; that was unilaterally inserted by the Plaintiffs without supporting authority. 503 F.Supp. at 1339. Instead, the second of the *Ruiz* factors is "treatment [that] must entail more than segregation and close supervision of the inmate patients." *Id*. In fact, the *Ruiz* factors actually describe "treatment requir[ing] the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat *in an individualized manner* those treatable inmates suffering from serious mental disorders." *Id*. (Emphasis added). The *Ruiz* factors do not include group therapy or out-of-cell programming or "therapeutic activities," as the Plaintiffs seek in this case.

Importantly, of the six *Ruiz* factors, the Defendant's mental health care program at ASGDC includes all those components, including a program of mental health screening at intake, employment of a sufficient number of trained mental health professionals, the maintenance of accurate, complete, and confidential mental health records, the administration and supervision of psychotropic medications, and a suicide prevention program. (**Ex. 5**, Caldwell Decl., ¶¶ 5-17). As far as a treatment program, the Defendant provides individualized treatment planning including crisis management and individualized counseling by qualified mental health professionals (QMHP) and self-help programs available in electronic format on the detainee's tablet. (**Ex. 5**, Caldwell Decl., ¶ 6; **Ex. 1**, Harvey Aff, ¶¶ 17, 26). ASGDC also includes a dedicated mental health unit for housing detainees with serious mental health needs. (**Ex. 5**, Caldwell Decl., ¶ 14; **Ex. 1**, Harvey Aff, ¶¶ 25-27).

While Defendant does provide group therapy and other types of out-of-cell group programming and "therapeutic activities," such activities are beyond the requirements of a local detention facility and not constitutionally required. Notably, the Plaintiffs have not cited any case law where a local detention facility was found to be required to provide group therapy to detainees. In contrast, this Court has ruled that "[w]ith regard to mental health and therapy programming, such rehabilitation is also not constitutionally required." *Phillips v. McKie*, 2011 WL 1326328, *4 (D.S.C. 2011), *report and recommendation adopted in* 2011 WL 1322867 (D.S.C. 2011). Citing *Bowring*, *supra*, another district court within the Fourth Circuit similarly ruled "[w]ith regard to mental health and therapy programming, such rehabilitation is not constitutionally required." *Anderson v. Green*, 2009 WL 2711885, *5 (D. Md. 2009). *See also*, *Boyer v. Iser*, 2021 WL 3852292, *11 (D.Md. 2021) ("lack of access to programming such as group therapy does not alone imply that a Fourteenth Amendment violation has occurred"); *Germaine-McIver v. County of Orange*, 2018 WL 6258896, *7, n.3 (C.D. Cal. 2018) (in case involving local detention center, court held "[t]here is no constitutional right to group therapy"); *Kole v. Lynch*, 2014 WL 3634065, *3 (D. Col. 2014) (in case involving county jail, court found detainee's claim of "no long-term individual or group therapy programs" lacked merit under the Eighth Amendment and the Due Process Clause).

The same is also true with respect to the Plaintiffs' claims for group programming or other out-of-cell programming for anger management, alcohol and drug treatment, sex offender treatment, and other forms of rehabilitative programs. The authority from the Supreme Court and within the Fourth Circuit is clear that inmates and detainees have no constitutional right to rehabilitation or educational programs. *See, Rhodes v. Chapman*, 452 U.S. 337, 348 (1981) (deprivation of rehabilitation and educational programs does not violate Eighth Amendment). *See*

*also*, *Moody v. Daggett*, 429 U.S. 78, 88, n.9 (1976) (prisoners have no due process protection with respect to their eligibility to participate in specific rehabilitation programs); *Bowring v. Godwin*, 551 F.2d 44, 48, n.2 (4th Cir. 1977) ("rehabilitation … is not mandated by any provision of the Constitution"); *Acree v. Clark*, 1986 WL 18023, *1 (4th Cir. 1986) ("Acree alleged that he was denied access to alcohol rehabilitation programs and vocational services. This claim fails because there is no constitutional right to such rehabilitation programs"); *Paige v. Oklahoma Dept. of Corrections*, 248 Fed. Appx. 35, 36 (10th Cir. 2007) (rejecting a prisoner's § 1983 claim that he had been deprived of his constitutional right to receive sex offender treatment because "[i]t is a settled matter that convicted persons do not have a constitutional right to rehabilitation").

