**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD/ANDERSON DIVISION**

| | | |
|---|---|---|
| Disability Rights South Carolina; 15 Unnamed Plaintiffs as Class Representatives on behalf of themselves and others similarly situated, | ) ) ) ) ) ) | Civil Action No. 8:22-cv-01358-MGL-WSB |
| Plaintiffs, | ) ) | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) | |
| Richland County, | ) ) | |
| Defendant. | ) | |

Plaintiffs respectfully submit this Motion for Summary Judgment and Permanent Injunctive Relief pursuant to Rules 56 and 65 of the Federal Rule of Civil Procedure.

## I.    FACTUAL BACKGROUND

### A.    Introduction

For over a decade, members of Richland County Council and county administrators failed to heed dire warnings of emergencies due to critical staffing shortages, uncontrolled detainee violence, and the unmet need for a therapeutic environment and services for detainees with serious mental illnesses ("SMI Detainees"). The confluence of these severe operating deficiencies has created an environment that continues to subject SMI detainees to a substantial risk of serious harm, notwithstanding Defendant's representations of attempting to mitigate its longstanding deliberate indifference.

Defendant has represented that since the commencement of this action it has made substantive changes to the Alvin S. Glenn Detention Center ("ASGDC") physical

1

facility to remediate the constitutional violations detailed in the pleadings. Although serious questions remain about the overall condition of the facility, Defendant appears to have made sufficient progress with its housing unit renovation project over the past six months that summary judgment on Plaintiffs' claim for Defendant's failure to provide safe and sanitary housing is not currently warranted. Plaintiffs ask the court to grant summary judgment on the remaining causes of action discussed below, declare Defendant's practices unconstitutional, and grant appropriate permanent injunctive relief.

**B.     SMI Detainees**

During the January 2024 site inspection of Plaintiffs' subject matter experts ("Expert Site Inspection"), ASGDC Director Crayman Harvey informed one of the Plaintiff's experts that detainees with mental illness were being housed in virtually all housing units throughout the facility, comprising 60 to 70 percent of the population. (*See* **Ex. 1, Report of Kenneth A. Ray, DBH, MEd.. ("Ray Report")** at 36.) Similarly, Laurinda Saxon-Ward, the ASGDC site manager for mental health services, testified that 608 of the 960 detainees in the jail's custody during November 2023 received mental health services. (**Ex. 2, Saxon-Ward Dep**. at 134:8–10, 152:14–17.) The total number of patients currently on the mental health caseload who have a serious mental illness is not currently maintained by Defendant. Although Advanced Healthcare Corporation ("ACH"), Defendant's contractual mental health agency, does determine if each patient it sees has a mild or serious mental illness, it apparently does not maintain an aggregate Total of the percent or number of SMI Detainees at any point in time. In 2020, however, then-ASGDC director Ronaldo Myers reported in a presentation to the Richland County Council

Detention Center Ad Hoc Committee that 66 percent of those with "mental health needs" were "seriously mentally ill." (**Ex. 3, Agenda Briefing** at 3.)

Further evidence of the placement of SMI Detainees throughout ASGDC is the Mental Health Housing Activity Report ("MHHA Report") prepared by the County's IT Department in response to a discovery request. (**Ex. 4, MHHA Report).** The MHHA Report identifies each housing unit to which an individual receiving mental health services during the reporting period was assigned. Each of the ASGDC phases was constructed in a different design and is used primarily to house different classifications of the general detainee population. Phase 1 consists of the open housing units with no cells to which detainees with a minimum-security classification are assigned (Alpha, Charlie, Delta, Echo , and Foxtrot). Detainees with medium or maximum classification are assigned generally to Phase III housing units (Golf, Hotel, India, Juliet) with single cell and double cell occupancy, and Phase V housing units (Kilo, Lima, Papa, Uniform, X-ray, and Yankee) have pods designed for eight detainees with either open bays or cells within the pods. In either case, the pods are situated behind plexiglass wall. Detainees from all classifications are assigned to special purpose units (Bravo, Mike, and BMU.). One of Plaintiff's subject matter experts, Dr. Kenneth A. Ray, calculated that for the 473 patients on the mental health caseload whose housing activity in December 2023 and January 2024 was reported, the average length of stay was 255.83 days, or approximately eight months and a week. During this period, the patients were assigned to a particular housing unit for an average of 94.4 days. (*See* **Exhibit 1, Ray Report** at 66-68).

C.    **Defendant Withholds Necessary Mental Health Care to ASGDC Detainees.**

A 2014 management operations study by Pulitzer/Bogard Associates, LLC commissioned by Defendant found that ASGDC did not have "sufficient and appropriate beds" to accommodate detainees with serious mental illness, advising that its efforts to "make do" through patch work measures were having "deleterious effects" on vulnerable detainee populations.[1] (**Ex. 5, 2014 Management Study** at 97.) More specifically, the 2014 Management Study presented numerous findings and recommendations concerning mental health services, including the need to end the practice of confining individuals with acute and sub-acute symptoms mental illness in seclusion for 23 hours a day, to protect SMI detainees by assigning them to a dedicated mental health housing unit, and to expand its limited scope of mental health services beyond medical management and crisis stabilization. (*Id.* at 27–30.)

Not prepared to take action based on the findings of this study, Defendant commissioned yet another major report, resulting in the issuance in October 2016 needs assessment by Carter Gable Associates, LLC (**Ex. 6, "2016 Needs Assessment"**). The 2016 Needs Assessment found, as had the 2014 Management Study, that Defendant was failing to meet the needs of detainees with mental illness in part because of inappropriate housing. (Id. at 1-17.) The study also projected that the prevalence of mental illness and medical issues among ASGDC detainees was expected to increase at a high rate. (Id. at 2-22.)

---

[1] Notably, this study followed one also commissioned by Defendant in 2008 that encompassed multiple dimensions of the facilities operations, with particular emphasis on addressing critical staffing shortages. *Id.* at 2-3, citing 2008 audit..

More than three years later, Defendant still had taken no steps to mitigate the daily harm to which its vulnerable population are exposed. In a February 20, 2020, meeting of Defendant's Detention Center Ad Hoc Committee, then ASGDC director Ronaldo Myers[2] submitted a briefing paper in which he made the case for the construction of a dedicated unit for the large population of SMI Detainees at ASGDC. (**Ex. 3 Agenda Briefing** at 3.) Director Myers stated that the special housing unit, where many SMI detainees were placed, was "not conducive to housing detainees with mental health needs," and, "[i]n fact, **_the lack of appropriate housing negatively impacts a detainee's mental health state due to prolonged confinement of 22-23 hours per day._**** (Id. at 3 (emphasis added).) With 24 (42%) of the 56 SHU cells then set aside for SMI detainees, Director Myers the jail's capacity to manage detainees who require disciplinary or administrative segregation was reduced, which is in turn increased the risk of harm to SMI detainees and other vulnerable populations. *Id.*

Notwithstanding the explicit and repeated advisories Defendant has received for nearly a decade that it was systematically exposing SMI detainees to harm, more than another two years passed before ASGDC took any action, for example, to designate a housing unit for SMI detainees. That step did not occur until November 2022 more than six months after the commencement of this action on April 28, 2022. Even then, the physical relocation was an inadequate half-measure failing to reasonably mitigate the substantial and multidimensional risks of serious harm to which women and men with mental illness continue to be exposed while a Defendant's custody and care.

---

[2] A 40-year veteran at the detention center, Mr. Myers had been the jail's director at two different periods, serving in that capacity for more than 15 years.

**D.     Failure to Protect from Violence**

ASGDC is named for a sergeant at the Richland County facility who, in September 2000, was overpowered and killed by three inmates attempting to escape. Over the past twenty years, ASGDC staff and detainees have continued to be scarred by violence. In fact, since the filing of this action in April 2022, the increasing level of violence and other serious incidents leave no doubt that Defendant has failed and continues to fail to protect detainees from harm.

For over a decade, Defendant has consistently demonstrated a pattern and practice of failing to maintain adequate staffing levels and to implement minimally adequate staffing practices at ASGDC. This persistent practice has directly compromised the ability to provide inmates with objectively reasonable and consistent monitoring, supervision, and care necessary to protect them from harm. (*See* **Exhibit 1, Ray Report** at 30). Dr. Ray has assessed the operations of a wide array of institutions concerning the care and custody of SMI inmates. Among these, he reports that ASGDC "stands out as particularly hazardous and inappropriate for the management and protection of SMI detainees. This assessment is rooted in a detailed review that identifies persistent, severe issues including critical shortages of adequate staffing, a consistent lack of necessary mental health services for SMI inmates, and a history of poorly maintained and unsafe living conditions. Moreover, Richland County has consistently failed to adhere to its own jail policies and procedures for years. This includes a failure to recognize and promptly address the prolonged and severe risks posed to its SMI population, which are inexplicable and alarming. The approach taken by Richland County in addressing the needs of SMI inmates is profoundly inadequate and stands as

unparalleled in its deficiencies, based on extensive professional observations."[3] (*Id.* at 73-74).

## II.     LEGAL ANALYSIS

### A.  Summary Judgment Standard

A party may move for partial summary judgment on a discrete issue that does not fully resolve a claim or defense. Fed. R. Civ. P. 56(a). The court can order that any material fact is not genuinely in dispute and treat the fact as established in the case. Fed. R. Civ. P. 56(g). Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate, however, when the evidence "is so one-sided that one party must prevail as a matter of law." *Tekmen v. Reliance Std. Life Ins. Co.*, 55 F.4th 951, 959 (4th Cir. 2022).

---

[3]Also recognizing the profound and severe risks to which ASGDC detainees are exposed, the United State Department of Justice released a report on January 15, 2025, of its investigation of the facility, finding, Defendant is violating the Constitutional rights of detainees because, among other things, of an unmitigated environment of violence that "Violence is pervasive at ASGDC. The frequency of serious physical assaults, which result in hospitalization or death – including assaults with weapons, assaults by multiple individuals on single victims, and sexual assaults – indicates severe and systemic lapses in security operations at the Jail." *See* **Ex. 7, Alvin S. Glenn Detention Center Repor**t at 4.

