

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION**

| | | |
|---|---|---|
| DISABILITY RIGHTS SOUTH CAROLINA, *individually*; and C.D., J.O., J.H., W.M., T.D., L.D., A.S., F.J., T.J., T.F., and K.B., *as Class Representatives on behalf of themselves and others similarly situated*, Plaintiffs, | § § § § § § § | |
| vs. | § § | Civil Action No.: 8:22-1358-MGL |
| RICHLAND COUNTY, Defendant. | § § § | |

**ORDER ADOPTING THE REPORTS AND RECOMMENDATIONS
AS PROVIDED HEREIN, GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,
AND GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## I.     INTRODUCTION

Plaintiffs Disability Rights South Carolina (Disability Rights), individually; and C.D., J.O., J.H., W.M., T.D., L.D., A.S., F.J., T.J., T.F., and K.B., as Class Representatives on behalf of themselves and others similarly situated, (Class Representatives) (collectively, Plaintiffs) filed this civil action against Defendant Richland County (the County). Class Representatives are former and current pretrial detainees with serious mental illnesses (SMI Detainees) who were or are confined at Alvin S. Glenn Detention Center (ASGDC) in Richland County, South Carolina.

ASGDC is owned, managed, operated, staffed, and overseen by the County. The Court will interchangeably refer to the County and ASGDC where appropriate.

Although the pleadings in this matter list Class Representatives as "Unnamed Plaintiffs," the Court has amended the caption to identify Class Representatives by their initials.

This matter is before the Court for review of two Reports and Recommendations (collectively, Reports) of the United States Magistrate Judge, which the Court will detail below. The Reports were made in accordance with 28 U.S.C. § 636 and Local Civil Rule 73.02 for the District of South Carolina.


## II.     FACTUAL AND PROCEDURAL HISTORY

The Reports contain a comprehensive recitation of the facts, which the Court finds unnecessary to repeat in full here. Nonetheless, for context, the Court will briefly summarize the relevant factual and procedural history.

Disability Rights is "a private, not-for-profit South Carolina corporation established as a protection and advocacy organization for the State of South Carolina and charged by state and federal law to protect and advocate for the rights of people with disabilities in South Carolina. On behalf of [SMI Detainees] at ASGDC, [Disability Rights] asserts organizational, associational, and statutory standing as a party to this action." Second Amended Complaint ¶ 15.

Plaintiffs allege "dangerous, inhumane, and unconstitutional conditions, policies, and practices . . . exist and have existed for an extended period of time [at ASGDC] because of [the County]'s failure to provide adequate mental health care and safe and sanitary conditions of confinement to [SMI Detainees] in custody at [ASGDC]." *Id.* ¶ 1. Accordingly, Plaintiffs filed this lawsuit for declaratory and injunctive relief. They assert a discrimination claim under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., as well as Eighth and Fourteenth Amendment claims under 42 U.S.C. § 1983 (Section 1983).

2

The parties filed cross-motions for summary judgment.  In the first Report (Report I), the Magistrate Judge recommends the Court grant the County's motion as to Plaintiffs' discrimination claim, deny the parties cross-motions as to Plaintiffs' Fourteenth Amendment claims, and grant the County's motion as to Plaintiffs' Eighth Amendment claims.  For ease of reference, the Court will categorize the Fourteenth Amendment claims as claims for failure to protect, inadequate mental health treatment, and conditions of confinement.

Plaintiffs also filed a motion for class certification.  In the second Report (Report II), the Magistrate Judge suggests the Court grant the motion, certify the class under Federal Rule of Civil Procedure 23(b)(2), and appoint class counsel.

The parties objected to Report I only.  The parties filed replies, and Plaintiffs filed a sur-reply.  Having been fully briefed on the relevant issues, the Court will now adjudicate the motions.


## III.     STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court.  The recommendation has no presumptive weight.  The responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976).  The Court is charged with making a de novo determination of those portions of the Report to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge or recommit the matter with instructions.  28 U.S.C. § 636(b)(1).

## IV.    DISCUSSION AND ANALYSIS

As a preliminary matter, the County moved for summary judgment as to Plaintiffs' discrimination, Fourteenth Amendment, and Eighth Amendment claims.  Plaintiffs' cross-motion, however, relates only to their Fourteenth Amendment claims.

### A.    Whether the Magistrate Judge erred in suggesting the Court grant the County's motion for summary judgment as to Plaintiffs' discrimination claim

Plaintiffs first contest the Magistrate Judge's suggestion the Court grant the County's motion for summary judgment as to their discrimination claim.

Title II of the ADA "allow[s] [plaintiffs] to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations."  *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008).  Disparate impact, which Plaintiffs aver is at issue here, exists where a policy or practice is "facially neutral in [its] treatment of different groups but . . . in fact fall[s] more harshly on one group than another and cannot be justified by business necessity."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

Plaintiffs maintain two practices, ASGDC's restrictive housing policy and use of force, "have a harsher, disparate impact on SMI Detainees."  Plaintiffs' Objections at 4.  But, Plaintiffs neglect to offer any substantive argument in support of their restrictive housing allegation and instead focus solely on ASGDC's purported use of force.  They posit the evidence demonstrates a significant statistical disparity in ASGDC's use of force toward SMI Detainees as opposed to non-SMI Detainees, and "[t]he remarkable difference in exposure to the negative effects of the employment of force—by taser, chemical agents, and restraint chairs—is far more than enough to raise an inference of causation."  *Id.* at 7.

4

The County, however, asserts Plaintiffs are unable to argue discriminatory use of force, as the operative complaint advances discrimination based only on ASGDC's restrictive housing policy. The County insists it is entitled to summary judgment as to such policy because "Plaintiffs have not shown that the housing placements for any of the [Class Representatives], including any placements in the Behavioral Management Unit (BMU), were [un]justified by the alleged conduct or that the [Class Representative] was placed there for discriminatory reasons." The County's Reply at 3.

In the second amended complaint, Plaintiffs allege ASGDC "discriminates against SMI Detainees on the basis of their mental illnesses by confining them, upon information and belief, at materially greater rates and for materially longer periods than non-disabled detainees are subjected to such confinement." Second Amended Complaint ¶ 129. Absent from the complaint, though, and as the County notes, is any contention ASGDC engages in discriminatory use of force. And, it is well established Plaintiffs are unable to constructively amend their complaint at this advanced stage of the litigation. *See, e.g.*, *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (prohibiting plaintiffs from amending their complaint through summary judgment briefing). Thus, the Court will overrule Plaintiffs' objections relative to ASGDC's purported use of force.