Nonetheless, while not constitutionally required, the Defendant has begun several group programs, including the "Becoming Her" program for female detainees that focuses on character and coping skills. (**Ex. 2**, Harvey Decl., ¶¶ 60-62). ASGDC detainees also have the opportunity to participate in other programming, including a Literacy for Life program, and arts program, a GED program, and the New Beginnings program, the latter of which is a faith-based program. (**Ex.2**, Harvey Decl., ¶ 63). Moreover, a drug and alcohol program known as the IRize program, is scheduled to begin on January 28, 2025. (**Ex. 2**, Harvey Decl., ¶ 64). In addition, detainees are provided with tablet which include access to additional e-learning and self-help programming. (**Ex.2**, Harvey Decl., ¶ 65).

Finally, in addition to demonstrating the mental health program at ASGDC satisfies the *Ruiz* factors, the evidence with respect to the remaining Individual Plaintiffs, including their mental health records, shows that they are receiving a constitutionally adequate level of mental health care and treatment. The Plaintiffs have not demonstrated that CR2, CR3, CR5, CR6, CR9, CR12, and

CR15 have been denied any "medically necessary" care or treatment.  (**Ex. 2**, Harvey Decl., ¶¶ 66-76).

In sum, the Defendant's mental health care program meets the constitutional minima as a matter of law.  As noted, the parties primarily disagree as to the requirement for group therapy and other out-of-cell programming, and the authority in this Circuit does not support the Plaintiffs' position that such programming is constitutionally mandated.  Accordingly, the Defendant is entitled to summary judgment on claims related to the provision of mental health care services.

### D.     Eighth Amendment Claim

The Plaintiffs' Second Cause of Action alleges a violation of their Eighth Amendment rights. However, the Plaintiffs have not properly pled any claim for a violation of their Eighth Amendment rights because each of the Plaintiffs are pre-trial detainees and not convicted prisoners. *See, Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 248 (4th Cir. 2005) ("because Slade is a pretrial detainee, not a prisoner, the protections afforded by the Due Process Clause of the Fourteenth Amendment, and not those afforded by the Eighth Amendment, apply"). As none of the Individual Plaintiffs are convicted prisoners serving definitive sentences, the Plaintiffs have not pled any factual or legal basis for any Eighth Amendment claim.

### E.     Conditions of Confinement – Access to Toilets, Showers, and Lighting

The Plaintiffs allege that the SMI Detainees are subjected to "inhumane living conditions" at ASGDC, specifically the lack of working toilets, sinks, showers, and light fixtures.  The evidence, however, reflects that the Defendant is currently engaged in the renovation of the housing units.  To date, the renovation of six housing units has been completed, specifically the Behavioral Management Unit and Units Yankee, Papa, X-Ray, Golf, and India.  (**Ex. 1**, Harvey Aff., ¶¶ 9, 12).  As Director Harvey attests, the renovations include the installation of "state-of-the

art electronic Willo Wedge locking systems for the cell doors, new stainless-steel sinks and toilets, new plumbing, and a water management system." *Id.* The cells also include "steel-reinforced light fixtures than cannot be broken and manipulated to create weapons and/or access to electricity for charging contraband cell phones and starting fires." *Id.* The plan is for every housing unit at ASGDC to undergo the same renovations. Currently, Units Lima, Uniform, Kilo, Hotel, and Juliet are closed and under renovations, with Unit Hotel to be re-opened later in January 2025, and Unit Juliet to be re-opened in April/May 2025. (**Ex.2**, Harvey Decl., ¶¶ 14, 17). The completed and ongoing renovations have addressed the concerns raised with the plumbing deficiencies, including broken toilets, sinks, and showers, as well as the issues with damaged or inoperable lighting fixtures.