**B. Defendant systematically violates SMI Detainees' Fourteenth Amendment rights.**

Standards for treatment of incarcerated individuals are measured by "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The country's "changing concepts of civilized conduct and treatment," *Sweet v. South Carolina Dep't of Corr.*, 529 F.2d 854, 860 (4th Cir. 1975), must grow over time to "embrace and express respect for the dignity of the person." *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008). Thus, "[t]he conditions in which prisoners are housed, like the poverty line, is a function of a society's standard of living. As that standard rises, the standard of minimum decency of prison conditions, like the poverty line, rises too." *Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir. 1988). Rather than relying primarily on precedent, therefore, this Court must bring its "own judgment . . . to bear on the question" of whether Defendants' conduct violates the Eighth Amendment. *Roper v. Simmons*, 543 U.S. 551, 563 (2005)

The Eighth Amendment prohibits cruel and unusual punishment and requires prison official to provide "humane conditions of confinement[,]" ensuring that "inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of inmates." *Id.* Importantly, the due process rights of a pretrial detainee are "*at least* as great as the Eighth Amendment protections available to the convicted prisoner." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (emphasis added). When a jail or prison adopts policies or practices "incompatible with the concept of human dignity," the "courts have a responsibility to remedy the resulting . . . violation." *Brown v. Plata*, 563 U.S. at 511.

8

A pretrial detainee has an established right under the Due Process Clause "to be free from punishment before his guilt is adjudicated." *Tate v. Parks*, 791 Fed. App'x 387, 390 (4th Cir. 2019). "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation omitted). Conditions of confinement establish a constitutional violation in combination when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Defendant subjects SMI Detainees to punishment without due process by failing to provide them necessary mental health care, by subjecting them to inhumane physical conditions, and by failing to protect them from violence.

The United States Court of Appeals for the Fourth Circuit recently held a pretrial detainee states a Fourteenth Amendment claim for deliberate indifference to a serious risk of harm on the "purely objective basis" that the challenged governmental action is not "rationally related to a legitimate governmental purpose" or is "excessive in relation to that purpose." *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). Thus, the plaintiff must show that the defendant's action or inaction was "objectively unreasonable" in that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1970)).

As stated above, the standard for each of these claims required pretrial detainees to show: (1) the existence of a condition that posed a substantial risk of serious harm; (2)

the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had the condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed. Short, 87 F.4th at 611. Stated differently, the plaintiff must show that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* In this case, Plaintiffs can show that Defendant is deliberately indifferent to the substantial risk of serious harm caused by its failure to protect detainees from rampant violence, the inhumane conditions it requires detainees to endure, and the failure to provide medical care to SMI Detainees with serious medical needs.

As set forth below, the evidence submitted in support of this Motion demonstrates no genuine issue of material fact that the conditions of confinement at ASGDC violate SMI Detainees' rights under the Fourteenth Amendment.

**1. Failure to provide necessary mental health services.**

The government is required to provide adequate care to meet the serious medical needs of incarcerated individuals. Estelle v. Gamble, 429 U.S. 97, 103 (1976). There is no underlying distinction between the right to medical care and the right to mental health care. *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) ("Courts treat an inmate's mental health claims just as seriously as any physical health claims."). A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

This obligation remains even if it has contracted with a private party to provide medical care. *West v. Atkins*, 487 U.S. 42, 56 (1988); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1188 (M.D. Ala. 2017).

While living in the unsafe and unsanitary conditions detailed above, SMI Detainees' need for mental health treatment is largely ignored. In class actions challenging systemic health care deficiencies, deliberate indifference to inmates' health needs may be shown by proving there are such "systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Baxley v. Jividen*, 508 F. Supp. 3d 28, 55 (S.D. W. Va. 2020) (quotation omitted).

The evidence discussed herein eliminates any genuine issue of material fact as to Plaintiffs' claim that Defendant fails to provide a necessary range of mental health services to SMI Detainees, that such failure is an unreasonable response to the substantial risk posed by not treating SMI Detainees' serious medical needs, and that Defendant is aware of the resulting harm and risk of harm to SMI Detainees caused by its inadequate mental health services at ASGDC. Thus, Plaintiffs are entitled to summary judgment declaring that ASGDC's systemic failure to provide necessary mental health services to SMI Detainees violates their constitutional rights and warrants injunctive relief.

### i. SMI Detainees have serious mental health needs that Defendant fails to treat.

### a. SMI Detainees have serious medical needs

There is no dispute that SMI Detainees have serious mental health needs. A medical need is serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "Serious mental

illness" is a term of art used in the field of psychiatry which refers to "a subset of particularly disabling conditions . . . defined by the diagnosis, duration, and severity of the symptoms." *Braggs v. Dunn*, 257 F. Supp. 3d at 1246.

 As defined in the Second Amended Complaint, SMI Detainees are individuals at any time since April 28, 2022, have been or will be confined at ASGDC and who, at any time since such date, have been or will be: (1) assigned to a "mental health" housing unit at ASGDC; (2) diagnosed by a psychiatrist or other licensed clinical mental health professional with certain mental illnesses; (3) diagnosed by a psychiatrist or other licensed clinical mental health professional with another mental disorder that has resulted in significant functional impairment (as defined therein); or (4) has been admitted to a licensed behavioral health or psychiatric hospital. (ECF No. 99, at ¶ 33.)

Based on this definition, SMI Detainees must have a psychiatric diagnosis, a history of psychiatric admission, or sufficient indicia of mental illness to warrant a special housing assignment. Accordingly, SMI Detainees clearly have a serious need for mental health services.

### b. Failure to provide necessary treatment

In institutional challenges to mental health care, systemic deficiencies can provide the basis for a finding of deliberate indifference. *See Baxley v. Jividen*, 508 F. Supp. 3d 28, 55 (S.D. W. Va. 2020) (quotation omitted). Courts have identified certain components as being minimally necessary for a correctional facility's mental health program, including the provision of a treatment plan that involves more than segregation and close supervision of the mentally ill. *See, e.g.*, *Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980) *aff'd in part and rev'd in part on other grounds*, 679 F.2d 1115 (5th Cir. 1982);

*Coleman v. Wilson*, 912 F. Supp. 1282, 1298 n.10 (E.D. Cal. 1995). Defendant's failure to address SMI Detainees' mental health needs is objectively unreasonable on a systemic level.

Nicole R. Johnson, M.D., Plaintiff's forensic psychiatrist who has served as an investigator for the Department of Justice and a consultant for some of the largest jails in the nation, sets forth certain essential elements of effective and therapeutic delivery of behavioral health services in a correctional setting. (**Ex. 8, Johnson Report** at 2–3.) These elements include: a comprehensive screening and intake process; a comprehensive mental health assessment and treatment planning process; therapeutic programming that provides a continuum of services capable of meeting the broad range of needs of incarcerated persons with mental illnesses, including individual counseling, group therapy, substance abuse treatment, appropriate administration of medication, and unstructured activities; and, a continuous quality improvement program to collect and analyze data concerning the performance of a mental health delivery system. (*Id.*)

To form her opinion regarding the deficiencies in ASGDC's services, Dr. Johnson reviewed medical records, mental health clinician deposition transcripts, patient interviews, and participated in the Expert Site Inspection. Dr. Johnson found significant deviations from the practice standards generally recognized and accepted in correctional facilities, including minimal to no behavioral health treatment, no therapeutic services including individual or group therapy, no therapeutic programming, and little to no differentiation in delivery of care or treatment planning. (**Ex. 8, Johnson Report** at 4–9.)

i. Inadequate Treatment

Importantly, as an integral part of treatment planning, correctional facilities must provide not only psychotropic medication but also appropriate psychotherapy or counseling to detainees who need it to treat their serious mental-health needs. *See Braggs v. Dunn*, 257 F. Supp. 3d at 1190 n.11 (crediting expert testimony that "treatment of serious mental illnesses requires, *at a minimum*, multidisciplinary efforts to coordinate and implement interventions, including psychotherapy or counseling, psychotropic medications, and monitoring for signs of decompensation or progress."). This means Defendant must make available a range of mental health services to provide when and if such services are needed by SMI Detainees, including individual counseling and group therapy. "Minimal and triage-based services" are not sufficient. *Braggs v. Dunn*, 257 F. Supp. 3d at 1197; see also *Jensen v. Shinn*, 609 F. Supp. 3d 789, 853 (D. Ariz. 2022) (discussing inadequacy of "drive-by mental health encounters").

As former Director Myers informed Defendant in 2020, SMI detainees at ASGDC are not provided an appropriate range of mental health treatment, including individual and group psychotherapy as needed. **(Ex. 3, Agenda Briefing** at 3.) That central fact is not in dispute and the practice continues today. This is made clear by detainee medical records, as well as testimony of ACH staff.

ACH Site Manager Laurrinda Saxon-Ward was unequivocal in her description of the services performed by the mental health staff she oversees, stating that "[w]hen we do individual therapy, I call its crisis management . . . we do brief therapy, brief solution therapy." (**Ex. 2, Saxon-Ward Dep**. at 91:16–17, and at 93:7–8.) Describing what she

14

directs her clinicians to do, Ms. Saxon-Ward states: "I don't expect my clinicians to sit down and have a one to one with the patients." (Id. at 240:9–11.) She further testified:

> Q. So when say you don't expect the clinicians to have – to sit down and have a one on one session with patients, you mean in a traditional therapeutic counseling session?
>
> A. Right. There's no privacy, there's no safe zone or safe place for that to happen.

(**Ex. 2, Saxon-Ward Dep.** 240:21–241:1.) In sharp contrast to the non-therapeutic services at ASGDC, Ms. Saxon-Ward discussed her extensive experience with individual counseling programs at the South Carolina Department of Mental Services (SCDMH) that could incorporate a broad range of therapeutic models based on the needs of the patients.