Regarding ASGDC's restrictive housing policy, the Magistrate Judge concluded Plaintiffs have failed to meet their burden of proving the policy had a significant discriminatory effect on SMI Detainees. Plaintiffs neglect to dispute this conclusion, nor could they reasonably do so. *See* Plaintiffs' Objections at 4 ("[T]he disparate impact must be significant. For this reason, the Magistrate Judge rejected Plaintiffs' contention that [they] could establish an ADA violation by showing [fifty] of the [seventy-seven] men confined were on the mental health caseload, when

approximately the same percent of detainees in the general ASGDC population were on the mental health caseload." (citations omitted)).  Therefore, the Court will also overrule Plaintiffs' objections as to ASGDC's restrictive housing policy.

For all these reasons, the Court is unable to agree with Plaintiffs' contention the Magistrate Judge erred in suggesting the Court grant the County's motion for summary judgment as to their discrimination claim.

>   **B.** **Whether the Magistrate Judge erred in recommending the Court deny the parties' cross-motions for summary judgment as to Plaintiffs' failure-to-protect claim**

The parties object to the Magistrate Judge's recommendation the Court deny their cross-motions for summary judgment as to Plaintiffs' failure-to-protect claim.  The Court will begin with the applicable law.

>   **1.** **Whether the Magistrate Judge erred in applying the objective standard adopted by the Fourth Circuit in Short v. Hartman**

The County first argues the Magistrate Judge improperly applied the objective standard adopted by the Fourth Circuit in *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

By way of background, in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court settled an ongoing disagreement among the Circuits regarding the standard for Fourteenth Amendment excessive force claims.  The Court explained "pretrial detainees (unlike convicted prisoners) cannot be punished at all[.]"  *Id.* at 397.  Hence, "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one."  *Id.* at 401.  In other words, "a pretrial detainee can prevail by providing only objective evidence . . . the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."  *Id.* at 398.

6

More than eight years later, the Fourth Circuit in *Short* determined *Kingsley* rendered "prior precedent applying a subjective deliberate indifference standard" to Fourteenth Amendment deliberate indifference claims untenable. 87 F.4th at 610. The Court determined "[t]he only way to respect the distinction *Kingsley* drew between the Eighth and Fourteenth Amendments is to recognize . . . *Kingsley*'s objective test extends to all pretrial detainee claims under the Fourteenth Amendment . . . for deliberate indifference to an excessive risk of harm." *Id.*

Thus, the Fourth Circuit joined the Second, Sixth, Seventh, and Ninth Circuits in adopting an objective standard for Fourteenth Amendment deliberate indifference claims. Under this standard, "pretrial detainees [may] state Fourteenth Amendment claims for deliberate indifference to a serious risk of harm on the purely objective basis that the 'governmental action' they challenge is not 'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 576 U.S. at 398).

Here, the County argues the Magistrate Judge improperly applied *Short*'s objective standard. The County emphasizes *Short* involved a claim of deliberate indifference to a medical need, rather than failure to protect. The County acknowledges there is an absence of "decisional law in the Fourth Circuit actually engaging in the analysis required to apply *Short* to a failure-to-protect claim." *Id.* at 4–5. Nevertheless, the County proposes the Court adopt the test enunciated in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (establishing a modified test for failure-to-protect claims based upon the principles set forth in *Kingsley*).

Plaintiffs, however, posit "[t]he *Castro* test . . . . incorporates a subjective, state-of-mind element that the Fourth Circuit expressly rejected in *Short*." Plaintiffs' Reply at 3. Plaintiffs contend the defendant in *Short* cited *Castro* to "argue[] *Kingsley*'s objective deliberate indifference test applied only when government officials affirmatively act[.]" *Id.* at 3–4. But, Plaintiffs assert,

the Fourth Circuit concluded it was unable to "artificially limit[] *Kingsley*'s objective test to claims that require 'affirmative act[s.]'" *Short*, 87 F.4th at 611 (quoting *Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020)).

The Court agrees with the County and thus concludes the *Castro* test is the proper standard under which to assess Plaintiffs' failure-to-protect claim.

As the Ninth Circuit explained in *Castro*, "*Kingsley* did not squarely address whether the objective standard applies to all kinds of claims by pretrial detainees, including both excessive force claims and [failure-to-protect] claims." 833 F.3d at 1069. The Ninth Circuit acknowledged, unlike excessive force claims, failure-to-protect claims "do[] not require an affirmative act." *Id.* Even still, the Court determined "there are significant reasons to hold that the objective standard applies to failure-to-protect claims as well." *Id.* These reasons include the fact "[t]he underlying federal right, as well as the nature of the harm suffered, is the same for pretrial detainees' excessive force and failure-to-protect claims[,]" and "the broad wording of *Kingsley*[,] . . . . [which] did not limit its holding to 'force' but spoke to 'the challenged governmental action' generally." *Id.* at 1069–70 (quoting *Kingsley*, 576 U.S. at 398).

"Because of the differences between failure-to-protect claims and claims of excessive force," the Ninth Circuit concluded "applying *Kingsley*'s holding to [failure-to-protect] claims requires further analysis." *Id.* The Court explained,

> *Kingsley* recognized that there are two state-of-mind issues at play in an excessive force claim.
>
> The first—the officer's state of mind with respect to his physical acts—was undisputedly an intentional one there, because the officer had taken the affirmative act of using force knowingly and purposefully. In the failure-to-protect context, in which the issue is usually inaction rather than action, the equivalent is that the officer's conduct with respect to the plaintiff was intentional. . . . [The first state-of-mind] factor would not be satisfied in the failure-to-protect context if the officer's inaction resulted from something totally unintentional.

> Under *Kingsley*, the second question in the failure-to-protect context would then be purely objective: Was there a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered?  That inquiry differs from the inquiry with respect to an Eighth Amendment [failure-to-protect] claim: [Under the Eighth Amendment], "the deprivation alleged must objectively be sufficiently serious; and the prison official must subjectively have a sufficiently culpable state of mind." . . . Under *Kingsley*, a pretrial detainee need not prove those subjective elements about the officer's actual awareness of the level of risk.  At the same time, however, the Supreme Court has instructed that "mere lack of due care by a state official" does not "'deprive' an individual of life, liberty, or property under the Fourteenth Amendment."  Thus, the test to be applied under *Kingsley* must require a pretrial detainee who asserts a due process claim for failure to protect to prove more than negligence but less than subjective intent—something akin to reckless disregard.

*Id.* at 1070–71 (emphasis omitted) (first quoting *Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002); and then quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)).