As Director Harvey further attests, "there is no detainee who is placed in a cell that does not have a working toilet." (**Ex. 1**, Harvey Aff., ¶ 38). Of the named Plaintiffs, Director Harvey testifies that only the following are still detainees housed at ASGDC: CR2, CR3, CR5, CR 6, CR9, CR12, and CR 15. (**Ex. 2**, Harvey Decl., ¶ 54). As Director Harvey confirms, each of those Plaintiffs are currently housed in cells with a working lock, toilet, sink, lighting, and access to showers in their units. (**Ex.2**, Harvey Decl., ¶¶ 54-57). Additionally, Director Harvey confirms that the County contracts with outside vendors including a pest control company to address pest-related issues. (**Ex. 1**, Harvey Aff., ¶ 40).

It is also important to recognize that Richland County was not in a position to close down ASGDC to perform these renovations. (**Ex. 1**, Harvey Aff., ¶ 34). The renovations had to be scheduled over time to allow for sufficient bed space to remain in operation and to utilize the available contractors. However, federal courts have recognized that such renovations or repairs do occur and are necessary and that temporary inconveniences that occur while renovations or

upgrades are performed do not give rise to constitutional deprivations.  By way of illustration, in the late 1990s, SCDC was faced with the need to place higher custody inmates at Turbeville Correctional Institution in units which, as designed and built, did not have toilet facilities in each cell.  As a result, as a temporary condition, inmates were locked down at night in cells without toilets and had to be let out to use the restroom.  Ultimately, SCDC obtained the funding for renovations to install plumbing facilities in each cell.  However, in the interim, there were multiple lawsuits filed claiming that housing inmates in cells without toilets was cruel and unusual punishment.  In finding no constitutional violation, this Court explained that "the inadequate conditions that are focus of this lawsuit were of relatively brief duration and the problem has now been remedied because the population is no longer locked down at night and adequate plumbing facilities are to be installed."  *See*, *Lewis v. Moore*, Civil Action No. 0:96-584-JFA, Order filed September 29, 1997.  Thus, this Court recognized that temporary inconveniences resulting from a lack of continuous access to toilets or sinks do not rise to the level of constitutional deprivation.

More recently, in *Crouchman v. Pickens County Council*, 2017 WL 767185 (D.S.C. 2017), *report and recommendation adopted in* 2017 WL 749393 (D.S.C. 2017), this Court considered a claim by a pre-trial detainee challenging multiple conditions in a local detention center. The detainee alleged that "sometimes his toilet or sink would be broken 'for days' and that on occasion he had to be 'let out to use the common area bathroom because his toilet don't work.'"  2017 WL 767185, *12. In granting summary judgment, this Court explained that "while Plaintiff undoubtedly did not like being detained, the fact remains that during the time period set forth in the Complaint he was a prisoner in a county jail facility, not a hotel, and it should be expected that the conditions in such a setting are often times less than ideal."  2017 WL 767185, *11.  This Court also found that the temporary denial of services due to disruption of service or maintenance/repair issues does not rise

to the level of a constitutional deprivation, particularly in the absence of evidence that the conditions were imposed with the intent to punish, or that the detainee suffered any significant injury.  2017 WL 767185, *12.

In sum, the Defendant is entitled to summary judgment with respect to the conditions of confinement claims, including claims related to the physical plant.

### F.          <u>Conditions of Confinement – Security-Related Issues</u>

The Plaintiffs also allege that there are security staffing shortages that place the Individual Plaintiffs at a substantial risk of bodily harm.  In making that claim, the Plaintiffs have previously relied on outdated data from 2020 to 2023, rather than more current staffing information. (**Ex. 1**, Harvey Aff., ¶ 33).  In his affidavit and declaration, Director Harvey outlines the measures taken by the Defendant to hire new security staff and to retain existing staff, including recruiting measures and increased salaries and bonuses.  (**Ex. 1**, Harvey Aff., ¶¶ 9-11; **Ex. 2** Harvey Decl., ¶¶ 28-31).  In addition, the Defendant contracts with Allied Security to use non-custodial security officers to fill posts that would otherwise be filled by detention officers, thereby freeing up those officers for other posts.  (**Ex. 1**, Harvey Aff., ¶ 12; **Ex. 2** Harvey Decl., ¶ 32).  Moreover, with the renovations that are ongoing, the housing units will contain secure control rooms within the units that will be manned by Allied Security officers, thereby providing 24-hour constant observation of the units and assistance to the assigned detention officers.  (**Ex. 1**, Harvey Aff., ¶ 31).