(**Ex. 2 Saxon-Ward Dep.** at 13:11–15:25.) In explaining the distinction between crisis management provided at ASGDC and individual therapy available at SCDMH, Ms. Saxon-Ward observed that "[i]ndividual counseling, it gives you privacy; it gives you a safe environment so you can express your feelings and thoughts without being judged or, you know, your privacy being violated. It's more intimate, you know, individual counseling." (*Id.* at 17:8–13.)

Former ACH mental health clinician Veronique Gilmore provides a similar description of ASGDC mental health services: medication management and coping skill development. (**Ex. 9, Gilmore Dep**. at 237:13–19.) And she confirms the same limitation. Ms. Gilmore differentiated her use of the term "actual therapy" from "brief interventions", explaining that in employing coping strategies and psychosocial education, "[t] here was no processing of feelings and things like that." (*Id.* at 36:1–8.)

The testimony of a third ACH clinician, Judy Lassiter, leaves no room for doubt. (**Ex. 10, Lassiter Dep**. at 114:5–8.) ("Q. …And as you've said before, those sessions did

not involve individual therapy, is that right? A. Correct.").) Ms. Lassiter went on to confirm that she had provided individual therapy in other jobs, confirming she understood what therapy was, then confirming she does not do individual therapy at ASGDC. (*Id.* at 114:9–17.) She also confirmed there is no therapy or other social or psychosocial groups at ASGDC. *(Id.* at 114:18–22.)

Former ACH clinician Patti Green corroborated Ms. Saxon-Ward's testimony that the available scope of mental services to ASGDC detainees expressly excluded traditional individual and group therapeutic treatment modalities. Ms. Green was hired by ACH in July 2022, not as a mental health therapist or counselor, but as discharge planner responsible for community coordination and referrals. (**Ex. 11, Green Dep**. at 12:13–25.) Ms. Green testified that from her first day on the job she would be expected, to her surprise, not only to be the jail's discharge planner, but to provide clinical mental health services to ASGDC detainees as well. (*Id.* at 14:5–8.) Ms. Green was advised that her duties included brief encounters generally every 30 days to see how her patients were doing, whether they needed to see an ACH medical provider, or were at suicide risk. (*Id.* at 24:24–25:21.) Although Ms. Green had no education, experience, or training to perform psychotherapy, (*id.* at 26:19–20, 27:5–8), that appeared immaterial to the services she provided to SMI Detainees because her supervisor, Ms. Saxon, told her they did not do therapy, (*id* at 27:11).

In addition, the only ASGDC full-time psychiatric nurse practitioner confirmed the limited range of treatment available to detainees without regard to the acuity of their condition.  In the letter attached to his declaration, MK, who, after failing to receive a response to his multiple requests to see a mental health staff member concerning his fear

of sexual threats by a male detention officer, filed a grievance.  (See **Ex. 12, Declaration of MK** at PLF_000384). Knarr reports that he was finally taken to the mental health clinic. His relief at being able to see a provider, however, was short-lived:

> I was glad. Finally. I quickly turned sad and hopeless when [Nurse Practitioner] Porter said, "So why do you need to see mental health so badly that you had to write a grievance?  We don't do counseling.  We don't have the manpower. What Is it?"

*Id..*

The following subsections will also examine the evidence that Defendant not only fail to alleviate detainees' symptoms of mental illness but exacerbates them in two particular respects: confining men and women with serious mental illnesses prolonged periods of isolation without adequate structured or unstructured time out-of-cell for therapeutic activities and failing to provide adequate suicide assessment and suicide watch.

Further compounding the harm prolonged isolation causes to SMI Detainees, detainees in restrictive housing units are locked in their cells for 23 hours or more a day. Detainees with serious mental illness do not receive "minimal, adequate care" when they spend "months in administrative segregation" with "harsh and isolated conditions" and "limited mental health services." *Brown v. Plata*, 563 U.S. at 503–04. Recognizing the consistent deterioration that people with serious mental illness suffer when held in isolation, courts have concluded that "placing seriously mentally ill prisoners in segregation amounts to denial of minimal care." See, e.g., *Georgia Advocacy Office v. Jackson*, No. 1:19-CV-1634-WMR-JFK, 2019 U.S. Dist. LEXIS 238805, *25 (N.D. Ga. Sept. 23, 2019); *Braggs v. Dunn*, 257 F. Supp. 3d at 1246; *Clark v. Coupe*, 55 F.4th 167, 180 (3rd Cir. 2022) (recognizing "the increasingly obvious reality that extended stays in

solitary confinement can cause serious damage to mental health"); *Shorter v. Baca*, 895 F.3d 1176, 1185–86 (9th Cir. 2018) (noting "substantial agreement" that some form of regular outdoor exercise is extremely important to inmate psychological and physical well-being). Defendant's practice of placing SMI Detainees in restrictive housing without consulting mental health providers and without providing adequate recreation amounts to categorically prohibited punishment. *Williamson v. Stirling*, 912 F.3d 154, 175 (4th Cir. 2018) (In circumstances where the treatment of a pretrial detainee is so disproportionate, gratuitous, or arbitrary that it becomes "a categorically prohibited punishment," such treatment will sustain a substantive due process claim.).

The MHHA Report (**Ex. 4**) shows during the 30-day period ending January 16, 2024 that 201 detainees on the mental health caseload, or 43 percent of the 473 distinct housing placements, were in units where they were locked down in their cell or pod 23 hours or more a day for prolonged periods.  Detainees in the disciplinary units are locked down uniformly 23 or more hours a day. In the MHHA report, 62 men on the mental health caseload were placed in BMU for disciplinary sanctions, as were 42 women. (**Ex. 1, Ray Report** at 66-68.)  In Phases III and V, the MHHA Report identifies 242 placements for men with mental illnesses who were placed in units where they were locked down over 23 hours a day. *Id.* Just over half of these placements (126) were in the four Phase III units. Based on detainee declarations, Defendant's practice in the Phase III units over the course of 2024 has been increasingly to maintain a strict lockdown protocol where detainees are released from the individual cells for no more than one hour per day. The 116 men housed in Phase V units (Kilo, Lima, and Uniform) occupy open-bay pods. Each unit contains seven pods. Each pod has a rated capacity for eight occupants. As with the

Phase III units, ASGDC policies permit detention officers and supervisors to release the men in these units for extended periods of unstructured activities, however, out-of-pod time appears to be limited to one hour or less a day.

Regardless of whether SMI Detainees are placed in restrictive housing for disciplinary or administrative reasons, they must be provided the opportunity for out-of-cell time daily. As Dr. Johnson explains, "[b]oth unstructured and structured therapeutic interventions are necessary medical treatments for this population." (*See* **Ex. 8, Johnson Report** at 12, ¶ 9.) She goes on to provide an example of the Department of Justice's current guidelines for jails and prisons of 10 hours of structured and 10 hours of unstructured programming for incarcerated individuals, especially in segregation. (*Id.*); see also *Georgia Advocacy Office v. Jackson*, 2019 U.S. Dist. LEXIS 238805, at *49–50 (Confining SMI Detainees to their cells for 23 hours per day is patently unconstitutional and cannot be justified by any legitimate governmental purpose.).

ASGDC's treatment and supervision of detainees at risk for suicide is facially deficient. Dr. Johnson's review of ASGDC's own suicide watch logs showed that there were hours unaccounted for, watches done in exact intervals, or done in longer intervals than required—all in dereliction of ASGDC policy and accepted standard of care. (**Ex. 8, Johnson Report** at 10, ¶ 7 (detailing specific examples).) Further, SMI Detainees on suicide watch are not consulted with in a private, confidential setting, which renders any assessment of those individuals questionable at best. (*Id.* at 9 ¶ 7.) Although a standard practice within the industry may not necessarily set the constitutional floor, a substantial deviation from the acceptable professional standard supports a finding of a constitutional violation. See *Braggs*, 257 F. Supp. 3d at 1215.

ii.     **Defendant has actual knowledge of significant, obvious risk.**

"A prison official's subjective actual knowledge can be proven through circumstantial evidence," *Makdessi v. Fields,* 789 F.3d 126, 133 (4th Cir. 2015), which may be inferred "from the fact that the risk of harm is obvious," *Hope*, 536 U.S. at 738, such that no official "could not have failed to know of it." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). Defendants therefore cannot "simply bury their heads in the sand and thereby skirt liability," *Makdessi*, 789 F.3d at 133, by "hid[ing] behind an excuse that [they were] unaware of a risk." *Brice*, 58 F.3d at 105.

No reasonable fact finder could find that Defendant was unaware of the risk posed to SMI Detainees by failing to render necessary mental health care from the very fact that the risk is obvious. *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). Importantly, these deficiencies are longstanding and well documented. As Dr. Ray found, Richland County has consistently failed to adhere to its own jail policies and procedures for years. (**Ex. 1, Ray Report** at 76, ¶ 36.) This includes a failure to recognize and promptly address the prolonged and severe risks posed to its SMI population, which are inexplicable and alarming. The approach taken by Richland County in addressing the needs of SMI inmates is profoundly inadequate and stands as unparalleled in its deficiencies, based on extensive professional observations. (*Id.*)

Defendant cannot sincerely deny its knowledge of the obvious risk posed by failing to provide necessary services to severely mentally ill detainees. See *Parrish*, 372 F.3d at 303. As early as 2011, Richland County Council acknowledged the need for a dedicated unit and services by appropriating millions of dollars for a facility expansion for this purpose, a acknowledged in  the 2014 Operation and Management Study, putting the County on notice of the harm to SMI Detainees who are locked down for 23 hours per

day. (**Ex. 5, Management Study** at 27–28 (it is not only likely that their symptoms will exacerbate, but they may also become suicidal, aggressive or assaultive).) Director Harvey agrees in principle, "because we all know keeping a mental health person behind the door, that doesn't (sic) no good. All it does is exasperates (sic) the illness." (**Ex. 13, Harvey Dep.** at page 358.)