Combining these principles, the Ninth Circuit held the four elements of a pretrial detainee's failure-to-protect claim are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1071.

As the Court noted above, Plaintiffs contend the third element of this test "incorporates a subjective state-of-mind element that the Fourth Circuit expressly rejected in *Short*."  Plaintiffs' Objections at 3.  The Court, however, is unconvinced.

The Ninth Circuit recognized, "[w]ith respect to the third element, the defendant's conduct must be objectively unreasonable[.]"  *Castro*, 833 F.3d at 1071.  The Court also emphasized "the

state-of-mind requirement articulated here is less stringent than the subjective test that preceded it." *Id.* at 1071 n.4. Indeed, "where a defendant actually knew of a substantial risk of serious harm and consciously took no action, one would expect a jury to find that the defendant made an intentional decision." *Id.*

Moreover, the Fourth Circuit has applied *Castro* in an unpublished opinion involving a Fourteenth Amendment failure-to-protect claim. *See Carmona v. Martin*, No. 23-6930, 2024 WL 4490695, at *2 (4th Cir. Oct. 15, 2024) (concluding the plaintiff "failed to adequately establish that 'a reasonable offic[ial] in the circumstances would have appreciated the high degree of risk involved . . . making the consequences of [the defendants'] conduct obvious'" (quoting *Castro*, 833 F.3d at 1071)); *see also, e.g.*, *Kemp v. Fulton Cnty.*, 27 F.4th 491, 497 (7th Cir. 2022) (adopting the *Castro* test and explaining the defendant "must intend to carry out a[n] [objectively reasonable] course of actions"); *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 729 (6th Cir. 2022) (implementing the *Castro* test and holding the defendant "must act intentionally in a manner that puts the plaintiff at substantial risk of harm, without taking reasonable steps to abate that risk, and by failing to do so actually cause the plaintiff's injuries").

For all these reasons, the Court will sustain the County's objection on this basis and apply the *Castro* test below.

### 2. *Whether the Magistrate Judge erred in declining to consider the Supreme Court's analyses in* Helling v. McKinney *and* Farmer v. Brennan

The County next posits the Magistrate Judge disregarded its argument the Supreme Court's analyses in *Helling v. McKinney*, 509 U.S. 25 (1993), and *Farmer v. Brennan*, 511 U.S. 825 (1994), apply in the Court's consideration of Plaintiffs' failure-to-protect claim.

For context, in *Helling*, a plaintiff seeking damages and injunctive relief appealed the grant of a directed verdict on his Eighth Amendment conditions of confinement claim. 509 U.S. at 28–

10

30. The Court concluded the plaintiff stated a claim for relief and thus remanded the matter to the district court. But, it advised the district court, "[o]n remand, the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct . . . ." *Id.* at 36.

Almost one year later, the Supreme Court in *Farmer* considered the same issue, albeit in the context of summary judgment. 511 U.S. at 829–32. The Court reiterated, "insofar as [the plaintiff] seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct,' their attitudes and conduct at the time suit is brought and persisting thereafter." *Id.* at 845–46 (quoting *Helling*, 509 U.S. at 36).

Specific to summary judgment, the *Farmer* Court explained the plaintiff "must come forward with evidence from which it can be inferred . . . the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and . . . they will continue to do so[.]" *Id.* at 846. The Court further clarified, "to establish eligibility for an injunction, the [plaintiff] must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Id.* "[I]n so doing," the Court advised, "the [plaintiff] may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the [plaintiff] is not entitled to an injunction." *Id.*

Here, the County asserts the Magistrate Judge entirely disregarded its argument "that in a purely injunctive relief case, the Supreme Court's analys[e]s in [*Farmer* and *Helling*] should still be controlling or, if not controlling, should still be persuasive." The County's Objections at 6. The County thus contends the Court "should focus on [ASGDC]'s current attitudes and conduct."

11

*Id.* at 7 (internal quotation marks omitted). And, the County insists ASGDC has taken "objectively reasonable available measures to abate the risk," such that it "is not deliberately indifferent, and there is no basis for injunctive relief to be awarded." *Id.*

Plaintiffs, however, insist the County has "fail[ed] to identify a single case or propose a legal theory in support of its contention that the purely objective standard required by *Kingsley* and *Short* should not extend to purely equitable claims." Plaintiffs' Reply at 5. "Even if the Court were to find *Farmer* and *Helling* . . . otherwise instructive," Plaintiffs imply the County's pre-litigation conduct remains relevant, as *Helling* indicates a "plaintiff must prove the elements of his claim existed both at the time of the commencement of the action, as well as later prior to trial." *Id.*

Ultimately, the Court is unable to conclude *Short* rendered *Farmer* and *Helling* wholly inapplicable in this case.

The prospective relief sought by the plaintiffs in *Farmer* and *Helling*—that is, "injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm," *Farmer*, 511 U.S. at 845–46—is the same relief sought by Plaintiffs here. *See* Second Amended Complaint at ¶ 132 ("The conditions of confinement at ASGDC and [the] policies, customs, patterns, practices, acts, and omissions complained of herein have deprived, and continue to deprive, the SMI Detainees of their respective rights, privileges, and immunities secured by the Constitution and laws of the United States."); *id.* at 33, 35 (requesting the Court issue an injunction restraining ASGDC from confining SMI Detainees unless it complies with certain conditions and enjoining ASGDC from accepting detainees from other jurisdictions until it is adequately staffed).

Although the Court is prohibited from considering subjective intent, Plaintiffs still must prove ASGDC neglected to "take reasonable available measures to abate [a substantial risk of

serious harm to SMI Detainees], even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of [ASGDC]'s conduct obvious[.]"  *Castro*, 833 F.3d at 1071.  In other words, Plaintiffs "must show [ASGDC] failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Short*, 87 F.4th at 611 (quoting *Farmer*, 511 U.S. at 836).

Even if Plaintiffs can demonstrate this failure, the Prison Litigation Reform Act prohibits the Court from "grant[ing] or approv[ing] any prospective relief unless [it] finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the [f]ederal right, and is the least intrusive means necessary to correct the violation of the [f]ederal right."  18 U.S.C. § 3626(a)(1)(A).  And, the scope of any such relief is necessarily determined by ASGDC's attitudes and conduct relative to the disputed conditions.  *See Porter v. Clarke*, 923 F.3d 348, 364–65 (4th Cir. 2019) ("[W]hen a defendant discontinues illegal conduct, a party seeking injunctive relief must demonstrate that such relief is 'needed,' meaning that 'there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953))).