As Director Harvey attests, ASGDC currently employs 125 detention officers and supervisors.  (**Ex. 2** Harvey Decl., ¶ 30).  Additionally, there are thirteen newly hired detention officers who will start work on January 27, 2025.  (**Ex. 2** Harvey Decl., ¶ 30).  That will bring the total of detention officers and supervisors to 138.  (**Ex. 2** Harvey Decl., ¶ 30).  That number does not include the Allied employees who fill some functions that would otherwise need to be done by

detention officers, including manning the control rooms in the units. Director Harvey further explains that the Defendant "is also focusing on hiring for specific jobs within the facility, such as transportation officers and control booth officers who are or will be certified detention officers who can also perform regular detention officer duties when needed" and that "[t]e goal is to man all new control booths constructed and being constructed within the units with County employed detention officers rather than contracted Allied employees." (**Ex. 2** Harvey Decl., ¶ 31).

On the staffing issue, the Plaintiff points to the South Carolina Association of Counties 2023 Staffing Analysis to argue that ASGDC is "grossly understaffed." However, as Director Harvey explains, "[t]he Staffing Analysis is a 'perfect world' analysis. The 294 "Security/Shift Workers" number includes 109 security staff as "shift relief" which would allow the County to avoid paying overtime if employees call out sick or otherwise do not show up for work. Further, the analysis includes 5 DOs/26 shift relief officers for the juvenile facility, which is not included in this lawsuit." (**Ex. 2** Harvey Decl., ¶ 33). Accordingly, by Harvey's calculations, there is a need for 140 security staff to man all of the adult detainee posts listed in the staffing report on a 24-hour basis without needing any detention officer to work overtime.

As Director Harvey further attests, all of the housing units are currently manned by a detention officer supported by a supervisor assigned to each phase, while the renovated units of BMU, Yankee, and X-Ray have two detention officers each with one additional Allied employee in the control room, and Units Golf and India have one detention officer each, with one additional person in the control room. Units Hotel and Juliet will be the same when re-opened. (**Ex. 2,** Harvey Decl., ¶¶ 10, 13, 14).

Finally, Director Harvey describes in his affidavit the initiatives that have been put into place to combat the introduction of contraband and to harden the security apparatus of the facility.

(**Ex. 1**, Harvey Aff., ¶¶ 46-52).  In his more recent declaration, Harvey provides an update of the anti-contraband efforts, which includes an internal investigation that resulted in the arrest of several employees and a contract nurse.  (**Ex. 2** Harvey Decl., ¶¶ 50-51).  The Defendant has also purchased and now have operational a mail scanner that can detect the presence of drugs such as fentanyl and K-2 in the mail, books, and other items sent to detainees.  (**Ex. 2** Harvey Decl., ¶ 52).  Director Harvey also provides statistics showing a "marked decrease in the overall amount of contraband found in the facility."  (**Ex. 2** Harvey Decl., ¶ 53).  He also reports that fights among detainees has decreased, including fights involving the use of a weapon.  (**Ex. 2** Harvey Decl., ¶ 45).  Moreover, the altercations rarely now involve any shank or weapon.  (**Ex. 2** Harvey Decl., ¶¶ 46-48).

In sum, the evidence demonstrates that there has been a marked improvement in safety-related issues.  The number of altercations are substantially decreased, including altercations involving the use of a weapon.  The security staffing numbers have improved, and when the manpower provided by Allied for the control rooms and other tasks is factored in, there is sufficient manpower to meet staffing requirements for the units.  For these reasons, the Plaintiffs cannot demonstrate that the current conditions within the units housing the Plaintiffs, nor any other units, do not meet the constitutional minima or present an unconstitutional risk of harm to the Plaintiffs.