Further, the filing of this lawsuit in 2022 nullifies any doubt as to Defendant's awareness of its constitutionally deficient mental health services. However, testimony from ASGDC's healthcare providers, medical records of SMI Detainees, detainee declarations, and Expert Witness observations make clear that ASGDC's system-wide deficiencies in mental health treatment continues today. *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) (response "so patently inadequate as to justify an inference that the official[s] actually recognized that [their] response to the risk was inappropriate under the circumstances"). Defendant's knowledge of the harm presented by not reasonably responding to SMI Detainees' need for mental health care is longstanding and well-documented.

### iii.     Unreasonable response

Since this suit was filed, Defendant has purportedly taken steps to address the allegations in DRSC's original Complaint, but such steps have not been a reasonable response to the issues at hand. To their credit, ASGDC and county officials have presented ideas and plans for addressing the woefully inadequate treatment of mentally ill detainees but assurances of potential prospective constitutional compliance provide no relief for SMI Detainees today. The longstanding nature of these deficiencies, the substantial notice that has been provided to Defendant, and the ongoing harm make clear that such ideas, without implementation, are not capable of mitigating current

constitutional harm. *See Coleman v. Wilson*, 912 F. Supp. at 1317 ("after five years of litigating, the claimed lack of awareness is not plausible").

On November 17, 2022, then-interim director Crayman Harvey announced the "historic closing of SHU." (**Ex. 14, Crayman Harvey Email**.) In an email to ASGDC staff, Mr. Harvey congratulated staff "Awesome job team!!! You just made history." The occasion for self-congratulations was, however, misguided and illusory. As Defendant's advisors have explained for more than a decade, the principal purpose in designating a discrete mental health unit is to create a "therapeutic environment" for SMI detainees, not to merely segregate them from the general population. (**Ex. 3, Agenda Briefing** at 3 and Attachment 5 at 1-17.) Limiting its actions to the latter, Defendant has knowingly and deliberately continued to expose SMI detainees to substantial risks of serious harm by failing to provide essential mental health services.

Notably, although ASGDC purports to have created specialized mental health units, the complete lack of therapeutic programming and treatment planning equates to unconstitutional warehousing of the mentally ill. *Wyatt v. Aderholt*, 503 F.2d 1305, 1309 n.4 (5th Cir. 1974) (without out-of-cell time and effective treatment, housing severely mentally ill prisoners in a mental-health unit is tantamount to "warehousing" the mentally ill). There is no dispute that Defendant does not provide mental health programming *even in the so-called mental health unit*. (*See* **Ex. 8, Johnson Report**, at 8, ¶ 6 ("There are no groups conducted to help them learn about their medications, appropriate social skills, adequate hygiene care, emotional control like anger management, current events, etc.").) As such, opening a unit to store mentally ill detainees illustrates a patently ineffective

gesture. *Coleman v. Wilson*, 912 F. Supp. at 1319 ("Patently ineffective gestures" do not prove lack of deliberate indifference, they demonstrate it.).

Importantly, Defendant cannot escape liability simply by attempting to show that they eventually took some form of "corrective action" in response to a risk of harm. *Lewis v. Cain*, No. 15-318-SDD-RLB, 2021 U.S. Dist. LEXIS 63293, *125 (M.D. La. Nov. 6, 2023) (citing *Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998)). "Efforts to correct systemic deficiencies that 'simply do not go far enough,' when weighed against the risk of harm, also constitute deliberate indifference," because such insufficient efforts are not "reasonable measures to abate" the known substantial risk of serious harm. *Id.* at *125–26 (citing *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002)).

Merely creating new units to deposit mentally ill detainees to languish is not a reasonable response to systemic deficiencies in the provision of mental health services. Defendant has not made any material changes to the mental health services it provides and SMI Detainees continue to decompensate while detained at ASGDC without access to necessary mental health services.

In his Report and Recommendation concerning Plaintiff DRSC's Motion for Preliminary Injunction, the Magistrate Judge recognized that the seminal case of *Ruiz v. Estell*, 503 F. Supp 1265 (S.D. Tex. 1980), identified the constitutionally mandated components of a correctional mental health system. (ECF No. 153 at 25.) The second of the six *Ruiz* components is generally stated as requiring "a treatment program that involves more than segregation in close supervision of mentally ill inmates." *Id.* at 30. In *Ruiz*, the court found the Texas Department of Correction mental health system inadequate because of similar deficiencies present at ASGDC.

| **RUIZ** | **ASGDC** |
|---|---|
| 1. Psychotherapy extremely difficult to obtain. *Ruiz* at 1333 | 1. Psychotherapy unavailable. ECF No. 115-9 at 3:9-21. |
| 2. Clinical psychologists spend most time interviewing inmates. Id. | 2. Counselors spend most time on check-ins with detainees ECF No. 115-10 at 7:8-18. |
| 3. No facilities for more sophisticated treatment in units. Id. at 1334. | 3. No space, no privacy, no safe zones for individual therapy. ECF No. 115-5 at 18:21-19:1. |
| 4. Little oversight of inmates with neuroses or psychoses. Id. | 4. SMI detainees left to languish. More acutely ill patients have less engagement with mental health staff. Dr. Johnson's Report, ECF No. 115-8 at 8, ¶ 4, noting acutely psychotic patients receiving no treatment. |
| 5. Mental health treatment center little more than warehouse for inmates with serious mental health disorder. Id. At 1335. | 6. No mental health unit exists for women; the unit for men offers no mental health programming and operates as the other lock-down housing units. Id. At 9-10. |

The court in *Ruiz* quotes one of the plaintiff-intervenor's experts characterizing the treatment provided mentally disordered inmates:

> Well, at that level of care you're just talking about bare maintenance. You're not really going to be able to do any treatment. The only thing you'll be able to do is give people medications and then come back and evaluate them every couple of months and change their medications, but that's not psychiatric treatment.

*Ruiz* at 1336.

After the passage of more than 40 years in the development of correctional mental health care, the similarities in the deficiencies in mental health treatment in *Ruiz* and ASGDC are alarming, as Dr. Johnston observed. ("I have not encountered a system where there is such a dearth in comprehensive mental health delivery of services that poses the unmitigated, substantial risk of serious harm to which detainees at [ASGDC] are exposed," (**Ex. 8, Johnson Report**, ECF No. 115-8 at 18.)).

The testimony of ASGDC clinicians, their supervisor, and the jail's only full-time psychiatric nurse practitioner leaves no doubt that the scope of treatment available to detainees with serious mental illness is limited because of the site of the service at a pretrial detention center, a practice the Magistrate Judge found indefensible under *Bowring*. (ECF No. 153 at 22.)  Dr. Johnson cites numerous examples in her report of individuals she interviewed or whose records she reviewed who satisfy the *Bowring* test for medical necessity (*Bowring v. Godwin*, 551 F. 2d at 47), namely that they were suffering from serious mental disorders; their illnesses could be significantly improved with psychotherapy and other intensive mental health intervention; and the likelihood of harm without such necessary treatment was substantial.  (*See* **Ex. 8, Johnson Report**, at 5, 7, 11, and 17).  These cases demonstrate Plaintiff satisfies the *Bowring* requirements for medical necessity, clearing establishing that by failing to provide psychotherapy and similar intensive individualized treatment programming. (*See* **Ex. 15, Johnson Supplemental Report** at 1 ("Medical necessity includes...individual therapy [for detainees who]  have a history of social issues, situational challenges, and/or anxieties that affect their activities of daily living – individual therapy means an appropriately

credentialed mental health staff member who would spend the time with the patient necessary to engage effectively in therapeutic interventions, including talking/listening, practicing of coping skills, providing clinical feedback, mirroring constructive interactions and most importantly tailoring the sessions based on the clinical needs of the patient").

### iv. SMI Detainees have been harmed and continue to be exposed to substantial risk of serious harm

Inadequacies in mental health policies and practices, "alone and in combination, subject mentally ill prisoners to actual harm and a substantial risk of serious harm." *Braggs v. Dunn*, 257 F. Supp. 3d at 1193. "Failure to provide meaningful treatment planning constitutes a substantial deviation from acceptable standards of prison health care; such deviations can pose a substantial risk of serious harm to those who have serious psychiatric needs." *Braggs*, 257 F. Supp. 3d at 1206. Without treatment plans, there cannot be meaningful continuity of care for SMI Detainees. Lack of coordination and planning renders treatment inefficient and creates "a substantial risk of prolonging pain and suffering of those who have treatable mental illnesses." Braggs, 257 F. Supp. 3d at 1206. In this case, ASGDC's practice of not offering appropriate mental health services creates a substantial risk of serious harm to SMI Detainees, including continued symptoms, pain, and suffering, as well as self-harm and suicide attempts.

Dr. Johnson stated it best: "I have not encountered a system where there is such a dearth in comprehensive mental health delivery of services that poses the unmitigated, substantial risk of serious harm to which detainees at the Alvin S. Glenn Detention Center are exposed." (**Ex. 8, Johnson Report** at 17.) Dr. Johnson provides several examples of the profound risk of serious harm caused by the pattern and practice Defendant's limited and superficial response to patient needs meals response to patient needs. These

26

examples include lack of any documentation regarding an acutely psychotic detainee who was hoarding medication (found with 265 pills in her possession); a detainee with signs and symptoms of dementia who had not been properly diagnosed or treated for three months; and a detainee who had been seen monthly for seven months and provided five different diagnoses including bipolar, PTSD, anxiety, schizophrenia, and self-reported mood disorders. (**Ex. 8, Johnson Report** at 5.)

SMI Detainees suffer harm and the continued substantial risk of harm caused by Defendant's practice of allowing them to languish in isolation without proper mental health care. See U*nited States v. Hinds Cn*ty., 2023 U.S. District LEXIS 135504, at *9 (neglect of seriously mentally ill constitutes unconstitutional risk of harm). Under the Constitution, prisoners are protected from the risk of future harm stemming from constitutional violations. *Helling*, 509 U.S. at 33 ("a remedy for unsafe conditions need not await a tragic event"). The harm to mentally ill detainees in restrictive housing is clearly established. (*See* **Ex. 8, Johnson Report** at 12, ¶ 9 (noting the "substantial risk of decompensation and worsening of mental health symptoms")); *accord Coleman v. Wilson*, 912 F. Supp. at 1320 (holding that a prison violated the Eighth Amendment by imposing administrative segregation on mentally ill inmates without providing proper care).