The Court thus finds *Farmer* and *Helling* instructive on this issue, and it will sustain the County's objection on this ground.  As such, the Court may consider post-litigation developments in the conditions at ASGDC in determining whether the facility currently fails to protect SMI Detainees.  Nevertheless, the Court agrees with Plaintiffs any evidence ASGDC failed to protect SMI Detainees at the time they filed this lawsuit remains relevant.  *See Farmer*, 511 U.S. at 846 (explaining a plaintiff must prove the defendant was "at the time suit was filed, and [is] at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and . . . [it] will continue to do so").

### 3. Whether Plaintiffs are entitled to summary judgment on their failure-to-protect claim

Plaintiffs maintain the evidence reveals chronic staffing shortages have caused a collapse of ASGDC's direct supervision management system and, in turn, have "expose[d] vulnerably and mentally disordered detainees to a substantial risk of serious harm." Plaintiffs' Objections at 11. Such risk is apparent, Plaintiffs contend, as ASGDC has witnessed a substantial increase in reported instances of inmate-on-inmate violence in the last three years. And, Plaintiffs posit the County's "general, conclusory, and future-focused representations" are "insufficient to refute the overwhelming evidence . . . adduced by Plaintiffs and to demonstrate a genuine issue of material fact." *Id.* at 21.

The County, however, asserts Plaintiffs "present[] a recitation of [their] previous arguments focusing on largely anecdotal evidence and incomplete, misleading, and essentially cherry-picked statistical evidence . . . ." The County's Reply at 4. Even still, the County insists Plaintiffs are unentitled to summary judgment because the record is replete with inconsistent evidence as to whether ASGDC has failed to protect SMI Detainees from a substantial risk of harm. The County emphasizes it has submitted proof of "marked improvements in the conditions at ASGDC, including the renovations of the housing units and other parts of the physical plant, the positive increase in the staffing numbers, the [twelve] improved contraband-control measures, the decrease in acts of violence, and similar markers." *Id.* at 11–12.

In Plaintiffs' sur-reply, they assert the evidence upon which the County relies—namely, an affidavit and declarations by ASGDC Director Crayman Harvey (Harvey)—constitutes opinion testimony by a witness lacking personal knowledge. And, Plaintiffs reiterate "the quality and quantity of the evidence concerning the substantial risk of harm to which SMI Detainees have been and continue to be exposed is so one-sided that a reasonable jury could find only for Plaintiffs by

concluding [the County] has violated its constitutional responsibility to protect [them] from harm." Plaintiffs' Sur-Reply at 8–9.

On the one hand, Plaintiffs have presented competent evidence indicating the County continues to act with deliberate indifference to a serious risk of harm to SMI Detainees. *See, e.g.*, January 2025 Department of Justice (DOJ) Report at 13, 22–23 (concluding ASGDC's attempts to address staffing shortages, contraband, and housing conditions have left systemic deficiencies uncorrected); *id.* at 34 (stating the DOJ "has reasonable cause to believe that ASGDC violates the . . . Fourteenth Amendment[] by failing to protect incarcerated people from an unreasonable risk of violence and harm"); January 2025 Declaration of C.D. (attesting officers are absent from Unit Echo every night except during medication distribution and stating two fights occurred in January 2025 when the assigned officer was absent); January 2025 Declaration of W.M. (claiming the same level of staffing exists in Unit Foxtrot and further stating a fight involving a weapon erupted in January 2025 when officers were absent); February 2025 Supplemental Report of Plaintiffs' Expert Dr. Emmitt Sparkman ¶¶ 22–23 (opining ASGDC's established practice of failing to adhere to its policies continues to result in unsafe conditions and inadequate security); February 2025 Supplemental Declaration of Plaintiffs' Expert Dr. Kenneth Ray ¶ 48 (identifying misrepresentations by leaders at ASGDC and concluding "[c]hronic understaffing, inadequate supervision, unchecked contraband, and the mistreatment of [SMI Detainees]" place them "at extreme and ongoing risk of violence, neglect, and inhumane treatment").

On the other hand, the County has presented evidence of post-litigation improvements in the very practices underlying Plaintiffs' failure-to-protect claim. *See, e.g.*, Deposition of Redacted Detainee 1 at 107, 112–13 (testifying an officer supervises Unit Hotel at all times and noting a recent decrease in violence, drug use, and contraband at ASGDC); Affidavit of Harvey ¶¶ 23–25,

30–33 & Ex. 2 (indicating renovations of Phase III and Phase V Housing Units will be completed by the end of this fiscal year and will include state-of-the-art locking systems, reinforced fixtures, and secure control rooms with 24/7 supervision); Deposition of Redacted Detainee 2 at 37 (stating Unit Juliet lacks any major contraband issues); Deposition of Redacted Detainee 3 at 103 (testifying female detainees are generally unable to obtain contraband); Declaration of Harvey ¶ 26 (attesting Unit Mike "is staffed 24/7 with a certified detention officer"); *id.* ¶ 36 (clarifying ASGDC is able to staff all security posts within single cell and pod units during the weekday day shift and almost all of these posts during the weekday night shift); *id.* ¶ 37 (stating "there is never a time that a person is not physically observing any single cell unit at ASGDC"); Supplemental Declaration of Harvey ¶ 2 (declaring the County has employed ninety-four detention officers and a total of 137 uniformed staff, which fails to account for third-party officer contracted through Allied Security); *id.* ¶ 6 (noting inmate-on-inmate assaults have "dramatically decreased in 2024 and 2025" as "additional security measures and use of technology has stemmed the tide of contraband entering the jail").

To the extent Plaintiffs assert Harvey's affidavit and declarations constitute impermissible testimony by a witness lacking personal knowledge, the Court is unpersuaded.

The County evidently designated Harvey as its Federal Rule of Civil Procedure 30(b)(6) witness in this matter. *See* Affidavit of Harvey ¶ 2 ("I am the current Director of [ASGDC] and the Rule 30(b)(6) witness for Richland County in this case."); Declaration of Harvey ¶ 2 (same). He is therefore absolved of any personal knowledge requirement. *See Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 193 (4th Cir. 2019) ("Rule 30(b)(6) deponents testify on behalf of entities, not themselves, and often do so based on careful advance preparation, not personal knowledge.").

For all these reasons, the Court agrees with the Magistrate Judge "[t]he parties present conflicting evidence[,]" Report I at 70, as to whether Plaintiffs are entitled to injunctive relief based on ASGDC's failure to protect SMI Detainees.  More specifically, genuine disputes of material fact exist as to whether ASGDC continues to place SMI Detainees "at substantial risk of suffering serious harm" and whether ASGDC has failed "to take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of [its] conduct obvious[.]"  *Castro*, 833 F.3d at 1071.