### G.    Americans with Disabilities Act Claim

In their Third Cause of Action, the Plaintiffs allege that the Defendant violates their rights under the Americans with Disabilities Act (ADA) "by failing to provide the minimal care necessary to meet the SMI Detainees' mental health needs and by discriminating against SMI Detainees as set forth above." (ECF 99, ¶ 130). The only "discrimination" alleged is as follows: "Defendant discriminates against SMI Detainees on the basis of their mental illnesses by confining them, upon

information and belief, at materially greater rates and for materially longer periods than non-disabled detainees are subjected to such confinement." *See*, *id.* ¶ 129.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. To establish a prima facie case under Title II, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he was excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See*, *Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

States are generally required to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. Specifically, the definition of "qualified individual with a disability" requires "reasonable modifications to rules, policies, or practice, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services." 42 U.S.C. § 12131(2). However, "[a] reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities. Rather, the public entity is obligated to make those modifications that do not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Miller v. Hinton*, 288 Fed. Appx. 901, 902 (4th Cir. 2008). The regulations promulgated by the U.S. Department of Justice (DOJ) provides that the ADA "does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in any undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3).

The leading case on the application of Title II to persons with mental disabilities is *Olmstead v. L.C.*, 527 S.C. 581 (1999). In that case, the plaintiffs were two mentally ill women, one diagnosed with paranoid schizophrenia and the other with a personality disorder, who had been treated in in-patient mental institutions. They sued the State of Georgia alleging that the failure to place them in community-based treatment programs violated the ADA. The Supreme Court found that the two women were entitled to be placed in community-based programs and affirmed the Eleventh Circuit's remand to the district court to consider the state's cost-based defense. The Supreme Court held as follows:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

527 U.S. at 607.[9]

Footnote 14 of the opinion is critical. The Supreme Court confirmed that the ADA is a statutory scheme intended to prevent discrimination, but the Court was not mandating a "standard of care" or setting a minimum level of services that may be required. In that light, the Court explained that "[w]e do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.' We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." 527 U.S. at 603, n.14.

---

[9] Of note, *Olmstead* is a plurality opinion. The principal sections of the opinion were joined by five justices, although Justice Stevens did not join in section III-B of the opinion.

As indicated, as the basis for their ADA claim, the Plaintiffs allege "a failure to provide adequate mental health services." (ECF 99, ¶¶ 124-130). However, the ADA is not violated by allegations or proof that a prison or local detention facility merely failed to attend to the medical or mental health needs of the inmates. In *Mondowney v. Baltimore County Detention Center*, 2019 WL 3239003 (D.Md. 2019), the plaintiff alleged that he was denied constitutionally adequate medical care while he was detained at the Baltimore County Detention Center. In dismissing the plaintiff's ADA claim, the district court wrote:

> To the extent that plaintiff claims that a denial of medical treatment violates his rights under the ADA, the claim fails. Although the Fourth Circuit has not addressed this issue in a published opinion, unpublished cases from this circuit, as well as published and unpublished cases from other circuits, indicate that a prisoner may not state a claim under the ADA for a lack of medical treatment.

2019 WL 3239003, *21. Among the supporting cases cited is *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996), in which the Seventh Circuit explained that the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." 84 F.3d at 249. The court noted that the plaintiff "is complaining about incompetent treatment of his paraplegia" and the "ADA does not create a remedy for medical malpractice." *Id*. The court concluded that "[n]o discrimination is alleged, that is, the Plaintiff "was not treated worse because he was disabled." *Id. See also, Valbert v. South Carolina Department of Mental Health*, 2013 WL 4500455, *10 (D.S.C. 2013) (court dismissed ADA claim because there was no evidence that plaintiff "was discriminated against because of his condition"); *Spencer v. Easter*, 109 Fed. Appx. 571, 573 (4th Cir. 2004) (failure to provide timely refills of prescription drugs did not amount to an ADA violation where there was no showing that it was done based on prisoner's disability); *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134, 1144 (10th Cir. 2005) (inmate's ADA claim was properly dismissed for failure to state claim as they were based on medical treatment decisions). Therefore,

because the Plaintiffs' ADA claims are premised on the alleged failure "to provide the minimal care necessary to meet the SMI Detainees' mental health needs," the Defendant is entitled to summary judgment.