Here, harm is evidenced through preventable deaths by suicide, exhibition of deteriorating behaviors, and symptoms of psychosis. (*See* **Ex. 8, Johnson Repor**t at 7, ¶ 4 ("Having active symptoms of a mental illness has been described as painful and miserable by individuals who have experienced symptoms and are now in recovery and operating at their baseline.")). For example, Dr. Johnson met with a detainee who presented as "actively psychotic and responding to internal stimuli, disorganized in her

thought process and presentation, delusional, and combative." (*Id.* at 7, ¶ 4.) Despite these symptoms, Dr. Johnson's review of the medical records of this detainee and others showed almost identical treatment to detainees without such acute symptoms. (*Id.* at 8, ¶ 5.)

Staff inattention and absence can have a fatal effect on incarcerated men and women in crisis. And so it did on March 2, 2024, hours after a grieving 20-year old woman pleaded with officers not to be put alone on lockup on the very day her boyfriend and the father of her unborn child was buried. (*See*, **Ex. 16, Declaration of CR16 and Ex. 17, Declaration of CR17**.)

This young woman's death is a text-book case of foreseeable missed opportunities to save her life. In fact, had ASGDC's mental health program satisfied even one of the essential elements of an adequate health care delivery system her life would have been spared. When a system is as dysfunctional as ASGDC's staff supervision is the last line of defense. For this young woman, it was literally the difference between life and death.

At the time of her death, Jamila (a pseudonym) had been incarcerated for three tempestuous days. After intake, she was placed in the general population dorm where she told friends she desperately wanted to be released on bond to attend the funeral of her boyfriend, who had died unexpectantly shortly before Jamila's arrest. (*See* **Ex. 16** at 1, ¶ 2.)  In addition, a friend in whom she confided said Jamila, already mother to a young daughter, reported that she was pregnant with the child of the boyfriend. (*Id.*, *see also* **Ex. 17** at 2, ¶ 6.)

Jamila's bond was denied. When she returned to her dorm, she was "very upset," crying and screaming because she couldn't attend the funeral. (*Id.*, **Ex. 16** at 1, ¶ 2.) No

officer was present in the unit to observe Jamila's outburst after she returned from bound court. Hours later, Jamila became involved in an altercation with a detainee who spit on her. Officers were summoned. Jamila reportedly told an officer "it was best for her not to be removed [to lock up]. Her man had just died and she had a lot going on. (*Id.* at 2, ¶ 4.) A friend with Jamila later reported that she "begged" a lieutenant not to remove her from this dorm where she felt safe. (*Id.*) Officers moved her to the female lock-down unit anyway without consulting mental health professionals. Had they done so, officers would have learned that Jamila had been placed on "observation" for nearly 10 hours which in Intake, a status normally assigned to individuals at suicide risk. (**Ex. 18, Jamila Mental Health Records,** 7–9.) They also would have seen that during two prior confinements at ASGDC in the prior 18 months, Jamila had been assigned an MH-2 code, meaning "serious mental illness" on three separate occasions, and an MH-1 code, mild mental illness, at two other times. (Id. at 3–9.) Moreover, they would have also learned that Jamila had been placed on suicide watch approximately 8 months earlier, having been found to be "Mentally Ill and Dangerous to Self" and Expressed Suicidal Ideation." (*Id.* at 7–8.)

Despite these readily available warning signs, Jamila was moved to Juliet, the female lockdown unit, and at 10:34 p.m., a nurse discovered the body of the young woman in her cell hanging from a sheet wrapped around her neck and tied through broken ht fixture attached to the ceiling. (**Ex. 19, Incident Report**.)

The harm caused to SMI Detainees from this longstanding practice is obvious and known to Defendant, who has failed to reasonably respond to the risk, leaving SMI Detainees to deteriorate in its custody. The record is clear. Based on the longstanding evidence of unambiguous statements from Defendant's consultants, former director, and

current mental health staff, no genuine question of material fact exists that Defendant withholds from SMI Detainees medically necessary mental health treatment. Its violation of such a fundamental constitutional right should not be permitted to continue under Defendant's misguided perception that an exception should somehow exist for pretrial detention centers. This violates SMI Detainees' Fourteenth Amendment rights as a matter of law, and summary judgment should be granted on this issue.

**2. Defendant is deliberately indifferent to the substantial risk of serious harm caused by its failure to protect detainees from violence.**

**i. Unsafe conditions.**

ASGDC conditions are unsafe by multiple objective measures. Under the Constitution, officials must take precautions to protect prisoners from violence and are "not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833. This means officials must have systems in place to ensure objectively reasonable levels of safety and supervision. *Tillery v. Owens*, 719 F. Supp. 1256, 1275 (W.D. Pa. 1989) ("The Constitution cannot and does not guarantee an assault-free prison environment but certainly it promises good faith protection."). The conditions at ASGDC present a generalized risk of violence due to ongoing and systemic deficiencies in Defendant's policies and practices as evidenced by pervasive staffing and logistical issues, lack of supervision of detainees, rampant access to weapons and other contraband, failure of ASGDC staff to follow policies, lack of proper screening and classification, and excessive use of force by ASGDC staff.

a. <u>Insufficient Staff Cannot Adequately Supervise Detainees</u>

The Constitution does not mandate constant direct supervision of confined individuals in a prison or jail, but where, as here, "an institution is designed to operate as

a direct supervision facility, direct supervision is the minimum constitutional requirement." *United States v. Hinds Cnty.*, No. 3:16-CV-489-CWR-RHWR, 2022 U.S. Dist. LEXIS 69057, at *57 (S.D. Miss. April 13, 2022). Jail officials must supervise prisoners by providing adequate numbers of qualified security staff and may not leave prisoner safety to the prisoners themselves. See *Hinds Cnty.*, 2022 U.S. Dist. LEXIS 69057, at *53 ("Sufficient staffing is essential for safeguarding detainees' constitutional right to protection from harm."); see also *United States v. Hinds Cnty*, No. 3:16-CV-489-CWR-RHWR, 2022 U.S. Dist. LEXIS 135504, at *11 (S.D. Miss. July 29, 2022) (discussing widespread impact of understaffing).

Defendant is operating ASGDC with less than one third of the security staff positions needed to protect detainees from harm. In a staffing study undertaken in 2023 by the SC Association of Counties at Defendant's request, the Association found that "the facility is constantly understaffed. Due to this shortage, officers are forced to leave mandated security posts and positions to perform other functions. These deficiencies create a safety hazard for employees, inmates, and the citizens of Richland County, along with increasing the County's liability exposure." **Ex. 20, ASGDC Staffing Assessmen**t at 9.

The number of detainees in custody in 2018 was an average daily population of 831.. It declined in 2023 to 701, which was the custody population that served as the basis for the staffing assessment. *Id.* For the past year, however, that trend has changed. The population skyrocketed to approximately 948 as of January 24, 2024 and was expected to continue to increase in the immediate future. (*See* **Ex. 21, Harvey Dep.** at 234, l. 16 – 235, l. 12).

Dr. Ray's analysis of security staff shift rosters from 2020 to 2023 reveals significant failures to comply with Defendant's crucial direct supervision policy. Specifically, the data show that on 1,527 occasions during that period housing units were not staffed at all, which accounts for 17.2 percent of the 401 total shifts examined. Furthermore, on over 3,778 instances, or 42.3 percent of the shifts, staffing levels fell below the threshold of one officer per unit.  (*See* **Ex. 1, Ray Report**, ECF at 49). This evidence demonstrates irrefutably that Defendant provides just over a 50% probability that ASGDC detainees will receive adequate and timely supervision, care, and protection due to persistent non-compliance with state law and its own policy. It is inconceivable that this level of staffing does not expose vulnerable and mentally disordered detainees to a substantial risk of serious harm.

 For two consecutive years from 2021 to 2023, Defendant reduced the number of funded security staff positions, dropping them from 264 in 2022 to 242 and from 242 in 2023 to 162.  (*See* **Ex. 1, Ray Report** at 20.)  Defendant's reported rationale for the reduction was to shift funding from unfilled positions for other jail purposes while committing to fund the apparently eliminated positions should a surge of candidates become available.  *See* Harvey Aff. (ECF No. 127-1 at 3, paragraph 10).   For this purpose, however, the denominator of funded positions is nothing less than 264, the number of authorized positions in 2022.  (*See* **Ex. 1, Ray Report** at 19.)  The more accurate staffing threshold, however, is a minimum of 294, the number of security staff determined to be needed in a 2023 staffing assessment conducted by the SC Ass'n of Counties. *Id.* at 44.  The study, however, used an average daily census of 701 detainees.  As noted by the Magistrate Judge, the jail's population had increased to over 1,000 in less than two years, surging

by more than 40 percent. (ECF No. 153 at 16, n.9). If the assessment were revised to take into account the substantially greater population in custody, it would show ASGDC is operating at less than 30 percent of the number of security staff needed to preserve Plaintiffs' constitutional rights.

b. Failure to Supervise

ASGDC's chronic shortage of security officers has caused the collapse of its security supervision model. "Direct supervision" is a term of art used by corrections professionals that refers to a common operating procedure for safely managing and supervising a correctional facility. *Hinds Cnty.*, 2022 U.S. Dist. LEXIS 69057, *54. The direct method for supervising a correctional facility requires placing detention officers inside housing units, where such officers have continuous direct contact with prisoners and are not routinely separated from prisoners by physical barriers. *Id.* at *55 (crediting expert testimony that "direct," as opposed to camera surveillance, "is the only practical way to run a jail.").