Accordingly, the Court will overrule Plaintiffs' objections relative to their failure-to-protect claim.

In light of the foregoing discussion and analysis, the Court rejects the parties' contentions the Magistrate Judge erred in recommending the Court deny their cross-motions for summary judgment as to Plaintiffs' failure-to-protect claim.

**C.     *Whether the Magistrate Judge erred in suggesting the Court deny the parties' cross-motions for summary judgment as to Plaintiffs' inadequate mental health treatment claim***

The parties also object to the Magistrate Judge's suggestion the Court deny their cross-motions for summary judgment as to Plaintiffs' inadequate mental health treatment claim.  Again, the Court will begin with the applicable legal standard.

*1.     Whether the Magistrate Judge erred in his discussion of the constitutional minima*

By way of background, the Fourth Circuit has explained,

[A] prison inmate[] is entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.

17

*Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *see Gordon v. Kidd*, 971 F.2d 1087, 1094,

1097 (4th Cir. 1992) (applying *Bowring* in the context of a pretrial detainee). Even still, "[t]he

right to treatment is . . . limited to that which may be provided upon a reasonable cost and time

basis and the essential test is one of medical necessity and not simply that which may be considered

merely desirable." *Id.* at 48.

       Once a pretrial detainee demonstrates he or she is entitled to psychological or psychiatric

treatment under *Bowring*, the inquiry shifts to the constitutional adequacy of such treatment. In

*Ruiz v. Estelle*, the court identified the following six minimum components of a constitutional

mental health treatment program:

> First, there must be a systematic program for screening and evaluating inmates in
> order to identify those who require mental health treatment. Second, . . . treatment
> must entail more than segregation and close supervision of the inmate patients.
> Third, treatment requires the participation of trained mental health professionals,
> who must be employed in sufficient numbers to identify and treat in an
> individualized manner those treatable inmates suffering from serious mental
> disorders. Fourth, accurate, complete, and confidential records of the mental health
> treatment process must be maintained. Fifth, prescription and administration of
> behavior-altering medications in dangerous amounts, by dangerous methods, or
> without appropriate supervision and periodic evaluation, is an unacceptable method
> of treatment. Sixth, a basic program for the identification, treatment, and
> supervision of inmates with suicidal tendencies is a necessary component of any
> mental health treatment program.

503 F. Supp. 1265, 1339 (S.D. Tex. 1980) (emphasis added) (citations omitted), *rev'd in part on

other grounds*, 679 F.2d 1115 (5th Cir. 1982). Given the absence of binding precedent on the

constitutional adequacy of mental health treatment programs, the parties propose the Court adopt

the *Ruiz* components. The Magistrate Judge evidently agreed, and the Court is unable to conclude

this was error.

       The Magistrate Judge determined, "[i]n light of *Bowring*, and the cases that follow it, there

can be no doubt [the County] is obligated to provide constitutionally adequate mental health

treatment to SMI Detainees upon a showing of medical necessity." Report I at 54. Thus, the

Magistrate Judge "appl[ied] the[] six *Ruiz* components in determining whether the mental health treatment services at ASGDC are constitutionally adequate" under the Fourteenth Amendment. *Id.* at 55. The County, however, challenges the Magistrate Judge's determination on several grounds.

First, the County maintains the Magistrate Judge disregarded "the key holding from *Bowring* . . . that a local detention facility must provide what is medically necessary and not what may be medically desirable." The County's Objections at 12. The County asserts *Bowring* and *Williams v. Branker*, 462 Fed. App'x 348 (4th Cir. 2012)—in which the Fourth Circuit rejected a convicted inmate's propositions he was entitled to effective mental health treatment and the prison was a guarantor of his mental health—indicate pretrial detainees are unentitled "to unqualified or unlimited access to mental health care." *Id.* Plaintiffs fail to offer any substantive response.

Having fully reviewed Report I, the Court is unable to discern any manner in which the Magistrate Judge implied SMI Detainees are entitled to unqualified or unlimited access to mental health care. Rather, the Magistrate Judge focused exclusively upon whether the mental health treatment program at ASGDC satisfies the *Ruiz* components. The Court will therefore overrule the County's objection on this basis.

Second, the County argues the Magistrate Judge, in applying the *Ruiz* components, failed to acknowledge Plaintiffs' evidence consists solely of expert opinion "as to what . . . is required by 'industry standards' or by a medical or mental health 'standard of care.'" *Id.* Plaintiffs, again, neglect to offer any substantive response to this argument. Nevertheless, the Court determines the County has inaccurately characterized the evidence upon which the Magistrate Judge relied.

In evaluating Plaintiffs' inadequate mental health treatment claim, the Magistrate Judge considered Plaintiffs' presentation of deposition testimony from ASGDC's former director and

mental health clinicians, rather than expert opinions about industry standards. Even still, although expert opinions and industry standards are unbinding, they "may be instructive in certain cases[.]" *Bell v. Wolfish*, 441 U.S. 520, 543 n.27; *see Rhodes v. Chapman*, 452 U.S. 337, 348 n.13 (1981) (explaining expert opinions as to desirable prison conditions "may be helpful and relevant with respect to some questions"). And, this appears to be such a case. Therefore, the Court will overrule the County's objection on this ground, as well.

Third, the County posits the Magistrate Judge "fail[ed] to draw the necessary distinctions between a long-term facility housing convicts with respect to its requirements for health care including mental health care and the availability of resources as compared to a local detention facility where convicts serve sentences of [ninety] days or less and pre-trial detainees are typically short-term." The County's Objections at 9–10. The County contends "the constitutional minima for a local detention center should not be judged by what the law requires of a long[-]term correctional facility." *Id.* at 10.

Plaintiffs, however, assert the County "can cite no case in the Fourth Circuit that has held a jail to a lower standard of medical care than a prison." Plaintiffs' Reply at 14. Further, Plaintiffs emphasize, "[i]n a jail setting, the Supreme Court and [the Fourth Circuit] have held that the constitutional rights afforded [to] pretrial detainees, who have not been convicted of a crime, are at least equal, if not greater, than those of prisoners convicted of a crime." *Id.* at 15. The Court agrees with Plaintiffs.

"The Supreme Court has held that a pretrial detainee has a right to be free from any form of punishment under the Due Process Clause of the Fourteenth Amendment." *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) (citations omitted). "This right, like the Eighth Amendment right of convicted prisoners, 'requires that government officials not be deliberately indifferent to any

serious medical needs of the detainee.'" *Tarashuk v. Givens*, 53 F.4th 154 (4th Cir. 2022) (quoting *Belcher*, 898 F.2d at 34); *see Bowring*, 551 F.2d at 47 ("We see no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.").