The Plaintiffs also contend that SMI Detainees are discriminated against by being placed in a "restrictive housing unit" because of their disabilities. The Plaintiffs have presented no evidence that this has occurred to the Individual Plaintiffs, as opposed to other unnamed detainees. But more importantly, the Plaintiffs have taken issue with the formation of the mental health unit and the placement of SMI Detainees in that unit. The Plaintiffs have presented no evidence, however, that SMI Detainees in the mental health unit are discriminated against based on their disabilities or that they are denied services provided to other non-SMI Detainees. In sum, the Defendant is entitled to summary judgment on the ADA claim.

### H.    Mootness

The injunctive relief claims filed by the Plaintiffs CR4, CR10, CR11, and CR14 are moot in that they are no longer housed at ASGDC. In *Williams v. Ozmint*, 716 F.3d 801 (4th Cir. 2013), the Fourth Circuit explained that ""m]ootness principles derive from the requirement in Article III of the Constitution that federal courts may adjudicate only disputes involving 'a case or controversy.'" 716 F.3d at 808. The Fourth Circuit reasoned as follows:

> The case-or-controversy requirement applies to all stages of a federal case. It is not enough that a dispute was very much alive when the suit was filed, but the parties must continue to have a "particularized, concrete stake" in the outcome of the case through all stages of litigation. This constitutional requirement is of paramount importance, because the federal courts have no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.

716 F.3d at 808-809. (Citations omitted). As the Fourth Circuit further explained, "[a] case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." 716 F.3d at 809.

Importantly, in the context of prisoner litigation, the Fourth Circuit has consistently ruled that claims for injunctive relief are deemed moot upon the transfer or release of an inmate. In the leading case of *Incumaa v. Ozmint*, 507 F.3d 281 (4th Cir. 2007), *cert. denied*, 128 S.Ct. 2056 (2008), the Fourth Circuit explained that "[m]ootness questions often arise in cases involving inmate challenges to prison policies or conditions, and courts, including our own, have held that the transfer of an inmate from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief, even if a claim for money damages survives." 507 F.3d at 286-87. The Court reasoned as follows:

> Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim. Any declaratory or injunctive relief ordered in the inmate's favor in such situations would have no practical impact on the inmate's rights and would not redress in any way the injury he originally asserted. And the newly situated inmate has no further need for such declaratory or injunctive relief, for he is free of the policy or practice that provoked his lawsuit in the first place.

507 F.3d at 287. *See also*, *Rendleman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("as a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there"); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987) ("[b]ecause the prisoner has been transferred, his request for injunctive relief is moot"); *Taylor v. Rogers*, 781 F.2d 1047, 1048, n.1 (4th Cir. 1986).

Because the Plaintiffs CR4, CR10, CR11, and CR14 are no longer housed at ASGDC, their claims for injunctive relief are clearly moot and should be dismissed or denied on that basis.

## **CONCLUSION**

Based on the foregoing discussion and analysis, Defendant Richland County respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiffs' Second Amended Complaint with prejudice.

<div style="margin-left:50%">

s/A. Johnston Cox
John T. Lay, Jr., Fed Bar No. 5539
A. Johnston Cox, Fed Bar No. 6534
Lindsay A. Joyner, Fed Bar No. 11557
J. Clayton Mitchell, III, Fed Bar No. 11739
Eleanor L. Jones, Fed Bar No. 13437
**GALLIVAN, WHITE & BOYD, P.A.**
1201 Main Street, Suite 1200 (29201)
Post Office Box 7368
Columbia, South Carolina 29202
(803) 779-1833
jlay@gwblawfirm.com
jcox@gwblawfirm.com
ljoyner@gwblawfirm.com
cmitchell@gwblawfirm.com
ejones@gwblawfirm.com

Andrew F. Lindemann, Fed Bar No. 5070
**LINDEMANN & DAVIS, P.A.**
5 Calendar Court, Suite 202
Post Office Box 6923
Columbia, South Carolina 29260
(803) 881-8920
andrew@ldlawsc.com

*Attorneys for Defendant*

</div>

January 15, 2025
Columbia, South Carolina