For over two years, many detention officers have been assigned to monitor not one, but multiple housing units. Under these circumstances, officers can only act as rotating monitors of detainee condition and conduct. They are no longer capable of functioning as the "eyes and ears" of the facility's security system. Jail management refers to these detention officers as "rovers." According to ASGDC personnel shift rosters, rovers have become the new norm, particularly at night and on weekends. *Id.*

ASGDC policy mandates the continuous presence of at least one officer on duty in each unit around the clock, every day of the year. This directive is foundational to maintaining security and order, detainee protection, and accessibility to emergency

assistance. Despite the clarity and imperative nature of this policy, a thorough review and analysis of more than 400 shift rosters from 2020 to 2023 reveal a consistent pattern and persistent practice of Defendant's failure to adhere to these minimum staffing guidelines. (*See* **Ex. 1, Ray Repor**t at 52-54) This analysis discloses 3,778 instances (42.3% of the shifts) where staffing levels fell below the standard threshold of one officer. The data further reveal that on 1,527 occasions housing units were not staffed at all, which accounts for 17.2% of the total shifts during the period. *Id.*

ASGDC policy has also required detention officers to conduct detainee safety and welfare checks ("watch tour") every 30 minutes. Detention center records, however, reveal that officers throughout the facility seldom perform the watch tours as expected. For the period in January 2024 examined by Dr. Ray, Defendant's own policy required detention officers to conduct approximately 1,176 rounds in each housing unit. Fewer than 17 percent of the required rounds were conducted. Of the rounds that were clocked, less than half (approximately 44.1%) of them met the 30-minute policy requirement. (Ibid. at 54-57)

| Housing Unit | Required Clocked Rounds (approx.) | Total Rounds Clocked | Percent of Required Clocked Rounds Done |
|---|---|---|---|
| A Unit | 1,176 | 94 | 8.0% |
| B Unit | 1,176 | 78 | 6.6% |
| D Unit | 1,176 | 83 | 7.1% |
| E Unit | 1,176 | 392 | 33.3% |
| F Unit | 1,176 | 73 | 6.2% |
| G Unit | 1,176 | 442 | 37.6% |
| H Unit | 1,176 | 378 | 32.1% |
| I Unit | 1,176 | 392 | 33.3% |
| J Unit | 1,176 | 353 | 30.0% |
| K Unit | 1,176 | 51 | 4.3% |
| L Unit | 1,176 | 28 | 2.4% |
| M Unit | 1,176 | 207 | 17.6% |
| U Unit | 1,176 | 83 | 7.1% |
| X Unit | 1,176 | 112 | 9.5% |
| Z Unit | 1,176 | 169 | 14.4% |
| Total | 17,640 | 2,935 | 16.64% |

ASGDC Clocked Rounds 01/01-25/2024

By operating unsupervised housing units, Defendant is forcing detainees to provide for their own safely and security as best as they can. Roving officers cannot detect or address violence or threats of violence that happen in their absence. Victims cannot report threats and assaults without considerable risk of further violence by perpetrators. Detainee victims understand that the detention officer will soon be gone again, the unit will be unguarded, and that they will once again be at the mercy of others who will predators. (*See*, e.g., **Ex. 22, Declaration of CR5** at 3, paragraph 2, and **Ex., 23 Declaration of CR12** at 1, paragraph 1).

The staffing deficiency at ASGDC impacts every facet of its operation and is both a direct and indirect cause of many of its constitutional deficiencies. Without adequate staffing, ASGDC cannot supervise prisoners, deter violence, or properly respond to emergencies. The system-wide impact of understaffing cannot be overstated. At ASGDC, lack of staffing causes situations where detention center staff fail to make housing unit security rounds for extended periods, officers are tasked with covering multiple units, inability to respond quickly to medical and safety emergencies, inability to conduct searches and take other measures to control weapons and other contraband. (*See* **Ex. 24, Report of Emmitt Sparkman** at 58–60.) Overall, these issues stemming from understaffing combine with other inadequate safety measures to create an environment permeated by violence and fear. In assessing whether a risk exists, "it does not matter whether the risk comes from a single source or other multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

c. Inadequate and rogue staff cause increased violence

As Defendant's security staff declined to dangerously low levels over the past three years, ASGDC records document a substantial increase in reported incidents of inmate-on-inmate violence, including assaults, stabbings, fights, and armed robberies. As the following table shows, ASGDC experienced a 161 percent increase in the number of serious incidents per month from 21.4 per month in 2022 to 45.9 per month through July 2023, the month through which the data was examined.



**Ex. 1, Ray Report** at 41.

The preceding table demonstrates that the total number of weapons seized grew from 110 in 2022 to 150 through July 2023, a 36 percent increase even for an abbreviated period. The incidents of assaults with weapons surged by 187 percent during that same time. A contrast of the annual monthly averages for 2022 and through July 2023 is even more telling: weapon confiscations grew by 122 percent (9.2 per month in 2022 to 21.4 per month in 2023), while assaults with weapons grew by a stunning 312 percent ( 0.7 per month in 2022 to 3.3 per month in 2023). *Id.*

36

.

An examination of reported incidents of contraband reflects a similar growth pattern in the table below. The monthly average of contraband incidents increased from 10 in 2022 to 36 through July 2023, a 260 percent spike.



*Id.* at 66 – 74.

Plaintiff's subject matter experts have concluded that ASGDC is in crisis. Supervisors find their day filled with plugging staffing holes, helping the detention officers, and dealing with daily crises. The critical staffing shortage set against the backdrop of increasing 911 call volumes indicates that each staff member faces significantly higher workloads, especially in handling critical situations. (*Id.* at 73).

## ii. Defendant's knowledge.

As stated above, ASGDC lacks basic systems to protect SMI Detainees. These deficiencies are long-standing and ASGDC's awareness cannot genuinely be denied. In fact, these severe and chronic staffing problems have been thoroughly documented and

plagued the detention center for over a decade. In studies Defendant commissioned in 2008 and again in 2014, the County's own consultants emphasize the then urgent need to address extant, persistent, and pervasive staffing and operational deficiencies required to improve the care, custody, and management of inmates. (*See* **Ex. 1, Ray Report** at 15)**.**

Other internal Richland County records reveal that Defendant has long been aware that ASGDC has not had the required number of detention officers to reliably staff its housing units. In 2019, the Richland County Interim Administrator Edward Gomeaux considered the lack of staffing. (*See* **Ex. 25, ASGDC Recruiting and Retention Project**, County-0151075). In July 2021, County Administrator Leonardo Brown conducted jail listening sessions with staff during which staff identified numerous threats to safety, including staffing shortages.  (*See* **Ex. 26, Town Hall Meeting**, County- 0144921).

In a February 2022 memorandum to the County Administrator, ASGDC Interim Director Shane Kitchen stated the jail's shortage of detention office constituted an "emergency" that warranted asking the county to call in the National Guard to provide emergency staffing. (*See* **Ex. 27, Kitchen Memorandum**, Kitchen at 0007-0008).

On March 24, 2022, South Carolina's chief jail inspector at SCDC, Blake Taylor, stated in correspondence to Administrator Brown that "the low level of security staffing has created what must be labelled as a control and safety emergency…." (*See* **Ex. 28 Taylor Letter to Brown** at GC 088). Since that letter, the jail's ratio of security staff to detainees has declined. (*See* generally, **Ex. 1, Ray Report**, Section 30 at 15 – 36).

Although this issue is not unique to ASGDC, the substantial harm and risk of harm that exists at ASGD when understaffing is combined with rampant contraband, lack of

direct supervision in open dorms, and overcrowded conditions in locked-down pods and cells is uniquely terrifying and unconstitutional. A*lberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (confinement in an institution where terror reigns constitutes cruel and unusual punishment). *See also infra at 50–55.*

Notwithstanding purported attempts to improve staffing, Defendant has failed to correct constitutionally deficiency practices. As a direct consequence, ASGDC remains manifestly unsafe, as illustrated by the sharp increase in phone calls to 911 or emergency services at ASGDC from 2020 to 2023. (**Ex. 1, Ray Report** at 66–71, ¶ 35.) see *Coleman v. Wilson*, 912 F. Supp. at 1318 ("Defendants are not free to disregard the constitutional rights of mentally ill inmates for three to four years."). As such, ASGDC's purported efforts to correct systemic deficiencies "simply do not go far enough" when weighed against the substantial risk of harm. *Braggs v. Dunn*, 257 F. Supp. 3d at 1252 (such efforts are not "reasonable measures to abate" the identified substantial risk of serious harm). Defendant cannot rely on patently ineffective gestures to sidestep liability for acts and omission with its control.

### iii. Unreasonable response

Measures that are not reasonably calculated to provide safety from violence do not establish a reasonable response to the risk. *Riley v. Oik-Long*, 282 F.3d 592, 597 (8th Cir. 2002). If protective measures prove inadequate, failure to take additional measures may be evidence of deliberate indifference. See *Jensen v. Clarks*, 94 F.3d 1191, 1200 (8th Cir. 1996). Defendant has not corrected known systemic staffing deficiencies that contribute to violence at ASGDC. "For over a decade, Richland County and ASGDC have consistently demonstrated a pattern and practice of failing to maintain adequate staffing

levels and to implement minimally adequate staffing practices at ASGDC." (**Ex. 1, Ray Report** at 13); see *Wilson v. S.C. Dep't of Corr.*, No. 0:19-2107-JFA-MGB, 2019 U.S. Dist. LEXIS 230568, at *67 (Nov. 25, 2019) (crediting expert report's findings on impacts of severe understaffing). Implementing these recommendations requires a concerted effort to reform staffing practices, enhance security and inmate supervision methodologies, and provide inmates with adequate opportunities for engagement, care, and to ensure objectively reasonable and consistent protection from harm. (**Ex. 1, Ray Report** at 17–18, ¶ 30.)

In fact, Dr. Ray found that "The disparity between the rates of decrease in staff numbers versus inmate numbers known by Richand County at the time staffing reductions were approved raises serious concerns regarding the priority Richand County places on inmate protection, care and custody service. (*Id.* at 19, ¶ 30.)  Persistent failure to supervise detainees exacerbates violence and accordingly, unconstitutional harm to detainees.

### iv. Harm

ASGDC policies and practices disregard its responsibility to protect detainees from harm. "Detainees depend on the jail systems for their very lives." *Hinds Cnty.*, 2022 U.S. Dist. LEXIS 135504, at *13–14 (quotations omitted). The all-permeating threat of violence of ASGDC is particularly harmful to SMI Detainees and further deteriorates untreated mental illness.