Though "the precise scope of [the government's] obligation [to provide mental health care] is unclear[,]" *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1978), as Plaintiffs recognize, "[t]he due process rights of a pretrial detainee are at least as great as the [E]ighth [A]mendment protections available to the convicted prisoner[,]" *id* at 870. *See Bowring*, 551 F.2d at 47 ("Failure or refusal to provide treatment, when indicating a deliberate indifference to serious [mental health] needs of [a pretrial detainee,] . . . violates the Fourteenth Amendment [D]ue [P]rocess [C]lause[] since the failure or refusal to treat could well result in the deprivation of life itself." (internal quotation marks omitted) (first quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); and then quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972))).

Accordingly, a mental health treatment program that is constitutionally inadequate under the Eighth Amendment is necessarily inadequate under the Fourteenth Amendment, too. And, because the Fourteenth Amendment protects pretrial detainees at least as much as the Eighth Amendment protects convicted inmates, the Court determines it would be wholly inappropriate to adopt a less stringent standard than *Ruiz* as the County implies. Thus, the Court will also overrule the County's objection on this basis.

### 2. *Whether the parties are unentitled to summary judgment on Plaintiffs' inadequate mental health treatment claim*

Regarding the merits of Plaintiffs' inadequate mental health treatment claim, the parties insist they are entitled to summary judgment.

Although the parties initially failed to address this issue, after carefully reviewing the record, the Court concludes Plaintiffs have neglected to submit any evidence establishing

21

Disability Rights, J.O., J.H., W.M., T.D., L.D., A.S., F.J., T.J., T.F., and K.B. are entitled to psychological or psychiatric treatment under *Bowring*. The parties have, however, presented conflicting evidence as to whether C.D. is entitled to such treatment and, if so, whether the mental health treatment program at ASGDC is constitutionally adequate under *Ruiz*.

> ### a.     Whether Plaintiffs have shown they are entitled to psychological or psychiatric treatment under Bowring

Plaintiffs present medical records for J.O., J.H., W.M., T.D., L.D., F.J., T.J., T.F., and K.B. But, medical records alone fail to establish these detainees are entitled to psychological or psychiatric treatment. *See Bowring*, 551 F.2d at 47 (requiring "a physician or other health care provider, exercising ordinary skill and care at the time of observation," to "conclude[] with reasonable medical certainty" the existence of three separate factors).

Plaintiffs argue their subject matter expert Dr. Nicole Johnson (Johnson) "cites numerous examples in her report of individuals she interviewed or whose records she reviewed who satisfy the *Bowring* test for medical necessity . . . ." Plaintiffs' Motion for Summary Judgment at 25. Namely, Johnson opines five individuals—whom she identifies as D001, D003, D004, D005, and D006—are "suffering from serious mental disorders; their illnesses could be significantly improved with psychotherapy and other intensive mental health intervention; and the likelihood of harm without such necessary treatment was substantial." *Id.*

Critically, though, only one of the SMI Detainees identified by Johnson, D001 (C.D.), is a named Plaintiff in this case. And, in direct contravention to Johnson, the County's subject matter expert Dr. Thomas Fowlkes (Fowlkes) concludes C.D.'s "medical records do not support that he has an SMI." Fowlkes's Report at 25. Even assuming C.D. has an SMI, however, Fowlkes asserts medical records indicate he "has been seen multiple times by the . . . mental health staff" and "is receiving prescription medications." *Id.*; *see* C.D.'s Medical Records from January to December

22

2024 (stating C.D. was seen twelve times by either a qualified mental health professional or the psychiatry clinic and noting C.D. was prescribed Seroquel for mood swings, Vistaril for anxiety, and Zoloft for depression).

The Court therefore concludes a genuine issue of material fact exists as to whether C.D. is entitled to psychological or psychiatric treatment under *Bowring*.  But, because Plaintiffs have neglected to set forth any evidence indicating Disability Rights, J.O., J.H., W.M., T.D., L.D., A.S., F.J., T.J., T.F., and K.B. are entitled to such treatment, the Court holds the County is entitled to summary judgment on this claim as to these Plaintiffs.

> ### b.     Whether Plaintiffs have shown the mental health treatment program at ASGDC is constitutionally inadequate under Ruiz

As for the constitutional adequacy of ASGDC's mental health treatment program under *Ruiz*, the Court agrees with the Magistrate Judge the parties have offered conflicting evidence.

To reiterate, the court in *Ruiz* identified the following six components of a constitutionally adequate mental health treatment program:

> First, there must be a systematic program for screening and evaluating inmates in order to identify those who require mental health treatment.  Second, . . . treatment must entail more than segregation and close supervision of the inmate patients. Third, treatment requires the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.  Fourth, accurate, complete, and confidential records of the mental health treatment process must be maintained.  Fifth, prescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment.   Sixth, a basic program for the identification, treatment, and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program.

503 F. Supp. at 1339.

Here, Plaintiffs present declarations from Johnson and M.K., a detainee at ASGDC, as well as testimony from Laurrinda Saxon-Ward (Saxon-Ward), former Mental Health Services Site

Manager at ASGDC; Patti Green (Green) and Veronique Gilmore (Gilmore), former clinicians with ASGDC's mental health service provider Advanced Correctional Healthcare, Inc. (ACH); and Judy Lassiter (Lassiter), a current ACH clinician.

Saxon-Ward testified ASGDC offers "individual therapy" called "crisis management." Saxon-Ward's Deposition at 91. Saxon-Ward stated, although she was unable to recommend intense individual counseling for short-term detainees, she provided crisis management, or brief solution therapy. *Id.* at 93. Saxon-Ward further explained she "[did not] expect [her] clinicians to sit down and have a one to one with the patients" given the reduced privacy inherent in a local detention center, but she did expect them to identify each patient's medical needs and coordinate services to meet those needs. *Id.* at 240; *see* Gilmore's Deposition at 36, 337 (testifying as to monthly brief interventions, which lasted between ten and fifteen minutes, during which clinicians provided coping strategies, delivered psychoeducation, and ensured medication compliance).

Similarly, Green testified she met with patients every thirty days to "find out how they're doing in the dorms, find out how they're doing on their medicine[,]" "ask[] them if they were suicidal[,]" and, if needed, "schedule them with the provider." Green's Deposition at 24–25. But, Green explained she was untrained in conducting therapy as a social worker. *Id.* at 27. And, when asked whether Saxon-Ward ever asked Green to perform therapy, Green replied, "No. [Saxon-Ward] told me we don't do therapy. . . . She said it's not the place for that; if you open wounds, you can't close them; we don't have time for that so we don't do therapy." *Id.*; *see* Declaration of M.K. at 18 (stating a nurse practitioner at ASGDC informed M.K. the facility lacks manpower to conduct counseling).