A. Inadequate Supervision Exacerbates Risk of Harm.

ASGDC housing units are designed for direct supervision of pretrial detainees by detention officers. Direct supervision of detainees requires at least one detention officer to be present in each unit, and two in units that are over capacity, at all times 24-hours a

day, seven days a week. Each officer is charged with the responsibility to monitor detainee conduct and conditions to ensure detainee safety and security and to call back-up assistance when necessary. (*See* **Ex. 21, Harvey Deposition** at 19, l. 25 – 26, l. 16).

All South Carolina detention centers are also required by state law to have sufficient staff to provide active, in-person direct supervision of all housing units at all times. (*See* **Ex. 24, Sparkman Report** at 5-6). Trained and qualified detention officers are the backbone of detention center's security system. By their presence and engagement detention officers are intended to function as the primary means of monitoring detainee behavior and deterring misconduct. ASGDC policy assigns them responsibility to detect and to report irregularities. (*See* **Ex. 29, Post Orders,** County-79082-79084, 79111-79113).

ASGDC policy also has required detention officers to conduct safety patrols or rounds by patrolling the units to which they have been assigned every thirty (30) minutes. (*See* **Ex. 1, Ray Report** at 52). They are to check on the safety of each detainee and the security of the unit. Jail regulations require that the officer record the safety patrol by pressing buttons labeled "watch tour" to begin and complete the patrol. Detention officers also conduct and report the count of detainees to insure that every detainee is accounted for and in place as assigned. When undertaking these functions, detention officers are the eyes and ears of the jail's security system. Without them, the system is deaf and blind.

Detention officers are required to monitor the distribution of three daily meals in the housing units. ASGDC has no central detainee cafeteria. They also accompany medical personnel while they distribute medication three times a day. According to ASGDC policy, detention officers are required to report detainee infractions, note

problems with the physical plant, including inoperable toilets, sinks, light fixtures, broken pipes and any damage to the facility. They are directed to be alert for and report indications of contraband, release detainees for their recreation, and oversee the distribution of the delivery of detainee purchases from the jail commissary. They are instructed to call for assistance when needed to address threats to safety and security. The ASGDC housing units require detention officers to be present 24-hours a day, seven days a week to oversee these vital tasks. Without them, the units become rudderless, dysfunctional, and dangerous. (*See* generally **Ex. 29, Post Orders**, County 79082-79084, 79111-79113).

     b. Increase in ASGDC Serious Incidents.

According to 911 call data maintained by the Richland County Emergency Medical Services, Fire Department, and Sheriff's Department, a total of 1,247 Serious Incidents[5] occurred at ASGDC from 2020 to 2023, including physical injuries and security and medical emergencies. (*See* **Ex. 1, Ray Report** at 68). There was a 138 percent increase in Serious Incidents from 2020 to 2023, including a 22 percent increase from 2022 to 2023.

---

[5] Emergency response agencies categorize responses to 911 calls into priority levels from P0 to P6 in decreasing level of severity and urgency. The P0 to P2 categories ("Serious Incidents") are assigned by the responding agency to the most critical incidents, including serious physical injuries, medical emergencies. (Ray Report at 65).



In his report, Dr. Ray identifies a "concerning upward trajectory in grave risks and incidents" to which individuals with serious mental illness are exposed with alarming regularity. (**Ex. 1, Ray Report** at 73, ¶5). Reports of inmate-on-inmate assaults with a weapon and stabbing/puncture incidents are staggering, with the former rising 800 percent (2 to 16 incidents) from 2022 to 2023 and the latter increasing 271 percent (14 to 38) during the same period. (*Id.*at 73-74).



As Dr. Ray observes, "these figures are not mere numbers; they represent a clear and present escalation in violence and health-related emergencies that necessitated

urgent and decisive action by Richland County officials to safeguard the wellbeing of SMI inmates. Richland County either failed to consider this basic jail administration information and or failed to accept the imperative to recognize these trends early on and with a reasonable degree of urgency to prevent and mitigate harm and to ensure a secure and humane environment for all inmates." (_Id._ at 73).

Dr. Ray reports that the 911 calls for these emergencies increased at alarming rates over the period from 2020 to 2023 and at consistently material rates from 2022 to 2023, well after the trends were unambiguous. For example, between 2020 and 2023, the average daily detainee population (ADP) increased modestly by 2.9 percent. During the same period, however, the total P0-P2 calls for Serious Incidents rose by 131 percent, while the increase from 2022 to 2023 was 22 percent. The average number of Serious Incidents per month more than doubled from 17.5 in 2021 to 45.9 in 2023, an increase of 162 percent. *(Id.* at 69-71).

During this same period, the contrast in staffing reduction in relation to the increase in serious P0-P2 calls for every 100 custody officers is noteworthy. While there was a marked 46.3 percent reduction in custody staffing levels between 2020 and 2023 (164 to 88 security staff), the number of P0-P2 calls per 100 custody staff climbed by 331.7 percent. Dr. Ray notes that this "staggering rise in call volume, juxtaposed with the falling staff numbers, underscores a significant rise in workload per staff member. The emerging picture is one that clearly evidences that existing staff faced and continue to face heightened pressures, raising important questions about Richland County's priorities and the degree to which it failed to recognize and reasonably address the growing urgency in potential and actual harm to SMI detainees." (*Id*. at 70).

44

c. <u>Impact on Medical Service Providers</u>

In April 2022, the same month this action was filed, the-then ASGDC healthcare contractor Wellpath refused to renew its lucrative professional services contract, citing its inability to provide services for which it was responsible due to unsafe conditions and a lack of security escorts for their nurses when they entered the housing units to see patients. (*See* **Ex. 30, County-47626**). The same problem continued with the replacement medical provider, ACH, who just months later also reported that the jail's security personnel could not protect its staff. (*See* **Ex. 31, ACH Emails**, ACH-000825-000826).

d. <u>Daily Struggles for Survival.</u>

Plaintiff detainees like CR10 and CR12 suffer from serious mental illness. They have been forced to fight for their survival daily due to a long-term, multi-dimensional failure of ASGDC and county management.

CR10 was booked into ASGDC in October 2023. He has been assigned to Bravo, the medical unit, for most of his detention. Bravo is an overcrowded, open design dorm, where detainees are placed for medical convalescence without regard to classification. Over 25 people sleep on the dayroom floor on "stack-a-bunks." Many have disabling physical complications or injuries, some of whom are confined to wheelchairs. Others need to use walkers to navigate the unit. Exposed wires dangle from ceiling light fixtures and walls. Detention officers assigned to the unit often leave for their station for lengthy periods during the day. (*See* **Ex. 32, CR10 Dep.** at 102, l. 6 – 103, l. 6; <u>also</u> *see* **Ex. 33, Declaration of CR10** at 3, paragraph 12 and 4, paragraph 22).

On January 3, 2024, CR12 was stabbed 11 times during an armed robbery of his canteen property. No officer was in the unit to help prevent or to stop this armed assault and robbery or to call for more officers to help repel the attack. (*See* **Ex. 34, Declaration of CR12.**) CR12 was bleeding heavily after the stabbings but found no refuge. He felt helpless and abandoned. Eventually, nurses appeared for routine rounds to pass out medications for his unit. CR12 was rescued by this fortunate intervention, not by the designated security staff or video security monitoring. CR12 reported this violent robbery/assault immediately to staff and named the perpetrators. *Id.*

CR12 was too traumatized and frightened to go back to sleep after being attacked by detainees in his housing unit. So, he packed his belongings and stood at the unit's entrance door at 3:00 a.m., waiting for a supervisor to arrive. He stood there in the open for about three hours until the sergeant finally came. CR12 begged to be moved to another housing unit. His request was refused. The same day he asked to speak with a different sergeant or a lieutenant all day, but they didn't make themselves available. He wanted to press charges and point out the men who robbed him but wasn't given the opportunity. *Id.*

CR12 sees rampant drug use at ASGDC, including smoking of drugs that he and everyone *including* the detention officers and higher-ranking officials can smell. He also witnessed two stabbings and four other armed robberies of detainees' canteen property. Most robberies happen on Mondays when canteen items are delivered to detainees. Officers observe detainees in possession of drugs, cell phones, and weapons and look the other way. CR12 has lodged complaints. The beatings and assaults go on and nothing changes. Id. at 3, paragraph 3.

Defendant objects to the consideration of these reports and others like them, all of which relate to pervasive conditions at ASGDC more than one year after the filing of this action. The incidents of harm due to inadequate staffing, however, have continued to wreak havoc throughout the facility. *See*, e.g., **Ex. 35, Declaration of JB**, 01/09/2025, at 2 ("Officers are rarely in [open housing unit] Delta during nights…or on weekends," where he was placed on November 17, 2024 where he has observed detainees with shanks and drugs, and witnessed a detainee attacked when no officer was present; also threatened by an officer that would be locked up for complaining about lack of security); *See* **Ex. 36, Declaration of CD**, 11/26/2024, at ¶¶ 3-7 (in unit X-ray on lock-up 23 hours a day with cellmate in a cell designed for one with second detainee sleeping on floor next to toilet in "very stressful kind of detention," where he was attacked by his "mentally unstable" cellmate, resulting in hospital treatment for fractured eye socket;  yelled for help and hit panic button without response while he waited with assailant for an hour; no officer was present in unit or responded to calls for help by other detainees; victim was discovered by nurse making medication rounds); *See* **Ex. 37, Declaration of JM**, 11/26/2024, at ¶¶ 2-13 (49-y/o detainee forced to sleep on floor as the 15th individual in Kilo pod designed for 8; after 3-4 days in late October or early November 2024 in overcrowded, "increasingly tense" cell, victim was attacked and beaten while security officer was asleep at her desk, resulting in hospitalization and projected surgery); *see* also **Ex. 38, Declaration of KB**, 11/26/2024, at ¶¶ 1-5 (observing detention officer in Kilo sleeping at her desk during a fight in November; stating officers cover multiple units, which results in periods when no officer is present).