Lassiter testified ASGDC neglects to offer individual therapy. Lassiter's Deposition at 114. Lassiter also stated "there are . . . no therapy groups or other social or psychosocial groups" in the mental health unit for women at Unit X-Ray. *Id.*

Finally, Johnson attested "[t]here is minimal to no behavioral health treatment occurring at ASGDC[,]" Johnson's Declaration ¶ II.B.1, "there is no delineation as to the level of acuity of patients at ASGDC[] [with] most patients receiv[ing] the same level of engagement[,]" *id.* ¶ II.B.2, "there are no formal treatment plans done at ASGDC[,]" *id.* ¶ II.B.3, "[t]he existing system in place to categorize patients based on level of acuity is inadequate[,]" *id.* ¶ II.B.5, and "[t]here is a complete absence of programming for ASGDC detainees receiving mental health services[,]" *id.* ¶ II.B.6.

Conversely, the County presents affidavits and declarations from ACH executive Dr. Melissa Caldwell (Caldwell), Harvey, Fowlkes, and another expert Dr. Kristen Dauss (Dauss).

As a preliminary matter, Plaintiffs aver Caldwell "has no personal knowledge of services provided at ASGDC to provide an opinion that psychotherapy is furnished." Plaintiffs' Objections at 34. But, in Caldwell's declaration, she attests, "[u]nless otherwise noted, I have personal knowledge of the information contained herein and swear it to be true." Caldwell's Declaration ¶ 1. Caldwell subsequently testified she "[does not] personally participate in [ACH's] site visits" to ASGDC. Caldwell's Deposition at 45. But, at best, this presents a credibility issue for the Court to address at trial. *See In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991) (explaining, in a non-jury case, the Court should refrain from drawing inferences from the evidence at the summary judgment stage where such inferences "involve issues of witness credibility or disputed material facts"). So, the Court will overrule Plaintiffs' objection relative to Caldwell's declaration.

Caldwell attests ACH provides around-the-clock "crisis management and acute care including suicide prevention, supportive interventions including education in coping skills, medication education and management, anger management skills, hygiene, and further individualized care . . . to all detainees who require them.  They include a variety of psychosocial and pharmacological therapies."  Caldwell's Declaration ¶ 6.  She explains "[s]afety planning, counseling, supportive interventions, education (adaptive skills), [and] psychotherapy[] are provided to alleviate symptoms, attain appropriate functioning, and prevent relapse.  Interventions are currently provided in an individual format."  *Id.*

Additionally, Caldwell notes ACH clinicians "develop[] and document[] individualized treatment plans for each detainee that determine[] the appropriate treatment option for the detainee based on their functionality and acuity levels within the jail as well as diagnostic presentation. . . . These treatment plans are continually reviewed and updated as the mental health staff visit the detainee."  *Id.* ¶ 10.  Caldwell asserts ASGDC has gender-specific mental health pods, which "are extremely rare in the correctional field[,]" allowing concentrated staff members to connect with SMI Detainees, protect them from vulnerability, and provide improved monitoring on a daily basis.  *Id.* ¶ 14.

Importantly, "if during any assessments, the mental health and/or medical staff determines that any detainee requires a higher level of medical and/or mental health care that is not available at . . . ASGDC," Caldwell clarifies ACH "staff can refer the detainee to the emergency room or another community provider."  *Id.* ¶ 17.  Indeed, between May and August 2024, ACH clinicians performed 126 "Mental Health Non-Contact Professional Activities (e.g., consult with community providers)"; 1,948 "Mental Health Services Clinical Contacts (e.g., counseling, psychotherapy)"; and 587 "Mental Health Services Clinical Contact-Psychiatry."  *Id.* ¶¶ 20–23.

Harvey explains he created a mental health unit for SMI Detainees in Unit Mike upon his arrival to ASGDC in 2022. Harvey's Affidavit ¶ 25. Harvey states Unit Mike consists of eight pods, and each pod contains eight individual cells and its own day room with a television. *Id.* ¶ 25. According to Harvey, "[e]xcept for routine lockdowns for medication pass and meal pass, . . . SMI [D]etainees in [Unit] Mike are out of their cells and interacting with the other detainees in their pod." *Id.* SMI Detainees also have access to an outdoor recreation area and personal electronic tablets with free "mental health programming, such as substance abuse classes, anger management classes, anxiety management, meditation and coping skills." *Id.* ¶¶ 17, 25; Declaration of Harvey ¶ 65 (noting the tablets utilize Edovo Learn, which "offers more than 25,000 hours of programs from more than 250 providers").

When an SMI Detainee arrives at ASGDC, Harvey attests the detainee "may stay in an individual cell in the intake area for observation and medication management for a temporary period of time before being assigned to [Unit] Mike." Affidavit of Harvey ¶ 28. But, Harvey notes "[t]hat measure is taken because there is a mental health professional in the intake area on a full-time basis who can monitor that detainee more closely." *Id.* ¶ 28; Declaration of Harvey ¶ 66 (explaining ACH clinicians and/or medical staff are present "in the intake area 24/7 performing initial screenings of new detainees . . . in addition to the regular checks performed by the ACH mental health staff").

Harvey states ASGDC "employs Allied [Security officers] whose only job is to conduct suicide checks on detainees every 5 to 15 minutes, 24/7, depending on the circumstances." Declaration of Harvey ¶ 67. Further, based on recommendations from the Federal Bureau of Prisons, Harvey notes "ASGDC now places [two] detainees on suicide watch in a cell (when possible), as studies have shown that this is beneficial." *Id.*

Harvey clarifies "[n]o detainee is placed in the BMU because of his mental health status." Affidavit of Harvey ¶ 22. Rather, "[i]f a detainee is housed in the BMU, he has earned his way there for disciplinary and/or extreme protective custody reasons." *Id.* And, "[a]ll detainees placed in restricted housing in BMU, including any detainees receiving mental health services are seen by medical staff every day and mental health staff as scheduled or needed." Declaration of Harvey ¶ 83.