8:22-cv-01358-MGL-WSB    Date Filed 01/15/25    Entry Number 179    Page 48 of 54

Vulnerable SMI Detainees are commonly victims of fearful of threatned and actual assaults by detainees and officers. *See*, e.g., **Ex.39, Declaration of NG**, 09/25/2024, ¶¶ 2-8 (hospitalized for schizophrenic episodes and hearing voices before his arrest, detainee was attacked when no officer was present in unit Uniform in July 2024 by two pod-mates; victim became upset and loud when taken to medical, to which officers responded by placing him in a small shower stall in Yankee where he was confined overnight, reporting that "It was uncomfortable and claustrophobic. Being in the small shower all night was awful. I couldn't sleep. I couldn't sit down. I had to pee on the drain by my feet….Gnats were coming out of the drain. I was shocked and upset that they did this to me"); *See* **Ex. 40, Declaration of HM**, 08/22/2024, ¶¶ 2-5 (an 18-y/o diagnosed with anxiety and depression; after observing two sergeants appear to assault a detainee in a property closet, began banging on cell door and insisting on seeing mental health, when he reports the following occurred:

> Sergeant Harwell came to my cell and cuffed me from behind. I was removed from his cell by Sergeant Harwell and Officer Rembert. The officers took me down to room 46 in BMU. Room 46 is toward the back of BMU, away from the officer's observation tower. Sergeant Harwell removed my cuffs and then took off his taser and body camera. I said that Me did not want to fight him. But, Sergeant Harwell punched me in the face with his fist in my jaw. I fell to the floor and Sergeant Harwell started punching me in Ws body. I started crying. When the beating stopped, I was placed back in the room with my roommate James Thompson. I was still crying and told my roommate of the beating by Sergeant Harwell. I have not been written up for any misconduct prior to my beating or later.

*Id.*

*See also* **Ex. 41, Declaration of RG**, 09/23/2024, ¶¶ 2-3 (unit is "frightening and dangerous," no way to get officer's attention in emergency in X-ray where locked down over 23 hours a day; also observed supervisor goading mentally ill detainee in active suicide threat by stating, "go ahead and do it," before officer intervened); *See* **Ex. 42, Declaration of MM,** 09/24/2024, ¶¶ 1-9 (Disabled for a decade due to schizophrenia,

bipolar disorder, and depression, did not receive medications for over 4 months after being booked and then received no treatment for depression; crowded conditions "make me very nervous"; men in same pod have "homemade knives"; when reported to officer he was hearing voices and feeling suicidal, the officer "told me to relax and go to my room or walk around"); *See* **Ex. 12, Declaration of MK**, 09/24/2024, (during his 15-month confinement at ASGDC, detainee reports having been robbed, beaten, stabbed, sexually assaulted by detainees and officers, and having witnessed ten stabbings and two rapes; he provides a vivid description of detainee-staff power dynamics, the brutality to which detainees in the medical unit, Bravo, are subjected without staff supervision, particularly from the vantage point of vulnerable "prey," the unavailability of mental health care as his mental health failed him and he contemplated suicide; and the rogue conduct, retaliation, and complicity of officers and supervisors).

Regarding the effect of unsupervised units, and the related consequences, on detainees with serious mental illness, Dr. Johnson stated that the deterioration of the environment in which an individual is confined can adversely affect detainees' mental health and undermine the therapeutic milieu necessary to adequately treat mentally illness. More specifically, Dr. Johnson identified the following ways in which the jail's failure to protect SMI detainees threatens their mental health and places them at substantial risk of serious harm:

- Increased paranoia due to more frequent assaults.
- Sleep deprivation for patients who fear for their safety.
- Anxiety triggered by knowing other detainees could have access to their cell and person.
- Feeling unsafe makes it difficult for SMI detainees to focus on recovery, leaving the vulnerable at risk.
- Presence of contraband, including weapons and drugs, puts the stability of mental health at risk.

- Because medications can cause drowsiness, patients are at greater risk of noncompliance with prescribed medication for fear of someone taking advantage of them.
- Lack of safety also contributes to access to care issues when staff doesn't feel safe on the unit and limits interactions with patients.

*See* **Ex. 8, Johnson Report** at 12-13.

The lack of control, inadequate staff, and limited supervision hinders mental health professionals from even attempting to check-ins with SMI Detainees as needed and obstructs their ability to provide a confidential setting to speak with detainees. ASGDC's own incident reports show an upward trend in the presence of contraband, weapons, controlled substances, and assaults on SMI Detainees all of which correlate with reduction in staffing levels. ASGDC does not have enough staff to supervise detainees while simultaneously conducting suicide watch rounds pursuant to ASGDC policy. *( Id.* at 9, ¶ 7.)

Overall, Defendant's unjustifiably insufficient response to the dangerous threat of violence ASGDC and the particular threat to SMI Detainees disregards the lives and health of SMI Detainees in its charge, causes substantial harm and risk of harm, and violates their Fourteenth Amendment rights.

C.     **The Requested Remedy**

Based on the foregoing, Plaintiffs ask the Court to grant summary judgment and declare that Defendant is violating  the Fourteenth Amendment rights of SMI Detainees as a matter of law by depriving them of medically necessary mental health services and by failing to protect them from harm. With the Court's declaration, Plaintiffs respectfully request the Court grant appropriate relief to permanently enjoin Defendant from subjecting SMI Detainees to ongoing substantial risks of serious harm.

1. **Standard for Injunctive Relief.**

To obtain a permanent injunction, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;[6] (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). As set forth below, Plaintiffs meet this standard.

First, the discussion above shows that SMI Detainees have long suffered ongoing injuries that are irreparable absent court intervention based on Defendant's practice of withholding medically necessary mental health treatment to detainees in open units or in restricted housing, by subjecting detainees to unreasonably long and excessive periods of confinement in overcrowded conditions without adequate structured or unstructured therapeutic activity, and by exposing them to a frightening and dangerous environment by failing to provide necessary supervision. When "the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates and/or creates a probability of recidivism and future incarceration," the court must conclude that the conditions violate the Constitution. *Rhodes v. Chapman*, 452 U.S. 337, 364 (1981) (concurrence). As the evidence shows, these injuries are both

---

[6] In cases, like this one, that involve constitutional violations, this factor merges with the first factor. See *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), rev'd and remanded on other grounds, 131 S. Ct. 746 (2011).

longstanding and ongoing. Defendant's constitutionally deficient practices continue to present the risk of substantial harm to these detainees.

Second, there are no available remedies at law adequate to compensate for SMI Detainees' constitutional injuries. *Leaders of a Beautiful Struggle*, 2 F.4th at 346 ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quotation omitted); *Thomas v. Bryant,* 614 F.3d 1288, 1322 (11th Cir. 2010) (No remedy at law will provide protection for unconstitutional condition of confinement in the future.). The fundamental constitutional guarantees of SMI Detainees have been and continue to be violated daily.

Third, the significant risk of harm to SMI Detainees far exceeds any harm Defendant will suffer if the injunction issues. SMI Detainees are suffering concrete and serious psychological harm that amounts to cruel and unusual punishment. They are subject to inhumane, unlivable conditions. Preventable deaths continue to occur because of Defendant's indifference to known constitutional violations. Importantly, Defendant cannot be harmed by issuance of a permanent injunction that prevents unconstitutional practices. , And, even if it could, the physical and emotional hardships to SMI Detainees are clear and, once suffered, not remediable. There is no comparable harm to Defendant. Considering the relative hardships at issue, a remedy in equity is warranted.

Finally, an injunction will serve the public interest. Injunctive relief benefits the public interest by protecting citizens from violations of their constitutionally protected rights. SMI Detainees are members of the public. Their loved ones are members of the public. The public at large benefits from remedying egregious violations of constitutional rights of American citizens. *Leaders of a Beautiful Struggle,* 2 F.4th at 346 ("It is well-

established that the public interest favors protecting constitutional rights."). The public also has an interest in having SMI Detainees leave the jail reasonably healthy and with the capacity to hold productive jobs, or, at the very least, leave the jail alive and not completely deteriorated. See, e.g., *C.P.M. v. D'Ilio*, 916 F. Supp. 415, 422 (D.N.J. 1996) ("there is no question that society has an interest in the rehabilitation and reassimilation of offenders into productive, employed, tax-paying citizens") (citing *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972)). As such, the requested relief will benefit the public interest.

### PLRA – Scope of Relief

Under the PLRA, a court granting prospective relief must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A)..

The precise method by which Defendant accomplishes these requirements should be left to Defendant. See *Lewis v. Casey,* 518 U.S. 343, 362 (1996) (explaining that correctional defendants should be given the first opportunity to correct their own constitutional violations). The Court cannot allow, however, these constitutional violations to continue simply because a remedy would involve intrusion into the realm of the administration of a pretrial detention center.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that this Court enter judgment declaring that the conditions at ASGDC violate the substantive due process rights of SMI Detainees under the Fourteenth Amendment as set forth herein and determine that

Plaintiffs are the prevailing party under 42 U.S.C. § 1988(b) and award attorneys' fees and costs in an amount to be determined.[7]

Respectfully submitted by:

s/Stuart M. Andrews
Stuart M. Andrews (Fed. I.D. No. 1099)
Nekki Shutt (Fed I.D. No. 6530)
Ashley Pennington (Fed. I.D. No. 3035)
Sarah J.M. Cox (Fed. I.D. No. 13166)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, 2nd Floor (29201)
PO Box 1929
Columbia, South Carolina 29202
T: 803.904.7915
F: 803.904.7910
SAndrews@BurnetteShutt.Law
NShutt@BurnetteShutt.Law
APennington@BurnetteShutt.law
SCox@BurnetteShutt.Law
**ATTORNEYS FOR PLAINTIFFS**

Columbia, South Carolina

January 15, 2025

---

[7] Plaintiffs would be the "prevailing party" if the court enters judgment that the challenged conditions violate the Fourteenth Amendment or enjoins Defendant from continuing those conditions. See *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 604-05 (2001). Plaintiffs request an opportunity to brief this issue and the amount of the award after this motion is decided.