Although ACH continues to provide mental health services at ASGDC, Harvey explains "ASGDC has contracted with the Columbia Area Mental Health [Center] to embed a [qualified mental health professional] within the facility Monday through Friday 8:00 a.m. to 5:00 p.m. to enhance [its] mental health services to detainees." *Id.* ¶ 59. ASGDC has also begun a three-week program called Becoming Her for "female detainees who are facing extended sentences for serious crimes." *Id.* ¶ 60. Moreover, ASGDC offers life skills classes; provides art, GED, and faith-based programs; and IRize, a drug and alcohol prevention program was scheduled to begin January 28, 2025.

In light of the services detailed above, Fowlkes opines the mental health treatment program at ASGDC is "reasonable, appropriate, and within the standard of care." Fowlkes's Declaration ¶ 6.a. Moreover, Fowlkes contends two treatment modalities—therapeutic community and group therapy—are "neither appropriate nor required by the standard of care in a county jail setting like ASGDC." *Id.* ¶ 6.a.i.3.

Fowlkes posits "[t]he ASGDC mental health treatment team [has] individualized treatment plans for each detainee based upon their specific needs, symptoms, and diagnoses." *Id.* ¶ 6.a.ii. More specifically, Fowlkes asserts "[t]he mental health care provided to [C.D.] is reasonable, appropriate, and within the standard of care." *Id.* ¶ 6.b.

Similarly, Dauss opines "access to adequate medical care is being provided" at ASGDC. Dauss's Declaration ¶ 9. Dauss explains, "[d]ue to their design, intended purpose, and operational constraints[,] county [detention centers] are fundamentally incompatible with the expectations that intensive psychiatric treatment facilities must meet." *Id.* ¶ 13.

Nevertheless, Dauss contends ASGDC provides adequate mental health services, which include identifying and referring detainees with mental health needs, offering crisis intervention services, managing psychotropic medication, and providing treatment documentation and follow up. *Id.* ¶ 17. Although Dauss acknowledges "there are areas for improvement [that] [ASGDC] leadership is making," she ultimately determines "the threshold for adequacy is currently being met." *Id.* ¶ 24.

Considering the foregoing evidence, much of which directly conflicts, the Court concludes genuine disputes of material fact exist as to whether C.D. is entitled to psychological or psychiatric treatment under *Bowring* and, if so, whether the mental health treatment program at ASGDC satisfies the constitutional minima under *Ruiz*. Accordingly, the Court will overrule the parties' objections relative to C.D.'s inadequate mental health treatment claim.

Finally, the Court observes the issue of medical necessity under *Bowring* depends upon the individual characteristics of each particular defendant. *See Bowring*, 551 F.2d at 47 (explaining "a physician or other health care provider, exercising ordinary skill and care at the time of observation," must "conclude[] with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial"). As such, the Court determines the class action requirement of commonality is unsatisfied as to C.D.'s inadequate mental health treatment claim. *See* Fed. R.

Civ. P. 23(a)(2) ("One or more members of a class may sue or be sued as representative parties on behalf of all members only if: . . . there are questions of law or fact common to the class[.]"); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (noting "[a] question is not common . . . if its resolution turns on a consideration of the individual circumstances of each class member" (internal quotation marks omitted)). The Court will therefore deny Plaintiffs' motion for class certification as to this claim.

> **D.     *Whether the Magistrate Judge erred in recommending the Court deny the parties' cross-motions for summary judgment as to Plaintiffs' conditions of confinement claim, grant the County's motion for summary judgment as to Plaintiffs' Eighth Amendment claims, and grant Plaintiffs' motion for class certification***

The parties fail to object to the Magistrate Judge's recommendation the Court deny their cross-motions for summary judgment as to Plaintiffs' conditions of confinement claim, grant the County's motion for summary judgment as to Plaintiffs' Eighth Amendment claims, and grant Plaintiffs' motion for class certification.

Except for the certification issue identified above, the Court agrees with the Magistrate Judge's rationale and suggestions. It is thus unnecessary for the Court to repeat the Magistrate Judge's discussion and analysis of such matters.

## V.     CONCLUSION

After a thorough review of the Reports and the record in this case under the standards set forth above, the Court overrules in part and sustains in part the parties' objections. Accordingly, the Court adopts the Reports to the extent they are consistent with this Order and incorporates them herein. It is therefore the judgment of the Court Plaintiffs' motion for summary judgment is **DENIED**, and the County's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. More specifically, the County's motion is granted as to Plaintiffs'

discrimination claim; as to the inadequate mental health treatment claims brought by Disability Rights, J.O., J.H., W.M., T.D., L.D., A.S., F.J., T.J., T.F., and K.B; and as to Plaintiffs' Eighth Amendment claims, which are all dismissed with prejudice. The motion is denied as to Plaintiffs' remaining claims.

Further, Plaintiffs' motion for class certification is **GRANTED IN PART AND DENIED IN PART**. Namely, the motion is granted as to Plaintiffs' failure-to-protect and conditions of confinement claims and denied as to C.D.'s inadequate mental health treatment claim.

Relative to the class claims, the Court appoints Plaintiffs C.D., J.O., J.H., W.M., T.D., L.D., A.S., F.J., T.J., T.F., and K.B. as class representatives. The Court also appoints the attorneys of Burnette Shutt and McDaniel PA, who have already appeared in this action, as class counsel.

Finally, the Court defines the class as all individuals:

1)  Who were, are, or will be detained at ASDGC on or after April 28, 2022; and

2)  Who were, are, or will be before their discharge from ASGDC:

    a)  Assigned to a mental health housing unit at ASGDC;

    b)  Diagnosed by a psychiatrist or other licensed clinical mental health professional with any of the following mental illnesses:

        i)   Cognitive disorders (e.g., traumatic brain injuries, Cognitive Disorder Not Otherwise Specified);

        ii)  Schizophrenia (all subtypes);

        iii) Schizoaffective Disorder (all subtypes);

        iv)  Paranoid Disorder (e.g., Delusional Disorders);

        v)   Major Depressive Disorder (all subtypes);

        vi)  Bipolar Disorder (all subtypes);

31

vii) Other Psychotic or Mood Disorders (e.g., Schizophreniform, Dysthymia, Psychotic Disorder Not Otherwise Specified);

c)  Diagnosed by a psychiatrist or other licensed clinical mental health professional with another mental disorder that is not listed above but that has resulted in significant functional impairment, defined as:

    i)   The inability to attend and effectively perform the usual or necessary activities of daily living;

    ii)  An extreme impairment of coping skills, rendering the patient exceptionally vulnerable to unintentional or intentional victimization and possible mismanagement; or

    iii) Behaviors that are bizarre and/or dangerous to self or others; or

d)  Admitted to a licensed behavioral health or psychiatric hospital.

**IT IS SO ORDERED.**

Signed this 23rd day of September 2025, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE
